UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| BOB BAFFERT, | ) | |
| *Plaintiff* | ) | |
| | ) | |
| v. | ) | 21 Civ. 3329 |
| | ) | |
| THE NEW YORK RACING | ) | |
| ASSOCIATION, INC., | ) | |
| *Defendant* | ) | |

**MEMORANUMDUM OF LAW IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION**

WYATT, TARRANT & COMBS, LLP
250 West Main Street, Suite 1600
Lexington, Kentucky  40507-1746
859.233.2012

STEPTOE & JOHNSON LLP
1114 Avenue of the Americas
New York, New York 10036
212.506.3900

June 14, 2021

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

FACTS .................................................................................................................................. 3

STANDARD OF REVIEW ................................................................................................... 8

ARGUMENT ........................................................................................................................ 9

     I.     Baffert Is Likely to Prevail on the Merits. ............................................................ 9

          A.     NYRA Violated 42 U.S.C. § 1983 ........................................................ 10

               1.     NYRA Failed to Provide Baffert
                      Any Process Before Suspending Him. ........................................ 10

               2.     NYRA Is a State Actor. ................................................................ 12

          B.     NYRA's Actions Are Contrary to New York Law .................................. 14

     II.     Baffert Will Be Irreparably Harmed Absent Injunctive Relief ........................... 18

     III.     The Balance of Hardships and Public Interest Favor Injunctive Relief ............... 21

CONCLUSION .................................................................................................................... 23

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*A.H. by and through Hester v. French*,
   985 F.3d 165 (2d Cir. 2021) .................................................................. 10, 18, 22

*Alpha Capital Anstalt v. Shiftpixy, Inc.*,
   432 F.Supp.3d 326 (S.D.N.Y 2020) ................................................................ 9

*Alvarez v. Hayward*,
   No. 1:06-CV-745, 2006 WL 2023002 (N.D.N.Y. July 18, 2006) .................................... 13

*American Manufacturers Mutual Insurance Co. v. Sullivan*,
   526 U.S. 40 (1999) ................................................................................. 12

*Barry v. Barchi*,
   443 U.S. 55 (1979) ............................................................................ 10, 11

*Board of Regents v. Roth*,
   408 U.S. 564 (1972) ................................................................................ 10

*Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*,
   598 F.3d 30 (2010) .................................................................................. 8

*Cleveland Board of Education v. Loudermill*,
   470 U.S. 532 (1985) ................................................................................ 10

*Doe v. Livanta LLC*,
   489 F.Supp.3d 11 (E.D.N.Y. 2020) ................................................................... 8

*Donk v. Miller*,
   365 F.3d 159 (2d Cir. 2004) ........................................................................ 11

*Dopp v. Franklin National Bank*,
   461 F.2d 873 (2d Cir. 1972) ......................................................................... 8

*Elrod v. Burns*,
   427 U.S. 347 (1976) ................................................................................ 18

*F. & M. Schaefer Corp. v. C. Schmidt & Sons, Inc.*,
   597 F.2d 814 (2d Cir. 1979) ......................................................................... 8

*Fabrikant v. French*,
   691 F.3d 193 (2d Cir. 2012) ........................................................................ 12

*Faively Transport Malmo AB v. Wabtec Corp.*,
    559 F.3d 110 (2d Cir. 2009)................................................................. 9, 18

*Forest City Daly Housing, Inc. v. Town of North Hempstead*,
    175 F.3d 144 (2d Cir. 1999)...................................................................... 18

*Galvin v. New York Racing Association Inc.*,
    70 F.Supp.2d 163 (E.D.N.Y. 1998), *aff'd*, (2d Cir. 1998) ............................ 11, 13, 17, 20

*Garcia v. New York Racing Association, Inc.*,
    No. 1:10-cv-01092, 2011 WL 3841524 (N.D.N.Y. Aug. 29, 2011) ................................ 13

*Hadges v. Yonkers Racing Corp.*,
    918 F.2d 1079 (2d Cir. 1990)...................................................................... 12

*Hamilton Watch Co. v. Benrus Watch Co.*,
    206 F.2d 738 (2d Cir. 1953)....................................................................... 10

*International Dairy Foods Association v. Amestoy*,
    92 F.3d 67 (2d Cir. 1999).......................................................................... 18

*Jackson v. Metropolitan Edison Co.*,
    419 U.S. 345 (1974)................................................................................ 12

*Jacobson & Co. v. Armstrong Cork Co.*,
    548 F.2d 438 (2d Cir. 1977)....................................................................... 19

*Jacobson v. New York Racing Association*,
    305 N.E.2d 765 (N.Y. 1973)................................................................... 17, 20

*Jamaica Ash & Rubbish Removal Co., Inc. v. Ferguson*,
    85 F.Supp.2d 174 (E.D.N.Y. 2000) .............................................................. 19

*Ligon v. City of New York*,
    925 F.Supp.2d 478 (S.D.N.Y. 2013)............................................................... 21

*Lugar v. Edmondson Oil Co.*,
    457 U.S. 922 (1982)................................................................................ 12

*Main Street Baseball, LLC v. Binghampton Mets Baseball Club, Inc.*,
    103 F.Supp.3d 244 (N.D.N.Y. 2015)............................................................... 22

*Mastrio v. Sebelius*,
    768 F.3d 116 (2d Cir. 2014) (per curiam)........................................................... 9

*Mullane v. Central Hanover Bank & Trust Co.*,
    339 U.S. 306 (1950)................................................................................ 11

*Murphy v. New York Racing Association*,
  525 N.Y.S.2d 548 (N.Y. Sup. Ct. 1998), *aff'd*, 537 N.Y.S.2d 259 (2d Dep't 1989)........ 13

*N.Y. Progress & Protection PAC v. Walsh*,
  733 F.3d 483 (2d Cir. 2013).................................................................................. 10

*New York ex rel. Schniederman v. Actavis PLC*,
  787 F.3d 638 (2d Cir. 2015).................................................................................. 8

*North American Soccer League, LLC v. United States Soccer Federation, Inc.*,
  883 F.3d 327 (2d Cir. 2018).............................................................................. 8, 18

*O'Mara v. Town of Wappinger*,
  485 F.3d 693 (2d Cir. 2007).................................................................................. 10

*Pacnet Servs. Ltd. v. Office of Foreign Assets Control*,
  --- F.Supp.3d ---, 2021 WL 722807 (E.D.N.Y. 2021) .................................................. 8

*Paykina on behalf of E.L. v. Lewin*,
  387 F.Supp.3d 225 (N.D.N.Y. 2019) ........................................................................ 22

*Roso-Lino Beverage Distributors, Inc. v. Coca-Cola Bottling Co.*,
  749 F.2d 124 (2d Cir. 1984).................................................................................. 19

*Saumell v. New York Racing Association*,
  447 N.E.2d 706, 709 (1983)...................................................................... 13, 16, 17

*Semmes Motors, Inc. v. Ford Motor Co.*,
  429 F.2d 1197 (2d Cir. 1970).................................................................................. 19

*Shady v. Tyson*,
  5 F.Supp.2d 102 (E.D.N.Y. 1998) ............................................................................ 19

*Step By Step, Inc. v. City of Ogdensburg*,
  176 F.Supp.3d 112 (N.D.N.Y. 2016) ........................................................................ 18

*Stevens v. New York Racing Association, Inc.*,
  665 F. Supp. 164 (E.D.N.Y.1987) ............................................................................ 13

*Tom Doherty Associates, Inc. v. Saban Entertainment, Inc.*,
  60 F.3d 27 (2d Cir. 1995).................................................................................... 19

*U.S. S.E.C. v. Citigroup Global Mkts., Inc.*,
  673 F.3d 158 (2d. Cir. 2012)................................................................................ 21

*University of Texas v. Camenisch*,
  451 U.S. 390 (1981)............................................................................................ 9

*V.W. by and through Williams v. Conway*,
    236 F.Supp.3d 554 (N.D.N.Y. 2017)..................................................................... 21

*Winter v. Natural Resources Defense Council, Inc.*,
    555 U.S. 7 (2008)..................................................................................................... 22

## STATUTES

42 U.S.C. § 1983 ................................................................................................... 2, 12

N.Y. Racing L. § 104 ................................................................................................ 15

N.Y. Racing L. § 206 ............................................................................... 13, 14, 17

N.Y. Racing L. § 208 ................................................................................................ 13

N.Y. Racing L. § 208 ................................................................................................ 13

N.Y. Racing L. § 210 ................................................................................................ 14

N.Y. Racing L. § 212 ................................................................................................ 14

N.Y. Racing L. § 216 ................................................................................................ 14

N.Y. Racing L. § 223 ................................................................................................ 14

## RULES

Fed. R. Civ. P. 65 .................................................................................................. 1, 8

## REGULATIONS

810 Ky. Admin. Reg. § 8:010 .................................................................................. 4

810 Ky. Admin. Reg. § 8:060 .................................................................................. 4

810 Ky. Admin. Regs. § 8:020 ................................................................................. 5

810 Ky. Admin. Regs. § 8:025 ................................................................................. 6

810 Ky. Admin. Regs. § 8:030 ............................................................................... 23

810 Ky. Admin. Regs. § 9:010 .................................................................................. 4

9 NYCRR § 4003.2 .................................................................................................. 15

9 NYCRR § 4003.2.1 ....................................................................................... 15, 16

9 NYCRR § 4012.3.................................................................................................................... 4

9 NYCRR § 4022.12................................................................................................................ 16

9 NYCRR § 4550.2................................................................................................................ 14

9 NYCRR § 4550.3............................................................................................................ 14, 15

9 NYCRR § 4550.4................................................................................................................ 15

Comes the Plaintiff, Bob Baffert ("Baffert"), by counsel, pursuant to Fed. R. Civ. P. 65, and for his memorandum of law in support of his Motion for a Preliminary Injunction against the Defendant, The New York Racing Association, Inc. ("NYRA"), enjoining it from suspending Baffert from entering horses to race at Belmont Park, Saratoga Race Course, and Aqueduct Racetrack, hereby states as follows:

## **INTRODUCTION**

Baffert is a well-respected participant in thoroughbred racing.  He has been a thoroughbred trainer for over 46 years and has won races at the highest level of the sport.  Horses he has trained have won two Triple Crowns, seven Kentucky Derbies, and countless other major stakes races, including the Belmont Stakes and Breeder's Cup Championships.  In 2009, Baffert was elected to the National Thoroughbred Hall of Fame.

Baffert possesses a valid and active license, granted to him by the New York State Gaming Commission (the "Gaming Commission"), that gives him the right to train and participate in horse racing in the State of New York.  That right is now being deprived by NYRA in violation of basic constitutional due process—Baffert received no prior notice nor any hearing—and in violation of New York state law.  NYRA has done so despite the fact that **Baffert faces no allegations concerning any misconduct associated with any racing activity within the State of New York, and Baffert has no history of any misconduct associated with his New York license**.  In fact, Baffert has raced horses for over 30 years in New York and has never had a single rules violation of any kind in the state.

Baffert is the trainer of the 147th Kentucky Derby winner, MEDINA SPIRIT.  Following reports that the post-Derby primary blood sample taken from MEDINA SPIRIT detected trace

amounts (21 picograms) [1] of a lawful, commonly used, therapeutic medication, betamethasone, NYRA—and not the Gaming Commission—declared that Baffert would be immediately and indefinitely suspended from entering horses in racetracks NYRA operates, including Belmont Park, Saratoga Race Course, and Aqueduct Racetrack. NYRA made this unilateral decision without affording Baffert any due process, relying only on the fact that Kentucky officials are *investigating* the results of the Kentucky Derby. Despite the fact that Baffert's license remains in good standing in both Kentucky and New York, and the fact that he has *never* been charged with any racing violations in the State of New York during the entirety of his career, NYRA has purported to suspend him from all of its tracks for an indefinite period of time. Given NYRA's virtual monopoly on horse racing in New York, that decision effectively amounts to a suspension of Baffert's license. NYRA's actions denied Baffert any semblance of due process of law, and were taken in direct conflict with New York's State racing statutes and regulations.

As a consequence, Baffert commenced this action under 42 U.S.C. § 1983, the Fourteenth Amendment to the United States Constitution, and New York state law, alleging that NYRA's actions have unlawfully deprived, and continue to deprive, Baffert of his right to participate in racing at the three racetracks NYRA operates. First, NYRA has acted without giving Baffert even a scintilla of due process. Second, the Gaming Commission is the sole entity in New York with the power to discipline Baffert and issue any adverse ruling associated with his New York license. The Gaming Commission has taken no action against Baffert and he maintains a current legal right to rely upon and use his New York racing license without limitation.

---

[1] A picogram is a trillionth of a gram. A picogram is the rough equivalent of one drop of water in an Olympic sized pool.

Currently, MEDINA SPIRIT has not been disqualified as the winner of the Kentucky Derby and Baffert has not faced any discipline from the Kentucky Horse Racing Commission. Under Kentucky's rules, after all testing of blood and urine samples is completed, the matter will be set for a hearing before the Kentucky Racing Stewards.  Any adverse action related to a disqualification, or a license suspension, only occurs after a hearing.  Even then, there is a right of appeal.  To date, there is ongoing testing of both the primary and split samples, and the matter has yet to be set for a hearing before the Kentucky Racing Stewards.

Importantly, if Kentucky were to ultimately suspend Baffert, that suspension would be honored by other racing jurisdictions throughout the country under the current reciprocity rules. Thus, there may come a time when Baffert's license is subject to suspension in New York. However, that time is not now and it certainly cannot be unilaterally imposed by NYRA.

Baffert files this Motion for Preliminary Injunction to preserve the status quo while the Kentucky procedures are underway and remain ongoing.  He accordingly respectfully requests that the Court enter immediate, temporary, and preliminary injunctive relief enjoining NYRA from preventing him from entering any horses he trains into races at New York tracks.

## **FACTS**

Baffert is one of the most well-known figures in Thoroughbred horseracing.  Horses he has trained have won the Kentucky Derby seven times; the Preakness Stakes seven times; the Belmont Stakes three times (contested over NYRA operated Belmont Park); and seventeen Breeders Cup Races.  (Ex. A,[2] Affidavit of Bob Baffert, sworn to June 11, 2021 ("Baffert Aff.") ¶ 3.) Of the thirteen American Triple Crown Winners in history, Baffert has trained two of them: AMERICAN

---

[2] Citations in the form "Ex. __" refer to the exhibits of the accompanying declaration of W. Craig Robertson III, dated June 14, 2021.

PHAROAH in 2015 and JUSTIFY in 2018.  (*Id*.)  In 2009, Baffert was elected to the National Thoroughbred Hall of Fame.  (*Id*.)  In 30 years of racing in New York, Baffert has never had a single violation of any kind in the state.  (*Id*. ¶ 2.)

On May 1, 2021, MEDINA SPIRIT—trained by Baffert—won the 147th Kentucky Derby at Churchill Downs Race Track in Louisville, Kentucky. (*Id*. ¶ 4.)  Following the Kentucky Derby, blood and urine samples were collected from MEDINA SPIRIT in accordance with Kentucky state laws and procedures (*id*.), which are consistent with those of New York. *See* 9 NYCRR § 4012.3. These protocols are governed by administrative regulations issued by the Kentucky Horse Racing Commission. *See* 810 Ky. Admin. Reg. §§ 8:010 and 8:060.

The Kentucky testing procedures require two samples to be extracted from a winning horse: a primary sample and a split sample.  Kentucky regulations define a "primary sample" as the "primary sample portion of the biologic specimen taken under the supervision of the commission veterinarian to be tested by the commission laboratory." *Id.* § 8:010(6).  In turn, the "split sample" is the "split sample portion of the biologic specimen taken under the supervision of the commission veterinarian to be tested by the split sample laboratory." *Id.* § 8:010(7).  After the race, the primary sample is immediately tested by a qualified testing laboratory.  *Id.* at 8:010, Section 11.  The split sample, however, remains in the commission's possession and is not tested unless the primary sample first returns a positive result for a substance in violation of Kentucky's rules.  *Id.* at 8:010, Section 12(1)(f).  Under Kentucky's rules, after testing of both the primary and split samples, the matter is set for a hearing before the Kentucky Racing Stewards.  *Id.* at 8:010, Section 11(7).  Any adverse action related to a disqualification of a horse, or a suspension of a license, only occurs after the foregoing steps have been followed and a hearing is completed before the Stewards. *See* 810 Ky. Admin. Regs. § 9:010.

On May 8, 2021, Baffert was informed by the Kentucky Horse Racing Commission that MEDINA SPIRIT's primary sample allegedly tested positive for 21 picograms of betamethasone, a lawful, commonly used, therapeutic, anti-inflammatory medication. (Ex. A, Baffert Aff. ¶ 5.)  A picogram is one-trillionth of a gram.   This ratio is the rough equivalent of one drop of water in an Olympic sized pool.  (Ex. B, Affidavit of Dr. Steven A. Barker ("Barker Aff.") ¶ 7.).  In sum, the result of MEDINA SPIRIT's primary sample *allegedly* revealed trace amounts of a lawful medication that would have had no pharmacological effect on the horse and would have had zero impact on the race.  (*Id.* ¶ 8.)

Betamethasone is not a performance-enhancing drug.  (*Id.* ¶ 9.)  Rather, it is a substance that can suppress inflammation much like other corticosteroids such as hydrocortisone and prednisone.  (*Id.*) It is not a banned substance; in fact, it is approved by the United States Food and Drug Administration and recognized by the Racing Medication Testing Consortium and Association of Racing Commissioners International as a valuable therapeutic substance and is included on their Controlled Therapeutic Medication Schedule.  (*Id.* ¶ 10.)  It is commonly administered to horses to reduce inflammation.  (*Id.*)  The Kentucky Horse Racing Commission labels betamethasone as a Class C substance.  810 Ky. Admin. Regs. § 8:020.  Class A and B substances are the most highly regulated and are deemed to have the most potential to affect the outcome of a race.  *Id.*  Class C substances are considered much more benign.  *Id.*  In short, betamethasone—and certainly in such extremely small amounts—is not a substance that would have altered MEDINA SPIRIT's performance in the Kentucky Derby in any way, shape or form. (Ex. B, Barker Aff. ¶ 8.)

Betamethasone is most commonly given to horses through injection.  If a horse is treated with this drug by injection, Kentucky's regulations require a 14-day withdrawal period to give the

substance time to dissipate from the horse's system prior to race day. 810 Ky. Admin. Regs. § 8:025, Section 1(k)(i).

However, aside from injection, scientific studies have proven that environmental or innocent contamination can lead to substances such as betamethasone being detected in the blood of a horse in picograms quantities. (Ex. B, Barker Aff. ¶ 11.)  This risk of environmental contamination has only magnified as technology improves and tests employed by various racing jurisdictions become more and more sensitive and capable of detecting increasingly more minute levels of substances. (*Id*. ¶ 11.)

Further, wound sprays and topical ointments for treatment of dermatitis in a horse often contain betamethasone.  (*Id.* ¶ 12.)  Many psoriasis creams or other products for humans can contain betamethasone.  (*Id*.)  Any of these external sources can be responsible for inadvertent contamination or transfer.  (*Id*.)

Veterinary records for MEDINA SPIRIT show that the horse was being treated by a veterinarian for a dermatological condition using a topical anti-bacterial, antifungal and anti-inflammatory cream called OTOMAX.  (*Id*. ¶ 13.)  Such treatment was proper veterinary care to cure the observed skin condition and would not in any way affect the performance of the horse. (*Id*.).  One of the ingredients in OTOMAX  is betamethasone.  (*Id*. ¶ 15.)  The alleged finding of 21 picograms of betamethasone in MEDINA SPIRIT is consistent with the fact that this substance was applied to the skin of the horse at least once a day, for several days, and was applied to the skin the day before the race.  (*Id*. ¶ 14.)

There is ongoing testing of MEDINA SPIRIT's blood and urine samples that is currently being performed to determine whether the betamethasone in the horse's system was the result of

an injection, the topical ointment OTOMAX, or resulted from some other means.[3] The Kentucky Horse Racing Commission has not made any decision concerning either Baffert or MEDINA SPIRIT. Put simply, MEDINA SPIRIT has not been disqualified as the winner of the Kentucky Derby and Baffert's training license has not been suspended. As set forth above, under Kentucky's rules, this can't happen until there is a formal hearing before the Kentucky Racing Stewards— which has yet to take place.

On May 17, 2021, as a result of the continued media frenzy surrounding MEDINA SPIRIT, NYRA announced that Baffert was "immediately" and "temporarily suspended" from entering horses at any NYRA track. (Ex. D, Letter from NYRA to Baffert, dated May 17, 2021.) NYRA operates all Thoroughbred race tracks in New York, namely Belmont Park, Saratoga Race Course, and Aqueduct Race Track. (Ex. E, Franchise Agreement, among NYRA, The State of New York and the New York State Franchise Oversight Board, dated September 12, 2008 (the "Franchise Agreement"), at Recital C (defining "Racetracks"); § 2.1 (granting NYRA 25-year "franchise" to operate the Racetracks).)[4] NYRA provided no indication as to the duration or the terms of its "suspension" other than that it will be "based on information revealed during the course of the ongoing investigation in Kentucky." (Ex. D.) In other words, NYRA announced it was immediately banning Baffert from participating in any New York races based solely on allegations in another jurisdiction. This announcement was unlawful in two primary respects. First, NYRA

---

[3] In fact, there is ongoing litigation in Kentucky concerning the testing of MEDINA SPIRIT's primary and split samples. (*See* Ex. C, Complaint, *Bob Baffert, et al v. Kentucky Horse Racing Commission*, Civil Action No. 21-CI-456 (Ky. Cir. Ct. June 7, 2021).)

[4] The state-owned NYRA racetracks in New York are Aqueduct Racetrack in Queens County, Belmont Park in Nassau County, and Saratoga Race Course in Saratoga County. These three racetracks conduct "world-class" racing year-round. A fourth facility, Finger Lakes Race Track in Canandaigua, New York, is a private facility that conducts seasonal race cards offering a purse structure that is infinitesimal when compared to the NYRA circuit. Finger Lakes essentially exists as a facility for horses that are not competitive on the NYRA circuit.

purported to suspend Baffert without giving him any notice or opportunity to be heard.  This was a clear violation of Baffert's due process rights.  Second, NYRA has no power or authority to suspend Baffert's New York racing license.  That power rests exclusively with the Gaming Commission.  NYRA's unlawful actions are causing, and will continue to cause, immediate and irreparable harm if not enjoined.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 65(a) provides that the Court may issue a preliminary injunction on notice to the adverse party.  A preliminary injunction may be granted when the party seeking the injunction can show: (1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest. *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 36-37 (2d Cir. 2018) (citing *New York ex rel. Schniederman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015); *Doe v. Livanta LLC*, 489 F.Supp.3d 11, 16 (E.D.N.Y. 2020).  The "serious question" standard allows a district court to grant an injunction where it is uncertain as to whether the moving party is more likely than not to prevail, but the costs outweigh the benefits of not granting the injunction.  *Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2010) (citing *F. & M. Schaefer Corp. v. C. Schmidt & Sons, Inc.*, 597 F.2d 814, 815-19 (2d Cir. 1979)).  In that same vein, courts in the Second Circuit will also consider whether the balance of equities tips in the party's favor. *See Pacnet Servs. Ltd. v. Office of Foreign Assets Control*, --- F.Supp.3d ---, 2021 WL 722807, at *19 (E.D.N.Y. 2021).

Further, if the imbalance of hardships and the equities weigh heavily in favor of the movant, an injunction should issue to maintain the status quo.  *N. Am. Soccer League*, 883 F.3d at 38; *Dopp v. Franklin Nat. Bank*, 461 F.2d 873, 881 (2d Cir. 1972).  The "status quo" is the "last actual,

peaceable uncontested status which preceded the pending controversy." *Mastrio v. Sebelius*, 768 F.3d 116, 120 (2d Cir. 2014) (per curiam).  Ultimately, "[t]he purpose of a preliminary injunction is … to preserve the relative position of the parties." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *see also Alpha Capital Anstalt v. Shiftpixy, Inc.*, 432 F.Supp.3d 326, 338 n.13 (S.D.N.Y 2020) (preliminary injunction focuses on the interim time period before trial and usually is determined on a less developed record than a permanent injunction).  The determination of whether a preliminary injunction should be issued is within the sound discretion of the trial court. *Faively Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 116 (2d Cir. 2009).

For the reasons set forth below, all of the factors favor granting a preliminary injunction in Baffert's favor in order to return the parties to the status quo that existed before NYRA's suspension.  First, Baffert will be irreparably harmed by NYRA's independent and unilateral decision suspending him from participating in any races at any of the major tracks located in the State of New York.  Second, Baffert is likely to prevail on the merits of his claims against NYRA because NYRA failed to provide Baffert with even a scintilla of due process as required by the Fourteenth Amendment and it lacks the legal authority to suspend his license.  At a minimum, Baffert's allegations present a "serious question" that is fair ground for litigation and the hardships suffered in this case fall *only* on Baffert.  Finally, the public interest weighs in favor of injunctive relief because there is a strong presumption in favor of protecting due process and property rights.  As such, Baffert's Motion should be granted.

## **ARGUMENT**

### I.    **Baffert Is Likely to Prevail on the Merits.**

The Second Circuit has stated that "it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus more deliberate investigation." *Hamilton Watch Co. v. Benrus Watch*

*Co.*, 206 F.2d 738, 741 (2d Cir. 1953).  Because the irreparable harm element is typically satisfied in cases like this one "alleging constitutional injury," the likelihood-of-success  element is thereby "the dominant, if not the dispositive, factor" in determining whether to grant preliminary injunctive relief. *A.H. by and through Hester v. French*, 985 F.3d 165, 176 (2d Cir. 2021) (quoting *N.Y. Progress & Protection PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013)).

As detailed below, Baffert is likely to prevail on two independent grounds: first, that NYRA failed to provide him due process; and second, that NYRA's suspension bypassed important statutory and regulatory protections under New York law and usurped the Gaming Commission's exclusive authority over licensing.

### A.    NYRA Violated 42 U.S.C. § 1983

In order to prevail on a Section 1983 claim, a plaintiff must prove that he was (1) deprived of a right protected by the Constitution or federal law, and (2) that the deprivation was precipitated by a state actor. *O'Mara v. Town of Wappinger*, 485 F.3d 693, 699-700 (2d Cir. 2007). Both elements are easily satisfied here.

### 1.    NYRA Failed to Provide Baffert Any Process Before Suspending Him.

Constitutionally protected property interests "are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure benefits and that support claims of entitlement to those benefits." *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972). The United States Supreme Court has held that a property right in a horse racing license is among those rights protected by the United States Constitution. *See Barry v. Barchi*, 443 U.S. 55, 64 (1979).

The essence of due process is that "a deprivation of life, liberty or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" *Cleveland Bd. of Ed. v. Loudermill*, 470 U.S. 532, 542 (1985) (quoting *Mullane v. Central Hanover Bank & Trust Co.*,

339 U.S. 306, 313 (1950)).  Consistent with this principle, the United States Supreme Court has held that licensees cannot have their licenses suspended by racing officials without a hearing—meaning they have a legitimate expectation of continued enjoyment of their licenses absent a finding of culpable conduct. *Barry* 443 U.S. at 64, n. 11; *see also Donk v. Miller*, 365 F.3d 159, 163 (2d Cir. 2004).

NYRA has plainly chosen to ignore those requirements in issuing its blanket and indefinite suspension to Baffert without notice or a hearing.  It instead apparently believes that it is free to unilaterally bar Baffert from New York for no reason or whatever reason it wants, which in this case seems to be based on little else than its perception of Baffert and its desire to virtue signal to a public mob that it is disinterested in the rule of law when it comes to Baffert.

Judge Ross considered a similar case in *Galvin v. New York Racing Association, Inc.*, 70 F.Supp.2d 163 (E.D.N.Y. 1998), *aff'd*, (2d Cir. 1998) (a courtesy copy of which is provided as Ex. E).  In *Galvin*, NYRA attempted to "suspend" a licensed veterinarian from access to all NYRA racetracks for a period of over seven months.  It did so after giving the veterinarian vague (but still decipherable) descriptions of alleged misconduct and affording him a four day hearing.  The veterinarian in *Galvin* filed suit against NYRA asserting that his due process rights had been violated under 42 U.S.C. § 1983 and seeking a preliminary injunction.

Judge Ross ruled in *Galvin* that the veterinarian had not received due process and enjoined NYRA from enforcing its suspension. *Id.* at 179.  In doing so, Judge Ross held that NYRA's three-day notice of a hearing was not "sufficient to prepare a defense" and "woefully inadequate." *Id.* at 174.  Judge Ross also held that a suspension from all NYRA tracks constituted irreparable harm because it essentially put the plaintiff out of business and that his practice would be "substantially damaged, if not destroyed." *Id*. at 171-72.

In *Galvin,* the plaintiff veterinarian received far more due process than Baffert has in this matter.  The *Galvin* plaintiff received notice of the charges against him and a hearing—neither of which has ever been provided to Baffert.  Yet Judge Ross still enjoined NYRA on the basis that its actions did not comply with due process.  Clearly if the *Galvin* plaintiff was entitled to injunctive relief, so is Baffert.

## 2. NYRA Is a State Actor.

Baffert has alleged that NYRA is an extension of the state and thus its decision amounts to state action for purposes of the Fourteenth Amendment and 42 U.S.C. § 1983. (*See* Pl. Compl. ¶¶ 64-69.)  To determine if a defendant's termination of a plaintiff's privileges constitutes "state action," there must be a nexus between the state and the challenged action such that the state is deemed responsible for the conduct itself. *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974).  Accordingly, "state action requires both an alleged constitutional deprivation 'caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible,' and that 'the party charged with the deprivation must be a person who may fairly be said to be a state actor.'" *Fabrikant v. French*, 691 F.3d 193, 206 (2d Cir. 2012) (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 50 (1999); *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 937 (1982) (emphasis omitted)). Nominally "private" business organizations can also be considered state actors if they have a "symbiotic relationship" with the State or if "there is a sufficiently close nexus between the State and the challenged action." *Hadges v. Yonkers Racing Corp*., 918 F.2d 1079, 1081 (2d Cir. 1990).

Under these standards, New York courts have repeatedly "conclude[d] that NYRA is a state actor within the meaning of § 1983." *Garcia v. New York Racing Ass'n, Inc*., No. 1:10-cv-

01092, 2011 WL 3841524, at *10 (N.D.N.Y. Aug. 29, 2011).[5]  In fact, in multiple cases before state and federal courts interpreting New York law and regulations, it has been stipulated that NYRA's actions constituted "state action" for the purposes of a constitutional analysis. *See, e.g., Galvin*, 70 F.Supp.2d at 173; *Saumell v. New York Racing Ass'n*, 447 N.E.2d 706, 709 (1983); *Murphy*, 525 N.Y.S.2d at 550.

This consensus view is well-grounded in the history and structure of NYRA. Specifically, New York State has granted NYRA the right through 2033 to operate the major state-owned racing facilities in New York—Aqueduct Racetrack in Queens, Belmont Park on Long Island, and Saratoga Race Course in Saratoga, *see* N.Y. Racing L. § 208(2)—and NYRA is required to do so under detailed contractual and statutory strictures that make NYRA essentially an arm of the state. For example:

- By statute, NYRA must operate in a manner that is "fully accountable to the people of the state of New York." N.Y. Racing L. § 206.

- Twelve of the NYRA's seventeen-member board are appointed by the governor or other elected officials. *Id*. § 207.

- The Gaming Commission—not NYRA—determines when races are run. *Id*. § 208(7).

- NYRA's profits are for the State's benefit, insofar as NYRA must pay the State an annual "franchise fee" that is the lesser of either its net income (with certain adjustments), or its cash on hand at the end of the year. *Id*. § 208(1).

---

[5] *See also Alvarez v. Hayward*, No. 1:06-CV-745, 2006 WL 2023002, at *3 (N.D.N.Y. July 18, 2006) ("The Court finds . . . that Defendant NYRA is a state actor."); *Stevens v. New York Racing Ass'n, Inc*., 665 F. Supp. 164, 172 (E.D.N.Y.1987) (concluding, for purposes of preliminary injunction against NYRA, that it is "likely that plaintiff will establish state action under the symbiotic relationship test"); *Murphy v. New York Racing Association*, 525 N.Y.S.2d 548, 550 (N.Y. Sup. Ct. 1998), *aff'd*, 537 N.Y.S.2d 259 (2d Dep't 1989) ("[I]t has been held in similar cases, that the state has assumed such an intimate relationship with [NYRA] that the [its] actions must be considered as 'state action' for these purposes.").

- NYRA can appoint "special police officers" with the same powers as State-employed officers. *Id*. § 223.

- The State may borrow funds for NYRA's capital improvements. *Id*. § 216(e); *see also* Ex. E, Franchise Agreement § 2.12(b).

- A Franchise Oversight Board, whose members are appointed by the governor, is mandated by statute to "oversee, monitor and review all significant transactions and operations" of NYRA. N.Y. Racing L. § 212(1), (8)(a)(iii).  If NYRA does not meet the Oversight Board's performance standards, NYRA could lose its franchise rights. *Id.* § 212(8)(a)(ii); Ex. E, Franchise Agreement § 2.2

- All assets and right of NYRA "revert to the state" when the franchise period ends. N.Y. Racing L. §§ 206(1), 210(4).

Considering the State's regulatory, financial, and administrative power over NYRA, in addition to the long line of New York case law explicitly finding that NYRA is a state actor for the purpose of these exact kinds of constitutional claims, there is little doubt that NYRA has acted as an extension of the State or under the color of State law in attempting to suspend Baffert from all New York racing.

## B.    NYRA's Actions Are Contrary to New York Law.

New York State law requires an "adjudicatory proceeding" prior to any action being taken related to the suspension of a licensee. 9 NYCRR § 4550.2(b).  Adjudicatory hearings are required to be "commenced by service of a notice of hearing or order to show cause." *Id.* at § 4550.3(a).  Formal notice must be provided to the licensee, including: (a) a statement of the time, place and nature of the hearing; (b) a statement of the legal authority and jurisdiction under which the hearing is to be held; (c) a reference to the particular section of the statutes and rules involved; (d) a short and plain statement of matters asserted; (e) information concerning circumstances under which an adjournment may be granted; (f) the consequence of a failure to appear for a scheduled hearing or proceeding; and (g) a statement that each party has the right to

be represented by counsel, to testify, to produce witnesses, to present documentary evidence, and to examine opposing witnesses and evidence. *See id.* § 4550.3(b)(1).

In instances when "the hearing seeks the revocation of a license previously granted by the commission," New York racing rules provide that "either the commission or any party may, upon written demand at least seven days prior to the hearing, require disclosure of the evidence that the other party intends to introduce at the hearing, including documentary evidence and identification of witnesses." *Id.* at § 4550.4(a).

In this case, none of these processes occurred. Baffert has not been presented with any formal allegations from NYRA concerning any violation of any State statute or regulation. He received no notice prior to NYRA's suspension, NYRA provided no legal basis for its alleged power to suspend him, and it deprived Baffert of any hearing or adjudicative process prior to suspending his duly-issued New York racing license. Instead, NYRA simply informed Baffert that he is peremptorily suspended and will continue to be suspended indefinitely.

NYRA lacks the power or authority to suspend him indefinitely from all New York race tracks. New York State law is clear that the Gaming Commission is the sole entity with "general jurisdiction over all gaming activities within the state and over the corporations, associations, and persons engaged therein." N.Y. Racing L. § 104(1). The Gaming Commission's regulations provide that all of its rules "affecting licensed racing associations shall be applicable also to franchised racing associations, racing corporations, and franchised racing corporations." 9 NYCRR § 4003.2.

Moreover, the Gaming Commission has the exclusive authority under New York law to license individuals associated with horseracing, and such a license is an absolute precondition to participating in horse racing activities within the State. *See id.* at §§ 4002.1(a) and (b). Those

-15-

licenses are issued with the requirement that each licensee comply with the rules of racing and that "violation thereof may be punished by suspension or revocation of such license." *Id.* at § 4002.1(c). In sum, the Gaming Commission is the sole entity capable of suspending or revoking a horseracing license issued under New York law.  The rules of racing are clear that only the Gaming Commission may "exclude" or "suspend the license" of a licensee and only if that person is found to be in violation of the Gaming Commission's rules and regulations pertaining to horseracing activities. *Id.* at § 4022.12.

The New York Racing Laws and regulations do not empower licensed racing associations or franchised racing corporations, such as NYRA, to usurp the Gaming Commission's exclusive power and issue its own suspensions for licensed individuals and entities.  Yet that is precisely what NYRA is attempting to do in purporting to indefinitely suspend Baffert from using his license anywhere in the State of New York.  Not surprisingly, in its letter to Baffert explaining the suspension, NYRA failed to provide any legal basis or source of authority in support of its claimed ability to issue such a suspension.  That is because it has none.  It is clear that NYRA has no legal ability to suspend Baffert and its actions attempting to do so violated New York State law.

It is anticipated that NYRA may try to rely on *Saumell v. New York Racing Association, Inc.,* 447 N.E.2d 706 (1983), which held that NYRA possesses a "common law right of exclusion." This would be misplaced.  Most importantly, *Saumell* was decided in 1983—long before the legislature vastly changed NYRA's structure and its relationship with the State in 2008. (*See generally* Ex. E, Franchise Agreement.)  In 1983, NYRA "own[ed] … Aqueduct, Belmont Park, and Saratoga racetracks." 447 N.E.2d at 709.  Now, those facilities are owned by the State of New York.  A central foundation to the *Saumell* Court's decision was that there was nothing in New

York statutory law "to suggest that the Legislature intended to pre-empt NYRA's common-law power of exclusion." *Id*. But there is now.  The common-law right of exclusion is a right extended to property owners; however, NYRA does not own any property—literally all of the real property encompassing the NYRA tracks is owned by the people of the State of New York.  If NYRA once possessed the common-law right to exclude, that right has been relinquished and now belongs to the people (by way of their elected representatives).  Further, in 2008, when the New York legislature amended the racing statutes as part of its land swap with NYRA, it give NYRA the exclusive right to operate franchise racetracks "subject to appropriate racing laws and regulations." N.Y. Racing L. § 206(1).  Under New York's racing laws, the exclusive authority to discipline or suspend a licensee rests with the Gaming Commission.

Two final point merit discussion.  The aforementioned *Galvin* decision—issued 15 years after *Saumell* and upheld by the Second Circuit—includes a comprehensive analysis of all preceding NYRA litigation, including *Saumell*.  In *Galvin*, Judge Ross recognized that "Given NYRA's virtual monopoly power over thoroughbred racing in the State of New York, its decision to exclude a licensee from its tracks is tantamount to barring [the licensee] from the only places in the State where he may ply his trade." *Id.* at 172 (referring to *Jacobson v. New York Racing Ass'n*, 305 N.E.2d 765 (N.Y. 1973)).  In short, Judge Ross did not allow NYRA to rely on a common law right of exclusion in denying the plaintiff veterinarian access to NYRA tracks.

Lastly, even *Saumell* held that due process must be afforded a licensee.  In fact, the *Saumell* court ruled against NYRA—holding that it failed to give the plaintiff any type of notice or opportunity to be heard before excluding him.  As such, even if *Saumell* controls (which it does not), it still holds that due process is a prerequisite NYRA's conduct.  In the case at bar, NYRA didn't even attempt to feign an attempt at due process of law.  Because NYRA is openly violating

-17-

New York law, Baffert is likely to prevail on the merits and injunctive relief should be issued in his favor.

## II.    Baffert Will Be Irreparably Harmed Absent Injunctive Relief.

For the second factor, the Court must consider whether Baffert has shown a likelihood of irreparable harm. *N. Am. Soccer League*, 883 F.3d at 37.  This requires Baffert to establish that he will suffer harm that is "neither remote nor speculative, but actual and imminent and that cannot be remedied by monetary damages." *Step By Step, Inc. v. City of Ogdensburg*, 176 F.Supp.3d 112, 133 (N.D.N.Y. 2016) (quoting *Forest City Daly Housing, Inc. v. Town of North Hempstead*, 175 F.3d 144, 153 (2d Cir. 1999)).  The injury must be imminent and one that cannot be remedied if a court waits until the end of trial to resolve it. *Faiveley*, 559 F.3d at 119.  This factor easily weighs in Baffert's favor.

In *Elrod v. Burns*, 427 U.S. 347 (1976), the Supreme Court held that when reviewing a motion for preliminary injunction, if it is found that a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated. *Id.* at 373.  Indeed, in cases alleging constitutional injury, a strong showing of a constitutional deprivation that results in non-compensable damages ordinarily warrants a finding of the irreparable harm required to grant a preliminary injunction. *French*, 985 F.3d at 176; *see also Int'l Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 71 (2d Cir. 1999).  This is true even if the constitutional violation occurs only for minimal periods of time. *French*, 985 F.3d at 184.  Baffert's New York racing license is a property right which may not be suspended or revoked without due process of law.  NYRA deprived him of any notion of due process of law by unilaterally suspending him from all New York racing—essentially nullifying his valid and unrestricted license—without due process of law.  Because of this due process violation, Baffert has suffered irreparable harm.

-18-

Additionally, the Second Circuit has repeatedly found irreparable harm where a party is threatened with the loss of business. *See Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 37 (2d Cir. 1995) (a loss of prospective goodwill can constitute irreparable harm); *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205 (2d Cir. 1970); *Roso-Lino Beverage Distribs., Inc. v. Coca-Cola Bottling Co.*, 749 F.2d 124, 125-26 (2d Cir. 1984). While loss of an employment opportunity is typically not sufficient to create irreparable harm, the termination of the business itself is. *See Shady v. Tyson*, 5 F.Supp.2d 102, 109 (E.D.N.Y. 1998). A discharged employee can be reinstated and given money damages to remedy their loss, but "[a] business that has been disrupted by the illegal termination of a critical contract … cannot be so easily returned to its previous status." *Galvin*, 70 F.Supp.2d at 170. The loss of business need not be total—the plaintiff is only required to demonstrate a risk that its customers would turn to competitors in a highly competitive market. *See Jacobson & Co. v. Armstrong Cork Co.*, 548 F.2d 438, 444-45 (2d Cir. 1977); *Jamaica Ash & Rubbish Removal Co., Inc. v. Ferguson*, 85 F.Supp.2d 174, 181 (E.D.N.Y. 2000) (damage to reputation and goodwill may constitute irreparable harm).

This is exactly the harm Baffert is experiencing as a result of NYRA's conduct. First, if NYRA is permitted to indefinitely ban Baffert from all race tracks in New York, Baffert will suffer irreparable harm to, among other things, his reputation and his right to rely upon the license duly issued to him by the Gaming Commission, along with the loss of his ability to pursue and practice in his chosen profession and livelihood. With each passing day that Baffert is denied the right to enter horses in races in New York, the irreparable harm to him increases. For example, the highly prestigious Saratoga summer meet is rapidly approaching. It conducts races that only run once a year and are limited to horses of certain ages. If Baffert is denied the opportunity to enter any of

this current horses in those races, that is an opportunity that can never be regained. (Ex. A, Baffert Aff. ¶¶ 8-9.) Such harm cannot be adequately compensated by monetary damages.

Given the unique nature of the industry, any prolonged suspension of Baffert will also have the effect of destroying his business for a period of time much longer than the suspension itself. This is because any suspension will necessarily precipitate a mass exodus from his care of horses worth tens of millions of dollars as owners cannot allow themselves to be excluded from participation in the lucrative Belmont/Saratoga race meets. Instead, they will transfer their horses to other trainers, effectively putting Baffert out of business. Baffert has already been contacted by at least one owner who has indicated that he intends to move his horses to other trainers. (*Id*. ¶ 9.)

By effectively suspending or revoking Baffert's racing license while he remains in good standing with the Gaming Commission, NYRA has injured him by unilaterally and baselessly preventing him from participating in his chosen profession, and risks substantially depriving him of all business in New York. It is equally clear that Baffert has suffered and will continue to suffer irreparable harm to his business and professional reputation in the absence of injunctive relief.

The New York Court of Appeals has explicitly held that a trainer and owner may properly allege irreparable injury when NYRA excludes them from its tracks without due process of law. *See Jacobson*, 305 N.E.2d at 768. In the *Jacobson* case, the State court held that "[e]xclusion from [the NYRA's] tracks is tantamount to barring the plaintiff from virtually the only places in the State where he may ply his trade." *Id.* In *Galvin*, Judge Ross adopted *Jacobson*'s holding and similarly held that the suspension of a veterinary license by NYRA is sufficiently irreparable harm to issue injunctive relief. *See Galvin*, 70 F.Supp.2d at 171-72. And, earlier this month, a state court granted a temporary restraining order in favor of a horse trainer who was suspended but who (unlike Baffert) had at least been given a hearing. (*See* Ex. G, Memorandum of Law, *In re Linda*

-20-

*Rice*, Index No. 2021-1154 (N.Y. Sup. Ct. June 7, 2021); Ex. H, Order to Show Cause, June 9, 2021.) This ruling reflects the commonsense point that a trainer challenging a suspension can never be made whole, even if the trainer's challenge prevails. And given the limited number of racing jurisdictions that conduct meets as prestigious and lucrative as Saratoga, any prohibition of Baffert's ability to "ply his trade" in New York makes his irreparable injury only more pronounced.

With each passing day, Baffert is prevented from entering horses to race in New York. Certain races, such as the Travers Stakes, only come around once a year and are limited to horses of a particular age.  Further, if Baffert is prevented from racing in New York, owners will continue to move horses away from him, effectively putting him out of business.  Every day that Baffert is prevented from entering horses in races is one more day of lost opportunity that he can never regain—and one more day for which there is no adequate monetary compensation.

Thus, under this Court's own precedent involving the exact same entity before the Court, NYRA's actions have undoubtedly caused Baffert irreparable injury and this factor is satisfied.

## III.    The Balance of Hardships and Public Interest Favor Injunctive Relief.

The Court is finally tasked with balancing the competing interests in determining whether to issue a preliminary injunction, and whether issuing the injunction serves the public interest.  A preliminary injunction will be in the "public interest" if the injunction would not cause harm to the public. *See U.S. S.E.C. v. Citigroup Global Mkts., Inc.*, 673 F.3d 158, 163 n.1 (2d. Cir. 2012).  The public interest generally supports injunctive relief where the moving party demonstrates a substantial likelihood of success on the merits and a strong showing of irreparable harm. *V.W. by and through Williams v. Conway*, 236 F.Supp.3d 554, 589 (N.D.N.Y. 2017).  Further, the interest is particularly strong where the rights to be vindicated are constitutional in nature. *Id.* (citing *Ligon v. City of N.Y.*, 925 F.Supp.2d 478, 541 (S.D.N.Y. 2013)).  As for weighing the equities, a moving party must establish that the balance of equities tips in his or her favor. *French*, 985 F.3d

at 176. In conducting this analysis, courts must balance the competing claims of injury and consider the effect on each party of granting or withholding the requested relief. *Main Street Baseball, LLC v. Binghampton Mets Baseball Club, Inc.*, 103 F.Supp.3d 244, 262 (N.D.N.Y. 2015) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). This factor again tips in heavily in Baffert's favor.

Here, Baffert has established that he is likely to prevail on his claims that NYRA acted contrary to New York State law and deprived him of due process of law by indefinitely suspending him without authority or any prior notice. Because Baffert established that his constitutional and state law rights have been violated, the public interest weighs heavily in favor of issuing injunctive relief. *See Paykina on behalf of E.L. v. Lewin*, 387 F.Supp.3d 225, 245 (N.D.N.Y. 2019).

Moreover, equitable considerations strongly favor issuing the injunction. On one hand, NYRA will suffer absolutely no harm by allowing Baffert to continue to ply his trade in New York and use his duly-issued racing license. The whole basis for the suspension—or at least, the only reason given—is the ongoing Kentucky investigation. New York, like most racing jurisdictions, has a reciprocity provision that enforces violations from other jurisdictions. N.Y. Racing L. § 910. Put differently, if Baffert is ultimately found to be in violation of Kentucky's rules of racing and is suspended in that state (which has not yet happened), then the Gaming Commission will certainly apply that final determination to New York. Thus, this is a case of NYRA completely jumping the gun and bypassing due process. Furthermore, if NYRA has any pharmacological concerns about horses entered in New York races under Baffert's name, New York regulations provide for extensive pre- and post-race testing protocols that NYRA can employ to screen for any prohibited substance.

Baffert, on the other hand, stands to suffer greatly absent injunctive relief and faces disproportionate punishment from NYRA extensively more severe than any racing authority can authorize. If Baffert is ultimately found to be in violation of Kentucky regulations, he faces a likely *maximum* of a 30 day suspension. 810 Ky. Admin. Regs. § 8:030, Section 4(3)(b). Because of the comprehensive process entailed in Kentucky, the Kentucky adjudication could progress for years before any final determination is made. Thus, because NYRA attaches Baffert's suspension to the Kentucky investigation, it is effectively banning Baffert from New York racing for a potential period of *several years* when the maximum penalty he may face in Kentucky is likely *30 days*.

Baffert has spent his entire professional life training Thoroughbred horses, and his livelihood has been jeopardized by NYRA's unlawful decision. Barring Baffert from participating in New York racing solely based on the preliminary results from the Kentucky Derby, and NYRA's perception of those results, steals away significant opportunities for Baffert for an indefinite and undefined period of time. As a duly licensed Thoroughbred trainer in New York, Baffert simply seeks to use his racing license and pursue his chosen profession, which he is fully entitled to do under New York law. Principles of equity and fairness dictate that Baffert's ability to participate in New York racing should not depend on an whim decision by a racing entity that will in no way be prejudiced by simply letting the Kentucky investigation run its course. The public interest favors maintaining the status quo until the Kentucky proceedings reach a conclusion.

## CONCLUSION

For the foregoing reasons, Baffert respectfully requests that this Court enter preliminary and immediate injunctive relief in his favor. Specifically, NYRA's alleged suspension of Baffert should be lifted and he should be allowed to fully and completely exercise his license to train and race horses in New York

-23-

Dated: New York, New York
       June 14, 2021

Respectfully submitted,

STEPTOE & JOHNSON LLP

By:  */s/ Charles Michael*
     Charles Michael
     1114 Avenue of the Americas
     New York, New York 10036
     (212) 506-3900
     cmichael@steptoe.com

W. Craig Robertson III
WYATT, TARRANT & COMBS, LLP
250 West Main Street, Suite 1600
Lexington, Kentucky  40507-1746
859.233.2012
wrobertson@wyattfirm.com
(*pro hac vice* application forthcoming)

*Counsel for Plaintiff Bob Baffert*

-24-