**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

BOB BAFFERT,

                    *Plaintiff*,

          v.

THE NEW YORK RACING
ASSOCIATION, INC.,

                    *Defendant*.

Civil Action No. 1:21-cv-03329-
CBA-RML

**DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO**
**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

GREENBERG TRAURIG, LLP
54 State Street, 6th Floor
Albany, New York 12207
(518) 689-1400

SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
(212) 558-4000

June 30, 2021

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................1

STATEMENT OF FACTS .......................................................................................3

    A.    NYRA is a Private, Not-for-Profit Corporation Responsible for Operating Three Racetracks in the State of New York. ............................................3

    B.    Plaintiff is a Prominent Thoroughbred Trainer with a History of Drug-Related Violations. ....................................................................5

    C.    Plaintiff-Trained Medina Spirit Tests Positive for Betamethasone After "Winning" the Kentucky Derby, and Plaintiff Offers Contradictory Accounts to Explain the Positive Test.......................................................6

    D.    With the Belmont Approaching, NYRA Temporarily Suspends Plaintiff from Entering or Stabling Horses at its Racetracks. ..............................8

STANDARD OF REVIEW ....................................................................................9

ARGUMENT ..................................................................................................10

I.     PLAINTIFF WILL NOT SUFFER IRREPARABLE HARM IN THE ABSENCE OF EMERGENCY RELIEF...................................................10

II.    PLAINTIFF HAS FAILED TO SHOW A LIKELIHOOD OF SUCCESS ON THE MERITS OR SERIOUS QUESTIONS GOING TO THE MERITS.................15

    A.    NYRA's Decision to Temporarily Suspend Plaintiff from the Racetracks Was Consistent with Its Right and Duty to Protect the Integrity of Racing. .........15

    B.    NYRA's Temporary Suspension of Plaintiff Did Not Violate 42 U.S.C. § 1983..............................................................................19

III.   THE RELEVANT PUBLIC INTEREST AND EQUITABLE CONSIDERATIONS OVERWHELMINGLY WEIGH IN FAVOR OF DENYING PLAINTIFF'S MOTION. .......................................................28

CONCLUSION ................................................................................................30

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Alvin v. Suzuki*,
    227 F.3d 107 (3d Cir. 2000)...................................................24

*Alzheimer's Found. of Am., Inc. v. Alzheimer's Disease & Related Disorders Ass'n, Inc.*,
    No. 10-cv-3314, 2015 WL 4033019 (S.D.N.Y. June 29, 2015) (Sweet. J.)............14

*Barry v. Barchi*,
    443 U.S. 55 (1979)..............................................20, 21, 22

*Burton v. Wilmington Parking Auth.*,
    365 U.S. 715 (1961)...................................................26

*Candelaria v. Baker*,
    No. 00-cv-0912, 2006 WL 618576 (W.D.N.Y. Mar. 10, 2006) ................9

*Matter of Casse v. N.Y. State Racing & Wagering Bd.*,
    70 N.Y.2d 589, 517 N.E.2d 1309, 523 N.Y.S.2d 423 (N.Y. 1987)..................23, 29

*Chiari v. N.Y. Racing Ass'n*,
    972 F. Supp. 2d 346 (E.D.N.Y. 2013) (Tomlinson, J.).........................18

*Citibank, N.A. v. Citytrust*,
    756 F.2d 273 (2d Cir. 1985)...........................................15

*Cranley v. Nat'l Life Ins. Co. of Vt.*,
    318 F.3d 105 (2d Cir. 2003)...........................................26

*Matter of Cnty. of Westchester v. Rent Guidelines Bd.*,
    71 A.D.2d 655, 419 N.Y.S.2d 6 (N.Y. App. Div. 2d Dep't 1979) .........................19

*Coll. Entrance Examination Bd. v. Cuomo*,
    788 F. Supp. 134 (N.D.N.Y. 1992).......................................15

*Cooper v. TWA Airlines, LLC*,
    274 F. Supp. 2d 231 (E.D.N.Y. 2003) (Amon, J.) .........................10, 14

*Datapak Assocs., Inc. v. Hoynash*,
    No. 04-cv-5731, 2004 WL 2290507 (S.D.N.Y. Oct. 8, 2004) (Casey, J.)............11

*De Jesus Moreno v. Nielsen*,
    460 F. Supp. 3d 291 (E.D.N.Y. 2020) (Mauskopf, C.J.) .........................10

*Devose v. Herrington*,
    42 F.3d 470 (8th Cir. 1994) .............................................9

*Donk v. Miller*,
    365 F.3d 159 (2d Cir. 2004).........................................................................20, 22

*Dwyer v. Regan*,
    777 F.2d 825 (2d Cir. 1985)................................................................................24

*eBay Inc. v. MercExchange, LLC*,
    547 U.S. 388 (2006)............................................................................................11

*Fabrikant v. French*,
    691 F.3d 193 (2d Cir. 2012)................................................................................26

*Faiveley Transp. Malmo AB v. Wabtec Corp.*,
    559 F.3d 110 (2d Cir. 2009)................................................................................10

*Forbes v. City of New York*,
    No. 05-cv-7331, 2008 WL 3539936 (S.D.N.Y. Aug. 12, 2008)..........................27

*Freedom Holdings, Inc. v. Spitzer*,
    408 F.3d 112 (2d Cir. 2005)................................................................................10

*Galvin v. N.Y. Racing Ass'n*,
    70 F. Supp. 2d 163 (E.D.N.Y. 1998) (Ross, J.) ..............................................13, 23

*Garcia v. N.Y. Racing Ass'n*,
    No. 10-cv-01092, 2011 WL 3841524 (N.D.N.Y. Aug. 29, 2011).........................25

*Gilmour v. N.Y. State Racing & Wagering Bd.*,
    405 F. Supp. 458 (S.D.N.Y. 1975) (Weinfeld, J.) ...........................................23, 28

*Grannan v. Westchester Racing Ass'n*,
    153 N.Y. 449, 47 N.E. 896 (N.Y. 1897).............................................................17

*Hadges v. Yonkers Racing Corp.*,
    918 F.2d 1079 (2d Cir. 1990)..........................................................................19, 25

*Matter of Halsey v. N. Y. Racing Ass'n*,
    800 N.Y.S.2d 347, No. 18789/2004, 2005 WL 701115 (N.Y. Sup. Ct. Mar. 1,
    2005) ...................................................................................................................16

*Holden v. E. Hampton Town*,
    No. 15-cv-4478, 2017 WL 1317825 (E.D.N.Y. Mar. 31, 2017) (Wexler, J.)..............19, 26, 27

*Inc. Vill. of Great Neck Plaza v. Nassau Cnty. Rent Guidelines Bd.*,
    69 A.D.2d 528, 418 N.Y.S.2d 796 (N.Y. App. Div. 2d Dep't. 1979) ....................19

*Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*,
    596 F.2d 70 (2d Cir. 1979)..................................................................................14

*Jacobson v. N.Y. Racing Ass'n*,
  33 N.Y.2d 144, 305 N.E.2d 765, 350 N.Y.S.2d 639 (N.Y. 1973) ........................12, 16, 17, 21

*Jayaraj v. Scappini*,
  66 F.3d 36 (2d Cir. 1995) ...................................................................................12

*Khulumani v. Barclay Nat'l Bank Ltd.*,
  504 F.3d 254 (2d Cir. 2007)...............................................................................26

*Lasky v. Van Lindt*,
  115 Misc. 2d 259, 453 N.Y.S.2d 983 (N.Y. Sup. Ct. 1982) ....................................22

*LG Cap. Funding, LLC v. Vape Holdings, Inc.*,
  No. 16-cv-2217, 2016 WL 3129185 (E.D.N.Y. June 2, 2016) (Amon, J.)..............10

*Loveridge v. Pendleton Woolen Mills, Inc.*,
  788 F.2d 914 (2d Cir. 1986)..........................................................................11, 14

*M&G Elecs. Sales Corp. v. Sony Kabushiki Kaisha*,
  250 F. Supp. 2d 91 (E.D.N.Y. 2003) (Spatt, J.).....................................................14

*Madden v. Queens Cnty. Jockey Club*,
  296 N.Y. 249, 72 N.E.2d 697 (N.Y. 1947) .......................................................16, 18

*Marrone v. Washington Jockey Club*,
  227 U.S. 633 (1913)..........................................................................................17

*Memphis Light, Gas & Water Div. v. Craft*,
  436 U.S. 1 (1978) .............................................................................................24

*Myron v. Consol. Rail Corp.*,
  752 F.2d 50 (2d Cir. 1985)..................................................................................27

*N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*,
  883 F.3d 32 (2d Cir. 2018)..................................................................................10

*N.Y. State Nat'l Org. for Women v. Pataki*,
  261 F.3d 156 (2d Cir. 2001)................................................................................24

*Nnebe v. Daus*,
  644 F.3d 147 (2d Cir. 2011)................................................................................21

*People v. Licata*,
  28 N.Y.2d 113, 268 N.E.2d 787, 320 N.Y.S.2d 53 (N.Y. 1971) ............................16

*Perez v. Hoblock*,
  248 F. Supp. 2d 189 (S.D.N.Y. 2002) (Berman, J.)...............................................22

*Perkins v. Londonderry Basketball Club*,
    196 F.3d 13 (1st Cir. 1999) ............................................................................ 27

*Pharaohs GC, Inc. v. U.S. Small Bus. Admin.*,
    990 F.3d 217 (2d Cir. 2021) ...................................................................... 9, 10

*Pinckney v. Bd. of Educ. of Westbury Union Free Sch. Dist.*,
    920 F. Supp. 393 (E.D.N.Y. 1996) (Spatt, J.) ............................................. 12

*Matter of Presti v. N.Y. Racing Ass'n*,
    46 A.D.2d 387, 363 N.Y.S.2d 24 (N.Y. App. Div. 2d Dep't 1975) ........... 16

*Rahner v. Yonkers Racing Corp.*,
    No. 78-cv-3967, 1978 U.S. Dist. LEXIS 15632 (S.D.N.Y. Sept. 11, 1978)
    (Leval, J.) .................................................................................................... 17

*Rodriguez ex rel. Rodriguez v. DeBuono*,
    175 F.3d 227 (2d Cir. 1999) ....................................................................... 10

*Rush v. Hillside Buffalo, LLC*,
    314 F. Supp. 3d 477 (W.D.N.Y. 2018) ....................................................... 14

*Salinger v. Colting*,
    607 F.3d 68 (2d Cir. 2010) .......................................................................... 11

*Matter of Saumell v. N.Y. Racing Ass'n*,
    58 N.Y.2d 231, 447 N.E.2d 706, 460 N.Y.S.2d 763 (N.Y. 1983) .............. *passim*

*Semmes Motors, Inc. v. Ford Motor Co.*,
    429 F.2d 1197 (2d Cir. 1970) ..................................................................... 13

*Soap Opera Now, Inc. v. News Am. Publ'g, Inc.*,
    No. 90-cv-2631, 1990 WL 124335 (S.D.N.Y. Aug. 17, 1990) (Ward, J.) ............. 12

*Stallworth v. Joshi*,
    No. 17-cv-7119, 2017 WL 8777378 (S.D.N.Y. Nov. 22, 2017) (Sullivan, J.) ........ 12

*Stevens v. N.Y. Racing Ass'n*,
    665 F. Supp. 164 (E.D.N.Y. 1987) (Sifton, J.) .......................................... 26

*Sussman v. Crawford*,
    488 F.3d 136 (2d Cir. 2007) ......................................................................... 9

*Matter of Tappis v. N.Y. State Racing & Wagering Bd., Harness Racing Div.*,
    36 N.Y.2d 862, 331 N.E.2d 697, 370 N.Y.S.2d 922 (N.Y. 1975) ............. 22

*Tom Doherty Assocs., Inc. v. Saban Enter., Inc.*,
    60 F.3d 27 (2d Cir. 1995) ........................................................................... 13

*Tough Traveler, Ltd. v. Outbound Prods.*,
  60 F.3d 964 (2d. Cir. 1995)...................................................................................15

*Two Locks, Inc. v. Kellogg Sales Co.*,
  68 F. Supp. 3d 317 (E.D.N.Y. 2014) (Spatt, J.)....................................................28

*Matter of Vaintraub v. N.Y. Racing Ass'n*,
  28 A.D.2d 660, 280 N.Y.S.2d 758 (N.Y. App. Div. 1st Dep't 1967).....................17

*Vandor, Inc. v. Militello*,
  301 F.3d 37 (2d Cir. 2002)...................................................................................24

*Winter v. NRDC, Inc.*,
  555 U.S. 7 (2008)...........................................................................................9, 30

*WPIX, Inc. v. ivi, Inc.*,
  691 F.3d 275 (2d Cir. 2012).................................................................................12

*Zapoteco v. Rapi, Inc.*,
  No. 20-cv-6335, 2021 WL 1964548 (E.D.N.Y. May 17, 2021) (Kovner, J.)..........30

*Zinermon v. Burch*,
  494 U.S. 113 (1990)............................................................................................24

**Statutes**

42 U.S.C. § 1983...............................................................................19, 25, 26, 28

N.Y. Rac. Pari-Mut. Wag. & Breed Law § 206............................................................4

N.Y. Rac. Pari-Mut. Wag. & Breed Law § 207............................................................4

**Other Authorities**

2017 Sess. Laws ch. 59, pt. NN....................................................................................4

9 N.Y.C.R.R. § 4022.12...................................................................................16, 17

9 N.Y.C.R.R. § 4043.........................................................................................................8

9 N.Y.C.R.R. § 4207.25...................................................................................5, 17

9 N.Y.C.R.R. § 4550.1...................................................................................................18

KY. ADMIN. REGS. 8:010.................................................................................................8

Defendant The New York Racing Association, Inc. ("NYRA") respectfully submits this memorandum of law in opposition to Plaintiff Bob Baffert's ("Plaintiff") motion for a preliminary injunction.

## PRELIMINARY STATEMENT

The aftermath of the 147th running of the Kentucky Derby was calamitous for the sport of Thoroughbred racing.  On May 1, 2021, 14.4 million viewers watched Medina Spirit, a 12-1 longshot trained by Plaintiff, finish first at the Kentucky Derby, the first leg of Thoroughbred racing's coveted Triple Crown.  Drug testing from post-race blood samples showed that Medina Spirit tested positive for betamethasone, a steroidal anti-inflammatory drug — a violation of Kentucky's (and New York's) equine medication protocols that could disqualify Medina Spirit from the race and vacate his first-place finish.  Medina Spirit's positive test marked the *fifth* time in the past year that a horse trained by Plaintiff tested positive for drugs, with the prior four drug-related violations culminating in fines imposed by racing regulators in three states.  Rarely in the history of the sport has there been such a confluence of drug positives involving so prominent a trainer as Plaintiff.

In response, Churchill Downs, which hosts the Kentucky Derby, temporarily suspended Plaintiff from entering horses at its racetrack.  For his part, Plaintiff gave multiple interviews to reporters in which he emphatically denied that Medina Spirit was given betamethasone, attributed Churchill Downs' suspension to "cancel culture," and floated conspiracy theories that someone intentionally contaminated Medina Spirit.  Almost immediately after making these public statements, Plaintiff reversed course and admitted that Medina Spirit in fact had tested positive for betamethasone.

Meanwhile, NYRA was preparing to host, on June 5, the Belmont Stakes ("the Belmont"), the third and final leg of the Triple Crown.  Given Plaintiff's history of drug-related violations,

Medina Spirit's positive test, Plaintiff's contradictory statements, Plaintiff's temporary suspension from Churchill Downs, and the fact that the Belmont was fast approaching, NYRA took the only sensible action under the circumstances — it temporarily suspended Plaintiff from entering and stabling horses at its Racetracks.  In a letter dated May 17, 2021, NYRA advised Plaintiff of the suspension and gave him an opportunity to promptly present to NYRA any relevant information, data or arguments.  Rather than avail himself of this opportunity, Plaintiff filed this action nearly a month later and now moves for a preliminary injunction.  The Court should deny Plaintiff's request for such an extraordinary and drastic remedy.

*First*, Plaintiff fails to demonstrate that he will suffer irreparable injury in the absence of emergency relief.  Rather than allege any actual or imminent injury or irreparable harm warranting a preliminary injunction, Plaintiff offers only conclusory assertions of potential harm, speculates that he may lose unidentified clients if the suspension is not lifted, and fails to submit any evidence demonstrating that the speculative loss of clients would substantially damage his business.  Even if the Court were to consider Plaintiff's potential client loss, such an injury could be remedied through money damages, rendering preliminary injunctive relief inappropriate.  Furthermore, Plaintiff's nearly month-long delay in seeking this preliminary injunction undercuts the sense of urgency needed to remedy his alleged harm.

*Second*, Plaintiff fails to establish that he is likely to succeed on the merits of his claims. Contrary to Plaintiff's unsupported assertion that NYRA could not temporarily suspend Plaintiff from its Racetracks because it does not own the grounds on which they are located, settled law holds that NYRA had both the common law and regulatory right to exclude anyone, including a licensed trainer, who engages in conduct detrimental to the best interests of racing.  Moreover, Plaintiff's assertion that NYRA violated his due process rights is incorrect.  NYRA was not

required to provide Plaintiff an opportunity to be heard before issuing a temporary suspension because NYRA's decision was based on probable cause that Plaintiff's actions warranted suspension and was necessary to protect the safety of the racehorses and their riders, and required to ensure the integrity of the sport.  In any event, NYRA provided Plaintiff with an opportunity to be heard, but he declined to use it, opting instead to wait nearly a month to commence this action.  Plaintiff also fails to allege facts sufficient to show that he is likely to prove that NYRA's temporary suspension of Plaintiff was "state action" — as required to implicate due process concerns.

*Third*, the public interest and balance of equities weigh clearly in favor of NYRA.  NYRA is obligated to protect its investment, brand and reputation, and supervise activities at its Racetracks in a manner that fosters the public's confidence in the safety and honesty of the sport.  Plaintiff's speculative assertions that his business might suffer or that his temporary suspension could last for a significant period of time cannot override NYRA's compelling interests in upholding the integrity of horse racing or assuring the safety of jockeys and horses.

Accordingly, Plaintiff's motion for a preliminary injunction should be denied.

## STATEMENT OF FACTS

### A.    NYRA is a Private, Not-for-Profit Corporation Responsible for Operating Three Racetracks in the State of New York.

NYRA is a private not-for-profit corporation organized as a racing association.  (*See* Ex. A[1] at 2; affidavit of David T. O'Rourke, dated June 30, 2021 ("O'Rourke Aff.") ¶ 5.)  It operates three racetracks and pari-mutuel wagering facilities in New York State (the "State"): (1) Aqueduct Racetrack; (2) Belmont Park Racetrack; and (3) Saratoga Race Course.  (O'Rourke Aff. ¶ 6.)  In

---

[1]      Citations to "Ex. _" refer to the exhibits attached to the accompanying declaration of Henry M. Greenberg, dated June 30, 2021.

2008, the State granted NYRA an exclusive 25-year franchise to conduct Thoroughbred racing and related operations at the Racetracks.  (*Id.* ¶ 9.)   NYRA performs those functions under a written Franchise Agreement with the State.  (*Id.* ¶ 10; *see* N.Y. Rac. Pari-Mut. Wag. & Breed Law ("N.Y. Racing Law") § 206; *see generally* Ex. C.)

NYRA is governed by a privately controlled board of directors consisting of 17 persons, six of whom are appointed by State elected officials.  (O'Rourke Aff. ¶ 11; *see* N.Y. Racing Law § 207(1)(a).)[2]   NYRA has its own bylaws and follows corporate formalities, such as board meetings (which are not open to the public), the purchasing of insurance, and the formation and operation of special committees.  (Ex. B §§ 3.01, 6.01, 6.02, 9.02; O'Rourke Aff. ¶ 12).  NYRA's day-to-day operations are not controlled by the State.  Rather, NYRA:

- appoints its own officers and sets their compensation (Ex. B §§ 7.01, 7.03; O'Rourke Aff. ¶ 13);

- leases its property from the State and has the right "to develop, redevelop, refurbish, renovate or make such other improvements, capital expenditures or otherwise" to those properties (Ex. D § 4.1(a); O'Rourke Aff. ¶ 16);

- is solely responsible for the payment of all impositions, utilities, and operating expenses for the Racetracks (Ex. D §§ 3.1-3.3; O'Rourke Aff. ¶ 15); and

- is obligated "to repair, alter, restore, replace and rebuild" the premises in the event of a casualty, (Ex. D § 11.2(a); O'Rourke Aff. ¶ 17), and is responsible for performing and bearing the costs of "all maintenance, repair and upkeep of [premises it leases], including the improvements thereon" (Ex. D § 5.3; O'Rourke Aff. ¶ 17).

---

[2]    Citing a repealed version of N.Y. Racing Law § 207, Plaintiff mistakenly asserts that 12 members of the 17-member board are appointed by elected officials.  (Mem. of Law in Supp. of Pl.'s Mot. for Prelim. Inj. ("Pl.'s Br.") at 13.)  The current version of N.Y. Racing Law § 207(1)(a) was enacted in 2017 for the purpose of reprivatizing NYRA.  2017 Sess. Laws ch. 59, pt. NN.  NYRA amended both its certificate of incorporation and bylaws to reflect this law change.  (*See* Ex. A at 2; Ex. B § 2.02.)

NYRA's Franchise Agreement requires NYRA to consider steps "to ensure jockey and equine safety" and to "use its reasonable best efforts to maximize attendance at each of the Racetracks." (Ex. C §§ 2.2(d), (h); O'Rourke Aff. ¶ 81.)  Under New York law, NYRA is empowered to exclude people from its Racetracks. (O'Rourke Aff. ¶¶ 75-78.)

**B.      Plaintiff is a Prominent Thoroughbred Trainer with a History of Drug-Related Violations.**

Plaintiff is a well-known Thoroughbred trainer, whose horses have won numerous significant races. (O'Rourke Aff. ¶¶ 18-19.)  But, over the course of Plaintiff's career, his horses have been cited for drug-related violations at least 30 times. (Exs. F-J, S; O'Rourke Aff. ¶ 22.)  In fact, over the 12 months preceding this year's Kentucky Derby, Plaintiff has been fined four times for drug-related violations:

- On July 14, 2020, the Arkansas Racing Commission imposed two $5,000.00 fines on Plaintiff as a result of two horses he trained testing positive for 3-hydroxylidocaine at Oaklawn Park on May 2, 2020. (Ex. E; O'Rourke Aff. ¶¶ 25-26.)

- On November 29, 2020, the California Horse Racing Board imposed a $2,500.00 fine on Plaintiff when a horse trained by him tested positive for dextromethorphan after running at Del Mar Racetrack on July 25, 2020. (Ex. E; O'Rourke Aff. ¶ 27.)

- On January 30, 2021, the Kentucky Horse Racing Commission ("KHRC") imposed a $1,500.00 fine on Plaintiff when a horse he trained tested positive for Betamethasone at Churchill Downs Racetrack ("Churchill Downs") on September 4, 2020. (Ex. E; O'Rourke Aff. ¶ 28.)  Plaintiff's horse was disqualified from the race and all purse money forfeited. (Ex. E; O'Rourke Aff. ¶ 28.)

**C.    Plaintiff-Trained Medina Spirit Tests Positive for Betamethasone After "Winning" the Kentucky Derby, and Plaintiff Offers Contradictory Accounts to Explain the Positive Test.**

In the wake of these four drug-testing violations, Plaintiff entered Medina Spirit, a three-year-old horse he trained, in the Kentucky Derby.  (O'Rourke Aff. ¶ 30.)[3]  On May 1, 2021, Medina Spirit finished first in the Kentucky Derby and was declared the winner.  (*Id.* ¶¶ 32, 34.)  Drug testing from post-race blood samples, however, revealed that Medina Spirit tested positive for 21 picograms per milliliter of betamethasone, a steroidal anti-inflammatory drug.  (*Id.* ¶¶ 35, 41.)

Betamethasone is a substance that can "increase the performance of a racehorse" and has "the potential to 'mask' injuries, allowing a horse to compete" in a race "when it otherwise should not."  (Declaration of Prof. Pierre-Louis Toutain, dated June 30, 2021 ("Toutain Decl.") ¶¶ 9, 16.)  Accordingly, a horse treated with betamethasone may be more likely to suffer from "catastrophic injury" than horses not treated with the drug.  (*Id.* ¶ 9.)  Any level of detection of this drug on race day is a violation under KHRC's equine medication protocols.  (O'Rourke Aff. ¶ 37.)[4]  This positive test for betamethasone also would have been a violation under New York's equine medication protocols.  (*See id.* ¶ 40.)

On May 8, 2021, KHRC advised Plaintiff that Medina Spirit had tested positive and that KHRC was conducting a further investigation.  (*Id.* ¶ 42.)  The following day, on May 9, 2021,

---

[3]    The Kentucky Derby is the most famous American horse race and is run annually on the first Saturday in May at Churchill Downs in Louisville, Kentucky.  (*See* O'Rourke Aff. ¶ 31; Ex. K.)  The Kentucky Derby, the Preakness Stakes (run in mid-May) and the Belmont Stakes (run early in June) make up Thoroughbred racing's coveted "Triple Crown" for three-year-old horses.

[4]    Although betamethasone is a permitted medication for horses in Kentucky, horses are only permitted to receive betamethasone more than 14 days before racing in Kentucky.  (O'Rourke Aff. ¶ 36.)  New York has a similar rule that prohibits treatment with betamethasone within seven days of racing.  (*Id.* ¶ 39.)  New York law prohibits betamethasone at a threshold level of 10 picograms per milliliter, 11 picograms per milliliter less than the amount of betamethasone detected during Medina Spirit's post-race test.  (*Id.* ¶ 40.)

Plaintiff held a press conference, in which he disclosed that Medina Spirit had tested positive for betamethasone and the matter was under investigation by KHRC.  (*Id.* ¶ 44.)  During the press conference, Plaintiff repeatedly denied that Medina Spirit was given betamethasone and suggested that "regulators" had acted unfairly over the preceding 18 months by sanctioning him for the presence of "contamination levels" of medication in his horses.  (*Id.* ¶¶ 45-46.)

On May 10, 2021, Churchill Downs temporarily suspended Plaintiff from entering horses on its racetrack.  (Ex. L; O'Rourke Aff. ¶ 49.)  Churchill Downs explained in a press release that: (a) "Medina Spirit's post-race blood sample indicated a violation of . . . Kentucky's equine medication protocols"; (b) "Medina Spirit's results in the Kentucky Derby will be invalidated" if these findings are upheld by a second blood sample test (sometimes called the "split sample"); (c) "[f]ailure to comply with the rules and medication protocols jeopardizes the safety of the horses and jockeys, the integrity of our sport and the reputation of the Kentucky Derby and all who participate"; and (d) Churchill Downs awaits the conclusion of the KHRC's investigation "before taking further steps."  (Ex. L; O'Rourke Aff. ¶ 49.)[5]

That same day, Plaintiff gave multiple interviews to reporters in which he continued to deny that Medina Spirit was given betamethasone, attributed Churchill Downs' suspension to "cancel culture," and floated a conspiracy theory speculating that someone may have intentionally contaminated Medina Spirit.  (O'Rourke Aff. ¶¶ 50-55.)  The next day, on May 11, 2021, Plaintiff reversed course in a written statement, admitting that the positive test was correct and not due to contamination and claiming that Medina Spirit's positive test was the result of veterinary treatment with a topical ointment.  (Ex. M; O'Rourke Aff. ¶¶ 56-57; *see* Ex. N (apologizing for statements

---

[5]     On June 2, 2021, Churchill Downs suspended Plaintiff from entering horses at its track for two years after a second test confirmed that betamethasone was present in Medina Spirit's blood. (Exs. Q, R; O'Rourke Aff. ¶¶ 102-03.)

in May 9 press conference).)  Neither Kentucky's nor New York's equine medication protocols excuse positive tests for betamethasone on the ground that the horse received a topical ointment from a veterinarian.  *See generally* 9 N.Y.C.R.R. § 4043; 810 KY. ADMIN. REGS. 8:010.

### D.  With the Belmont Approaching, NYRA Temporarily Suspends Plaintiff from Entering or Stabling Horses at its Racetracks.

The Belmont is a historic race of immense importance to NYRA and American sports. (O'Rourke Aff. ¶ 65.)  First run in 1867, the Belmont is the oldest of the three Triple Crown races, and traditionally called "The Test of the Champion" because it is the longest of the Triple Crown races.  (*Id.* ¶ 66.)  As the final leg of the Triple Crown — and given its stored history — the Belmont is one of Thoroughbred racing's most famous and prestigious races.  (*Id.* ¶ 67.)  It is certainly the most prominent Thoroughbred race in New York State each year, with millions of viewers on television and tens of millions of dollars wagered each year.  (*Id.* ¶ 68.)

Although Plaintiff did not then have any horses entered in races or stabled at the Racetracks, it was likely, if not certain, that Plaintiff would attempt to enter Medina Spirit in the Belmont scheduled for June 5, 2021.  (*Id.* ¶¶ 87-88.)  With the Belmont fast approaching, NYRA took action to temporarily suspend Plaintiff from entering horses in races and stabling horses at the Racetracks.  (*Id.* ¶¶ 88, 91.)  In a letter dated May 17, 2021, NYRA's CEO and President advised Plaintiff that the temporary suspension was effective immediately and identified the following specific grounds for the action taken: (1) Churchill Downs' suspension of Plaintiff following the running of the Kentucky Derby and the reasons for such suspension, including Medina Spirit's positive test for betamethasone; (2) Plaintiff's four drug testing violations over the past year; and (3) Plaintiff's differing explanations and theories as to why Media Spirit tested positive for betamethasone.  (*Id.* ¶¶ 91-92.)

The letter stated that Plaintiff's temporary suspension was imposed by NYRA in the "best interests of thoroughbred racing." (*Id.* ¶ 93.) To do otherwise, the letter continued, "would compromise NYRA's investment in its operations as well as the public's perception of thoroughbred racing generally." (*Id.* ¶ 94.) The letter noted that NYRA expected to make a final determination regarding the length and terms of Plaintiff's suspension based on information revealed during the course of the ongoing investigation in Kentucky. (*Id.* ¶ 95.)

Finally, the letter advised Plaintiff: "If you . . . wish to present to NYRA any information, data or arguments concerning this matter, please do so within seven business days from receipt of this letter." (*Id.* ¶ 96.) Plaintiff never availed himself of this opportunity to be heard or raise any objection with NYRA. (*Id.* ¶ 97.) Instead, nearly a month after NYRA imposed the temporary suspension, Plaintiff commenced this action on June 14, 2021 and now moves for a preliminary injunction. (*Id.* ¶ 97; Pl.'s Br. at 23; Dkt. No. 1-1.)

## STANDARD OF REVIEW

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a *clear showing*, carries the burden of persuasion." *Sussman v. Crawford*, 488 F.3d 136, 139 (2d Cir. 2007) (internal quotation marks omitted) (alteration in original). "The purpose of issuing a preliminary injunction is to 'preserve the status quo and prevent irreparable harm until the court has an opportunity to rule on the . . . merits.'" *Candelaria v. Baker*, No. 00-cv-0912, 2006 WL 618576, at *3 (W.D.N.Y. Mar. 10, 2006) (quoting *Devose v. Herrington*, 42 F.3d 470, 471 (8th Cir. 1994) (per curiam)).

Plaintiff bears the burden of establishing: (i) "that he is likely to succeed on the merits"; (ii) "that he is likely to suffer irreparable harm in the absence of preliminary relief"; (iii) "that the balance of equities tips in his favor"; and (iv) "that an injunction is in the public interest." *See Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008); *accord Pharaohs GC, Inc. v. U.S. Small Bus. Admin.*,

990 F.3d 217, 225 (2d Cir. 2021); *see also N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018) (noting that a movant could show "both serious questions on the merits and a balance of hardships decidedly favoring the moving party" in lieu of "a likelihood of success on the merits").

## ARGUMENT

### I. PLAINTIFF WILL NOT SUFFER IRREPARABLE HARM IN THE ABSENCE OF EMERGENCY RELIEF.

"A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (internal quotation marks and citation omitted). Courts should deny a motion for a preliminary injunction "in the absence of a showing of irreparable harm." *De Jesus Moreno v. Nielsen*, 460 F. Supp. 3d 291, 297 (E.D.N.Y. 2020) (Mauskopf, C.J.); *accord Cooper v. TWA Airlines, LLC*, 274 F. Supp. 2d 231, 239 (E.D.N.Y. 2003) (Amon, J.). "Accordingly, the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered." *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999) (internal quotation marks and citation omitted); *see also LG Cap. Funding, LLC v. Vape Holdings, Inc.*, No. 16-cv-2217, 2016 WL 3129185, at *3-5 (E.D.N.Y. June 2, 2016) (Amon, J.) (denying injunction where plaintiff failed to establish irreparable harm).

"To satisfy the irreparable harm requirement, Plaintiff[] must demonstrate that absent a preliminary injunction [he] will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005) (citation and internal quotation marks omitted). Rather than presume irreparable injury, courts "must actually consider the injury the plaintiff will suffer if he or she loses on the preliminary injunction but ultimately

prevails on the merits, paying particular attention to whether the 'remedies available at law, such as monetary damages, are inadequate to compensate for that injury.'" *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010) (citing *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). A preliminary injunction should be denied where money damages are sufficient because "equity should not intervene where there is an adequate remedy at law." *Loveridge v. Pendleton Woolen Mills, Inc.*, 788 F.2d 914, 918 (2d Cir. 1986).

Plaintiff does not allege any actual or imminent injury or irreparable harm warranting a preliminary injunction. Notwithstanding that "[c]onclusory statements are an insufficient foundation on which to find irreparable harm," *Datapak Assocs., Inc. v. Hoynash*, No. 04-cv-5731, 2004 WL 2290507, at *2 (S.D.N.Y. Oct. 8, 2004) (Casey, J.), Plaintiff alleges vague, conclusory, and speculative assertions concerning the alleged impact of NYRA's temporary suspension in his affidavit (*see, e.g.*, Dkt. No. 3-3, Aff. of Bob Baffert ("Baffert Aff.") ¶ 8 (alleging that every day he is suspended "is one more day of lost opportunity"); *id.* ¶ 9 (claiming that a "prolonged suspension will likely have the effect of harming my business"); *id.* (claiming that the suspension "*may* precipitate" the transfer of horses in his care to other trainers (emphasis added)); *id.* (claiming that he was notified by an unidentified owner that the owner will transfer horses to another trainer for unspecified reasons)). Significantly, Plaintiff does not allege that he intended and was prepared to enter even a single horse in any particular race in New York, much less any race that will be occurring in the immediate future.

Having failed to come forward with evidence of imminent and irreparable harm, Plaintiff seeks to fill the gap with a "presumption" of irreparable harm based on an alleged constitutional violation. (Pl.'s Br. at 18.) However, "[c]ourts may no longer simply presume irreparable harm; rather, plaintiffs must demonstrate that, on the facts of the case, the failure to issue an injunction

would actually cause irreparable harm." *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 285 (2d Cir. 2012).

Moreover, "an allegation of a constitutional violation is not a magic wand that can be waved to

conjure up irreparable harm." *Stallworth v. Joshi*, No. 17-cv-7119, 2017 WL 8777378, at * 7

(S.D.N.Y. Nov. 22, 2017) (Sullivan, J.).   This is particularly true where a plaintiff alleges a

violation of "procedural due process rather than a substantive right." *See Pinckney v. Bd. of Educ.

of Westbury Union Free Sch. Dist.*, 920 F. Supp. 393, 400 (E.D.N.Y. 1996) (Spatt, J.) (finding no

irreparable injury where superintendent alleged his suspension without pay violated procedural

due process).   Indeed, courts routinely deny preliminary injunctive relief where, as here, a plaintiff

has alleged a constitutional violation but failed to establish irreparable harm.[6]   *See, e.g.*, *Jayaraj v.

Scappini*, 66 F.3d 36, 40 (2d Cir. 1995) (vacating order granting preliminary injunction where

plaintiff alleged First Amendment and due process violations but failed to establish irreparable

harm); *Stallworth*, 2017 WL 8777378, at *7 (finding no irreparable harm where plaintiffs alleged

that agency's policy of summarily suspending a taxi driver's license upon arrest for certain charges

violated, among other things, due process).

Similarly unavailing is Plaintiff's contention that irreparable harm is found where "a party

is threatened with the loss of business." (Pl.'s Br. at 19.)  Notably, "the loss of *a* business, and not

simply 'loss of business,' constitutes irreparable harm." *Soap Opera Now, Inc. v. News Am.

Publ'g, Inc.*, No. 90-cv-2631, 1990 WL 124335, at *4 (S.D.N.Y. Aug. 17, 1990) (Ward, J.)

---

[6]      Contrary to Plaintiff's assertion that the New York Court of Appeals "explicitly held" that a trainer and owner may "allege irreparable injury" after being excluding from racetracks "without due process of law" (Pl.'s Br. at 20), that court made no finding of irreparable injury in *Jacobson v. N.Y. Racing Ass'n*, 33 N.Y.2d 144, 305 N.E.2d 765, 350 N.Y.S.2d 639 (N.Y. 1973).   In that case, a licensed owner and trainer brought suit challenging NYRA's decision to exclude him from its racetracks.  *Id.* at 150, 305 N.E.2d at 766, 350 N.Y.S.2d at 642.   The issue presented to the New York Court of Appeals was simply whether the complaint stated a viable claim for relief; injunctive relief was neither sought nor ruled upon.

(emphasis added); *see Tom Doherty Assocs., Inc. v. Saban Enter., Inc.*, 60 F.3d 27, 28 (2d Cir. 1995).  Although the harm to a business need not be total, it must be "so great as to seriously compromise the company's ability to continue in its current form."  *Galvin v. N.Y. Racing Ass'n*, 70 F. Supp. 2d 163, 170, 172 (E.D.N.Y. 1998) (Ross, J.) (establishing irreparable harm through testimony that veterinarian's practice would be "substantially damaged, if not destroyed, during the pendency of the lawsuit").

Plaintiff does not and cannot allege that NYRA's temporary suspension will "obliterate" his California-based business.  *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205 (2d Cir. 1970).  Here, Plaintiff merely suggests that he may lose unidentified clients if his suspension is indefinite.  (Baffert Aff. ¶¶ 8-9.)  But even if Plaintiff were to lose some clients due to the suspension, he submitted no evidence demonstrating that this loss would substantially damage his business.  Rather, Plaintiff, a trainer licensed in "several racing jurisdictions," (*id.* ¶ 2), only conclusory asserts that the potential loss of clients would "effectively put [him] out of business in the State of New York" (*Id.* ¶ 9).  This is in stark contrast to the injury at issue in *Galvin*, upon which Plaintiff mistakenly relies.  In *Galvin*, NYRA suspended a professional equine veterinarian who specialized in Thoroughbred racehorses from its racetracks.  70 F. Supp. 2d at 168.  The veterinarian testified that he worked "almost exclusively at NYRA tracks" and that "98 percent of his veterinary work took place on NYRA-operated tracks."  *Id.* at 171.  In addition, two veterinarians with "many years of experience practicing as an equine veterinarian in the State of New York" testified that the plaintiff's business would be "completely destroyed" and "harmed for a considerable period of time."  *Id.*

Even if the Court were to credit Plaintiff's assertions that he might lose clients, they are nevertheless insufficient because such an injury could be remedied through money damages.  *See,*

*e.g.*, *Loveridge*, 788 F.2d at 917 (holding that allegations that a business may become less profitable fail to establish irreparable harm since "such a loss would be compensable in money damages"); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979) (holding that money damages would be adequate compensation for loss of customers and business).

Equally insufficient is Plaintiff's conclusory assertion that the suspension may result in harm to his "professional reputation." (Pl.'s Br. at 20.) As a threshold matter, any alleged harm to Plaintiff's reputation stems solely from Plaintiff's own actions, not NYRA's actions. *See Cooper*, 274 F. Supp. 2d at 240 (finding evidence of harm undermined where "at least a portion" of the harm was "not causally related to the actions complained of in th[e] lawsuit"). Moreover, "conclusory statements of loss of reputation will not justify an irreparable harm finding." *Rush v. Hillside Buffalo, LLC*, 314 F. Supp. 3d 477, 485 (W.D.N.Y. 2018) (quoting *Alzheimer's Found. of Am., Inc. v. Alzheimer's Disease & Related Disorders Ass'n, Inc.*, No. 10-cv-3314, 2015 WL 4033019, at *11 (S.D.N.Y. June 29, 2015) (Sweet, J.)). Nor will assertions of reputational harm in the absence of evidence. *M&G Elecs. Sales Corp. v. Sony Kabushiki Kaisha*, 250 F. Supp. 2d 91, 105 (E.D.N.Y. 2003) (Spatt, J.) (finding that plaintiff failed to show likely irreparable harm where, in pertinent part, it "presented no evidence of a risk of loss of reputation"). Here, Plaintiff merely argues in his briefing that he "will suffer irreparable harm to . . . his reputation." (Pl.'s Br. at 19; *see also id.* at 20 ("[Plaintiff] has suffered and will continue to suffer irreparable harm to his business and professional reputation in the absence of injunctive relief.").) Not only are these generic statements entirely conclusory, they are also not demonstrated by any evidence. In fact, the term "reputation" does not even appear in Plaintiff's affidavit. (*See generally* Baffert Aff.)

Finally, Plaintiff's unsupported allegations of irreparable harm are belied by his delay in seeking emergency relief. "Preliminary injunctions are generally granted under the theory that

there is an urgent need for speedy action to protect the plaintiffs' rights." *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985). Delay "undercuts the sense of urgency" upon which the availability of preliminary injunctive relief is predicated. *Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d. Cir. 1995) (quoting *Citibank*, 756 F.2d at 277). Thus, "courts have held that delays in seeking preliminary injunction serve as a ground for denying such relief." *Coll. Entrance Examination Bd. v. Cuomo*, 788 F. Supp. 134, 144 (N.D.N.Y. 1992); *id.* at 145 (holding that plaintiffs are allowed to make tactical decisions regarding a delay in filing, but "must bear the consequences of this delay").

Here, Plaintiff learned of NYRA's temporary suspension on May 17, 2021. (Baffert Aff. ¶ 6.) At that point, the Belmont would be run nearly three weeks later, on June 5, 2021. Although NYRA invited Plaintiff to submit any "information, data or arguments" within seven business days of his receipt of the letter (Dkt. No. 1-1), he opted not to do so. Nor did he promptly seek emergency relief. Rather, he waited nearly a month, until June 14, 2021, to bring this action. Plaintiff has offered no excuse for his delay, and the fact that he waited until *after* the running of the Belmont undercuts any suggestion that the suspension caused or will cause injury, or that injunctive relief is necessary.

In sum, the Court should deny Plaintiff's request for preliminary injunctive because he failed to establish that he has or will imminently suffer any irreparable injury.

## II.   PLAINTIFF HAS FAILED TO SHOW A LIKELIHOOD OF SUCCESS ON THE MERITS OR SERIOUS QUESTIONS GOING TO THE MERITS.

### A.   NYRA's Decision to Temporarily Suspend Plaintiff from the Racetracks Was Consistent with Its Right and Duty to Protect the Integrity of Racing.

As a threshold matter, Plaintiff argues that NYRA lacks the power to exclude a licensed trainer from its facilities unless and until his license is revoked by the New York State Gaming Commission ("Gaming Commission") and that NYRA's decision to temporarily suspend Plaintiff

usurped the Commission's authority.  (Pl.'s Br. at 15-16.)  That is simply not the law in New York. (*See* Affirmation of Robert Williams, dated June 29, 2021 ¶¶ 5-15 (tracing history of NYRA's right to exclude from its racetracks individuals, including licensees, which right is recognized in 9 N.Y.C.R.R. § 4022.12 and continues to be recognized by the Gaming Commission).)  To the contrary, a veritable mountain of New York case law has affirmed an operator's common law right of exclusion and upheld NYRA's authority to exclude persons from its Racetracks, including persons licensed by the State.[7]  For instance, the New York Court of Appeals in *Matter of Saumell v. N.Y. Racing Ass'n*, reaffirmed NYRA's authority to exclude licensees, emphasizing that the State's licensing power is "independent of and separate from NYRA's common-law right to exclude a licensed person in the best interests of racing."  58 N.Y.2d at 239, 447 N.E.2d at 710, 460 N.Y.S.2d at 767.  In other words, the fact that the State took no action to revoke a jockey's license in *Matter of Saumell* "had no bearing upon the right of NYRA to exclude [him] in the first instance or upon the continued effectiveness of the exclusion previously effected by NYRA."  *Id.*; *see also Rahner v. Yonkers Racing Corp.*, No. 78-cv-3967, 1978 U.S. Dist. LEXIS 15632, at *2

---

[7]      *See, e.g.*, *Matter of Saumell v. N.Y. Racing Ass'n*, 58 N.Y.2d 231, 234, 447 N.E.2d 706, 707, 460 N.Y.S.2d 763, 765 (N.Y. 1983) ("The common-law right of . . . NYRA . . . to exclude persons from its premises includes the right when there is reasonable cause to believe a jockey licensed by the New York State Racing and Wagering Board guilty of misconduct to deny him access."); *Jacobson*, 33 N.Y.2d at 150, 305 N.E.2d at 768, 350 N.Y.S.2d at 643 (recognizing that NYRA possesses the authority to exclude a licensee); *People v. Licata*, 28 N.Y.2d 113, 115, 268 N.E.2d 787, 788, 320 N.Y.S.2d 53, 55 (N.Y. 1971) ("The rule is well established that the operator of a race track can exclude a person from attending its races[.]") (internal quotation marks and citation omitted); *Madden v. Queens Cnty. Jockey Club*, 296 N.Y. 249, 253-54, 72 N.E.2d 697, 697-98 (N.Y. 1947) (enunciating rule that NYRA has the right to exclude unlicensed patrons from its premises "as long as the exclusion is not founded on race, creed, color or national origin"), *cert. denied*, 332 U.S. 761 (1947); *Matter of Presti v. N.Y. Racing Ass'n*, 46 A.D.2d 387, 389-90, 363 N.Y.S.2d 24, 26-27 (N.Y. App. Div. 2d Dep't 1975) (upholding NYRA's exclusion of unlicensed racing broker from racetrack); *Matter of Halsey v. N.Y. Racing Ass'n*, 800 N.Y.S. 2d 347, No. 18789/2004, 2005 WL 701115, at *1 (N.Y. Sup. Ct. Mar. 1, 2005) (upholding NYRA's exclusion of an unlicensed owner from entering racetracks who "yell[ed] at NYRA starting gate personnel," "agitat[ed] the race horses," and "distract[ed] the starters and jockeys").

(S.D.N.Y. Sept. 11, 1978) (Leval, J.) ("The fact that the New York State Racing and Wagering Board, having not yet made a determination on its hearing, has not entered any order affecting plaintiffs' racing privileges in New York generally is irrelevant to the right of Yonkers Raceway to protect itself by lawful procedures which respect the due process rights of affected persons."). Moreover, the rules and regulations of the Gaming Commission codify the common law right of exclusion. *See* 9 N.Y.C.R.R. § 4022.12.[8]

Plaintiff attempts to assert — without any support — that the common-law right of exclusion extends only to property owners, meaning that NYRA could allegedly not invoke the right because it no longer owns the Racetracks. (Pl.'s Br. at 17.)  However, the New York Court of Appeals has repeatedly held that the common law right of exclusion is possessed by *operators* of racetracks, such as NYRA.  *See, e.g.*, *Jacobson*, 33 N.Y.2d at 149, 305 N.E.2d at 767, 350 N.Y.S.2d at 642 (noting that the "the operator of a racetrack" can "exclude a patron from the premises provided the exclusion is not based on race, creed, color or national origin"); *Matter of Vaintraub v. N.Y. Racing Ass'n*, 28 A.D.2d 660, 660, 280 N.Y.S.2d 758, 759 (N.Y. App. Div. 1st Dep't 1967) (same).  Indeed, racetrack operators have possessed the right to exclude persons from the grounds for well over a century.  *See Marrone v. Washington Jockey Club*, 227 U.S. 633, 636 (1913) (noting discretion regarding racetrack exclusion); *see also Grannan v. Westchester Racing Ass'n*, 153 N.Y. 449, 464, 47 N.E. 896, 901 (N.Y. 1897) (noting that "ruling the delinquent off the

---

[8]     The common law right of exclusion is not absolute.  A racetrack cannot exclude a person for an unlawful reason, such as race discrimination.  *See Jacobson*, 33 N.Y.2d at 149, 305 N.E.2d at 767, 350 N.Y.S.2d at 642.  Nor can NYRA impose a severe sanction against a licensee of the Gaming Commission with impunity.  *See id.* at 150, 305 N.E.2d at 768, 350 N.Y.S.2d at 642 (noting that NYRA does not have "an absolute immunity from having to justify the exclusion of an owner and trainer whom the State has deemed fit to license").  Rather, NYRA has the power to exclude licensed patrons as long as it is acting in "the best interests of racing generally" based on "reasonable discretionary business judgment."  *Id.*; *see also Matter of Saumell*, 58 N.Y.2d at 238, 447 N.E.2d at 709, 460 N.Y.S.2d at 766.

track" is "the principal[] method of enforcing obedience to its rules and the usages of the turf"). Plaintiff's attempt to dismiss NYRA's well-recognized right of exclusion accordingly fails.

Likewise unavailing is Plaintiff's unsupported contention that because the Gaming Commission, a State agency, is required to follow the hearing procedures set forth in Part 4550 of its regulations when acting against a person's license, NYRA, a private corporation, must likewise follow those procedures.  (Pl.'s Br. at 14-15.)  By its terms, Part 4550's hearing procedures apply only to the Gaming Commission.  *See* 9 N.Y.C.R.R. § 4550.1 ("This Part applies to all adjudicatory proceedings held by the commission pursuant to this Chapter.").

Contrary to Plaintiff's suggestion, the fact that NYRA is heavily regulated and holds a franchise from the State (just like its predecessor entities) does not transform it into the functional equivalent of the Gaming Commission.  NYRA is not a State agency or public authority.  To the contrary, courts uniformly acknowledge that "NYRA is a private, New York not-for-profit corporation organized as a racing association."  *Chiari v. N.Y. Racing Ass'n*, 972 F. Supp. 2d 346, 354 (E.D.N.Y. 2013) (Tomlinson, J.).  Further, a franchise is a right conferred upon individuals and corporations, not public entities.  *See Madden*, 296 N.Y. at 255, 72 N.E.2d at 699 ("A franchise is a special privilege, conferred by the State on an individual . . . .").

Even where courts have found that NYRA owed certain duties to the public, they have refused to hold that NYRA is a public corporation or is obliged to follow the administrative hearing procedures used by state agencies.  In *Matter of Saumell*, for example, the New York Court of Appeals held that the fact that NYRA conceded it was a state actor in that particular case did not trigger the applicability of the hearing procedures in the State Administrative Procedures Act, given that NYRA "has directors or trustees and stockholders, not members, and is a private corporation, not a public benefit corporation."  58 N.Y.2d at 239-40, 447 N.E.2d at 710, 460

N.Y.S.2d at 767-68 (citations omitted); *cf. Inc. Vill. of Great Neck Plaza v. Nassau Cnty. Rent Guidelines Bd.*, 69 A.D.2d 528, 534, 418 N.Y.S.2d 796, 799 (N.Y. App. Div. 2d Dep't. 1979) (finding that the Rent Guidelines Board, although involved in state-like functions, was not an agency of the state as defined in the State Administrative Procedure Act and therefore not subject to its rulemaking procedures); *Matter of Cnty. of Westchester v. Rent Guidelines Bd.*, 71 A.D.2d 655, 656, 419 N.Y.S.2d 6, 6 (N.Y. App. Div. 2d Dep't 1979) (same), *appeal dismissed*, 48 N.Y.2d 692, 422 N.Y.S.2d 67, 397 N.E.2d 757 (N.Y. 1979).   Because NYRA's status as a private corporation has been affirmed and respected by the courts, Plaintiff's arguments to the contrary are meritless.

## B.   NYRA's Temporary Suspension of Plaintiff Did Not Violate 42 U.S.C. § 1983.

Plaintiff's claim under 42 U.S.C. § 1983 is wholly without merit.   In order to prevail on his § 1983 claim, Plaintiff must prove that: (1) NYRA deprived him of "rights, privileges, or immunities secured by the Constitution or laws of the United States," *Holden v. E. Hampton Town*, No. 15-cv-4478, 2017 WL 1317825, at *5 (E.D.N.Y. Mar. 31, 2017) (Wexler, J.); and (2) NYRA's temporary suspension of him constituted "state action," *Hadges v. Yonkers Racing Corp.*, 918 F.2d 1079, 1083 (2d Cir. 1990).   Plaintiff fails to prove either element.

### 1.   The Temporary Suspension Did Not Violate Due Process.

Even if the Court were to assume NYRA's temporary suspension constitutes "state action" (it does not), *see infra* Part II.B.2, NYRA afforded Plaintiff all the process he was due.   *First*, Plaintiff's suspension is temporary and based on probable cause showing that his actions warrant suspension, including objective, chemical tests showing that horses trained by Plaintiff received performance enhancing drugs and Plaintiff's contradictory public statements attempting to explain those positive tests.   To the extent that NYRA is advancing "State" interests, NYRA is protecting the most important interests the State has in connection with horse racing; that is, the integrity of

the sport and the public's confidence in its legitimacy immediately prior to the Belmont Stakes — the preeminent Thoroughbred race in New York State.  Under settled law, therefore, NYRA did not violate Plaintiff's due process rights by temporarily suspending him without first conducting a pre-suspension hearing.  *Second*, NYRA gave Plaintiff an opportunity to present "any information, data or arguments" concerning his temporary suspension, but Plaintiff failed to avail himself of this opportunity and instead sued NYRA.

a.   *Probable Cause Supports Plaintiff's Temporary Suspension, Which Was Necessary to Protect the Integrity of the Sport.*

Plaintiff's due process claim relies on the meritless argument that he was entitled to notice and a hearing before NYRA imposed a temporary suspension.  Plaintiff was due no such process under the circumstances.

Relying on *Barry v. Barchi*, 443 U.S. 55 (1979), Plaintiff asserts that "the United States Supreme Court has held that licensees cannot have their licenses suspended by racing officials without a hearing."  (Pl.'s Br. at 11.)  But *Barchi* eviscerates Plaintiff's position because the Supreme Court's decision establishes that NYRA could deny Plaintiff access to the Racetracks without a pre-suspension hearing.  Indeed, the Supreme Court ruled that the former New York Racing and Wagering Board could suspend a trainer of a horse that tests positive for drugs *without conducting a pre-suspension hearing*, provided that the trainer was afforded an opportunity to be heard without appreciable delay.  *Barchi*, 443 U.S. at 64, 66.  In doing so, the Supreme Court established the rule that "the absence of a pre-suspension hearing (pending a post-suspension hearing) does not violate due process so long as probable cause exists to believe the trainer's actions warrant suspension."  *Donk v. Miller*, 365 F.3d 159, 163 (2d Cir. 2004) (construing *Barchi*); *see also Nnebe v. Daus*, 644 F.3d 147, 158 (2d Cir. 2011) (holding that a municipality "is not required to grant a driver a hearing before suspending his license because of an arrest").

-20-

Here, uncontroverted facts establish probable cause that Plaintiff's actions warrant suspension. In the wake of four other drug-testing violations in the past year alone, Churchill Downs temporarily suspended Plaintiff from entering any horses at its track when the Baffert-trained Medina Spirit's blood samples tested positive for betamethasone after racing in the Kentucky Derby. (O'Rourke Aff. ¶ 49.) Plaintiff then offered contradictory accounts to explain the positive drug-test, ranging from suggesting that someone had contaminated Medina Spirit to later admitting that the drug was in the horse's blood due to the use of a topical ointment. (O'Rourke Aff. ¶¶ 44-48, 50-57.) These events left no "questions of credibility and conflicts in the evidence" that needed to be resolved at a pre-suspension hearing. *See Matter of Saumell*, 58 N.Y.2d at 241, 447 N.E.2d at 711, 460 N.Y.S.2d at 768 (quoting *Barchi*, 443 U.S. at 65) (recognizing that no pre-suspension hearing was necessary in *Barchi* based on evidence from drug test).

Plaintiff does not even argue that he complied with Kentucky's equine medication protocols, but rather focuses on supposed mitigation evidence (*e.g.*, evidence that betamethasone was introduced to Medina Spirit for a reason other than performance enhancement or evidence that the level of betamethasone identified would not affect performance). But such mitigation evidence does not meaningfully support Plaintiff's attempt to meet its "heavy burden" in proving that denying access to NYRA's Racetracks "was not a reasonable discretionary business judgment, but was actuated by motives other than those relating to the best interests of racing generally." *Jacobson*, 33 N.Y.2d at 150, 305 N.E.2d at 768, 350 N.Y.S.2d at 643 (setting forth standard licensee must meet under New York law to show that racetrack's exclusion was unacceptable).

Where, as here, there was probable cause to conclude that the conduct at issue warranted suspension, "the State's interest in preserving the integrity of the sport and in protecting the public

from harm becomes most acute." *Donk*, 365 F.3d at 163 (quoting *Barchi*, 443 U.S. at 65); *see also Perez v. Hoblock*, 248 F. Supp. 2d 189, 196 (S.D.N.Y. 2002) (Berman, J.) ("It is important to remember that as a sporting event, horse racing occupies a unique position among the professional sports activities which take place in this state; it is the only sport in which wagering is legal.  As such, the state has a vital interest in protecting the integrity of the sport and preventing any potential for abuse.") (quoting *Lasky v. Van Lindt*, 115 Misc. 2d 259, 262, 453 N.Y.S.2d 983, 986 (N.Y. Sup. Ct. 1982)), *aff'd*, 368 F.3d 166 (2d Cir. 2004).  Moreover, the factors considered by NYRA in determining that swift action to bar Plaintiff from New York racetracks was necessary (*see* O'Rourke Aff. ¶¶ 63-96) provided "substantial assurance that the trainer's interest is not being baselessly compromised."  *Donk*, 365 F.3d at 163 (quoting *Barchi*, 443 U.S. at 65).  Given NYRA's obligation to "preclude the appearance or the fact of impropriety" in horse racing, the New York Court of Appeals has held that even "on-the-spot sanctions and penalties in advance of hearings" are consistent with due process.  *Matter of Tappis v. N.Y. State Racing & Wagering Bd., Harness Racing Div.*, 36 N.Y.2d 862, 864, 331 N.E.2d 697, 698, 370 N.Y.S.2d 922, 923 (N.Y. 1975).

The State's interest is particularly strong here given the high-profile nature of the Belmont Stakes and Medina Spirit.  The Belmont Stakes, the third of the Triple Crown races, is the most high-profile horse race in New York State and was scheduled to take place on June 5, 2021, only weeks after Medina Spirit's positive test following the Kentucky Derby.  (*See* O'Rourke Aff. ¶¶ 64-68.)  Millions of people would watch the Belmont Stakes on television and tens of millions of dollars would be wagered on the outcome of the race.  (O'Rourke Aff. ¶ 68.)  Under those circumstances, if Plaintiff and Medina Spirit had entered the Belmont Stakes, it would have significantly harmed NYRA, the integrity of the sport, and the public's perception of the sport's

legitimacy.  (*See* O'Rourke Aff. ¶¶ 84-96.)  NYRA's "vital interest in protecting its investment," "supervising its activities at the raceway so that its patrons have confidence that the sport is honestly conducted,"[9] "protecting competitors from participation in tainted horse races," "safeguarding the wagering public from fraud," and "protecting horses from the dangers of racing under the effects of analgesics or stimulants"[10] clearly outweigh Plaintiff's interests.

Plaintiff's due process argument relies almost exclusively on *Galvin* — a case that does not support his position.  In *Galvin*, a veterinarian challenged a seven-month suspension imposed on him following a five-day hearing.  The court's holding that the suspension failed to comport with due process was based on the deficiencies in the notice given to the veterinarian regarding the allegations that would be the subject of the hearing and the amount of time given to the veterinarian's counsel to prepare for his defense.  *See Galvin*, 70 F. Supp. 2d at 177 ("Seven or nine days to prepare a defense against at least twelve separate charges of misconduct occurring over seven years is clearly insufficient.").  This case, by contrast, involves only a temporary suspension, and Plaintiff is in the process of pursuing additional testing and evidence that he apparently believes will be relevant to the final determination NYRA will make.  (*See* Pl.'s Br. at 6-7.)

> b.    *Plaintiff Failed to Avail Himself of the Opportunity NYRA Afforded Him to Be Heard.*

In its letter notifying Plaintiff that he was suspended and informing him of the grounds for that suspension, NYRA asked Plaintiff "to present to NYRA any information, data or arguments" concerning his temporary suspension within seven business days.  (O'Rourke Aff. ¶ 96.)  Instead

---

[9]    *Gilmour v. N.Y. State Racing & Wagering Bd.*, 405 F. Supp. 458, 460 (S.D.N.Y. 1975) (Weinfeld, J.).

[10]    *Matter of Casse v. N.Y. State Racing & Wagering Bd.*, 70 N.Y.2d 589, 596, 517 N.E.2d 1309, 1312, 523 N.Y.S.2d 423, 426 (N.Y. 1987).

of responding to NYRA's request, Plaintiff submitted nothing to NYRA and waited nearly a month to commence this action.  (*See id.* ¶ 97.)  Assuming *arguendo* that NYRA was required to provide any type of hearing in conjunction with issuing its temporary suspension (it was not), an "informal consultation" should suffice to satisfy due process in a case like this one.  *Matter of Saumell*, 58 N.Y.2d at 240, 447 N.E.2d at 711, 460 N.Y.S.2d at 768 (quoting *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 16 n.17 (1978)).

In evaluating the constitutional adequacy of process, courts consider both the procedures followed and the remedies available.  *See Zinermon v. Burch*, 494 U.S. 113, 125 (1990).  A plaintiff's due process rights have not been violated where he has been "provide[d] apparently adequate procedural remedies" but "has not availed himself of those remedies."  *N.Y. State Nat'l Org. for Women v. Pataki*, 261 F.3d 156, 169 (2d Cir. 2001) (quoting *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000)).  If an available process "appears to provide due process, the plaintiff cannot skip that process and use the federal courts as a means to get back what he wants."  *Alvin*, 227 F.3d at 116 (citing *Dwyer v. Regan*, 777 F.2d 825, 834-35 (2d Cir. 1985), *modified*, 793 F.2d 457 (1986)).  Moreover, "a claimant cannot . . . let the time for seeking a state remedy pass without doing anything to obtain it and then proceed in federal court on the basis that no state remedies are open."  *Vandor, Inc. v. Militello*, 301 F.3d 37, 39 (2d Cir. 2002) (citation omitted).  Plaintiff's brief does not even acknowledge his failure to provide any information in response to NYRA's request — never mind explain why he chose to sue NYRA rather than provide NYRA with the information requested.

Given the clear showing that Plaintiff's actions warrant a suspension and the fact that Plaintiff is still pursuing evidence that he contends will mitigate a potential punishment,[11] this Court should deny his request for a preliminary injunction.  Plaintiff should obtain whatever evidence he can find and submit it for NYRA to consider in connection with NYRA's final determination regarding the length and terms of Plaintiff's suspension.

### 2.    NYRA's Decision to Suspend Plaintiff Was Not "State Action."

Plaintiff's claim under 42 U.S.C. § 1983 also fails because he has not made the requisite showing that NYRA's decision to suspend him constituted "state action."  *Hadges*, 918 F.2d at 1083.  NYRA is a not-for-profit corporation privately controlled by a board of directors of 17 people, only six of whom are appointed by elected officials of New York State.  (*See* O'Rourke Aff. ¶¶ 5-11.)  A plaintiff may prove that a private corporation's actions constitute "state action" by satisfying one of two tests:  the "close nexus test" or the "symbiotic relationship test." *Hadges*, 918 F.2d at 1081.  Each of the cases Plaintiff relies on for its contention that NYRA's suspension constitutes state action relies on the symbiotic relationship test.  To the extent that Plaintiff relies on the close nexus test, the Court should reject Plaintiff's argument because he has "failed to state any facts supporting an inference that state officials participated in the conduct of which he complains."  *Garcia v. N.Y. Racing Ass'n*, No. 10-cv-01092, 2011 WL 3841524, at *6 (N.D.N.Y. Aug. 29, 2011).

Plaintiff's arguments under the symbiotic relationship test also fail.  In order to establish state action under the symbiotic relationship test, a plaintiff must show that "the state 'has so far

---

[11]    Plaintiff apparently intends to defend himself by obtaining further testing of Medina Spirit's blood and urine "to determine whether the betamethasone in the horse's system was the result of an injection, the topical ointment Otomax, or resulted from some other means" and by submitting an expert declaration that argues (without citation to any evidence or study) that "the presence of such a trace amount of betamethasone has no pharmacological effect on a horse."

insinuated itself into a position of interdependence with the [non-state actor] that it must be recognized as a joint participant in the challenged activity.'" *Holden*, 2017 WL 1317825, at *6 (quoting *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 725 (1961)). Plaintiff's support for his state action argument comes from a line of cases citing the analysis in *Stevens v. N.Y. Racing Ass'n*, 665 F. Supp. 164, 171 (E.D.N.Y. 1987) (Sifton, J.). The court in *Stevens* held that "it appears probable that plaintiff will establish state action at trial," because the State "authoriz[ed] the creation of" NYRA, the State created an "agency which loans money to defendant," the governor appointed members to NYRA's board of trustees, and NYRA "pass[ed] money from the betting public to the state's coffers." *Stevens*, 655 F. Supp. at 172-173. Following *Burton*, the case establishing the symbiotic relationship test, the court held that those facts likely were sufficient to establish state action. *See id.* at 171-72.

In the more than 30 years since *Stevens* was decided, the legal basis for that decision has eroded. The Second Circuit has repeatedly held that "a private entity does not become a state actor for purposes of § 1983 merely on the basis of 'the private entity's creation, funding, licensing, or regulation by the government.'" *Fabrikant v. French*, 691 F.3d 193, 207 (2d Cir. 2012) (quoting *Cranley v. Nat'l Life Ins. Co. of Vt.*, 318 F.3d 105, 112 (2d Cir. 2003)). The Supreme Court "has given *Burton* a very narrow interpretation" closely limited to its facts. *Khulumani v. Barclay Nat'l Bank Ltd.*, 504 F.3d 254, 314 n.8 (2d Cir. 2007) (Korman, J., concurring in part and dissenting in part) (quotations omitted). "Courts that continue to consider symbiosis 'often examine whether the government has control over the private actor's day-to-day operations and whether the government shares in any profits the private entity has generated *from the challenged conduct*.'" *Holden*, 2017 WL 1317825, at *6 (quoting *Forbes v. City of New York*, No. 05-cv-7331, 2008 WL 3539936, at *7 (S.D.N.Y. Aug. 12, 2008)) (emphasis in *Forbes*); *see Perkins v. Londonderry*

-26-

*Basketball Club*, 196 F.3d 13, 21 (1st Cir. 1999) (key factors considered in symbiotic relationship analysis are whether "private entity is (or is not) independent in the conduct of its day-to-day affairs" and whether the State "knowingly shared in the profits spawned by [the private entity's] discriminatory conduct").

Given these developments in the applicable legal standard, Plaintiff likely would not show that NYRA's decision to suspend Plaintiff constituted "state action" because Plaintiff does not allege any facts showing that the State has control over NYRA's day-to-day operations or that the State profited from Plaintiff's suspension.  Plaintiff points to a number of facts related to NYRA's operations and the State's oversight of NYRA, including that (1) the Gaming Commission determines when races are run, (2) NYRA's profits are for New York State's benefit, (3) NYRA can appoint "special police officers," (4) the State may borrow funds for NYRA's capital improvements, and (5) a Franchise Oversight Board oversees NYRA's operations and significant transactions.  (*See* Pl.'s Br. at 13-14.)  But these connections between NYRA and New York State do not operate to make every action of NYRA a "state action."  Even in a case where there was "federal funding, regulation, stock ownership and representation on the board of directors," the Second Circuit held that the termination of a railway employee did not constitute "state action" because there was "nothing resembling federal supervision of day-to-day activities" of the railway. *Myron v. Consol. Rail Corp.*, 752 F.2d 50, 55 (2d Cir. 1985).

That same principle applies here — New York State does not control the day-to-day activities of NYRA, including its decision to suspend Plaintiff.  To the contrary, NYRA, among other things, (1) has its own bylaws and follows corporate formalities (including non-public board meetings), (2) appoints its own officers (including the officers who made the decision to suspend Plaintiff) and sets their compensation, and (3) has the power "to develop, redevelop, refurbish,

renovate or make such other improvements, capital expenditures or otherwise" to the properties that it leases from the State — all free from state control.  (O'Rourke Aff. ¶¶ 12-16.)  Plaintiff also does not cite any evidence showing that NYRA or the State made any "profit" from "the challenged conduct" (*i.e.*, temporarily suspending Plaintiff).  Put simply, Plaintiff has not put forward any evidence that New York State was a "joint participant" in NYRA's decision to suspend Plaintiff.  As a result, this Court should reject his claim under 42 U.S.C. § 1983.

## III.   THE RELEVANT PUBLIC INTEREST AND EQUITABLE CONSIDERATIONS OVERWHELMINGLY WEIGH IN FAVOR OF DENYING PLAINTIFF'S MOTION.

Because Plaintiff failed to establish irreparable harm or any likelihood of success on the merits of his claims, this Court need not consider the public's interests in awarding injunctive relief or the balance of the equities.  *See, e.g.*, *Two Locks, Inc. v. Kellogg Sales Co.*, 68 F. Supp. 3d 317, 333-34 (E.D.N.Y. 2014) (Spatt, J.) (declining to reach arguments with respect to balance of equities where plaintiff failed to establish likelihood of success on the merits).  Even so, the public interest and equities heavily weigh against enjoining NYRA from exercising its regulatory and common law right to temporarily suspend Plaintiff from its Racetracks.

Plaintiff overlooks the obvious when he argues that NYRA will "suffer absolutely no harm" if the preliminary injunction is granted.  (Pl.'s Br. at 22.)  NYRA has a vital business interest — indeed an obligation — in protecting its investment, brand and reputation, and supervising activities at its Racetracks so that the public has confidence that the sport is conducted in an honest and safe manner.  (O'Rourke Aff. ¶ 79; Exs. O, P.)  *See Gilmour*, 405 F. Supp. at 461 (acknowledging a raceway owner's "vital interest in protecting its investment," and "supervising its activities at the raceway so that its patrons have confidence that the sport is honestly conducted").  A breach of NYRA's obligation to properly supervise conduct at its Racetrack,

-28-

especially with respect to matters of equine and jockey safety, may result in revocation of NYRA's franchise under its franchise agreement with the State.  (O'Rourke Aff. ¶¶ 80-83.)

Moreover, the public and NYRA's patrons depend on NYRA to ensure that races are conducted in a fair and honest manner and to take immediate steps against actors who threaten the integrity of the sport.  (*Id.* ¶¶ 75-89.)  Betamethasone's ability to mask injuries can lead to "catastrophic injury," resulting in "a problem" for both "the welfare of the animals" and "the fairness of the races."  (Toutain Decl. ¶ 9.)  An injunction requiring NYRA to allow Plaintiff to enter horses in races and stable horses at its Racetracks immediately after repeated drug-related violations threatens the reputation of NYRA and public confidence in its operations.  (*Id.* ¶¶ 81-86; *see, e.g.*, *Matter of Casse,* 70 N.Y.2d at 595-96, 517 N.E.2d at 1312, 523 N.Y.S.2d at 426 (identifying important state interests in "assuring the fairness and integrity of horse racing" and "safeguarding the wagering public from fraud").  An injunction precluding suspension until after a hearing, which could take weeks if not months — particularly because Plaintiff is still pursuing evidence that he presumably believes is relevant to his defense — would not only jeopardize the safety of horses and jockeys, it would compromise the integrity of Thoroughbred racing and the public's confidence in its legitimacy.

On the other side of the scale, Plaintiff has failed to demonstrate any substantial hardship if the Court denies his request for a preliminary injunction.  His arguments rest on the unsupported, speculative theory that NYRA's temporary suspension may last for years, and that he may, at some unspecified time in the future, seek to enter horses in races in New York.  (Pl.'s Br. at 23.)  Moreover, Plaintiff does not demonstrate that he had any plans to stable horses in New York anytime soon, and there is no reason that Plaintiff's claims could not be decided within the year.  Even if the Court were to consider the possibility that Plaintiff could potentially lose some clients

as a result of the temporary suspension, the public's and NYRA's interest in the safety and integrity of horse racing far outweighs Plaintiff's alleged hardship.  Accordingly, "the balance of equities" significantly tips in NYRA's favor, and denying Plaintiff's request for preliminary injunctive relief is in the public interest.  *See Zapoteco v. Rapi, Inc.*, No. 20-cv-6335, 2021WL 1964548, at *4 (E.D.N.Y. May 17, 2021) (Kovner, J.); *Winter*, 555 U.S. at 20.

## CONCLUSION

Plaintiff's motion for a preliminary injunction should be denied.

Dated:   Albany, New York
         June 30, 2021                    Respectfully submitted,

                                          */s/ Henry M. Greenberg*
                                          Henry M. Greenberg (*greenbergh@gtlaw.com*)
                                          Cynthia L. Neidl (*neidlc@gtlaw.com*)
                                          GREENBERG TRAURIG, LLP
                                          54 State Street, 6th Floor
                                          Albany, New York 12207
                                          Telephone:  (518) 689-1400

                                              - and -

                                          Ann Elizabeth Ostrager (*ostragerae@sullcrom.com*)
                                          Harry F. Murphy (*murphyh@sullcrom.com*)
                                          SULLIVAN & CROMWELL LLP
                                          125 Broad Street
                                          New York, New York 10004
                                          Telephone:  (212) 558-4000

                                          *Attorneys for Defendant The New York Racing Association, Inc.*

-30-