**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

BOB BAFFERT,

                *Plaintiff,*

      v.

THE NEW YORK RACING
ASSOCIATION, INC.,

                *Defendant.*

Civil Action No. 1:21-cv-03329-
CBA-RML

---

## DECLARATION OF HENRY M. GREENBERG

HENRY M. GREENBERG, pursuant to 28 U.S.C. § 1746(2), declares under penalty of perjury that the following is true and correct:

1.      I am a shareholder with the law firm of Greenberg Traurig, LLP, attorneys for Defendant The New York Racing Association, Inc. ("NYRA") in the above-captioned action. As such, I am fully familiar with the facts and circumstances in this action.

2.      I submit this Declaration and the attached exhibits in opposition to Plaintiff Bob Baffert's ("Plaintiff") motion for a preliminary injunction.

3.      Attached as **Exhibit A** is a true and correct copy of NYRA's Amended & Restated Certificate of Incorporation.

4.      Attached as **Exhibit B** is a true and correct copy of NYRA's Amended Bylaws.

5.      Attached as **Exhibit C** is a true and correct copy of the Franchise Agreement (without exhibits), dated September 12, 2008, between NYRA and the State of New York.

6.      Attached as **Exhibit D** is a true and correct copy of the Ground Lease Agreement for the Saratoga Race Course (without exhibits), dated September 12, 2008.

7.     Attached as **Exhibit E** is a compilation of true and correct copies of entries in The Jockey Club's Thoroughbred Regulatory Rulings database concerning Plaintiff's drug-related violations between 2010 and 2020 and a Kentucky Horse Racing Commission Stewards Ruling, dated January 30, 2021, concerning a drug-related violation by Plaintiff.

8.     Attached as **Exhibit F** is a true and correct copy of Gary B. Grave's article "Bob Baffert no stranger to failed drug tests by his horses," published by the Associated Press and dated May 10, 2021 (excerpted to remove advertisements).

9.     Attached as **Exhibit G** is a true and correct copy of Joe Drape's article "California Examines Puzzling Trend of Horses' Sudden Deaths," published by The New York Times and dated April 10, 2013.

10.     Attached as **Exhibit H** is a true and correct copy of Gus Garcia-Roberts and Steven Rich's article "The dark side of Bob Baffert's reign," published by The Washington Post and dated June 18, 2021.

11.     Attached as **Exhibit I** is a true and correct copy of Joe Drape's article "Kentucky Derby Winner Medina Spirit Fails Drug Test," published on May 9, 2021 by The New York Times and updated on June 2, 2021.

12.     Attached as **Exhibit J** is a true and correct copy of Tori B. Powell's article "Churchill Downs suspends trainer Bob Baffert for 2 years after horse's failed drug test," published by CBS News and dated June 2, 2021.

13.     Attached as **Exhibit K** is a true and correct copy of John Clay's article "Back to nearly normal, Kentucky Derby TV ratings surge over last year, published by the Lexington Herald-Leader and dated May 4, 2021.

14.     Attached as **Exhibit L** is a true and correct copy of the article "Churchill Downs' Statement in Response to Medina Spirit's Post-Race Test Result Allegations," published by Churchill Downs Incorporated and dated May 9, 2021 (excerpted to remove advertisements).

15.     Attached as **Exhibit M** is a true and correct copy of the article "Baffert says ointment used for Medina Spirit's skin condition contained betamethasone," written by WKYT's News Staff, published by WKYT, and dated May 11, 2021 (excerpted to remove advertisements).

16.     Attached as **Exhibit N** is a true and correct copy of the article "Bob Baffert's full statement on Medina Spirit," written by NBC Sports Staff, published by NBC Sports and dated May 15, 2021.

17.     Attached as **Exhibit O** is a true and correct copy of David T. O'Rourke's article "NYRA's David O'Rourke: Horseracing Integrity Act 'Vital To Equine Health, Integrity Of Our Sport,'" published by the Paulick Report and dated January 27, 2020 (excerpted to remove advertisements).

18.     Attached as **Exhibit P** is a true and correct copy of David Grening's article "Q and A: NYRA's David O'Rourke," published by Daily Racing Form and dated July 8, 2019.

19.     Attached as **Exhibit Q** is a true and correct copy of Joe Drape's article "Positive Drug Test Confirmed for Kentucky Derby Winner Medina Spirit," published by The New York Times on June 2, 2021 and updated on June 14, 2021.

20.     Attached as **Exhibit R** is a true and correct copy of Steven Taranto's article "Churchill Downs suspends trainer Bob Baffert for two years following Medina Spirit's drug test reults [*sic*]," published by CBS Sports and dated June 2, 2021.

21.     Attached as **Exhibit S** is a true and correct copy of Bennett Liebman's article

"The Beleaguered Sport of Thoroughbred Horse Racing," published by the New York State

Bar Association and dated May 27, 2021.

Dated: Albany, New York
       June 30, 2021

_____
Henry M. Greenberg

# EXHIBIT A

**DECLARATION OF HENRY M. GREENBERG, ESQ.**

**06/30/2021**

---

**AMENDED & RESTATED**

**CERTIFICATE OF INCORPORATION**

----------------------------------------------------------------

# AMENDED & RESTATED CERTIFICATE OF

## INCORPORATION OF

## THE NEW YORK RACING ASSOCIATION, INC.

Under Section 805 of the Not-For-Profit Corporation Law and
Sections 201 and 207 of the Racing, Pari-Mutuel Wagering and Breeding Law

----------------------------------------------------------------

Filed by:

## AMENDED & RESTATED CERTIFICATE OF INCORPORATION OF THE NEW YORK RACING ASSOCIATION, INC.

Under Section 805 of the Not-For-Profit Corporation Law and Sections 201 and 207(1)(a) of the Racing, Pari-Mutuel Wagering and Breeding Law

THE UNDERSIGNED, being a natural person at least 18 years of age and acting as an officer of the New York State Racing Association, hereby certifies that the Certificate of Incorporation of the Corporation (the "Certificate of Incorporation"), which was filed by the Department of State of the State of New York on September 12, 2008, and then amended pursuant to State Law in December 2012, is hereby restated and again amended under Section 805 of the Not-For-Profit Corporation Law of the State of New York (the "Not-For-Profit Corporation Law") and Section 207 of the Racing, Pari-Mutuel Wagering and Breeding Law of the State of New York (the "Racing Law"), as amended, in order to effect amendments to Sections Second, Fifth, Sixth, and Ninth thereof. With the unanimous approval of the majority of the Members of the Corporation at a Meeting held on December 6, 2017, and the approval of the New York State Gaming Commission, in accordance with Section 201(b) of the Racing Law, the text of the Certificate of Incorporation is restated as amended to read as set forth in full herein.

**FIRST:** The name of the corporation (hereinafter called the "Corporation") is "THE NEW YORK RACING ASSOCIATION, INC."

**SECOND:** In accordance with Section 206(1) of the Racing Law (L.1982, c. 865, §1, as amended, Chapters 18 and 140 of the Laws of 2008), as amended from time to time, the Corporation is a corporation as defined in subparagraph (a)(5) of Section 102 of the New York Not-For-Profit Corporation Law, as amended, and, consistent with the Non-Profit Revitalization Act of 2013, is a not-for-profit corporation that shall be deemed a charitable corporation pursuant to Section 201 of the Not-For-Profit Corporation Law, and shall be a membership corporation.

**THIRD:** The Corporation is formed for the purpose and objective of conducting race meetings at one or more thoroughbred racetracks, conducting pari-mutuel wagering and furthering the raising and breeding and improving the breed of horses, including exercising the particular powers conferred by Section 203 of the Racing Law with all the general powers of corporations created under the laws of the State of New York. The Corporation intends to conduct running or steeplechase race meetings in the following counties: Queens, Nassau and Saratoga.

**FOURTH:** In furtherance of the foregoing purposes, the Corporation shall have all of the powers enumerated in Section 202 of the Not-For-Profit Corporation Law and such other powers as are now or hereafter permitted by law for a corporation organized for such purposes including, without limitation, all the powers and rights conferred by the Racing Law.

**FIFTH:** Pursuant to Section 207(1) of the Racing Law, as amended by Chapter 59, Part NN, §1 of the Laws of 2017, the Corporation shall have seventeen (17) individual members (each, a "Member," and collectively, the "Membership"), who shall be those individuals then serving as members of the Board with full voting rights.

**SIXTH:** Pursuant to Section 207(1) of the Racing Law, as amended by Chapter 59, Part NN, §1 of the Laws of 2017, the Corporation shall have seventeen (17) individual voting directors (each, a "Director," and collectively, the "Board"), to be elected or appointed as follows:

(a) one (1) shall be the President and Chief Executive Officer of the Corporation, *ex officio* and without term limitation;

(b) two (2) appointed by the Governor of New York State;

(c) two (2) each appointed by the Temporary President of the Senate and Speaker of the Assembly;

(d) eight (8) appointed by the Executive Committee of the NYRA Reorganization Board of Directors, which shall continue to exist until such time as these appointments are made;

(e) one (1) appointed by New York Thoroughbred Breeders, Inc.; and

(f) one (1) appointed by New York Thoroughbred Horsemen's Association, Inc.

Consistent with the Racing Law, the term of voting membership on the Board, other than the director serving on the Board *ex officio* due to his or her role as Chief Executive Officer of the Corporation, shall be three years. Such Directors, other than the Chief Executive Officer, shall be limited to serving as a voting member the lesser of three terms or nine years. Notwithstanding the foregoing, the initial term of one member appointed by each of the Governor, Temporary President of the Senate, and Speaker of the Assembly, the member appointed by the New York Thoroughbred Horsemen's Association, and the member appointed by the New York Thoroughbred Breeders, Inc. shall expire March 31, 2018. The initial term of the remaining members appointed by each of the Governor, Temporary President of the Senate, and Speaker of the Assembly and two members appointed by the New York Racing Association Reorganization Board shall expire on March 31, 2019, and the remaining members may serve for three full three-year terms.

The failure to elect or appoint one or more Directors pursuant to this Section Sixth shall not impair the ability of the Corporation to take any action which the Corporation has the power or authority to take under applicable law, this Certificate of Incorporation or the Corporation's Bylaws.

With respect to any Director elected or appointed pursuant to this Section Sixth, Directors may vote to remove, with or without cause, any Director other than a Director who was appointed by the Governor, Temporary President of the Senate, Speaker of the Assembly, NYTHA, or NYTB. Directors who were appointed by the Governor, Temporary President of the Senate, Speaker of the Assembly, NYTHA, or NYTB, may only be removed, with or without cause, by the appropriate appointing authority. To the extent that any vacancy arises on the Board from time to time as a result of the resignation, removal or death of a director, with regards to any Director other than a Director who was appointed by the Governor, Temporary President of the Senate, Speaker of the Assembly, NYTHA, or NYTB, the Executive Committee shall fill such vacancy in accordance with Section 207(1)(a)(iii) of the Racing Law. Where the vacancy created is that of a Director who was appointed by the Governor, Temporary President of the Senate, Speaker of the Assembly,

NYTHA, or NYTB, the Director's appointing authority shall be notified and provided with the opportunity to fill the position for the unexpired portion of the term.

**SEVENTH:** The office of the Corporation shall be located in the County of Queens in the State of New York and shall be the principal business office of the Corporation.

**EIGHTH:** The Secretary of State is hereby designated as agent of the Corporation upon whom process against the Corporation may be served. The post office address to which the Secretary shall mail a copy of any process against the Corporation served upon it is:

> The New York Racing Association, Inc. 110-00 Rockaway Blvd.
> Jamaica, New York 11417

**NINTH:** The Corporation shall indemnify each of its current and former directors and officers from time to time (and their heirs, executors and administrators) to the fullest extent permitted by law. The directors of the Corporation, and any person or persons acting on their behalf, while acting within the scope of their authority, shall be exempt from any personal liability resulting from carrying out any of the powers expressly given in the Racing Law, except for acts of malfeasance or gross negligence.

**TENTH:** Subject to the Racing Law, if the Corporation voluntarily relinquishes the State racing franchise held by the Corporation prior to the expiration of such franchise, or voluntarily declines to continue conducting race meetings and pari-mutuel betting on the races run at such race meetings as required by its franchises unless such declination is the result of strikes, acts of God, or other unavoidable causes not under the control of the Corporation, or voluntarily affects corporate dissolution in the manner provided for by article ten or eleven of the Not-For-Profit Corporation Law and other applicable provisions of law, or if such franchise is revoked by the New York State Racing and Wagering Board, then, notwithstanding any other provision of law to the contrary, the Corporation shall transfer to the New York State Franchise Oversight Board at the time of such relinquishment, declination, revocation or dissolution all right, title and interest held by the Corporation in all such facilities and associated assets, and all capital improvements made to the real property and such facilities.

**ELEVENTH:** Subject to the Racing Law, the duration of the Corporation shall be co-terminous with the expiration, revocation or relinquishment of the Corporation's racing franchise, as provided under the Racing Law, but shall not exceed September 12, 2033. Notwithstanding the foregoing, to the extent the Corporation's racing franchise is extended at any time, the Corporation's duration shall automatically be extended so that the Corporation's duration shall at all times be coterminous with the duration of its racing franchise.

[REMAINDER OF PAGE LEFT INENTIONALLY BLANK]

IN WITNESS WHEREOF, the undersigned has signed this Certificate of Incorporation and affirmed as true the statements made herein under the penalties of perjury this ₆day of December , 2017.

Joseph J. Lambert
SVP, Chief Administrative, Officer,
General Counsel and Corporate Secretary

# EXHIBIT B

**DECLARATION OF HENRY M. GREENBERG, ESQ.**

**06/30/2021**

---

**AMENDED BYLAWS OF**

**THE NEW YORK RACING ASSOCIATION, INC.**

AMENDED BYLAWS OF

THE NEW YORK RACING ASSOCIATION, INC.,

A New York Not-for-Profit Corporation

As of 12.6.2017

## AMENDED BYLAWS
## of
## THE NEW YORK RACING ASSOCIATION, INC.

## ARTICLE I
## NAME, PURPOSES, OFFICE

Section 1.01    Name. The name of the Corporation is "The New York Racing Association, Inc." (the "Corporation"), a not-for-profit corporation organized under the laws of the State of New York.

Section 1.02    Purposes. The Corporation is formed for the purpose and objective of conducting race meetings at one or more thoroughbred racetracks, conducting pari-mutuel wagering and furthering the raising and breeding and improving the breed of horses, with all the general powers of corporations created under the laws of the State of New York.

Section 1.03    Office. The principal office of the Corporation shall be located at 110-00 Rockaway Blvd., Jamaica, New York, in the county of Queens, in the State of New York. The Corporation may change the location of the principal office to any other location at which the Corporation operates a racetrack in the State of New York and maintain additional offices at such other places within the State as the Board of Directors of the Corporation (the "Board") may from time to time determine or the business of the Corporation may require.

## ARTICLE II
## MEMBERS

Section 2.01    General. The Corporation is a membership organization.

Section 2.02    Membership. The Corporation shall have seventeen (17) individual members (each, a "Member," and collectively, the "Membership"), who shall be those individuals serving as members of the Board with full voting rights pursuant to Section 207(1) of the New York Racing, Pari-Mutuel Wagering and Breeding Law (the "Racing Law") (L.1982, c. 865, § 1, as amended, L .2008, c.47-A and c. 18, §1, as amended L. 2012, c. 457 § 4, as amended L. 2016, c.73 §1, as amended L. 2017, c. 59, Part NN, §1).

Section 2.03    No Right of Member to Transfer Membership Interests. A Member shall not be entitled to transfer his or her membership interests to any person.

## ARTICLE III
## MEETINGS OF THE MEMBERSHIP

Section 3.01    Annual and Special Meetings.

(a)    Annual Meeting. There shall be an annual meeting of the Members (the "Annual Membership Meeting") at such time and place as shall be determined by the Chairperson or by resolution of the Board and in accordance with the Not-For-Profit Corporation Law of the State of New York, as amended from time to time (the "Not-For-Profit Corporation Law"). All business which properly comes before the Annual Membership Meeting shall be transacted, including, without limitation, the following:

(i)    consideration of reports for the closing year; and

(ii)     any special business on which the Members may act in accordance with applicable law and as shall be set forth on the agenda for the Annual Membership Meeting, of which due notice has been given in accordance with Section 3.03 of the Bylaws.

(b)     Special Meetings. A special meeting of the Members (a "Special Membership Meeting") may be called at any time (i) by the Chairperson, (ii) by resolution of the Board or (iii) upon the written request of such number of Members constituting not less than one-third (1/3) of the then present Membership delivered to the Secretary of the Corporation. If a Special Membership Meeting is called by written request of the Members, upon receiving the written request, the Secretary shall cause prompt notice of the meeting to be given to the Members in accordance with the Bylaws or, if the Secretary fails to do so within five (5) business days, any Member signing the demand may give such notice. Notice of any Special Membership Meeting shall also specify the persons who are calling such meeting and shall contain a specific statement of the purpose or purposes for which such meeting is to be held. Special meetings shall deal only with matters of business which either have been stated in the notice of the meeting or as to which notice of such matter has been waived by all the Members in accordance with Section 606 of the Not-For Profit Corporation Law.

Section 3.02     Voting.

(a)     Number of Votes. Each Member shall have one (1) vote at all meetings of the Membership.

(b)     Quorum and Action. A quorum at all meetings of the Membership shall consist of a majority of the total number of persons then serving as Members. A quorum at all meetings shall consist of a majority of the total number of persons then serving as Members. A Member shall be considered present in person or by proxy. All actions of the Membership shall become effective upon a majority of the votes cast by the persons present in person or by proxy and entitled to vote thereon.

Section 3.03     Timing of Notice of Membership Meetings. Notice of the date, time and place of any Membership meeting shall be given, in person, by first-class mail or by electronic mail, by the Secretary of the Corporation, if given in person, by first-class mail or via electronic mail, not less than ten (10) days nor more than fifty (50) days in advance of such meeting to each Member; provided, however, if such notice is mailed by any other class of mail, such notice shall be given not less than thirty (30) days nor more than sixty (60) days before such date. There shall be included with notice of any Membership meeting a suitable form of proxy for use by the Members. Nothing in this Section 3.03 shall prohibit the Membership from holding any Special Membership Meeting on shorter notice, or without any notice at all, in accordance with Section 606 of the Not-For-Profit Corporation Law.

Section 3.04     Action Without a Meeting. Any action required or permitted under these Bylaws to be taken by a vote of the Members at any meeting of the Membership, as applicable, may be taken without a meeting by written consent, setting forth the action to be so taken, signed by all the then Members.

## ARTICLE IV
## BOARD OF DIRECTORS

Section 4.01     Powers and Number. The Board shall have general power to control and manage the affairs and property of the Corporation subject to applicable law and in accordance with the purposes and limitations set forth in the Certificate of Incorporation and in these Bylaws. The Board shall consist of seventeen (17) voting directors (collectively, the "Board"), one (1) shall be the President and Chief Executive Officer of the Corporation, *ex officio* and without term limitation; two (2) appointed by the Governor of New York State; two (2) each appointed by the Temporary President of the Senate and Speaker of the

Assembly; eight (8) directors appointed by the Executive Committee of the NYRA Reorganization Board of Directors, which shall continue to exist until such time as the appointments required hereunder are made; one (1) appointed by New York Thoroughbred Breeders, Inc.; and one (1) appointed by New York Thoroughbred Horsemen's Association, Inc., as set forth in Section 207(1)(a) of the Racing Law. The Board may include additional *ex officio*, non-voting members as appointed pursuant to a majority vote of the Board. The failure to appoint one or more Directors pursuant to the Certificate of Incorporation or the Racing Law shall not impair the ability of the Corporation to take any action which the Corporation has the power or authority to take under applicable law, the Certificate of Incorporation or the Bylaws. The term "Entire Board" shall mean at any time the total number of Directors entitled to vote which the Corporation would have if there were no vacancies.

Section 4.02    Voting Rights. All seventeen members of the Board, including the individual serving on the Board due to his or her role as Chief Executive Officer of the Corporation, shall have equal voting rights. Notwithstanding the foregoing, each individual appointed by the Executive Committee of the NYRA Reorganization Board of Directors shall be required to seek a racetrack management license issued by the gaming commission, and shall not be authorized to vote on any Board matter unless and until such license is issued accordingly.

Section 4.03    Term of Service. The term of voting membership on the Board, other than the director serving on the Board *ex officio* due to his or her role as Chief Executive Officer of the Corporation, shall be three years. Such Directors, other than the Chief Executive Officer, shall be limited to serving as a voting member the lesser of three terms or nine years. Notwithstanding the foregoing, the initial term of one member appointed by each of the Governor, Temporary President of the Senate, and Speaker of the Assembly, the member appointed by the New York Thoroughbred Horsemen's Association, and the member appointed by the New York Thoroughbred Breeders, Inc. shall expire March 31, 2018. The initial term of the remaining members appointed by each of the Governor, Temporary President of the Senate, and Speaker of the Assembly and two members appointed by the New York Racing Association Reorganization Board shall expire on March 31, 2019, and the remaining members may serve for three full three-year terms.

Section 4.04    Chairperson and Vice-Chairperson of the Board. The Governor of the State of New York shall nominate a Director to serve as the initial Chairperson of the Board for a three year term, who shall serve at the pleasure of the Governor, subject to confirmation by a majority of the Board. Thereafter, the Board shall elect its Chairperson, who shall serve at the pleasure of the Board, from among its members. The Chairperson shall preside at all meetings of the Board. In addition, the Board, by resolution adopted by a majority of the Entire Board, may annually designate from among its members a Vice-Chairperson, who, if present, shall preside at all meetings of the Board when the Chairperson is absent from such meetings. In the absence of both the Chairperson and the Vice-Chairperson from a Board meeting, such member of the Board as the Board members present may designate shall preside at the meeting. No employee of the Corporation shall serve as Chairperson of the Board or hold any other title with similar responsibilities, unless the Board approves such employee serving as Chairperson of the Board by a two-thirds vote of the Entire Board and contemporaneously documents in writing the basis for the Board approval. No such employee shall be considered an "independent director" for purposes of the Not-for-Profit Corporation Law.

Section 4.05    Resignation. Any Director may resign at any time by delivering a resignation in writing to the Chairperson, the President or the Secretary and, in the case of an appointed Director, to their appointing authority. The resignation shall take effect at the time specified therein, and acceptance of the resignation, unless required by its terms, shall not be necessary to make the resignation effective.

Section 4.06    Vacancies. If any vacancy arises on the Board as a result of the resignation, removal or death of any Director of the Corporation, other than the Chief Executive Officer, or a Director

-3-

appointed by the Governor, Temporary President of the Senate, Speaker of the Assembly, NYTHA, or NYTB, the Executive Committee shall fill such vacancy in accordance with Section 207(1)(a)(iii) of the Racing Law. Upon the occurrence of any such vacancy on the Board, the Secretary of the Corporation shall promptly give the remaining Directors and the Corporate Governance and Nominating Committee of the Board of Directors notice in writing of such vacancy. The Corporate Governance and Nominating Committee shall convene as promptly as possible thereafter to conduct searches, consider potential candidates and make a recommendation to the remaining Directors on a potential candidate to fill such vacancy. As promptly as possible following the receipt of the Corporate Governance and Nominating Committee's recommendation of a person to fill such vacancy, the Secretary shall call a meeting of the remaining Directors to fill such vacancy on the Board or, at the discretion of the Chairperson, in lieu of calling a meeting of the remaining Directors, the Secretary shall prepare a form of unanimous written consent for circulation to the remaining Directors to fill such vacancy without a meeting of the remaining Directors. Notwithstanding any recommendation of the Corporate Governance and Nominating Committee, the remaining Directors shall have complete discretion as to whether or not to elect any director candidate recommended by the Corporate Governance and Nominating Committee, and the remaining Directors in their discretion may elect any individual not recommended by the Corporate Governance and Nominating Committee to fill such vacancy. If, however, the vacancy created is that of a Director who was appointed by the Governor, Temporary President of the Senate, Speaker of the Assembly, NYTHA, or NYTB, the Director's appointing authority shall be notified and provided with the opportunity to fill the position for the unexpired portion of the term.

Section 4.0     Removal. The Directors may vote to remove, with or without cause, any Director other than a Director who was appointed by the Governor, Temporary President of the Senate, Speaker of the Assembly, NYTHA, or NYTB. Directors who were appointed by the Governor, Temporary President of the Senate, Speaker of the Assembly, NYTHA, or NYTB, may only be removed, with or without cause, by the appropriate appointing authority.

Section 4.08     Compensation. No compensation of any kind shall be paid to any Director for the performance of his or her duties as a Director; provided, however, that Directors shall be reimbursed by the Corporation for their actual and necessary out-of-pocket expenses incurred in the performance of their duties to the Corporation, to the extent such expenses are reasonable. Subject to Article XII below (Conflicts of Interest, Contracts and Services of Directors and Officers) and the applicable provisions of the Not-for-Profit Corporation Law (including, to the extent applicable, the "related party transaction" requirements set forth at Section 715, as amended), provided that there is full disclosure to the Board of the terms of such compensation and, to the extent required by the Bylaws, the arrangement has been approved in accordance with the Bylaws and the applicable provisions of the Not-for-Profit Corporation Law, this Section 4.08 shall not in any way limit reimbursement of or payment for services provided to the Corporation by the Director in any capacity separate from his or her responsibilities as a Director, including, without limitation, in his or her capacity as an officer or employee of the Corporation (in the case of an officer or employee of the Corporation who is also a Director). Any such compensation shall be commensurate with services performed. No person who may benefit from a compensation arrangement may be present at or otherwise participate in any Board or committee deliberation or vote concerning such person's compensation; provided, however, that such person may, upon the request of the Board or committee thereof, present information as background or answer questions prior to the commencement of deliberations or voting relating thereto.

## ARTICLE V
## MEETINGS OF DIRECTORS

Section 5.01    Meetings. Meetings of the Board (annual or regular) may be held on any day, and at such time and place, as shall be determined by the Board. Unless the Board by resolution determines otherwise, meetings of the Board shall be held four (4) times a year within the State of New York.

Section 5.02    Special Meetings. Special meetings of the Board shall be called at any time by the Secretary, acting upon the request of the Board, the Chairperson, the President or the written request of Directors constituting a majority of the Entire Board. Each special meeting of the Board shall be held on such date and time and at such place as shall be specified in the notice of such meeting.

Section 5.03    Notice or Actual or Constructive Waiver. No notice shall be required for annual or regular meetings for which the date, time and place have been fixed by the Board. Written notice (including by email) of the date, time and place shall be given for special meetings of the Board at least forty-eight (48) hours in advance of such special meeting. The notice of a special meeting of the Board shall contain the specific purpose of the meeting. Business transacted at such a special meeting of the Board shall be limited to such specific purpose. Any requirements of furnishing a notice shall be waived by any Director who signs a waiver of notice before, at its commencement or after the meeting, or who attends the meeting without protesting (either prior to or at its commencement) the lack of notice to such Director. Any annual, regular or special meeting of the Board may be adjourned for any reason; provided, however, that the recommencement of any such adjourned meeting shall occur no later than ten (10) days from the original date of such meeting.

Section 5.04    Quorum and Action. Except as required by law or as hereinafter provided, a majority of the Entire Board shall constitute a quorum at any meeting of the Board. A majority of the Directors present, whether or not a quorum is present, may adjourn a meeting to another time and place. Except as otherwise provided by the Not-For-Profit Corporation Law, and except as otherwise provided in the Bylaws, the action of the Board shall be the action taken, at a meeting duly assembled, by vote of a majority of the Directors present at the time of the vote (excepting any *ex officio* Directors not entitled to vote), a quorum being present at such time. Each Director present at a meeting of the Board shall have one (1) vote with respect to each resolution or action voted on by the Board. With the consent of the Chairperson, which consent, if given, shall apply to all Directors, any one or more members of the Board may participate in a meeting of the Board by means of a conference telephone or similar communications equipment allowing all persons participating in the meeting to hear each other at the same time and participation by such means shall constitute presence in person at a meeting.

Section 5.05    Actions Without a Meeting. Any action required or permitted under these By-laws to be taken by the Board may be taken without a meeting if all members of the Board consent in writing to the adoption of a resolution authorizing the action. The resolution and the written consents thereto by the Directors shall be filed with the minutes of the proceedings of the Board referenced in Section 8.01 of these Bylaws. Any such written consent may be in electronic form and may be transmitted through mail, e-mail or other electronic means, telegraph or facsimile transmission (but, if in electronic form, a paper copy thereof shall be filed with the minutes of the proceedings of the Board).

Section 5.06    Delegation of Authority. Except as otherwise imposed under applicable law or provided in these Bylaws, the Board may delegate to one or more of the Corporation's officers, agents or employees, such powers and duties as the Board may deem appropriate. However, delegation of authority to any person shall not relieve any Director of his or her duty to the Corporation under Section 717 of the Not-For-Profit Corporation Law. In no event shall the Board delegate to any person authority with respect to the following matters:

(a) The submission to Members of any action requiring the Members' approval under the Not-For-Profit Corporation Law;

(b) The filling of any vacancies in the Board or in any committee of the Board;

(c) The amendment or repeal of these Bylaws or the adoption of amended and restated Bylaws of the Corporation;

(d) The amendment or repeal of any resolution of the Board which by its terms shall not be so amendable or repealable;

(e) Election or removal of officers and directors;

(f) The approval of a merger or plan of dissolution;

(g) The adoption of a resolution recommending to the Members action on the sale, lease, exchange or other disposition of all or substantially all the assets of the Corporation; and

(h) The approval of amendments to the Certificate of Incorporation.

## ARTICLE VI
## COMMITTEES

Section 6.01    Committees. The members of each Committee shall be appointed by the Board annually at the recommendation of Corporate Governance and Nominating Committee. The Chairman of the Board and the President/Chief Executive Officer will provide input on Board membership and Committee assignments. The Board, by resolution adopted by a majority of the Entire Board, may from time to time designate from their number one or more committees consisting of three (3) or more Directors to serve at the pleasure of the Board, each of which, to the extent provided in the resolution designating it, shall have the authority of the Board with the exception of any authority the delegation of which is prohibited by Section 712 of the Not-For-Profit Corporation Law. Additionally, the Board may provide for committees of the Corporation, which shall have such powers as the Board may lawfully delegate.    Corporate committees shall have the power to recommend action to the Board, but shall not have the power to take any official action. The Chairperson shall serve *ex officio* as a member of all Board committees and corporate committees. The Chairperson may propose a committee member to serve as chairperson of such committees, subject to the approval of the Board. Each committee of the Board shall report to the full Board its activities and actions undertaken at the next regular Board meeting.

Section 6.02    Mandatory Committees. The Board shall constitute an executive committee (the "Executive Committee") which shall consist of not less than (3) Directors (in addition to the Chairperson of the Board, who shall serve as a member *ex officio*), all of whom shall be selected and appointed by the Board; provided that (i) at least one (1) such Director shall be a public member from among the members appointed by the Governor to the Board in accordance with the Certificate of Incorporation and Section 207(1)(b) of the Racing Law (to the extent any such Director is serving on the Board). In addition, the Board shall constitute each of the committees listed in subsections (a) through (c) below and each such committee shall consist of not less than three (3) Directors (in addition to the Chairperson of the Board, who shall serve as a member *ex officio*), at least one (1) of which shall be a public member from among the members appointed by the Governor appointed to the Board in accordance the Certificate of Incorporation and Section 207(1)(b) of the Racing Law (to the extent any such Director is serving on the Board). More-

over, the Board shall constitute the committees listed in subsections (d) and (e) below and each such committee shall consist of not less than three (3) Directors (in addition to the Chairperson of the Board, who shall serve as a member *ex officio*).

(a)  Management Compensation and Development Committee.  The Compensation Committee shall assist the Board in setting executive compensation guidelines and to review and make recommendations regarding compensation plans, policies and programs of the Corporation, such guidelines and recommendations to be consistent with the operation of other first class thoroughbred racing operations in the United States. In addition, the Management Compensation & Development Committee may review and make recommendations regarding employment agreements, compensation plans, employment development plans, organizational severance terms, and other relevant policies and programs of NYRA.

(b)  Finance and Audit Committee.  The Finance and Audit Committee assists the Board in overseeing the integrity of NYRA's financial statements, the independence, qualifications and performance of NYRA's independent auditor, NYRA's compliance with legal and regulatory requirements, and the financial policies, financial condition and primary financial risks of NYRA.

(c)  Corporate Governance and Nominating Committee.  The Corporate Governance and Nominating Committee identifies and recommends individuals qualified to fill any vacancy on the Board of members where NYRA is the appointing authority, recommends to the Board appointments to Board committees, develops and recommends to the Board guidelines for effective corporate governance, and leads the Board in its annual review of the performance of the Board.

(d)  Equine Safety Committee.  The Equine Safety Committee assists the Board in fulfilling NYRA's continuing commitment to the highest level of safety for the horses and jockeys at the racetracks. The committee is responsible for oversight of equine safety measures and protocols.

(e)  Racing Committee.  The Racing Committee approves the annual stakes schedules, considers long- term racing objectives, and addresses all issues related to NYRA's racing operations.

Section 6.03  Term.  With the exception of the Chairperson who serves *ex officio* as a member of all committees and subject to Section 6.02 hereof, each member of any committee shall serve on such committee at the pleasure of the Board.

Section 6.04  Vacancies.  Subject to Section 6.02 hereof, any vacancy that shall occur on any Committee for any reason during the course of the year may be filled by recommendation of the Corporate Governance and Nominating Committee with notice to the Board.

Section 6.05  Meetings and Notice.  Each committee may hold meetings at such time or times and at such place or places as it shall determine from time to time. No notice shall be required for meetings of any committee for which the date, time and place have been fixed by such committee. Written notice (including by e-mail) of the date, time and place shall be given for meetings of each committee in sufficient time for the convenient assembly of the committee members unless the lapse of such time has been waived. The notice of any meeting of any committee shall specify the specific purpose of the meeting. Business transacted at such a meeting shall be limited to such specific purpose. Any requirements of furnishing a notice shall be waived by any committee member who signs a waiver of notice before or after the meeting, or who attends the meeting without protesting, prior thereto or at its commencement, the lack of notice to such committee member. With the consent of the chairperson of any committee, which consent, if given, shall apply to all Directors serving on such committee, any one or more Directors serving on any committee

may participate in a meeting of a committee by means of a conference telephone or similar communications equipment allowing all persons participating in the meeting to hear each other at the same time and participation by such means shall constitute presence in person at a meeting. Each committee shall keep a record of its proceedings.

Section 6.06    Quorum and Vote. Except as required by law or as hereinafter provided, at all meetings of any committee, the presence in person, or by telephone or similar communications equipment, when permitted by the chairperson of the meeting, of committee members constituting a majority of the entire committee, shall be necessary and sufficient to constitute a quorum, and the act of a majority of the committee members present, a quorum being present, shall be the act of such committee.

Section 6.07    Actions Without a Meeting. Any action required or permitted under these By-laws to be taken by any committee may be taken without a meeting if all members of the committee consent in writing to the adoption of a resolution authorizing the action. The resolution and the written consents thereto by the members of the committee shall be filed with the minutes of the proceedings of the committee referenced in Section 8.01 of these Bylaws. Any such written consent may be in electronic form and may be transmitted through mail, e-mail or other electronic means, telegraph or facsimile transmission (but, if in electronic form, a paper copy thereof shall be filed with the minutes of the proceedings of the committee).

## ARTICLE VII
## OFFICERS

Section 7.01    Election and Term of Office. The officers of the Corporation shall include a President, a Secretary, and any other officers (including one or more Vice-Presidents) as the Board may deem necessary or appropriate, each of whom shall be elected by the Board from time to time. Any two or more offices may be held by the same person except the offices of the President and Secretary. Each officer shall hold office until the next annual meeting of the Board and the election of his or her successor, or until his or her earlier death, resignation or removal. The officers of the Corporation shall each have such powers and duties as are set forth herein and as generally pertain to their respective offices and such powers and duties as from time to time may be conferred upon them by the Board.

Section 7.02    Removal and Vacancies. Any officer may be removed with or without cause by the Board. A vacancy in any office may be filled by the Board for the unexpired term of the vacant office.

Section 7.03    Other Agents and Advisors. The Board may from time to time appoint such agents and advisors as it shall deem necessary, each of whom shall hold its position at the pleasure of the Board, and shall have such authority, perform such duties and receive such reasonable compensation, if any, as the Board may from time to time determine consistent with the applicable provisions of the Not-for-Profit Corporation Law.

Section 7.04    President. The President shall have general supervision and authority over the affairs of the Corporation including such duties and powers as customarily pertain to such office, subject, however, to the control and oversight of the Board and the Executive Committee. The President shall keep the Board and the Executive Committee fully informed about the affairs of the Corporation.

Section 7.05    Vice-President. The most senior Vice-President, if any, shall, in the absence or disability of the President, act in the place of the President, or, if there shall be no Vice-President, the President's duties shall be performed by a Director designated by the Board. Each Vice-President, if any, shall also perform such other duties as from time to time may be assigned to him or her by the Board, the President or the Executive Committee, which duties may include powers elsewhere assigned or delegated to other officers.

-8-

Section 7.06    Secretary. The Secretary shall keep the minute books and, if there be one, the seal of the Corporation, serve or cause to be served all notices on behalf of the Corporation including notices of meetings of the Membership, the Board and committees of the Board (provided that, if notice is otherwise properly given, the absence or failure of the Secretary to give notice shall not affect the validity of the notice or meeting). Furthermore, the Secretary shall maintain the minutes of the meetings of the Membership, the Board, the committees of the Board and actions by written consent in lieu of a meeting, and in general perform all duties incident to the office of Secretary under the Bylaws and have such duties and powers as customarily pertain to such office, and such other duties as from time to time may be assigned to him or her by the Board, the President or the Executive Committee, which duties may include powers elsewhere assigned or delegated to other officers.

Section 7.07    Compensation. Any officer of the Corporation is authorized to receive a reasonable salary and other reasonable compensation (including, without limitation, benefits, incentives and retirement programs) for services rendered to the Corporation, subject to Section 4.08 above and the applicable provisions of the Not-for-Profit Corporation Law. .

## ARTICLE VIII
## BOOKS, RECORDS AND FINANCIAL AUTHORITY

Section 8.01    Books and Records. There shall be kept at the principal office of the Corporation accurate books of account of the activities and transactions of the Corporation, including a minute book, which shall contain a copy of the Certificate of Incorporation, a copy of the Bylaws, the Corporate Governance Code of Conduct and the Competitive Purchasing Bidding Policy, and all minutes of meetings and actions by written consent without a meeting of the Members, the Board and each committee of the Board.

Section 8.02    Execution of Instruments. The Board or, if delegated to the Executive Committee, the Executive Committee is authorized to select the banks or depositories it deems proper for the funds of the Corporation. The Board or, if delegated to the Executive Committee, the Executive Committee, shall determine who shall be authorized from time to time and in what manner on the Corporation's behalf to sign checks, drafts or other orders for the payment of money, acceptance, notes or other evidences or indebtedness, to enter into contracts or to execute and deliver other documents and instruments.

Section 8.03    Loans to Directors and Officers. No loans, other than through the purchase of bonds, debentures, or similar obligations of the type customarily sold in public offerings, or through ordinary deposit of funds in a bank, shall be made by the Corporation to its Directors or officers, or to any other corporation, firm, association or other entity in which one or more Directors or officers are directors or officers or hold a substantial financial interest. A loan made in violation of this Section 8.03 shall be a violation of the duty to the Corporation of the Directors or officers authorizing it or participating in it; provided, however, that the obligation of the borrower with respect to any such loan shall not be affected thereby.

Section 8.04    Exemption from Personal Liability. The directors of the Corporation, and any person or persons acting on their behalf, while acting within the scope of their authority, shall be exempt from any personal liability resulting from carrying out any of the powers expressly given in Chapter 18 of the Laws of 2008, except for acts of malfeasance or gross negligence.

## ARTICLE IX
## INDEMNIFICATION OF DIRECTORS AND OFFICERS

Section 9.01    Indemnification. The Corporation shall indemnify each of its current and former Directors and officers from time to time (and their heirs, executors and administrators) to the fullest extent

permitted by law who is made, or threatened to be made, a party to an action or proceeding (a "Proceeding") by reason of the fact that such person (or his or her testator or intestate) was a Director or officer of the Corporation or served in any capacity another corporation or a partnership, joint venture, trust, employee benefit plan or other enterprise at the Corporation's request. With respect to each person who serves as a Director or officer at any time while the foregoing provisions of this Article IX are in effect, such provisions are intended to and shall constitute a contract between the Corporation and, severally, each such person in consideration of such person's services as a Director or officer and no repeal or modification of any of such provisions shall adversely affect any rights of such person or obligations of the Corporation to such person under such provisions with respect to any action or omission of such person occurring, or any state of facts existing, before such repeal or modification, regardless of whether a claim arising out of such action, omission or state of facts is asserted before or after such repeal or modification. To the fullest extent permitted by law, expenses incurred by a current or former Director or officer (or an heir, executor or administrator thereof) in defending a Proceeding may be paid by the Corporation in advance of the final disposition of such Proceeding upon receipt of an undertaking by or on behalf of such person to repay the amount so advanced in case, and to the extent, it shall ultimately be found in the manner provided by law that such person is not entitled to be indemnified by the Corporation against such expenses as authorized by this Section 9.01. The Corporation may indemnify and advance expenses to employees and agents of the Corporation to the same extent that it may do so in the case of a Director or officer of the Corporation.

Section 9.02    Insurance.  The Corporation shall have the power to purchase and maintain such insurance as is permitted by law and as the Board may from time to time determine is prudent to protect the Corporation against losses caused by the acts of any Director, officer, or employee, to reimburse the Corporation for any obligation to indemnify a Director, officer, employee or agent incurred by the Corporation and to indemnify Directors, officers, employees and agents under circumstances where indemnity by the Corporation is not permitted but insurance coverage is permitted by applicable law.

## ARTICLE X
## CORPORATE SEAL

The Corporation need not have a corporate seal. If the Corporation determines to have a corporate seal, such seal shall be in such form as the Board shall prescribe.

## ARTICLE XI
## FISCAL YEAR

The fiscal year of the Corporation shall be determined by the Board.

## ARTICLE XII
## CONFLICTS OF INTEREST, CONTRACTS AND SERVICES OF
## DIRECTORS AND OFFICERS; CONFLICT OF INTEREST AND WHISTLEBLOWER
## POLICIES

Section 12.01    Disclosure.

(a)    Each voting member of the Board shall annually make a written disclosure to the Board of any interest held by such Director, such Director's spouse or unemancipated child in any entity undertaking business in the racing or breeding industry. Such interest disclosure shall be promptly updated, in writing, in the event of any material change.

(b)    Prior to election or appointment to the Board or an office, as applicable, and thereafter on an annual basis, each Director and officer shall disclose in writing, to the Board, in the case of a

Director, or the Chairperson, in the case of an officer, to the best of his or her knowledge, any Interest (as defined below) such Director or officer may have in any corporation, organization, partnership or other entity which provides professional or other goods or services to the Corporation for a fee or other compensation, and any position or other material relationship such Director or officer may have with any person or entity with which the Corporation has any business relationship (collectively, a "Conflict of Interest"). A copy of each disclosure statement shall be made available to any Director, to any officer of the Corporation upon request, and to the Corporation's independent business integrity counsel.

(c) If at any time during his or her term of service, a Director or officer acquires any Interest or otherwise a circumstance arises which may pose a Conflict of Interest, that Interest and/or Conflict of Interest shall be promptly disclosed in writing to the Board, in the case of a Director, or the Chairperson, in the case of an officer.

(d) When any matter for decision or approval comes before the Board or any committee of the Board in which a Director or officer has an Interest or Conflict of Interest, that Interest or Conflict of Interest shall be immediately disclosed to the Board or relevant committee of the Board by that Director or officer.

Section 12.02    Definition of "Interest". Whether a Director or officer has an Interest in an entity shall be determined by whether such Director or officer would derive an individual economic benefit, either directly or indirectly, from any transaction or relationship involving such entity or any decision on a matter involving such entity by the Board or a committee of the Board, other than from being an owner or a breeder of a horse that runs at the racetracks operated by the Corporation.

Section 12.03    Voting. No Director shall vote on any matter in which he or she has a Conflict of Interest.

Section 12.04    Non-Participation. Any Director or officer who has a Conflict of Interest in a matter shall leave the room in which any discussions regarding such matter are carried on, if so requested by the Board or the relevant committee of the Board; provided, however, that such Director or officer may participate in any discussions regarding his or her Conflict of Interest.

Section 12.05    Attempts to Influence. Directors and officers shall not attempt to influence other Directors and officers regarding matters in which they have a Conflict of Interest, without first disclosing any such Conflict of Interest.

Section 12.06    Other Activities. Directors, except as otherwise provided by law, may engage in private employment, or in a profession or business; provided, however, no Director shall have any direct or indirect economic interests in any video lottery gaming facility, excluding incidental benefits based on purses or awards won in the ordinary conduct of racing operations, or any direct or indirect interest in any development undertaken at the racetracks of the New York State racing franchise including real estate development parcels as defined in the Franchise Agreement.

Section 12.07    Conflict of Interest and Whistleblower Policies. The Corporation shall adopt a Conflict of Interest Policy and a Whistleblower Policy, to the extent required by and in a manner consistent with the Not-for-Profit Corporation Law (including Section 715 (Related Party Transactions), Section 715-a (Conflict of Interest Policy), and Section 715-b (Whistleblower Policy)). The Board, or a designated committee thereof, shall oversee the adoption and implementation of, and compliance with, the Conflict of Interest Policy and Whistleblower Policy of the Corporation, in accordance with the applicable provisions of the Not-for-Profit Corporation Law.

Section 12.08   Audit & Oversight. The Board, or a designated committee thereof, shall, to the extent required, carryout the audit oversight functions set forth in Section 712-a of the Not-for-Profit Corporation Law, as amended.

## ARTICLE XIII
## AMENDMENTS TO BYLAWS

Section 13.01   Amendments at Meetings of the Board. The Bylaws may be amended at any duly convened meeting of the Board by resolution adopted by unanimous vote of the Entire Board and provided that notice of the proposed resolution and amendment, including a copy of the proposed amendment, has been given to all Directors in the manner provided by the Bylaws for the giving of notice of a special meeting of the Board or the giving of such notice has been waived in the manner provided by the Bylaws.

Section 13.02   Amendments by Written Consent. The Bylaws may also be amended by unanimous written consent of all the Directors without a meeting of the Board given in the manner provided by the Bylaws, provided that such amendment shall be included in the consent or notice of the proposed amendment and such notice shall have been given to each Director or waived in accordance with Section 13.01 hereof.

## ARTICLE XIV
## AMENDMENT OF CERTIFICATE OF INCORPORATION

Amendments of the Certificate of Incorporation shall be approved by the Members at any duly convened meeting of the Membership by resolution adopted by a majority of the entire Membership (assuming no vacancies) provided that notice of the proposed resolution and amendment, including a copy of the proposed amendment, has been given to all Members in the manner provided by the Bylaws for the giving of notice of any meeting of the Membership or the giving of such notice has been waived in the manner provided by the Bylaws. Alternatively, amendments of the Certificate of Incorporation may be approved by unanimous written consent of all the Members without a meeting of the Membership given in the manner provided by the Bylaws, provided that such amendment shall be included in the consent or notice of the proposed amendment and such notice shall have been given in the manner provided in the Bylaws for the giving of notice of any meeting of the Membership or the giving of such notice has been waived in the manner provided by the Bylaws. Upon approval of any such amendment by the Membership, the Secretary shall submit the amendment to the Certificate of Incorporation to the New York State Racing and Wagering Board (the "Racing Board") for its review, consideration and approval in accordance Racing Law §201(b). Any such approval shall (i) be indorsed or annexed to any such amendment to the Certificate of Incorporation and (ii) state that, in the Racing Board's opinion, the purposes of Article II of the Racing Law and the public interest will be promoted by such amendment, and that such amendment will be conducive to the interests of legitimate racing. References in these Bylaws to the Certificate of Incorporation shall include all amendments thereto or changes thereof, as approved and indorsed or annexed by the Racing Board, unless specifically excepted by law. In the event of a conflict between the Certificate of Incorporation and these Bylaws, the Certificate of Incorporation shall govern.

# EXHIBIT C

## DECLARATION OF HENRY M. GREENBERG, ESQ.

### 06/30/2021

---

## FRANCHISE AGREEMENT

### September 12, 2008

## FRANCHISE AGREEMENT

FRANCHISE AGREEMENT (the "*Agreement*"), dated as of September 12, 2008, by and among The New York Racing Association, Inc. ("*New NYRA*"), The State of New York (the "*State*") and The New York State Franchise Oversight Board (the "*FOB*").

### RECITALS

A.     Unless otherwise defined herein, capitalized terms used but not otherwise defined herein shall have the meanings set forth in Article I below.

B.     New NYRA is the not-for profit racing corporation incorporated pursuant to Section 402 of the Not-For-Profit Corporation Law of the State of New York, as authorized by Chapter 18 of the Laws of 2008.

C.     Pursuant to (1) the New York State Racing, Pari-Mutuel Wagering and Breeding Law, as amended (the "*Racing Law*"), and (2) that certain Stipulation Relating to, Among Other Things, the Operation of the Racetracks, dated December 31, 2007, as amended, from 1955 up to and including the date hereof, New NYRA's predecessor in interest, The New York Racing Association Inc. ("*Old NYRA*"), has operated the racing facilities known as Aqueduct Racetrack ("*Aqueduct*"), Belmont Park ("*Belmont*") and Saratoga Race Course ("*Saratoga*" and collectively with Aqueduct and Belmont, the "*Racetracks*") and conducted thoroughbred racing and pari-mutuel and simulcast wagering thereon, together with various activities related thereto, including, without limitation, live wagering and retail, food, beverage, trade expositions, and entertainment facilities.

D.     On November 2, 2006 (the "*Petition Date*"), Old NYRA filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, as amended (the "*Bankruptcy Code*"), with the United States Bankruptcy Court for the Southern District of New York (the "*Bankruptcy Court*"), Case No. 06-12618 (JMP) (the "*Chapter 11 Case*").

E.     On February 13, 2008, the New York State Senate (the "*Senate*") and the New York State Assembly (the "*Assembly*") passed legislation, S. 6950 and A. 9998, respectively, providing for, among other things, the granting of the franchise to New NYRA to continue thoroughbred racing operations and pari-mutuel and simulcast wagering at the Racetracks for a period of not more than twenty-five (25) years, (the "*Legislation*"). On February 19, 2008, the then Governor enacted the Legislation into law as Chapter 18 of the Laws of 2008.

F.     On April 28, 2008, (1) the Bankruptcy Court conducted a hearing (the "Confirmation Hearing") to consider the Modified Third Amended Plan of Debtor Pursuant to Chapter 11 of the United States Bankruptcy Code, dated April 28, 2008 (the

"*Modified Plan*"), in accordance with section 1129 of the Bankruptcy Code and (2) in connection therewith, Old NYRA presented testimony and other evidence regarding, among other things, (a) the compromise and settlement between Old NYRA and the State, including, without limitation, the granting of the Franchise to New NYRA, the levels of the Support Fee and the CAPEX Amount, each as set forth in the Legislation, that certain State Settlement Agreement, dated as of the date hereof, by and among Old NYRA, New NYRA, the State, the Oversight Board and the New York State Division of the Lottery (the "*Settlement Agreement*") and herein, the waiver of certain claims by the State and the payment of other monies to Old NYRA by the State and (b) compliance with the provisions of section 1129 of the Bankruptcy Code, including, without limitation, the feasibility of the Plan and the viability of New NYRA's ongoing operations. By order, dated April 28, 2008 (the "*Approval Order*"), and based upon the evidence presented at the Confirmation Hearing, the Bankruptcy Court (1) confirmed the Modified Plan and (2) authorized the consummation of the transactions contemplated by the Modified Plan, including, without limitation, the execution and delivery of (i) this Agreement and (ii) the Settlement Agreement.

        G.     Chapter 383 of the Laws of 2001 authorized video lottery terminal gaming ("*VLT Gaming*") to be conducted at Aqueduct.

        H.     On June 24, 2008, the Senate and the Assembly passed legislation, S. 8709 and A. 11502, respectively, amending the Legislation and the Racing Law to correct certain technical errors and certain provisions of the Legislation, including, without limitation, the distribution mechanism associated with the VLT Revenues, as defined below (the "*Chapter Amendment*"). On June 30, 2008, the Governor enacted the Chapter Amendment into law.

        I.     Contemporaneously herewith, (a) the Plan became effective, (b) Old NYRA irrevocably relinquished and conveyed all of Old NYRA's right, title and interest in, to and under the (i) Racetrack Properties, all improvements thereon and all physical assets appurtenant thereto, including, without limitation, the land underlying the Racetracks, each as described in the Deeds, (ii) works of art, including, without limitation, those works of art listed on Exhibit "P" to the Settlement Agreement, (iii) all rights to intellectual property, including, without limitation, trademarks, tradenames, copyrights and simulcasting rights (collectively, the "*Intellectual Property*"), and (iv) leasehold improvements and interests, now existing or hereafter created with respect to the foregoing ((i) through (iv) collectively, the "*Transferred Property*") to the People of the State of New York in consideration for and in reliance upon the following: (1) the payment to Old NYRA of One Hundred Five Million Dollars ($105,000,000.00) for services and expenses required relating to payments for capital works or purposes, including, without limitation, payments for the purposes of acquisition of clear title to the Racetrack Properties and related real property, (2) the waiver of (i) the State Obligations, (ii) the repayment of any and all obligations arising from or relating to the DIP Orders and the DIP Facility, other than the Supplemental DIP Loan, and (iii) the State Claims (other than the Remaining Tax Claim and the DEC Claim, as defined in the Settlement Agreement), to the extent not otherwise withdrawn, (3) the making of (i) payments to

New NYRA during the Term necessary to support racing operations and the satisfaction of New NYRA's operating expenses, including, without limitation, the payment of New NYRA's pension plan obligations, and (ii) capital expenditure advances by the State or VLT Operator, as the case may be, to New NYRA over the Term of the Franchise, each as set forth in the Racing Law and the State of New York Tax Law, as modified by the Legislation and the Chapter Amendment, and (4) the FOB, as agent for the State, entering into the Leases providing for the lease and/or license of Aqueduct, the lease and/or license of Belmont and the lease of Saratoga, subject to the rights of the State and the FOB pursuant thereto, to New NYRA for the Term at the rate of One Dollar ($1.00) per year, and (c) (1) Old NYRA conveyed all of its right, title and interest in and to all Intellectual Property, now existing or hereafter created and relating to the operation of the Racetracks, and all rights or interests in such assets to the People of the State of New York and (2) the FOB, as agent for the State, entered into a License Agreement providing for the grant by the FOB to New NYRA of an exclusive license to use such Intellectual Property during the Term in connection with the operation of the Racetracks and the conduct of pari-mutuel and simulcast wagering, as more specifically set forth in the License Agreement, and expressly authorizing New NYRA's use, management and operation thereof, subject to the rights of the FOB pursuant to the Legislation, at the rate of One Dollar ($1.00) per year.

NOW, THEREFORE, IT IS HEREBY AGREED, by and among the undersigned, as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1    Recitals. The recitals set forth above are incorporated by reference and are explicitly made a part of this Agreement.

Section 1.2    Definitions. The following definitions shall apply to and constitute part of this Agreement and all schedules, exhibits and annexes hereto:

"*Adjusted Net Income*" shall mean the amount of New NYRA's audited net income as of December 31st of any calendar year during the Term, as defined below, plus (a) the amount of depreciation and amortization recognized for such calendar year, as set forth in New NYRA's statement of cash flows, minus (b) (i) the amount of monies received by New NYRA for capital expenditures in accordance with the Legislation, the Chapter Amendment and Section 2.9 hereof, as the case may be, and (ii) the amount of principal payments made by New NYRA for the repayment of indebtedness in the ordinary course of business, including, without limitation, payments made with respect to the Allowed IRS Claim pursuant to the Plan, all calculated in accordance with GAAP.

"*Ancillary Property*" shall mean the parcels of property described on Exhibit "A" hereto.

"*Aqueduct Facilities Ground Lease*" shall mean the agreement to be executed by New NYRA and the FOB, as agent for the State, relating to the lease of certain portions of the Racetrack Property located at Aqueduct, all improvements thereon and all physical assets appurtenant thereto, a copy of which is annexed hereto as Exhibit "B", as the same may be amended from time to time in accordance with its terms.

"*Aqueduct Land Ground Lease*" shall mean the agreement to be executed by New NYRA and the FOB, as agent for the State, relating to the lease of certain portions of the Racetrack Property located at Aqueduct, a copy of which is annexed hereto as Exhibit "C", as the same may be amended from time to time in accordance with its terms.

"*Aqueduct Sublease*" shall mean the agreement to be executed by New NYRA and the VLT Operator, relating to, among other things, the lease of certain portions of the Racetrack Property located at Aqueduct, including certain facilities located in the clubhouse and grandstand at Aqueduct, a copy of which is annexed hereto as Exhibit "D", as the same may be amended from time to time in accordance with its terms.

"*Assembly*" shall mean The Assembly of the State of New York.

"*Ballfield Properties*" shall mean (a) Lots 62, 118, 119, 127, 133, 135, 136 and 138 of Block 11535, (b) Lots 73, 110 and 113 of Block 11536, (c) Lots 5, 9, 10, 12, 14 and 110 of Block 11551 and (d) Lot 204 of Block 11652 of the Tax Map of the County of Queens in the State of New York.

"*Belmont Ground Lease*" shall mean the agreement to be executed by New NYRA and the FOB, as agent for the State, relating to the lease and/or license of Racetrack Property, all improvements thereon and all physical assets appurtenant thereto located at Belmont, a copy of which is annexed hereto as Exhibit "E", as the same may be amended from time to time in accordance with its terms.

"*Business Day*" shall mean any day of the week other than a Saturday, Sunday or other day on which banks in the State of New York are required or permitted to close.

"*Chapter Amendment*" shall mean the amendment to the Legislation which shall correct certain technical errors and clarify certain provisions of the Legislation, including, without limitation, the distribution mechanism associated with the VLT Revenues.

"*Deeds*" shall mean, collectively, the deeds provided by Old NYRA to the People of the State of New York pursuant to which Old NYRA conveyed all of its right, title and interest in, to and under the Racetrack Properties.

"*DIP Agreements*" shall mean, collectively, that certain (a) Debtor-in-Possession Credit Agreement, dated as of November 3, 2006, between Old NYRA and the State, (b) Amended and Restated Debtor-in-Possession Loan and Security Agreement, dated as of March 16, 2007, between Old NYRA and the State and (c) Amendment No. 1 to Amended and Restated Debtor-in-Possession Loan and Security Agreement, dated as of March 28, 2008, between Old NYRA and the State.

"*DIP Facility* " shall mean the financing facility entered into by Old NYRA and the State in accordance with the terms and provisions of the DIP Orders and DIP Agreements.

"*DIP Orders*" shall mean, collectively, that certain (a) Final Order Authorizing, Nunc Pro Tunc, Debtor in Possession to Enter into Post-Petition Credit Agreement and Obtain Post-Petition Financing Pursuant to Sections 363 and 364 of the Bankruptcy Code and Granting Liens, Security Interests and Superpriority Claims, dated February 22, 2007, and (b) Order Authorizing Debtor in Possession Pursuant to Sections 363 and 364 of the Bankruptcy Code to Obtain Supplemental Postpetition Financing From the State of New York and Granting Liens, Security Interests, Superpriority Claims and Related Relief, dated March 16, 2007.

"*Effective Date*" shall mean the first (1st) Business Day after the date on which all conditions to effectiveness set forth in Section 6.2 hereof shall have been satisfied or waived in writing by each of the Parties.

"*Franchise*" shall mean the authority to conduct racing and pari-mutuel wagering thereon with respect to thoroughbred racing at the Racetracks, as provided for in Chapter 18 of the Laws of 2008.

"*GAAP*" shall mean generally accepted accounting principles in the United States in effect from time to time.

"*Ground Leases*" shall mean the Aqueduct Land Ground Lease, the Aqueduct Facilities Ground Lease, the Belmont Ground Lease and the Saratoga Ground Lease.

"*Leases*" shall mean, collectively, the Aqueduct Land Ground Lease, the Aqueduct Facilities Ground Lease, the Belmont Ground Lease, the Saratoga Ground Lease and the Aqueduct Sublease.

"*Legislature*" shall mean, jointly, the Assembly and the Senate.

"*NYRA Entities*" shall mean, collectively, Old NYRA and New NYRA.

"*Operating Cash*" shall mean (a) New NYRA's cash, as available on December 31st of any calendar year during the Term, used exclusively for operations and expressly excluding (1) all restricted cash accounts, (2) all segregated accounts as per

audited financial statements and (3) all cash on hand necessary to fund on-track pari-mutuel operations through the vault, including, without limitation, all cash maintained in New NYRA's vault in connection therewith minus (b) forty-five (45) days of New NYRA's then current year's budgeted expenses, as calculated pursuant to GAAP, which amount shall be calculated by dividing New NYRA's then current year's budgeted annual expenses by the number of days in such calendar year and multiplying such average amount by forty-five (45).

"*Person*" shall mean an individual, corporation, limited liability corporation, professional corporation, limited liability partnership, partnership, limited partnership, association, joint stock company, estate, legal representative, trust, unincorporated association, government or any political subdivision or agency thereof, and any business or legal entity and any spouses, heirs, predecessors, successors, representatives or assignees of any of the foregoing.

"*Racing and Wagering Board*" shall mean The New York State Racing and Wagering Board.

"*Racing Premises*" shall mean the premises leased or licensed to New NYRA in accordance with the terms and provisions of the Ground Leases and, as applicable, the Aqueduct Sublease; provided, however, that, upon recapture by the FOB of all or any portion of the Real Estate Development Parcels, such recaptured portions shall be deemed excluded from the term "Racing Premises".

"*Racetrack Properties*" shall mean all of the real property associated with the Racetracks and the operation thereof, including, without limitation, the land underlying each of the Racetracks, but expressly excluding the Ancillary Property and the Ballfield Properties.

"*Real Estate Development Parcels*" shall mean those parcels of land located at Aqueduct and Belmont which are expressly designated in the Aqueduct Facilities Ground Lease and the Belmont Ground Lease, respectively, as "Real Estate Development Parcels".

"*Saratoga Ground Lease*" shall mean the agreement to be executed by New NYRA and the FOB, as agent of the State, relating to the lease of Racetrack Property, all improvements thereon and all physical assets appurtenant thereto located at Saratoga, a copy of which is annexed hereto as Exhibit "F", as the same may be amended from time to time in accordance with its terms.

"*Senate*" shall mean The Senate of the State of New York.

"*Speaker*" shall mean the Speaker of the Assembly.

"*State Claims*" shall mean any and all claims of the State of New York or proofs of claim filed by the State of New York against Old NYRA in Old NYRA's chapter 11 case, all as set forth in Recital L to the Settlement Agreement.

"*State Obligations*" shall mean the obligations of Old NYRA to revert or escheat funds to the State as a result of the non-tendering of pari-mutuel tickets relating to the period prior to the Effective Date.

"*State Parties*" shall mean, jointly, the State and the FOB.

"*Supplemental DIP Loan*" shall mean the advance in the amount of Nine Million Dollars ($9,000,000.00) made by the State of New York to NYRA pursuant to the DIP Agreements.

"*Temporary President*" shall mean the Temporary President of the Senate.

"*VLT*" shall mean a video lottery terminal.

"*VLT Operations*" shall mean the operation of video lottery terminal gaming and related operations within the confines of the VLT Premises.

"*VLT Operator*" shall mean the entity selected by the State as the operator with respect the VLT Operations at Aqueduct, pursuant to a memorandum of understanding among the Governor, the Temporary President of the Senate, and the Speaker of the Assembly, upon prior consultation with Old NYRA or New NYRA, as the case may be.

"*VLT Premises*" shall mean that portion of Aqueduct designated for VLT Operations and referred to in the Aqueduct Sublease and which shall include (i) the gaming floor, (ii) the back-of-the-house area, (iii) gaming and non-gaming amenities related thereto and (iv) associated facilities and other portions of Aqueduct agreed upon by the State, the VLT Operator and New NYRA as necessary for the successful operation of video lottery gaming.

"*VLT Revenues*" shall mean the amount of total revenue wagered on VLTs at Aqueduct after payout for prizes won in accordance with Section 1612(b) of the New York State Tax Law.

Section 1.3    Other Terms. Other terms may be defined elsewhere in this Agreement and, unless otherwise indicated, shall have such meaning throughout this Agreement. As used in this Agreement, any reference to any federal, state, local, or foreign law, including any applicable law, will be deemed also to refer to such law as amended and all rules and regulations promulgated thereunder, unless the context requires otherwise. The words "*include*", "*includes*", and "*including*" will be deemed to be followed by "*without limitation*". Pronouns in masculine, feminine, or neuter genders will be construed to include any other gender, and words in the singular form will be

construed to include the plural and vice versa, unless the context otherwise requires. The words "*this Agreement*", "*herein*", "*hereof*", "*hereby*", "*hereunder*", and words of similar import refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited.

Section 1.4    Interpretation. The Parties have participated jointly in the negotiation and drafting of this Agreement. If an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the parties hereto and no presumption or burden of proof will arise favoring or disfavoring any party hereto because of the authorship of any provision of this Agreement.

## ARTICLE II
## FRANCHISE TERMS

Section 2.1    Term of Franchise. As of the Effective Date, New NYRA shall be granted the Franchise for the period from the date hereof up to and including the twenty-fifth (25th) anniversary hereof (the "*Term*"). Notwithstanding anything contained herein to the contrary, during the Term, New NYRA shall perform all of the functions as may be necessary or appropriate to conduct racing, racing operations, pari-mutuel and simulcast wagering at or with respect to the Racetracks. Without in any way limiting the foregoing, during the Term, New NYRA shall have the right and responsibility to manage and operate all functions at the Racing Premises, including, but not limited to, and subject to applicable Racing Law and regulations, (a) the hiring and management of racing secretaries, stewards, race officials, backstretch employees and other equine and racing related functions, (b) establishing the purses, the stakes program and owner's relations at the Racetracks, (c) maintenance of the Racing Premises and associated facilities, (d) the selection of vendors for food, beverage and other concessions on the Racing Premises, and (e) such other activities as may be approved by the FOB; provided, however, that New NYRA, in its discretion, may use or permit the use of the Real Estate Development Parcels or licensed premises at Belmont for business purposes unrelated to racing or racing operations; and, provided, further, that, in accordance with the Aqueduct Land Ground Lease and the Belmont Ground Lease, upon thirty (30) days' prior written notice from the FOB to New NYRA, New NYRA shall cease or cause the cessation of such non-racing activity on the Real Estate Development Parcels, and surrender possession thereof to the FOB in order to allow any FOB-approved development to proceed or such alternative use as may be approved by the FOB to be conducted on such property; and, provided, further, that, with the consent of the VLT Operator, which consent may be granted or withheld in the sole and absolute discretion of the VLT Operator, and subject to the requisite approvals, New NYRA may operate pari-mutuel and simulcast wagering on the VLT Premises.

Section 2.2    Performance Standards. From and after the Effective Date, New NYRA shall use its best efforts to satisfy the following performance standards (collectively, the "*Performance Standards*") with respect to racing operations against which Performance Standards New NYRA shall be evaluated by the FOB every four (4) years:

(a) Racing Dates. New NYRA shall apply to the Racing and Wagering Board to run racing a minimum of two hundred forty-six (246) total race days each calendar year, which racing days will include a minimum of (i) one hundred twenty (120) race days at Aqueduct, (ii) ninety (90) race days at Belmont and (iii) thirty-six (36) race days at Saratoga. Assignment of race days shall be subject to approval of the Racing and Wagering Board.

(b) New York Bred Races. New NYRA shall run a minimum of six hundred (600) New York bred races each year, subject to availability of a sufficient number of New York bred horses to run competitive races with customary field size. The number of New York bred races will be dependent on the State's foal crop and the continuation of State support of the State breeding industry substantially as currently operated.

(c) Stalls. New NYRA shall fill stalls at each of the Racetracks in a fair and equitable manner and subject to existing track customs so as to maximize field size and quality of horses on Racetrack grounds.

(d) Jockey and Equine Safety. New NYRA shall consider the advantages and disadvantages of installing synthetic surfaces at the Racetracks and training facilities with leading equine artificial surface experts from around the Nation to determine the advisability of such installation. Installation will be subject to FOB approval. New NYRA shall also consider other steps in consultation with industry experts to ensure jockey and equine safety.

(e) CAFO. New NYRA shall comply with the requirements of State Concentrated Animal Feeding Operation nutrient management plan and shall remediate and notify the FOB of any violation of such plan as soon as practicable.

(f) Backstretch. New NYRA shall develop and implement a plan, subject to approval of the FOB, to improve substantially over a five year period the condition of the housing and working environment for backstretch workers; provided, however, that compliance with this Performance Standard shall be conditioned on the State or the VLT Operator making required daily payments to New NYRA for track improvements and other capital expenditures in an amount equal to four percent (4%) of VLT Revenues.

(g) Saratoga Training. New NYRA shall maintain and operate the existing Saratoga training facility during the period from at least April 15 through November 1 of each year, subject to weather conditions.

(h) Handle and Attendance. New NYRA shall embrace objectives to encourage growth in on- and off-track handle through track and VLT Gaming marketing, simulcasting, and internet wagering. New NYRA shall use its reasonable best efforts to increase average daily handle at each of the Racetracks. New NYRA shall provide the FOB with such handle figures as the FOB may reasonably

request, at the conclusion of each meet, for consultation and discussion on patterns and trends that may necessarily be affecting this objective. The FOB and New NYRA shall work cooperatively to make any reasonable adjustments that may be necessary to meet the growth objectives. To the extent possible, similar objectives shall apply to on-track attendance. Recognizing patronage shifts between VLT Gaming, racing and simulcasting operations, and the long-term decline in racing attendance in the United States, New NYRA shall use its reasonable best efforts to maximize attendance at each of the Racetracks.

(i)     Purses. New NYRA shall not commingle horsemen's bookkeeper funds with its other funds.

(j)     Expenses. New NYRA shall operate its racing and wagering business so as to maintain (i) operating expense levels, (ii) levels of capital expenditures and the items on which such capital expenditures are spent and (iii) executive compensation at commercially reasonable levels and in accordance with racing and wagering industry standards and shall report to New NYRA and the FOB at least quarterly in each of such matters.

(k)     Community. New NYRA shall use its reasonable best efforts to maintain its tracks and facilities such that their physical appearance and conditions do not detract from the community; provided, however, that the parties recognize that New NYRA's ability to make major track investments and other capital expenditures is subject to receipt of daily payments from the State or the VLT Operator in an amount equal to four percent (4%) of VLT Revenues.

In accordance with Sections 2.3(a) and 7.10 of this Agreement, New NYRA will be entitled to receive notice of failures to satisfy these Performance Standards and, where feasible, the opportunity to cure such failures and material and/or repeated breaches (which repeated breaches the FOB shall determine, in the aggregate, constitute a material breach) of the Performance Standards, which, following delivery of such notice in accordance with the provisions of Section 7.10 hereof and an opportunity to cure in accordance with the Racing Law, may constitute grounds to terminate the Franchise. Notwithstanding the foregoing, nothing contained in this Section 2.2 shall limit the FOB from exercising its rights, powers, duties and obligations in accordance with the terms and provisions of the Racing Law.

Section 2.3     Revocation of the Franchise.

(a)     Alleged Non-Compliance with Standards. During the Term, the FOB shall notify New NYRA, in writing, of any alleged material breach of the Performance Standards or alleged repeated non-material breaches of the Performance Standards which the FOB has determined, when viewed in the aggregate, constitute an alleged material breach of such Performance Standards. Prior to the commencement of any action by the FOB with respect to such alleged material breach or determined material breach, the FOB shall provide written notice to New NYRA and New NYRA

shall have a reasonable opportunity to cure any such alleged material breach of the Performance Standards or alleged repeated non-material breaches of the Performance Standards which the FOB has determined, when viewed in the aggregate, constitute a material breach of such Performance Standards. Upon a written finding by the FOB that (a) a material breach of the Performance Standards or repeated non-material breaches of the Performance Standards which, when viewed in the aggregate, constitute a material breach of the Performance Standards has occurred and (b) such material breach or determined material breach has not been cured by New NYRA after a reasonable opportunity to cure has been provided, the FOB may recommend to the Racing and Wagering Board that the Franchise be revoked and this Agreement be terminated. If so referred, the Racing and Wagering Board shall conduct a hearing in accordance with Section 245 of the Racing Law.

(b)     Hearing and Review. Any hearing which may be held for the purpose of revoking the Franchise and terminating this Agreement shall be conducted in accordance with the terms and provisions of Section 245 of the Racing Law. In the event that, upon conclusion of any such hearing, the Racing and Wagering Board determines to revoke the Franchise and terminate this Agreement, the Racing and Wagering Board shall make an order and cause such order to be entered in the minutes of the Racing and Wagering Board and a copy thereof to be served upon New NYRA. Notwithstanding the foregoing, any action of the Racing and Wagering Board to revoke the Franchise and terminate this Agreement shall be reviewable by the Supreme Court of the State of New York, in the manner provided by and subject to the provisions of Article 78 of the New York Civil Practice Law and Rules.

Section 2.4     Franchise Fee. In consideration for the grant and use of the Franchise pursuant to the Legislation and this Agreement, during the Term, and on an annual basis, but in no event later than April 5th of any calendar year, New NYRA shall remit to the State a franchise fee to conduct pari-mutuel wagering at the Racetracks equal to the lesser of (a) Adjusted Net Income and (b) Operating Cash. New NYRA's failure to remit the franchise fee as required pursuant to this Section 2.4 and the Racing Law shall constitute a breach of this Agreement and Section 208 of the Racing Law and give rise to the right of the Racing and Wagering Board to seek the revocation of the Franchise and the termination of this Agreement in accordance with the terms and provisions of Sections 244 and 245 of the Racing Law.

Section 2.5     Governance

(a)     Articles/Charter/By-Laws. On or prior to the Effective Date, the NYRA Entities shall (1) have filed such documents with the State as are necessary to create New NYRA as a Type "C" New York State not-for-profit corporation, under the general supervision of the Office of the Attorney General, and transfer such assets as are necessary, and consistent with the terms and provisions of the Legislation, the Plan, the Settlement Agreement and herein, to New NYRA, (2) have filed with the Secretary of State articles of incorporation (the "*Articles*"), substantially in

form annexed hereto as Exhibit "G", and (3) have adopted by-laws (the "*By-Laws*"), substantially in the form annexed hereto as Exhibit "H".

(b)     Trustees. From and after the Effective Date, New NYRA's Board of Directors shall be comprised of twenty-five (25) members: (1) fourteen (14) of whom shall be selected by Old NYRA's existing Board of Directors or, with respect to the period following the Effective Date, by New NYRA's designated directors and not by the directors appointed by the Governor, the Speaker and the Temporary President, as the case may be, (2) seven (7) of whom shall be appointed by the Governor (of whom (i) one (1) shall be a current or former officer or director of a New York State Off-Track Betting Corporation, (ii) one (1) shall be appointed upon the recommendation of New York Thoroughbred Breeder's Inc., (iii) one (1) shall be appointed upon the recommendation of the New York Thoroughbred Horsemen's Association, or such other entity as is certified and approved pursuant to Section 228 of the Racing Law, and (iv) one (1) of whom shall be appointed upon the recommendation of the New York State American Federation of Labor and Congress of Industrial Organizations), (3) two (2) of whom shall be selected by the Speaker and (4) two (2) of whom shall be selected by the Temporary President; provided, however, that, in the event that, during the Term, the Legislature amends the Racing Law, or a rule, regulation or provision is promulgated, or otherwise, to modify the aggregate number of members of New NYRA's Board of Directors, the State and the FOB agree that, under all circumstances, the number of members appointed, and to be appointed, to New NYRA's Board of Directors in accordance with the provisions of Section 2.5(b)(1) above shall be equal to or greater than that set forth above in order to maintain or increase the percentage of members selected pursuant to Section 2.5(b)(1) above to those selected pursuant to the other subsections of this Section 2.5 and, to the extent required, New NYRA shall modify the Articles and By-Laws consistent therewith.

(c)     Executive Committee/Committees. The existence and powers and responsibilities of an executive committee and such other committees as are appointed by a majority of the Board of Directors shall be consistent with those set forth in the By-laws of New NYRA. Without limiting the foregoing, including, without limitation, the number of committees that may be appointed, the Board of Directors shall establish (1) a compensation committee to fix salary guidelines, such guidelines to be consistent with the operation of other first class thoroughbred racing operations in the United States, (2) a finance committee to review annual operating budgets for New NYRA and capital budgets for each of the Racetracks, (3) a nominating committee to nominate any new directors to be designated by New NYRA to replace the existing directors designated by New NYRA and (4) an executive committee (the "*Executive Committee*"); provided, however, that (i) each of the aforementioned committees shall include at least one of the directors designated by the Governor and (ii) the Executive Committee shall also include (a) at least one of the directors designated by the Speaker and (b) at least one of the directors designated by the Temporary President.

(d)     Officers. New NYRA shall determine all officers of the corporation.

(e)    Code of Conduct. On the Effective Date, New NYRA shall adopt, and during the Term be governed by, a Code of Conduct substantially in the form annexed hereto as Exhibit "I".

Section 2.6    Lease of Real Property. On the Effective Date, (a) (1) New NYRA and the FOB, on behalf of the State of New York, shall enter into the Ground Leases and (2) pursuant to an escrow agreement, New NYRA shall execute and deliver into escrow the Aqueduct Sublease, as sublessee, which Aqueduct Sublease shall be held in escrow and not become effective until such time as the VLT Operator is selected by the State and subject to binding and effective documentation in connection with the VLT Operations, and (b) as of the date that the VLT Operator is selected by the State and subject to binding and effective documentation in connection with the VLT Operations, which documentation shall include the execution of the Aqueduct Sublease by the VLT Operator, as sublessor, (1) all rights of New NYRA in, to and under the Aqueduct Facilities Ground Lease shall be assigned to the VLT Operator, (2) New NYRA shall be relieved from any and all obligations and liabilities under the Aqueduct Facilities Ground Lease thereafter arising, (3) the Aqueduct Facilities Ground Lease shall be amended and restated between and among the FOB, on behalf of the State of New York, as lessor, and the VLT Operator, as lessee, and (4) the Aqueduct Sublease shall be deemed released from escrow and become binding on the parties thereto.

Section 2.7    Totalizator Services/Internet Wagering Platform. New NYRA (a) shall have the right to select one or more vendors to provide New NYRA with totalizator services, subject to the review and approval by the FOB of any contract or agreement in connection therewith, and (b) subject to New NYRA's unilateral right to opt out, directly or indirectly, shall have the right to integrate its internet wagering platform with any such platform of an authorized off-track betting corporation; provided, however, that, in reviewing and approving any agreement referred to in clause (a) above, the FOB shall consider a proposed vendor's ability to reduce totalizator expenses and the general development and production costs of any internet wagering platform of New NYRA and any authorized off-track betting corporation.

Section 2.8    Operational Support Payments. New NYRA and the State agree that, in the event that VLT Operations are not scheduled to commence at Aqueduct on or prior to March 31, 2009, the State and New NYRA shall negotiate in good faith to provide New NYRA with payments necessary to support racing operations and satisfaction of New NYRA's operating expenses, including, without limitation, the payment of New NYRA's pension plan obligations, until the commencement of VLT Operations at Aqueduct. Upon the commencement of VLT Operations at Aqueduct, on a daily basis, and for the term of the license to operate VLTs at Aqueduct, an amount equal to three percent (3%) of total VLT Revenues derived from VLT Operations at Aqueduct shall be deposited by the VLT Operator, or distributed by the VLT Operator for the purpose of being deposited, into a New NYRA account to be used by New NYRA for the support of New NYRA's racing operations and satisfaction of New NYRA's operating expenses, including, without limitation, the payment of New NYRA's pension plan obligations (the "*Support Fee*"); provided, however, that, in the event that legislation is

passed providing for the installation of VLTs and the commencement of VLT Operations at a location at which New NYRA operates racing and pari-mutuel wagering other than Aqueduct, prior to the installation thereof, the State and New NYRA shall negotiate in good faith to adjust the amount of the Support Fee for the benefit of New NYRA.

Section 2.9    Capital Expenditures. New NYRA and the State agree that, in the event that VLT Operations are not scheduled to commence at Aqueduct on or prior to March 31, 2009, the State and New NYRA shall negotiate in good faith to provide New NYRA with payments necessary to support New NYRA's capital expenditures in maintaining and upgrading the Racetracks. Upon commencement of VLT Operations at Aqueduct, on a daily basis, and for the term of the license to operate VLTs at Aqueduct, an amount equal to four percent (4%) (the "*CAPEX Amount*") of VLT Revenues shall be deposited by the VLT Operator, or distributed by the VLT Operator for the purpose of being deposited, into a New NYRA account designated by New NYRA (the "*CAPEX Account*") to be used by New NYRA for capital expenditures in maintaining and upgrading the Racetracks; provided, however, that, in the event that legislation is passed providing for the installation of VLTs and the commencement of VLT Operations at a location at which New NYRA operates racing and pari-mutuel wagering other than Aqueduct, prior to the installation thereof, the State and New NYRA shall negotiate in good faith to adjust the amount of the CAPEX Amount for the benefit of New NYRA; and, provided, further, that, New NYRA may use the funds in the CAPEX Account for the payment of (1) taxes associated with the receipt of the CAPEX Amount or deposit thereof in the CAPEX Account and (2) debt service associated with borrowings or other indebtedness incurred in connection with maintaining and upgrading the Racetracks.

Section 2.10    Purse Support. From and after the Effective Date, on a daily basis, and upon commencement of VLT Operations at Aqueduct and thereafter for the term of the license to operate VLTs at Aqueduct, during the Term, an amount equal to (a) six and one-half percent (6.5%) of VLT Revenues for the first (1st) year of VLT Operations at Aqueduct, (b) seven percent (7%) of VLT Revenues for the second (2nd) year of VLT Operations at Aqueduct and (c) seven and one-half percent (7.5%) of VLT Revenues for the third (3rd) year of VLT Operations at Aqueduct and thereafter, shall be deposited by the VLT Operator, or distributed by the VLT Operator for the purpose of being deposited, into a New NYRA account to be used by New NYRA solely for the enhancement and funding of purses for races run at the Racetracks.

Section 2.11    Breeder Support. From and after the Effective Date, on a daily basis, and upon commencement of VLT Operations at Aqueduct and thereafter for the term of the license to operate VLTs at Aqueduct, during the Term, an amount equal to (a) one percent (1%) of VLT Revenues for the first (1st) year of VLT Operations at Aqueduct, (b) one and one-quarter percent (1.25%) for the second (2nd) year of VLT Operations at Aqueduct and (c) one and one-half percent (1.5%) for the third (3rd) year of VLT Operations at Aqueduct and thereafter, shall be deposited by the VLT Operator, or distributed by the VLT Operator for the purpose of being deposited, into a New NYRA account to be used by New NYRA solely for the enhancement and funding of breeding for the manner of racing conducted at the Racetracks.

Section 2.12    Financing.

(a)    New NYRA Financing.  Nothing contained herein shall limit New NYRA's ability to incur indebtedness, including, without limitation, the issuance of non-convertible securities in connection therewith, and grant liens on and security interests in New NYRA's assets and interests, including, without limitation, the revenue streams set forth herein; provided, however, that the incurrence of indebtedness or the granting of liens or security interests, other than those arising in the ordinary course of business, including, without limitation, materialmen's and mechanics' liens, shall require the prior approval of the FOB; and, provided, further, that, unless the prior approval of the FOB, or such other entity as may be required, is obtained, New NYRA shall not create any lien or security interest in any asset that is leased or licensed to New NYRA by the FOB or otherwise runs with the Franchise, the repayment with respect to which would extend beyond the Term.

(b)    State Financing.  The State, through the Urban Development Corporation, may borrow to fund capital improvements at the Racetracks and borrow, on behalf of New NYRA, pursuant to FOB approval, secured against New NYRA's right to receive payments for capital improvements in accordance with Section 2.9 hereof; provided, however, that, the indenture or other instrument or agreement executed in connection with any such borrowing shall restrict the use of net proceeds to capital expenditures at the Racetracks; and, provided, further that any such borrowing shall be secured only by such future stream of capital improvement payments payable to New NYRA pursuant to Section 2.9 hereof.  The Urban Development Corporation shall initially borrow funds necessary for approved capital expenditures in years one through five of the Franchise and, then, at appropriate times as determined by the FOB, for years six through ten, years eleven through fifteen, years sixteen through twenty and years twenty-one through twenty-five.  The amount of borrowing for approved capital expenditures shall not exceed the amount that would have been paid out for facility improvements in the event the full payment pursuant to subdivision "F" of Section Sixteen Hundred Twelve of the Tax Law for that purpose was made.

Section 2.13    Racetrack Operations.

(a)    Aqueduct.  The State and New NYRA agree that the thoroughbred racing schedule at Aqueduct shall be substantially similar to the current racing schedule.  The State reserves the right to develop, or select a third party to develop, retail, hotel and entertainment facilities (or such other uses or facilities as may be approved by the FOB) at Aqueduct on the Real Estate Development Parcels and/or the VLT Premises in conjunction with (i) the VLT Operations or (ii) otherwise; provided, however, that, any such real estate development shall prohibit the conduct of pari-mutuel and simulcast wagering at Aqueduct by any party other than New NYRA; and, provided, further, that, any such real estate development shall only be undertaken (i) if by a third party, pursuant to a competitive bidding process approved by the FOB, (ii) after consultation with the local advisory board referred to in Section 212 of the Racing Law and consideration of local zoning and planning regulation, and (iii) in a manner that will

not adversely impact any historic structure that is included in or eligible for inclusion in the National or State Register of Historic Places, and shall be subject to the unanimous approval of the FOB and all applicable statutory and regulatory requirements and permitted waivers thereof. The State shall not seek to develop any such retail, hotel entertainment facilities on the portions of Aqueduct that constitute the Racing Premises; and, provided, further, that the State or a lessee other than New NYRA may develop the shared parking area at Aqueduct if adequate substitute parking is provided to New NYRA.

(b) Belmont. The State and New NYRA agree that the thoroughbred racing schedule at Belmont shall be substantially similar to the current racing schedule. The State reserves the right to develop, or select a third party to develop, facilities at Belmont on the Real Estate Development Parcels in the manner and subject to the limitations set forth in Section 10.1 of the Belmont Ground Lease; provided, however, that, any such real estate development shall only be undertaken (i) if by a third party, pursuant to a competitive bidding process approved by the FOB, (ii) after consultation with the local advisory board referred to in Section 212 of the Racing Law, if any, and (iii) in a manner that will not adversely impact any historic structure that is included in or eligible for inclusion in the National or State Register of Historic Places, and shall be subject to the unanimous approval of the FOB and all applicable statutory and regulatory requirements and permitted waivers thereof.

(c) Saratoga. The parties hereto agree that the thoroughbred racing schedule at Saratoga shall be substantially similar to the current racing schedule. The State acknowledges that no VLT facilities will be installed at Saratoga and that the historic and unique character of Saratoga will be preserved.

Section 2.14 Real Estate Taxes. During the Term, and consistent with the provisions set forth in the Legislation, New NYRA shall not be taxable and shall have no obligation to pay real estate taxes or payments in lieu of such taxes associated with the ownership, lease or use of the Racetrack Properties, including, without limitation, the Racing Premises, any and all such obligations being the sole and exclusive obligation and responsibility of the State.

## ARTICLE III
## VLT OPERATIONS

Section 3.1 Aqueduct. The State, in consultation with New NYRA (but not subject to New NYRA's approval) shall select an entity to develop VLTs and serve as the VLT Operator to operate VLTs on the VLT Premises. The State, the FOB, the VLT Operator and New NYRA shall use their commercially reasonable best efforts to coordinate issues associated with the VLT Operations and New NYRA's racing operations, and the lease and such other agreement between the State (acting through the FOB) and the VLT Operator shall contain appropriate terms and conditions to address the joint use and occupancy of Aqueduct by the VLT Operator and New NYRA and the interests and the requirements of New NYRA with respect to its racing and pari-mutuel

operations. Without in any way limiting the foregoing, the VLT Operations at Aqueduct shall be guided by the following principles:

(a)     New NYRA and the VLT Operator shall cooperate with each other on the design and construction of the VLT Premises.

(b)     The VLT Premises shall be constructed by, and at the sole cost and expense of, the State, its agencies and authorities, the VLT Operator, and other public and private investors, and such construction shall be performed in accordance with the terms and provisions of Section 5.2(c) of the Aqueduct Sublease.

(c)     From and after the commencement of VLT Operations at Aqueduct, no admission price shall be paid by customers for entry into Aqueduct, the Racing Premises or the VLT Premises, except for admission to movies, night clubs, gymnasiums, boxing and wrestling matches and other live performances or other leisure and entertainment activities, and, upon entry to Aqueduct, customers shall have the ability to access either the VLT Premises or the Racing Premises without any undue restrictions.

(d)     The VLT Operator and New NYRA may enter into an operating agreement and form a joint operating committee to ensure that the facilities are operated in a first-class, customer-friendly, manner consistent with maximizing returns to each of the parties. Subject to government requirements, the operating agreement may address hours of operation, maintenance issues, capital improvements, etc. The parties may agree on a cost sharing agreement for common costs, which agreement may include provisions for shared services and staffing, where appropriate.

(e)     The VLT Operator and New NYRA may enter into agreements that provide for an appropriate marketing plan and budget to support attendance at Aqueduct and the VLT Premises. Each entity may supplement the marketing plan with its own targeted marketing plan, provided that such supplemental plan shall not be prejudicial to the marketing efforts of the other.

(f)     Any agreements between the VLT Operator and New NYRA will provide for the resolution of any disputes between the VLT Operator and New NYRA; provided, however, that, in the event that such parties are unable to resolve any particular dispute, any operating agreement shall provide for binding arbitration under the rules of the American Arbitration Association or such other appropriate organization

(g)     With the consent of the VLT Operator, which consent may be granted or withheld in the sole and absolute discretion of the VLT Operator, and subject to the requisite approvals, New NYRA may conduct pari-mutuel and simulcast wagering on the VLT Premises.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES

Section 4.1    Representation and Warranties of the FOB. The FOB hereby represents and warrants that: (a) it is duly organized and validly existing under the Legislation, which constitutes the articles of organization of the FOB, with all requisite power and authority to execute this Agreement and to consummate the transactions contemplated hereby; (b) it has full requisite power and authority to execute and deliver and to perform its obligations under this Agreement, and the execution, delivery and performance hereof, and the instruments and documents required to be executed by it in connection herewith (i) have been duly and validly authorized by it and (ii) are not in contravention of its articles of organization or any agreements specifically applicable to it; and (c) no proceeding, litigation or adversary proceeding before any court, arbitrator or administrative or governmental body is pending against it which would adversely affect its ability to enter into this Agreement or to perform its obligations hereunder.

Section 4.2    Representations and Warranties of the State. The State hereby represents and warrants that: (a) it has full requisite power and authority to execute and deliver and to perform its obligations under this Agreement, and the execution, delivery and performance hereof, and the instruments and documents required to be executed by it in connection herewith (i) have been duly and validly authorized by it and (ii) are not in contravention of any agreements specifically applicable to it, including, without limitation, the Constitution of the State of New York, which constitutes the State's articles of organization, or any existing New York State law, court or administrative regulation, decree or order, to which the State is subject or by which it is bound; (b) no proceeding, litigation or adversary proceeding before any court, arbitrator or administrative or governmental body is pending against it which would adversely affect its ability to enter into this Agreement or to perform its obligations hereunder; and (c) it, or one of its affiliated State Parties, directly or indirectly, has the power and authority to bind each other State Entity to the terms of this Agreement or otherwise has been duly authorized by such other State Entity to execute and deliver this Agreement on its behalf.

Section 4.3    Representation and Warranties of New NYRA. New NYRA hereby represents and warrants that: (a) subject to entry of the Approval Order, it is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization with all requisite power and authority to carry on the business in which it is engaged, to own the properties it owns, to execute this Agreement and to consummate the transactions contemplated hereby; (b) subject to entry of the Approval Order, it has full requisite power and authority to execute and deliver and to perform its obligations under this Agreement, and the execution, delivery and performance hereof, and the instruments and documents required to be executed by it in connection herewith (i) have been duly and validly authorized by it and (ii) are not in contravention of its organization documents or any material agreement specifically applicable to it; and (c) no proceeding, litigation or adversary proceeding before any court, arbitrator or

administrative or governmental body is pending against it which would adversely affect its ability to enter into this Agreement or to perform its obligations hereunder.

## ARTICLE V
## COVENANTS

Section 5.1    Covenants of the FOB. The FOB hereby covenants and agrees as follows:

(a)    On the Effective Date, the FOB shall provide New NYRA with a certificate to the effect that each of the representations and warranties set forth in Section 4.1 of this Agreement is true and correct as of the Effective Date.

Section 5.2    Covenants of New NYRA. New NYRA hereby covenants and agrees as follows:

(a)    On the Effective Date, New NYRA shall provide the FOB with a certificate to the effect that each of the representations and warranties set forth in Section 4.2 of this Agreement is true and correct as of the Effective Date.

(b)    From and after the Effective Date, New NYRA shall operate its business and conduct racing operations at the Racetracks, including, without limitation, running races, steeplechases and race meetings and conducting pari-mutuel and simulcast wagering thereon, in accordance with the applicable provisions of this Agreement, the Legislation, the Chapter Amendment and the Racing Law and the applicable rules and regulations of the Racing and Wagering Board.

(c)    Unless otherwise agreed to by the FOB and New NYRA, during the period from and after the Effective Date, New NYRA shall fund purses for races run at the Racetracks in an amount, calculated in the aggregate on an annual basis for the preceding year as of December 31 of each year, not greater than (1) such amount as may be required by the Laws of New York State plus (2) such additional amount as may be required to reduce Old NYRA's "purse cushion" pursuant to the terms and conditions of the Racing Law and any order of the Bankruptcy Court.

## ARTICLE VI
## EFFECTIVENESS AND TERMINATION OF AGREEMENT

Section 6.1    Closing. The consummation of the transactions contemplated hereby shall take place at a closing to be held at 10:00 am., New York time, on the Effective Date at the offices of Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, or such other date or place as is mutually agreed upon in writing by the Parties hereto.

Section 6.2    Conditions to Effective Date. The effectiveness of the terms and provisions of this Agreement are expressly subject to the following conditions unless and to the extent waived in writing by the Parties:

(a)    The execution and delivery of this Agreement by each of the entities identified on the signature pages of this Agreement.

(b)    The effectiveness of the Approval Order and the consummation of the Modified Plan have not been enjoined or otherwise stayed.

(c)    The filing of the Articles with the Secretary of State of the State of New York and confirmation of acceptance of such filing has been filed with the Racing and Wagering Board and the FOB.

(d)    The execution and delivery of such documents as necessary to convey all of Old NYRA's right, title and interest in the Racetrack Properties and such other Transferred Property to the People of the State of New York.

(e)    The execution and delivery of the Leases.

(f)    The contemporaneous substantial consummation of the transactions contemplated by the Plan.

(g)    The payment of funds and the waiver of obligations required pursuant to Section 2.4 of the Settlement Agreement.

(h)    The execution and delivery of the License Agreement.

(i)    The entry by the Bankruptcy Court of an order in aid of consummation of the Modified Plan and approving the form and substance of this Agreement and the Settlement Agreement, in form and substance reasonably satisfactory to the State and the FOB.

Section 6.3    Termination of Agreement. In the event that the Franchise (i) shall be duly revoked by a Final Order, (ii) shall expire and the Term not be otherwise renewed or extended, or (iii) shall otherwise terminate in accordance with the provisions of the Racing Law, then (a) this Agreement, the License Agreement and the Leases shall be deemed, automatically, without further notice or legal action, terminated as of such date, and, except as provided herein, neither New NYRA nor the FOB shall have any further obligations to the other party under this Agreement, the License Agreement or the Leases to the extent arising from and after the date thereof, and (b) all property of New NYRA shall be deemed irrevocably relinquished to the State, including, without limitation, any then-present or future rights that New NYRA may have, or might claim with respect to thoroughbred racing facilities and associated assets located, or subsequently located, at the Racetracks, including (i) the land underlying the Racetracks, (ii) all improvements thereon and all physical assets thereon, including, without

limitation, all capital improvements made by New NYRA to the Racetracks during the Term and (iii) all assets associated with the Franchise and the operation of the Racetracks, including, without limitation, all rights to Intellectual Property now existing or hereafter created, and any and all Franchise rights or interests in such assets, including, but not limited to, leasehold improvements and interests, contracts and contractual rights, works of art, and all other personalty then in New NYRA's possession or control.

## ARTICLE VII
## MISCELLANEOUS

Section 7.1     Amendments. This Agreement may not be modified, amended or supplemented except by a written agreement executed by each Party to be affected by such modification, amendment or supplement; provided, however, that (a) the agreement to pay, or cause the payment of, the Support Fee and the CAPEX Amount to New NYRA in accordance with Sections 2.8 and 2.9 hereof, respectively, (upon which payments and levels Old NYRA relied upon in connection with the proposal, confirmation and consummation of the Modified Plan) is not intended, nor shall it be construed, to limit the rights and authority of the Legislature to take such actions, including, without limitation, the passage of legislation during the Term, as the Legislature deems appropriate, necessary and in the best interests of racing, racing operations, the racing industry or otherwise and (b) in the event that any of the levels of consideration set forth in Sections 2.8 and 2.9 of this Agreement are increased or decreased pursuant to legislation passed by the Senate and the Assembly and enacted into law, the terms and provisions of Sections 2.8 and 2.9 hereof shall be deemed modified, amended or supplemented, without action necessary by any Party hereto, solely to reflect such increased or decreased levels of consideration; provided, however, that, in the event that such levels of consideration are decreased pursuant to legislation passed by the Senate and Assembly and enacted into law, (i) nothing contained herein or in any other agreement, instrument or document executed and delivered in connection herewith is intended, nor should it be construed, to limit or otherwise waive the rights, claims or causes of action of the NYRA Entities to recover from, among others, the State (but not the VLT Operator) the amounts of VLT Revenues to be paid to New NYRA in accordance with the provisions of Section 1612, Subdivisions (f)(1) and (2) of the New York State Tax Law as in existence as of the enactment of the Legislation and (ii) New NYRA shall have the right to commence an action against, among others, the State (but not the VLT Operator) for damages based upon the amount of such decreased levels of consideration.

Section 7.2     Good Faith Negotiations. The Parties further recognize and acknowledge that each of the Parties hereto is represented by counsel, and such Party received independent legal advice with respect to the advisability of entering into this Agreement. Each of the Parties acknowledges that the negotiations leading up to this Agreement were conducted regularly and at arm's length; this Agreement is made and executed by and of each Party's own free will; that each knows all of the relevant facts and his or its rights in connection therewith, and that he or it has not been improperly influenced or induced to make this settlement as a result of any act or action on the part

of any party or employee, agent, attorney or representative of any party to this Agreement.

Section 7.3    Third Party Beneficiaries. Nothing in this Agreement, express or implied, is intended or shall be construed to confer upon, or to give to, any Person other than the Parties hereto and their respective successors and assigns, any right, remedy or claim under or by reason of this Agreement or any covenant, condition or stipulation thereof; and the covenants, stipulations and agreements contained in this Agreement are and shall be for the sole and exclusive benefit of the Parties hereto and their respective successors and assigns.

Section 7.4    Governing Law and Service of Process. This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York, without giving effect to any principles of conflicts of law. Any legal action, suit or proceeding between New NYRA and either of the FOB or the State with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, shall be brought in any court of competent jurisdiction within the State of New York. The Parties hereby agree and consent that service of process therein may be made, and personal jurisdiction over any Party hereto in any such action, suit or proceeding may be obtained, by service of a copy of the summons, complaint and other pleadings required to commence such action, suit or proceeding upon the Party at the address of such Party set forth in Section 7.10 hereof, unless another address has been designated by such Party in a notice given to the other Parties in accordance with Section 7.10 hereof.

Section 7.5    Specific Performance. It is understood and agreed by the Parties that money damages may not be a sufficient remedy for any breach of this Agreement by any Party and each non-breaching Party may be entitled to specific performance and injunctive or other equitable relief as a remedy of any such breach; provided, however, that the Parties agree that New NYRA shall be entitled to specific performance and injunctive or other equitable relief in order to enforce the provisions of Section 2.5 hereof regarding the composition of New NYRA's Board of Directors.

Section 7.6    Headings. The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and are not part of this Agreement and do not in any way limit or modify the terms or provisions of this Agreement and shall not affect the interpretation hereof.

Section 7.7    Binding Agreement Successors and Assigns; Joint and Several Obligations. This Agreement shall be binding upon New NYRA, the State and the FOB only upon the execution and delivery of this Agreement by the Parties listed on the signature pages hereto. This Agreement is intended to bind and inure to the benefit of the State, the FOB and New NYRA and their respective successors, assigns, administrators, constituents and representatives; provided, however, that this Agreement shall not be assignable by New NYRA without the prior written consent of the State and the FOB; and, provided, further, that any assignment of this Agreement and the rights and

obligations set forth herein by the State or the FOB shall not impair any of the rights provided to New NYRA hereunder or pursuant to the Laws of New York State.

Section 7.8 Entire Agreement. This Agreement, together with all documents and agreements entered into pursuant to this Agreement, including, but not limited to, the Approval Order, the Modified Plan, the Legislation, the Chapter Amendment and the State Settlement Agreement, constitute the full and entire agreement between the Parties with regard to the subject hereof, and supersedes all prior negotiations, representations, promises or warranties (oral or otherwise) made by any Party with respect to the subject matter hereof. No Party has entered into this Agreement in reliance on any other Party's prior representation, promise or warranty (oral or otherwise) except for those that are expressly set forth in this Agreement.

Section 7.9 Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original copy of this Agreement and all of which, when taken together, shall constitute one and the same Agreement. Copies of executed counterparts transmitted by telecopy or other electronic transmission service shall be considered original executed counterparts, provided receipt of copies of such counterparts is confirmed.

Section 7.10 Notices. All demands, notices, requests, consents, and other communications hereunder shall be in writing and shall be deemed to have been duly given (i), when personally delivered by courier service or messenger, (ii) upon actual receipt (as established by confirmation of receipt or otherwise) during normal business hours, otherwise on the first business day thereafter if transmitted by facsimile, electronic mail or telecopier with confirmation of receipt, or (iii) three (3) Business Days after being duly deposited in the mail, by certified or registered mail, postage prepaid-return receipt requested, to the following addresses, or such other addresses as may be furnished hereafter by notice in writing, to the following Parties:

If to New NYRA, to:

> The New York Racing Association, Inc.
> Aqueduct Racetrack
> 110-00 Rockaway Boulevard
> South Ozone Park, New York 11417
> Attention: General Counsel
> Telecopy: (718) 835-2432

with a copy to:

> WEIL, GOTSHAL & MANGES LLP
> 767 Fifth Avenue
> New York, New York 10153
> Attention: Brian S. Rosen, Esq.
> Telecopy: (212) 310-8007

If to the State or the FOB, to:

Franchise Oversight Board
c/o Executive Chamber
The Capitol
Albany, New York  12224
Attention:  Counsel
Telecopy:  (518) 486-9652

with a copy to:

Empire State Development Corporation
633 Third Avenue
New York, New York  10017
Attention: President
Telecopy:  (212) 803-3715

-and-

New York State Office of the Attorney General
Litigation Bureau (Bankruptcy Section)
The Capitol
Albany, New York 12224
Attention:  Counsel
Telecopy:  (518) 473-1572

-and-

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
Attention:  Alan W. Kornberg, Esq.
Telecopy:  (212) 757-3990

Section 7.11    Further Assurances. Each of the Parties hereto agrees to execute and deliver, or to cause to be executed and delivered, all such instruments, and to take all such action as the other Parties may reasonably request in order to effectuate the intent and purposes of, and to carry out the terms of, this Agreement.

Section 7.12    State Appendix. New York State Appendix A, a copy of which is annexed hereto as Exhibit "J", is incorporated herein and made a part of this Agreement.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of the date set forth above.

THE NEW YORK RACING
ASSOCIATION, INC.

By: _____
    Name:  C. Steven Duncker
    Title:  Chairman

THE NEW YORK STATE FRANCHISE
OVERSIGHT BOARD

By: _____
    Name: Laura L. Anglin
    Title: Chairperson

THE STATE OF NEW YORK

By:_____
    Name:
    Title:

Approved as to form by:

THE OFFICE OF THE ATTORNEY
    GENERAL OF THE STATE OF NEW
    YORK

By:_____
    Name:
    Title:

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of the date set forth above.

THE NEW YORK RACING
ASSOCIATION, INC.

By: _____

    Name:  C. Steven Duncker
    Title:  Chairman

THE NEW YORK STATE FRANCHISE
OVERSIGHT BOARD

By: _____

    Name:
    Title:

THE STATE OF NEW YORK

By: *David A. Paterson*

    Name:  David A. Paterson
    Title:  Governor

Approved as to form by:

THE OFFICE OF THE ATTORNEY
    GENERAL OF THE STATE OF NEW
    YORK

By: _____

    Name:
    Title:

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be
executed as of the date set forth above.

THE NEW YORK RACING
ASSOCIATION, INC.

By: _____
Name:  C. Steven Duncker
Title:  Chairman

THE NEW YORK STATE FRANCHISE
OVERSIGHT BOARD

By: _____
Name: Laura L. Anglin
Title: Chairperson

THE STATE OF NEW YORK

By: _____
Name:
Title:

Approved as to form by:

THE OFFICE OF THE ATTORNEY
GENERAL OF THE STATE OF NEW
YORK

By: _____
Name:
Title:

APPROVED AS TO FORM
NYS ATTORNEY GENERAL

SEP 12 2008

Peter Favretto
PETER FAVRETTO
ASSOCIATE ATTORNEY

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of the date set forth above.

THE NEW YORK RACING
ASSOCIATION, INC.

By: _____
    Name:  C. Steven Duncker
    Title:  Chairman

THE NEW YORK STATE FRANCHISE
OVERSIGHT BOARD

By: _____
    Name:
    Title:

THE STATE OF NEW YORK

By: *David A. Paterson*
    Name:
    Title:

Approved as to form by:

THE OFFICE OF THE ATTORNEY
GENERAL OF THE STATE OF NEW
YORK

By: _____
    Name:
    Title:

```
APPROVED AS TO FORM
NYS ATTORNEY GENERAL

SEP 12 2008

PETER FAVRETTO
ASSOCIATE ATTORNEY
```

# EXHIBIT D

**DECLARATION OF HENRY M. GREENBERG, ESQ.**

**06/30/2021**

---

**SARATOGA RACE COURSE**

**GROUND LEASE AGREEMENT**

**September 12, 2008**

SARATOGA RACE COURSE

GROUND LEASE AGREEMENT

between

THE PEOPLE OF THE STATE OF NEW YORK ACTING BY AND
THROUGH THE STATE FRANCHISE OVERSIGHT BOARD
PURSUANT TO CHAPTER 18 OF THE LAWS OF 2008
as Lessor,

and

THE NEW YORK RACING ASSOCIATION, INC.

as Lessee

September 12, 2008

# TABLE OF CONTENTS

ARTICLE I Grant, Term of Lease and Certain Definitions ................................................. 1
   1.1    Leasing Clause ........................................................................................... 1
   1.2    Term ............................................................................................................ 2
   1.3    Certain Definitions .................................................................................... 2

ARTICLE II Rental ........................................................................................................... 4
   2.1    Base Rental ................................................................................................. 4

ARTICLE III Impositions and Utilities ........................................................................... 4
   3.1    Payment of Impositions ............................................................................. 4
   3.2    Additional Charges and Utilities ............................................................... 5
   3.3    Operating Expenses ................................................................................... 5

ARTICLE IV Improvements and Alterations ................................................................... 5
   4.1    Improvement Rights and Alterations; Capital Plan ................................... 5
   4.2    Easements and Dedications ........................................................................ 6
   4.3    Zoning ........................................................................................................ 7
   4.4    Indemnification for Mechanics' Liens ...................................................... 7

ARTICLE V Use of Leased Premises .............................................................................. 7
   5.1    Permitted Uses ........................................................................................... 7
   5.2    Compliance with Laws .............................................................................. 7
   5.3    Maintenance and Repairs .......................................................................... 8
   5.4    Disposition of Personal Property ............................................................... 8

ARTICLE VI Insurance .................................................................................................... 9
   6.1    Required Coverages of Lessee ................................................................... 9

ARTICLE VII Assignment and Subletting ...................................................................... 9
   7.1    Assignment ................................................................................................ 9
   7.2    Concessions, Subletting and Licensing ..................................................... 9
   7.3    General Provisions ................................................................................... 10
   7.4    Transfer by Lessor of the Leased Premises ............................................. 10

ARTICLE VIII Leasehold Mortgages/Subordination .................................................... 11
   8.1    Lessor's Consent to Leasehold Mortgage ............................................... 11

ARTICLE IX Default of Lessee ..................................................................................... 11
   9.1    Non-Revocation Events of Default .......................................................... 11
   9.2    Remedies for Non-Revocation Event of Default ..................................... 11
   9.3    Revocation of Franchise Agreement ........................................................ 12
   9.4    Lease Termination Following Revocation of Franchise Agreement ........ 12
   9.5    No Waiver ................................................................................................ 12
   9.6    Remedies Cumulative .............................................................................. 12

ARTICLE X Intentionally Omitted ................................................................................. 13

ARTICLE XI Casualty Restoration ............................................................................... 13
    11.1    Notice of Damage .......................................................................... 13
    11.2    Obligation to Restore ..................................................................... 13
    11.3    Restoration Funds .......................................................................... 13
    11.4    No Termination or Abatement ........................................................ 15

ARTICLE XII Representations, Warranties and Special Covenants................................ 16
    12.1    Lessor's Representations, Warranties and Special Covenants ................. 16
    12.2    Lessee's Representations, Warranties and Special Covenants ................. 17

ARTICLE XIII Indemnification, Waiver and Release ...................................................... 18
    13.1    Lessee Indemnification .................................................................. 18
    13.2    Lessor's Indemnification ................................................................ 18
    13.3    Survival ......................................................................................... 18

ARTICLE XIV Miscellaneous ....................................................................................... 18
    14.1    Inspection ...................................................................................... 18
    14.2    Estoppel Certificates ..................................................................... 19
    14.3    Lease Termination Agreement........................................................ 19
    14.4    Notices .......................................................................................... 19
    14.5    Modifications ................................................................................. 20
    14.6    Descriptive Headings ..................................................................... 21
    14.7    Force Majeure ............................................................................... 21
    14.8    Partial Invalidity............................................................................ 21
    14.9    Applicable Law and Venue............................................................. 21
    14.10   Attorneys' Fees ............................................................................. 21
    14.11   Net Rental ..................................................................................... 21
    14.12   No Broker....................................................................................... 21
    14.13   Memorandum of Lease .................................................................. 22
    14.14   No Waiver...................................................................................... 22
    14.15   Consents........................................................................................ 22
    14.16   Non-Interference............................................................................ 22
    14.17   Primacy of Documents................................................................... 23
    14.18   Counterparts.................................................................................. 23
    14.19   State Appendix............................................................................... 23
    14.20   Regulatory Space .......................................................................... 23
    14.21   Lessor Mortgage of Leased Premises ............................................ 23
    14.22   Successors and Assigns.................................................................. 23

## GROUND LEASE AGREEMENT

GROUND LEASE AGREEMENT (this "Lease"), dated as of
September /2, 2008, by and between THE PEOPLE OF THE STATE OF NEW YORK
ACTING BY AND THROUGH THE STATE FRANCHISE OVERSIGHT BOARD
PURSUANT TO CHAPTER 18 OF THE LAWS OF 2008, having an address at c/o
Executive Chamber, The Capitol, Albany, New York 12224, Attn: Chairman (the
"Lessor"), and THE NEW YORK RACING ASSOCIATION, INC., a not-for profit
racing corporation incorporated pursuant to Section 402 of the Not-For-Profit
Corporation Law of the State of New York, as authorized by Chapter 18 of the Laws of
2008, with a place of business at 110-00 Rockaway Boulevard, South Ozone Park, New
York 11417 (the "Lessee"), sometimes collectively referred to herein as the "Parties" or
singularly as a "Party."

## RECITALS

Contemporaneously with the execution of this Lease, and pursuant to (i)
the authority granted by Chapter 18 of the Laws of 2008 passed February 13, 2008, by
the New York State Senate and the New York State Assembly, and signed into law by the
Governor of the State on February 19, 2008 (as the same may hereafter be amended, the
"Legislation"), (ii) the Chapter 11 plan filed by the New York Racing Association Inc.
("Old NYRA") pursuant to section 1121(a) of the Bankruptcy Code (the "Plan"), as
confirmed by an order, dated April 28, 2008, of the United States Bankruptcy Court for
the Southern District of New York and (iii) the State Settlement Agreement made by and
among Lessee, Old NYRA and the State of New York, the New York State Racing and
Wagering Board, the New York State Non-Profit Racing Association Oversight Board
and the New York State Division of the Lottery (the "Settlement Agreement"), Old
NYRA is conveying all right, title and interest in and to the Leased Premises (as
hereinafter defined) to Lessor. Lessor and Lessee are concurrently herewith entering into
that certain Franchise Agreement (as hereinafter defined) pursuant to which Lessee is
granted the Franchise (as hereinafter defined) to conduct thoroughbred racing and pari-
mutuel wagering with respect to thoroughbred racing at the Leased Premises.

In order for Lessee to operate the Franchise granted pursuant to the
Franchise Agreement, Lessor is authorized pursuant to the Legislation to lease to Lessee
the Saratoga Racing Premises (as defined in the Franchise Agreement). Lessor desires to
lease the Saratoga Racing Premises to Lessee, for such rentals, and upon such terms and
conditions, contained in this Lease.

## ARTICLE I

### Grant, Term of Lease and Certain Definitions

1.1     Leasing Clause.  Upon and subject to the terms, provisions and
conditions hereinafter set forth, Lessor does hereby LEASE, DEMISE and LET unto

Lessee, and Lessee does hereby take and lease from Lessor, the Leased Premises, TO HAVE AND TO HOLD, together with all rights, privileges, easements and appurtenances belonging to or in any way pertaining to the Leased Premises (including the Art Work (hereinafter defined)), for the term hereinafter provided, upon and subject to the terms, conditions and agreements contained herein.

      1.2    Term. The term of this Lease (the "Term") shall be for a period commencing on the Commencement Date (hereinafter defined), and terminating on the date on which the Franchise Agreement terminates pursuant to the terms thereof, or upon the sooner termination of this Lease as set forth herein (the "Expiration Date").

      1.3    Certain Definitions. Capitalized terms not otherwise defined herein shall have the respective meanings given them in the Franchise Agreement. The following terms shall have the respective meanings set forth below in this Section 1.3 for purposes of this Lease:

      (a)    Additional Charges. All other taxes, levies impositions, assessments of whatever type or nature levied or assessed against the Leased Premises, Improvements, and /or Lessee, other than Impositions.

      (b)    Art Work. All art work transferred from Old NYRA to Lessor, including, but not limited to, the items listed on Exhibit C hereto.

      (c)    Base Rental. The base rental for the Leased Premises as defined in Section 2.1 of this Lease.

      (d)    Commencement Date. The date first above written, on which date this Lease has been fully executed by Lessor and Lessee and approved and filed in the Office of the State Comptroller pursuant to Section 112 of the State Finance Law.

      (e)    Contaminants. Any material, substance or waste classified, characterized or regulated as toxic, hazardous or a pollutant or contaminant under any Requirements, including asbestos in any form which is or could become friable, urea formaldehyde foam insulation, transformers or the equipment which contain dielectric fluid containing levels of polychlorinated biphenyls in excess of fifty parts per million.

      (f)    Contractor. Any construction manager, contractor, subcontractor, laborer or materialman who shall supply goods, services, labor or materials in connection with the development, construction, management, maintenance or operation of any part of the Leased Premises.

      (g)    Default Rate. The rate of interest per annum applicable to judgment claims in the State of New York.

(h)    Franchise. The authority granted to Lessee to conduct racing and pari-mutuel wagering with respect to thoroughbred racing, as provided for in the Legislation and the Franchise Agreement.

(i)    Franchise Agreement. That certain Franchise Agreement between Lessor and Lessee of even date herewith which is annexed hereto as Exhibit B.

(j)    Impositions. All taxes set forth in Paragraph 8.a. of the Legislation, as the same is amended by Subdivision 3 of Section 530 of the Real Property Tax Law and constructed through Sections 102, 530 and 532 of the Real Property Tax Law, levied or assessed against the Leased Premises and Improvements and coming due during the Term, now or hereafter located thereon associated with the ownership, which are required, pursuant to the above referenced sections, to be paid by Lessor. In no event shall Impositions include any personal or corporate income or franchise taxes imposed upon Lessee, or other taxes imposed on the income or revenues from the operation of the Leased Premises or other activities of Lessee.

(k)    Improvements. All buildings, structures, improvements and other real and personal property associated therewith from time to time situated on the Leased Premises.

(l)    Insurance Trustee. An institutional lender with offices located in the State of New York, proposed by Lessee and reasonably satisfactory to Lessor, which agrees to serve as the Insurance Trustee for purposes of this Lease on terms reasonably satisfactory to Lessor and Lessee.

(m)    Land. Those certain tracts of land underlying the Leased Premises.

(n)    Lease. This Lease Agreement by and between Lessor, as lessor, and Lessee, as lessee.

(o)    Lease Year. Each calendar year during the Term of this Lease, with the first Lease Year being the partial year beginning on the Commencement Date and ending on December 31 of the year in which the Commencement Date occurs, and the final Lease Year expiring on the Expiration Date.

(p)    Leased Premises. The Land, together with all present and future improvements on the Land, including, without limitation, rights, privileges, easements and appurtenances benefiting, belonging to or in any way appertaining thereto, including, but not limited to, (i) any and all rights, privileges, easements and appurtenances of Lessor as the owner of fee simple title to the Land now or hereafter existing in, to, over or under adjacent streets, parking lots, sidewalks, alleys and property contiguous to the Land, and (ii) any and all strips and gores relating to the Land, commonly referred to as the Saratoga Race Course, New York, all as more particularly described in Exhibit A annexed hereto.

(q)    Legislation. As defined in the Recitals.

(r)    Lessee. As defined in the Recitals.

(s)    Lessor. As defined in the Recitals.

(t)    Person. A corporation, an association, a partnership (general or limited), a limited liability company, a joint venture, a limited liability partnership, a private company, a public company, a limited life public company, a trust or fund (including but not limited to a business trust), an organization or any other legal entity, an individual or a government or any agency or political subdivision thereof.

(u)    Rental. The rent payable during the Term.

(v)    Requirements. All applicable laws, rules, regulations or other legal requirements enacted by a governmental authority having jurisdiction over the Leased Premises or the operations or the activity at the Leased Premises, including, but not limited to, the protection of the environment.

(w)    State. The People of the State of New York.

(x)    Sublessee. Any permitted sublessee or user under Section 7.2 of this Lease.

(y)    Term. The term of this Lease as provided in Section 1.2 of this Lease.

## ARTICLE II

### Rental

2.1    Base Rental. Lessee shall pay to Lessor the Base Rental for the Leased Premises in an amount equal to One Dollar ($1.00) per annum, which Base Rental has been paid in full for the entire Term, in advance, on the date hereof (the "Base Rental"). Notwithstanding the foregoing, Lessee shall pay other charges and costs due under this Lease as additional rent throughout the term of this Lease.

## ARTICLE III

### Impositions and Utilities

3.1    Payment of Impositions. Lessor shall be solely responsible for the payment of all Impositions before the same become delinquent. Lessee agrees to cooperate with Lessor in seeking the delivery of all notices of Impositions to Lessor directly from the applicable taxing authorities. Lessor shall be entitled to contest the amount or validity of any Impositions, at Lessor's expense; provided that such contest

does not materially adversely affect Lessee's use of and operations upon the Leased
Premises.

        3.2    Additional Charges and Utilities. Lessee shall be solely responsible
to pay all charges when due for (i) Additional Charges and (ii) utilities furnished to the
Leased Premises, including, but not limited to, electricity, gas, heat, light and power,
telephone and any and all other services and utilities furnished to the Leased Premises
(the "Utilities"), including, without limitation, charges for Additional Charges and
Utilities incurred prior to the Commencement Date. Lessee may, at Lessee's sole cost
and expense, dispute and contest any and all charges for Additional Charges and Utilities
for which Lessee is responsible for payment, provided there is no danger of an imminent
threat of Lessor losing title to the Leased Premises. If there is the threat of the Leased
Premises becoming subject to any lien, encumbrance or charge, Lessor may require
Lessee to deposit with Lessor a surety bond issued by a surety company of recognized
responsibility, guaranteeing and securing payment in full of such charges for Additional
Charges or Utilities.

        3.3    Operating Expenses. Lessee shall be solely responsible for the
payment of all operating expenses for the Leased Premises, including without limitation
repair and maintenance charges, insurance charges, and all other charges incurred in
connection with the operation of the Leased Premises pursuant to this Lease (the
"Operating Expenses").

## ARTICLE IV

### Improvements and Alterations

        4.1    Improvement Rights and Alterations; Capital Plan.

        (a)    Lessee shall have the right, subject to the restrictions
imposed by the Legislation, the Franchise Agreement and the applicable Requirements,
to develop, redevelop, refurbish, renovate or make such other improvements, capital
expenditures or otherwise ("Alterations"), to the Leased Premises and the fixtures and
improvements thereon, as shall be necessary or desirable for the operation of the Leased
Premises for the uses permitted under this Lease and the Franchise Agreement.

        (b)    Intentionally Omitted.

        (c)    Lessee has heretofore delivered to Lessor, and Lessor,
concurrently with the execution of this Lease, hereby approves, a five-year capital
expenditure plan (the "Capital Plan") setting forth in reasonable detail the capital
expenditures and the budgeted costs therefor which Lessee proposes to make with respect
to the Leased Premises for the Lease Years 2008-2013. Lessee shall be entitled to
perform all Alterations which are set forth in an approved Capital Plan, without further
approval from Lessor. If Lessee desires to perform any Alterations which are not set forth
in an approved Capital Plan, Lessee shall obtain the prior written consent of Lessor, not

to be unreasonably withheld or delayed, to such Alterations, unless such Alterations (y) will not, in the good faith estimation of Lessee's architect or engineer, cost more than $100,000 to complete and (z) do not affect any structural elements or building systems of the Improvements which, in the case of (y) and (z) above, Lessor's prior written consent shall not be required.

(d)     Prior to performing any proposed Alterations to which Lessor's consent has been obtained, including those set forth in an approved Capital Plan, Lessee shall, at Lessee's expense, procure and maintain in its possession: (w) detailed plans and specifications for such Alterations, (x) a construction budget setting forth the cost to perform and complete such Alterations, (y) insurance certificates from all Contractors evidencing the insurance coverages required under this Lease and (z) all permits, approvals and certifications required by any governmental authorities having jurisdiction over the Leased Premises. Upon completion of any Alterations, Lessee shall obtain any certificates of final approval of such Alterations required by any governmental authority, together with the "as-built" plans and specifications for such Alterations (together, the "Completion Documents"). Upon Lessor's request, Lessee shall promptly provide to Lessor, in hard copy or electronic form (as Lessor may request), any or all of the documents required to be obtained under this Section 4.1(d), including the Completion Documents upon completion of the Alteration.

(e)     All Alterations shall be made and performed, in all material respects, in accordance with the plans and specifications therefor (as submitted to Lessor, if applicable), as same may be modified from time to time. All Alterations shall be made and performed in a good and workmanlike manner, using materials substantially similar in quality to the existing materials at the Leased Premises, and in compliance with all applicable Requirements, as well as requirements of insurance bodies having jurisdiction over the Leased Premises. No Alterations shall impair the structural integrity or soundness of any Improvements.

(f)     All Alterations made by Lessee shall become the property of Lessor upon the expiration of the Lease. Throughout the Term of this Lease, to the extent permitted under the applicable tax laws, rules and regulations, Lessee shall have the sole and exclusive right to take depreciation of all Alterations made by Lessee to the Leased Premises.

4.2     Easements and Dedications. In order to maintain and/or improve the Leased Premises, it may be necessary or desirable that street, water, sewer, drainage, gas, power lines, set back lines, and other easements, and dedications and similar rights be granted or dedicated over or within portions of the Leased Premises by plat, replat, grant, deed or other appropriate instrument. Lessor shall, within thirty (30) days following written request by Lessee to Lessor, and to the extent reasonably necessary as fee owner of the Leased Premises, join with Lessee in executing and delivering such documents, as may be appropriate or reasonably required for the future improvement of the Leased Premises.

4.3    Zoning. In the event that Lessee deems it necessary or appropriate to obtain use, zoning, site plan approval or any permit from the appropriate governmental entity having jurisdiction over the Leased Premises, or any part thereof, Lessor shall, within thirty (30) days following written request by Lessee to Lessor, and to the extent reasonably necessary as fee owner of the Leased Premises, execute such document, or join in such petitions, applications and authorizations as may be appropriate or reasonably required by Lessee, and cooperate in good faith with Lessee in any such reasonable efforts.

4.4    Indemnification for Mechanics' Liens. Lessee will pay or cause to be paid all costs and charges for work performed by Lessee or caused to be performed by Lessee in or to the Leased Premises. Lessee will indemnify Lessor against, and hold Lessor and the Leased Premises free, clear and harmless of and from, any and all vendors', mechanics', laborers', or materialmans' liens and claims of liens, and all other liabilities, liens, claims and demands on account of such work by or on behalf of Lessee. If any such lien, at any time, is filed against the Leased Premises, or any part thereof, on account of work performed or caused to be performed by Lessee in or to the Leased Premises, Lessee will cause such lien to be discharged of record within forty-five (45) days after Lessee has received actual notice of the filing of such lien. If Lessee fails to pay any charge for which a mechanic's lien has been filed, and has not discharged same of record as described above, Lessor may, at its option, upon ten (10) days' prior written notice to Lessee and in addition to exercising any other remedies Lessor has under this Lease on account of a default by Lessee, pay such charge and related costs and interest, and the amount so paid, together with reasonable attorneys' fees incurred in connection with the removal of such lien, will be immediately due from Lessee to Lessor.

## ARTICLE V

## Use of Leased Premises

5.1    Permitted Uses. Lessee's use of the Leased Premises shall be primarily for the management and operations of all functions as may be necessary or appropriate to conduct racing, racing operations, pari-mutuel and simulcast wagering (collectively, "Uses"), together with various activities related thereto, including without limitation, live wagering and retail, food, beverage, trade expositions and entertainment facilities, racing, equestrian, social and community activities, and other uses and activities historically conducted on the Leased Premises (collectively, "Ancillary Uses" and, taken together with the Uses, the "Permitted Uses") at or with respect to the Leased Premises, subject to and in compliance with the provisions of the Franchise Agreement, applicable Requirements including without limitation the Legislation, and the Certificate of Occupancy for the Leased Premises. Lessee shall not conduct, manage or otherwise operate VLT Operations at the Leased Premises.

5.2    Compliance with Laws.

(a)     Lessee shall use, operate and maintain the Leased Premises and the Improvements situated thereon in compliance with all applicable laws, regulations or ordinances of the United States, the State of New York, the City of Saratoga Springs or other lawful authority having jurisdiction over the Leased Premises, as applicable (collectively, "Requirements").

(b)     Lessee shall have the right to contest the validity, enforceability or applicability of any Requirements applicable to the Land, Building and Improvements constituting the Leased Premises and Improvements, provided that there is no danger of an imminent threat of Lessor losing title to the Leased Premises or criminal liability to Lessor. During such contest, compliance with any such contested Requirements may be deferred by Lessee; provided, however, that Lessee shall promptly comply with the final determination of any such contest. If non-compliance (x) shall result in a lien being filed against the Leased Premises or (y) may reasonably be expected (in Lessor's reasonable judgment) to result in civil liability to Lessor, Lessor may require Lessee to deposit with Lessor a surety bond issued by a surety company of recognized responsibility guaranteeing and securing the payment in full of such lien. Prior to instituting such proceeding, Lessee shall provide notice to the Attorney General of the State of New York, which may choose to be a party in such contest. Any such proceeding instituted by Lessee shall be commenced as soon as is reasonably possible after the issuance of any such contested matters, or after actual notice to Lessee of the applicability of such matters to the Leased Premises, and shall be prosecuted with reasonable dispatch. In the event that Lessee shall institute any such proceeding, Lessor shall cooperate with Lessee in connection therewith, and Lessee shall be responsible for the reasonable and actual out-of-pocket costs and expenses incurred by Lessor in connection with such cooperation.

5.3     Maintenance and Repairs. Lessee shall perform all maintenance, repair and upkeep of the Leased Premises, including the Improvements thereon, so as to keep the same in good order and repair in compliance with all Requirements (subject to Lessee's right to contest pursuant to Section 5.2(b)). The costs of such maintenance shall be borne solely by Lessee.

5.4     Disposition of Personal Property. Lessee shall have the right to dispose of any personal property or Alterations during the term of this Lease in the ordinary course of business, but Lessee agrees that it will not purposefully remove any such personal property or Alterations to circumvent the intent that the same shall become the property of Lessor at the end of the Term and Lessee further agrees that it shall replace any such personal property or Alterations to the extent they are required to conduct racing operations. Notwithstanding the foregoing, the Art Work may not be disposed of by Lessee without the prior written consent of Lessor, which consent Lessor may withhold in its sole discretion.

## ARTICLE VI

### Insurance

6.1    Required Coverages of Lessee.

(a)    Lessee, throughout the Term, or as otherwise required by this Lease, shall obtain and maintain Insurance, in full force and effect, from an insurance company licensed or authorized to do business in the State of New York, in accordance with the terms, coverages and requirements set forth in Exhibit D attached hereto.

## ARTICLE VII

### Assignment and Subletting

7.1    Assignment.  Lessee may, subject to the prior written approval of Lessor as required by Section 138 of the State Finance Law and the receipt of all required governmental approvals in connection with any assignment of Lessee's rights and obligations under the Franchise Agreement, assign (or sublease, license or otherwise transfer) to any party to which the Franchise is assigned, Lessee's leasehold interest granted to Lessee under this Lease, in whole only. It is understood and agreed that Lessee's interest in the Lease may only be assigned or transferred to a party in which the Franchise is being assigned and which party shall hold the Franchise at the time of assignment, or any successor thereto. Upon any such assignment, the assignee shall execute and deliver to Lessor a written assumption, in form and substance satisfactory to the Lessor in its reasonable judgment, of all of the obligations of Lessee under this Lease. Lessee shall be released from any obligations arising under this Lease which accrue from and after such an assignment, but not those accruing prior to the date of such assignment. For purposes of this Section 7.1, approval of the Franchise Oversight Board of an assignment of the Franchise Agreement shall be deemed to constitute approval by the Lessor of Lessee's assignment of this Lease.

7.2    Concessions, Subletting and Licensing.  (a) Lessee shall have the right from time to time, with the prior written consent of Lessor to the extent required by the Legislation (including without limitation Section 206 thereof), to grant concessions at the Leased Premises as Lessee may deem proper for the conduct at the Leased Premises of Ancillary Uses as permitted in Section 5.1 hereof ("Concessions"). All Concessions shall be entered into in compliance with the Legislation (including, without limitation, Section 208-6 thereof), and other Requirements. Agreements for the operation of Concessions may, at the election of Lessee, be in the form of subleases, licenses or concession agreements; provided, that no subletting or licensing shall relieve Lessee of any of its obligations under the Lease, and all Concessions, whether in the form of subleases, licenses or concession agreements, shall be strictly subject and subordinate to the terms and provisions of this Lease.

(b) Other than with respect to the grant of Concessions, Lessee may not sublet all or any portion of the Leased Premises without the prior written consent of Lessor, in Lessor's sole discretion, as required by Section 138 of the State Finance Law and the receipt of all required governmental approvals in connection with any sublease or transfer. Notwithstanding anything to the contrary contained herein, (x) the stabling of horses belonging to third parties shall not constitute a sublease under the terms of this Lease and (y) those subleases set forth on Exhibit E hereto (the "Permitted Subleases") shall not be subject to the general subleasing prohibition set forth in this Section 7.1 and Lessor hereby consents to the Permitted Subleases. In addition to the foregoing, Lessee shall also have the right to enter into any sublease or occupancy agreement with The New York Thoroughbred Breeders Inc., The New York Thoroughbred Horsemen's Association (or such other entity as is certified and approved pursuant to Section 228 of the New York State Racing, Pari-Mutuel Wagering and Breeding Law, as amended), The New York State Racing and Wagering Board, The New York State Department of Taxation and Finance, and with any governmental authorities, agencies, boards or regulators of the State, with the prior written consent of Lessor, such consent not to be unreasonably withheld, conditioned or delayed.

7.3     General Provisions. Lessee shall, in connection with any Concession, whether or not Lessor's consent is required thereto, provide written notice to Lessor of the name, legal composition and address of any Concessionaire, together with a complete copy of the agreement under which such Concession is granted, and a description of the nature of the Concessionaire's business to be carried on in the Leased Premises.

7.4     Transfer by Lessor of the Leased Premises. Lessor and Lessee acknowledge and agree that certain benefits accrue to Lessor and Lessee by virtue of Lessor's ownership of fee title to the Leased Premises and that such benefits are material inducements to Lessor and Lessee to enter into this Lease. Accordingly, Lessor covenants and agrees that, during the Term of this Lease and any renewals or extensions thereof, and prior to the termination of this Lease, whether through expiration of the Term or the earlier termination thereof pursuant to a right to so terminate this Lease, it will at all times own and hold title to the Leased Premises, as encumbered by this Lease, for the benefit of and on behalf of the State in accordance with the Legislation, and further covenants and agrees that it will not, if and to the extent prohibited by the Legislation, sell, transfer or otherwise convey all or any portion of the Leased Premises to any Person or entity, other than an agency, division, subdivision or department of the State of New York, or a public benefit corporation, local development corporation, municipal corporation or public authority constituting a political subdivision of the State of New York.

## ARTICLE VIII

### Leasehold Mortgages/Subordination

8.1     Lessor's Consent to Leasehold Mortgage. Lessee shall have the right, subject to the prior written consent of Lessor as provided in the Legislation, to mortgage or encumber this Lease and Lessee's interest in the Leased Premises and/or in any improvements made and owned by Lessee and/or in Lessee's personal property, furniture, fixtures and equipment. In no event shall Lessee's mortgage encumber or affect Lessor's fee title to the Land or Improvements. Each mortgage of Lessee's interest shall provide that the terms and conditions of this Lease, and Lessor's title to the Improvements at the expiration of this Lease, remains superior, and any mortgage of Lessee's interest is subordinate to the rights of Lessor hereunder.

### ARTICLE IX

### Default of Lessee

9.1     Non-Revocation Events of Default. The following events shall each constitute a "Non-Revocation Event of Default" under this Lease:

(a)     Monetary Defaults. Failure on the part of Lessee to pay Rental or any other sums and charges when due to Lessor hereunder and the continuation of such failure for thirty (30) days after written notice to Lessee.

(b)     Nonmonetary Defaults. Failure on the part of Lessee to perform any of the terms or provisions of this Lease other than the provisions (x) requiring the payment of Rental and (y) breach of which would give rise to the revocation of the Franchise Agreement pursuant to the terms thereof, and the continuation of such failure for thirty (30) days after written notice to Lessee, provided that if the default is of such character as to require more than thirty (30) days to cure, if Lessee shall fail to commence curing such default within thirty (30) days following Lessor's notice and thereafter fail to use reasonable diligence in curing such default.

9.2     Remedies for Non-Revocation Event of Default. If a Non-Revocation Event of Default shall occur, Lessor shall be entitled, at Lessor's election, to exercise any remedies available at law or in equity on account of such Non-Revocation Event of Default, including without limitation to bring one or more successive suits for monetary damages and/or specific performance, but Lessor shall not be entitled to terminate this Lease and remove Lessee from possession of the Leased Premises. In addition to the foregoing, Lessor may undertake to cure such Non-Revocation Event of Default for the account of and at the cost and expense of Lessee, and the full amount so expended by Lessor (with interest accruing at the Default Rate) shall immediately be owing by Lessee to Lessor.

9.3    Revocation of Franchise Agreement.    Notwithstanding anything in this Lease to the contrary, if Lessee's Franchise shall be duly revoked pursuant to Racing Law §§ 244 and 245, then this Lease shall be deemed automatically, without further notice or legal action, terminated as of the date of such Franchise revocation, and Lessor shall have the right, at Lessor's election, to exercise any of the remedies set forth in Section 9.4 of this Lease which are applicable following termination of the Lease. Lessee shall have the right to remain in possession of the Leased Premises for a period of not more than thirty (30) days following the termination of the Lease, solely for the purposes of orderly vacating the Leased Premises in the condition required by this Lease, TIME BEING OF THE ESSENCE to the obligation of Lessee to vacate the Leased Premises as provided in this Lease no later than the thirtieth (30th) day following Lease termination.

9.4    Lease Termination Following Revocation of Franchise Agreement.

(a)    If this Lease shall be terminated as provided in Section 9.3, Lessor, without notice, may re-enter and repossess the Leased Premises using such force for that purpose as may be necessary and permissible pursuant to applicable laws, without being liable for indictment, prosecution or damages therefor and may dispossess Lessee by summary proceedings or otherwise.

(b)    No termination of this Lease pursuant to Section 9.3, or taking possession of or reletting the Leased Premises or any part thereof, shall relieve Lessee of its liabilities and obligations under this Lease arising prior to the date of termination.

9.5    No Waiver. No failure by Lessor to insist upon the strict performance of any covenant, agreement, term or condition of this Lease or to exercise any right or remedy consequent upon a breach thereof, and no acceptance of full or partial Rental during the continuance of any such breach, shall constitute a waiver of any such breach or of such covenant, agreement, term or condition, unless Lessor agrees in writing to waive such breach at the time of its occurrence or anytime thereafter. No covenant, agreement, term or condition of this Lease to be performed or complied with by Lessee, and no breach thereof, shall be waived, altered or modified except by a written instrument executed by Lessor. No waiver of any breach shall affect or alter this Lease, but each and every covenant, agreement, term and condition of this Lease still continue in full force and effect with respect to any other then existing or subsequent breach thereof.

9.6    Remedies Cumulative. All amounts expended by Lessor to cure any default or to pursue remedies hereunder shall be paid by Lessee to Lessor upon demand and shall be in addition to the Rentals otherwise payable hereunder. Each right and remedy of Lessor provided for in this Lease shall be cumulative and shall be in addition to every other right or remedy provided for in this Lease or now or hereafter existing at law or in equity or by statute or otherwise, and the exercise or beginning of the exercise by Lessor of any one or more of the rights or remedies provided for in this Lease or now or hereafter existing at law or in equity or by statute or otherwise shall not

preclude the simultaneous or later exercise by Lessor of any or all other rights or remedies provided for in this Lease or now or hereafter existing at law or in equity or by statute or otherwise.

## ARTICLE X
## Intentionally Omitted

## ARTICLE XI
## Casualty Restoration

11.1   Notice of Damage. If all or any part of any of the Leased Premises shall be destroyed or damaged in whole or in part by fire or other casualty of any kind or nature (including any casualty for which insurance was not obtained or obtainable), ordinary or extraordinary, foreseen or unforeseen (a "Casualty"), Lessee, upon actual knowledge of the occurrence of such Casualty, shall give to Lessor prompt notice thereof.

11.2   Obligation to Restore.

(a)   Lessee Obligation to Restore. In the event of a Casualty, Lessee shall be obligated to repair, alter, restore, replace and rebuild (collectively, "Restore" and the act of Restoring, a "Restoration") the Leased Premises, as nearly as possible equal to the condition, quality, character and class of the Leased Premises existing immediately prior to such occurrence. Notwithstanding the foregoing, Lessee, with the consent of Lessor, not to be unreasonably withheld, conditioned or delayed, may Restore the Leased Premises with such changes and modifications that Lessee may deem desirable in the exercise of its sound business judgment, for use for racing operations and to accommodate the Permitted Uses; it being agreed that Lessee shall not be required to rebuild such facilities that Lessee deems are no longer useful or necessary for the continued operation of racing at the Leased Premises (the "Unnecessary Facilities") and accordingly that withholding, conditioning or delaying consent for failure to rebuild the Unnecessary Facilities will be deemed unreasonable. Provided that Lessee's Property Insurance at the time of a Casualty is in full force and effect and is in compliance with the requirements of this Lease, including policy limits equal to the full replacement cost of the Improvements, Lessee shall not be obligated or required to expend any funds in connection with a restoration (x) in excess of the Insurance Proceeds, plus (y) the deductible amount under Lessee's Property Insurance.

(b)   No Obligation of Lessor to Restore. Lessor shall have no obligation to Restore the Leased Premises.

11.3   Restoration Funds.

(a)    In the event of a Restoration which is subject to Section 11.2(a) and which cost thereof is to exceed $1,000,000, Lessee shall cause to be deposited with the Insurance Trustee all proceeds of Lessee's Property Insurance, less the cost, if any, incurred in connection with the adjustment of the loss and the collection thereof (hereinafter referred to as the "Insurance Proceeds"). Prior to commencing any Restoration, Lessee shall furnish Lessor with an estimate of the cost of such Restoration, prepared by an independent licensed professional engineer or registered architect selected by Lessee and reasonably approved by Lessor (the "Approved Engineer"). The Insurance Proceeds shall be applied by the Insurance Trustee to the payment of the cost of the Restoration, and shall be paid to, or for the account of, Lessee from time to time, as the Restoration progresses, but not more frequently than once in any calendar month. Said Insurance Trustee shall make such payments upon written request of Lessee accompanied by the following:

(i)    a certificate, dated not more than fifteen (15) days prior to such request, signed by Lessee and by an architect in charge of the Restoration who shall be selected by Lessee and reasonably satisfactory to Lessor setting forth that:

(A)    the sum then requested either has been paid by Lessee or is justly due to contractors, subcontractors, materialmen, architects or other persons who have rendered services or furnished materials in connection with the Restoration, giving a brief description of the services and materials and the several amounts so paid or due and stating that no part of such sum has been made the basis for a withdrawal of Insurance Proceeds in any previous or then pending request or has been paid out of any Insurance Proceeds received by Lessee, and that the sum requested does not exceed the value of the services and materials described in the certificate.

(B)    the cost, as estimated by the persons signing such certificate, of the Restoration remaining to be done subsequent to the date of such certificate, does not exceed the amount of Insurance Proceeds remaining deposited with the Insurance Trustee after the payment of the sum so requested; and

(ii)    a certificate dated not more than fifteen (15) days prior to such request of a reputable national title company then doing business in the State of New York, covering the period from the date of this Lease to the date of such certificate, setting forth that there are no liens or encumbrances of record of any kind on the Leased Premises or Lessee's interest therein other than those that Lessee is contesting in good faith, those permitted by the terms of this Lease, and except such as will be discharged by payment of the amount then requested.

(b)    Upon compliance with the foregoing provisions of this Section 11.3, the Insurance Trustee shall, out of such Insurance Proceeds, pay or cause to be paid to Lessee or to the Persons named in the certificate, the respective amounts stated

therein to have been paid by Lessee or to be due to said Persons, as the case may be. All sums so paid to Lessee and any other Insurance Proceeds received or collected by or for the account of Lessee, and the right to receive the same, shall be held by Lessee in trust for the purpose of paying the cost of the Restoration.

(c)     When the Insurance Trustee shall receive evidence satisfactory to it of the character required by subparagraph (a) of this Section 11.3 and that the Restoration has been completed and paid for in full and that there are no liens of the character referred to herein, the Insurance Trustee shall pay any remaining balance of the Insurance Proceeds to Lessee, unless Lessor has notified the Insurance Trustee that there has been a Non-Revocation Event of Default by Lessee under this Lease, in which case the Insurance Trustee shall refrain from paying to Lessee any remaining balance of the Insurance Proceeds until the Insurance Trustee shall have received (i) notice from Lessor that the Non-Revocation Event of Default has been cured (which Lessor shall give to Insurance Trustee within fifteen (15) Business Days from the date of determination), or (ii) notice from Lessee or Lessor of an official determination by a court of competent jurisdiction that there was no such Non-Revocation Event of Default by Lessee under this Lease as claimed by Lessor. Subject to the availability of lawful appropriations and consistent with Section 8 of the State Court of Claims Act, Lessor hereby agrees to indemnify Lessee for any claims against Lessee and for any loss, cost or expense incurred by Lessee by reason of Lessor claiming a Non-Revocation Event of Default causing the Insurance Trustee to withhold the Insurance Proceeds and preventing Lessee from making payments when due, where a court of competent jurisdiction makes an official determination that there was no such Non-Revocation Event of Default by Lessee under this Lease.

(d)     It is expressly understood that the requirements under this Article XI are for the benefit only of Lessor, and no contractor or other person shall have or acquire any claim against Lessee as a result of any failure of Lessee actually to undertake or complete any Restoration or to obtain the evidence, certifications and other documentation provided for herein.

11.4     No Termination or Abatement. This Lease shall not terminate or be forfeited or be affected in any manner by reason of damage to or total, substantial or partial destruction of any of the Building or any part thereof or by reason of the untenantability of the same or any part thereof, for or due to any reason or cause whatsoever, and Lessee, notwithstanding any law or statute present or future, waives any and all rights to quit or surrender any part of the Leased Premises thereof. It is the intention of Lessor and Lessee that the foregoing is an "express agreement to the contrary" as provided in Section 227 of the Real Property Law of the State of New York.

## ARTICLE XII

### Representations, Warranties and Special Covenants

12.1    Lessor's Representations, Warranties and Special Covenants.
Lessor hereby represents, warrants and covenants as follows:

(a)    Existence.  Lessor has been established and exists pursuant
to the Legislation.

(b)    Authority.  Pursuant to the Legislation, Lessor has all
requisite power and authority to own its property and the Leased Premises, effectuate its
mandate, enter into this Lease and consummate the transactions herein contemplated, and
by proper action in accordance with all applicable law has duly authorized the execution
and delivery of this Lease and the consummation of the transactions herein contemplated.

(c)    Binding Obligation.  This Lease will be a valid obligation
of Lessor and is binding upon Lessor in accordance with its terms once approved by the
applicable state authorities.

(d)    No Defaults.  The execution by Lessor of this Lease and the
consummation by Lessor of the transactions contemplated hereby do not, as of the
Commencement Date, result in a breach of any of the terms or provisions of, or constitute
a default or a condition which upon notice or lapse of time or both would ripen into a
default under the Legislation, which constitutes the articles of organization of Lessor, or
under any resolution, indenture, agreement, instrument or obligation to which Lessor is a
party or by which the Leased Premises or any portion thereof is bound; and does not to
the knowledge of Lessor, constitute a violation of any order, rule or regulation applicable
to Lessor or any portion of the Leased Premises of any court or of any federal or state or
municipal regulatory body or administrative agency or other governmental body having
jurisdiction over Lessor or any portion of the Leased Premises.

(e)    Consents.  No permission, approval or consent by third
parties or any other governmental authorities, other than those that have already been
obtained, is required in order for Lessor to enter into this Lease, make the agreements
herein contained, other than those which have been obtained.

(f)    Quiet Enjoyment.  So long as the Franchise Agreement is
in full force and effect, Lessee shall have the quiet enjoyment and peaceable possession
of the Leased Premises during the Term of this Lease, against hindrance or disturbance of
any person or persons whatsoever claiming by, through or under Lessor.

(g)    Proceedings.  To the knowledge of Lessor, there are no
actions, suits or proceedings pending or threatened in writing against Lessor which
would, if successful, prevent Lessor from entering into this Lease or performing its
obligations hereunder.

(h)   Limitations. Except as otherwise expressly provided herein, this Lease is made by Lessor without representation or warranty of any kind, either express or implied, as to the condition of the Leased Premises, title to the Leased Premises, its merchantability, its condition or its fitness for Lessee's intended use or for any particular purpose and all of the Leased Premises is leased on an "as is" basis with all faults.

12.2   Lessee's Representations, Warranties and Special Covenants. Lessee hereby represents, warrants and covenants as follows:

(a)   Existence. Lessee is a not-for-profit racing corporation incorporated pursuant to Section 402 of the Not-for-Profit Corporation Law of the State of New York, as authorized by Chapter 18 of the Laws of 2008, validly existing and in good standing under the laws of the State of New York and its adopted and currently effective articles of incorporation.

(b)   Authority. Lessee has all requisite power and authority to own its property, operate its business, enter into this Lease and consummate the transactions herein contemplated, and by proper action has duly authorized the execution and delivery of this Lease and the consummation of the transactions herein contemplated.

(c)   Binding Obligations. This Lease constitutes a valid and legally binding obligation of Lessee and is enforceable against Lessee in accordance with its terms.

(d)   No Defaults. The execution by Lessee of this Lease and the consummation by Lessee of the transactions contemplated hereby do not, as of the Commencement Date, result in a breach of any of the terms or provisions of, or constitute a default or a condition which upon notice or lapse of time or both would ripen into a default under the Legislation, the articles of organization of Lessee, or under any resolution, indenture, agreement, instrument or obligation to which Lessee is a party or by which the Leased Premises or any portion thereof is bound; and does not to the knowledge of Lessee, constitute a violation of any order, rule or regulation applicable to Lessee or any portion of the Leased Premises of any court or of any federal or state or municipal regulatory body or administrative agency or other governmental body having jurisdiction over Lessee or any portion of the Leased Premises.

(e)   Consents. No other permission, approval or consent by third parties or any other governmental authorities is required in order for Lessee to enter into this Lease or consummate the transactions herein contemplated, other than those which have been obtained.

(f)   Proceedings. To the knowledge of Lessee, there are no actions, suits or proceedings pending or threatened in writing against Lessee which would, if successful, prevent Lessee from entering into this Lease or performing its obligations hereunder.

## ARTICLE XIII

### Indemnification, Waiver and Release

13.1    Lessee Indemnification. Lessee shall indemnify, defend and hold harmless the Lessor, Empire State Development Corporation, the Franchise Oversight Board, the Racing and Wagering Board, and their respective officers, directors, trustees, employees, members, managers, and agents (the "Lessor Indemnitees"), from and against any and all claims, actions, damages, liability and expense, arising from or out of (i) the negligence or intentional acts or omissions of Lessee, its officers, directors, agents or employees at the Leased Premises ("Lessee Parties") in connection with the occupancy or use by Lessee of the Leased Premises or any part thereof, and (ii) any occurrence at the Leased Premises not arising out of the negligence or intentional acts or omissions of a Lessee Party, but which is covered by the insurance which Lessee is required to maintain pursuant to the terms of this Lease (or any additional insurance which Lessee actually carries). Lessee's liability arising out of (ii) above shall be limited to the actual amount of proceeds available under such insurance. In case any Lessor Indemnitee shall be made a party to any litigation covered by this indemnity, whether or not also commenced by or against Lessee, then Lessee shall indemnify, defend and hold the Lessor Indemnitees harmless and shall pay all costs, expenses and reasonable attorneys' fees incurred or paid by the Lessor Indemnitees in connection with such litigation.

13.2    Lessor's Indemnification. Subject to the availability of lawful appropriations and consistent with Section 8 of the State Court of Claims Act, Lessor shall hold Lessee and its officers, directors, trustees, employees, members, managers, and agents (the "Lessee Indemnitees"), harmless from any final judgment of a court of competent jurisdiction to the extent attributable to the negligence of Lessor and its officers or employees when acting within the course and scope of their employment.

13.3    Survival. The provisions of this Article XIII shall survive the expiration or termination of this Lease with respect to matters that accrued prior to the Expiration Date, whether or not claims in respect of such matters are brought prior to or following the Expiration Date.

## ARTICLE XIV

### Miscellaneous

14.1    Inspection. Lessee shall permit Lessor and its agents, upon no less than twenty-four (24) hours' prior notice, to enter into and upon the Leased Premises during normal business hours for the purpose of inspecting the same on the condition that Lessor and its agents shall use reasonable efforts to ensure that Lessee's and Lessee's invitees' use and quiet enjoyment of the Leased Premises is not interfered with.

14.2     Estoppel Certificates. Either Party shall, at any time and from time to time upon not less than ten (10) days' prior request by the other Party, execute, acknowledge and deliver to such requesting party, a statement in writing certifying (i) its ownership of its interest hereunder, (ii) that this Lease is unmodified and in full force and effect (or if there have been any modifications, that the same is in full force and effect as modified and stating the modifications), (iii) the dates to which the Rental and any other charges have been paid, and (iv) that, to the best of their knowledge, no default hereunder on the part of the other Party exists (except that if any such default does exist, then such default shall be specified).

14.3     Lease Termination Agreement. If requested by Lessor or Lessee, Lessor and Lessee shall, upon termination of this Lease, execute and deliver to one another an appropriate release, cancellation and termination of the Lease, in form proper for recording, of all Lessee's interest in the Leased Premises and all of Lessee's obligations under the Lease, other than such obligations as survive the termination hereof.

14.4     Notices. All notices hereunder to the respective Parties will be in writing and will be served by personal delivery or by prepaid, express mail (next day) via a reputable courier service, or by prepaid, registered or certified mail, return receipt requested, addressed to the respective parties at their addresses set forth below. Any such notice to Lessor or Lessee will be deemed to be given and effective: (i) if personally delivered, then on the date of such delivery, (ii) if sent via express mail (next day), then one (1) business day after the date such notice is sent, or (iii) if sent by registered or certified mail, then three (3) business days following the date on which such notice is deposited in the United States mail addressed as aforesaid. For purposes of this Lease, a business day shall be deemed to mean a day of the week other than a Saturday or Sunday or other holiday recognized by banking institutions of the State of New York. Copies of all notices will be sent to the following:

If to Lessee:

> The New York Racing Association, Inc.
> Aqueduct Racetrack
> 110-00 Rockaway Boulevard
> South Ozone Park, New York 11417
> Attn: General Counsel

With a copy to:

> Weil, Gotshal & Manges LLP
> 767 Fifth Avenue
> New York, New York 10153
> Attn: Brian S. Rosen, Esq.

> The New York State Franchise Oversight Board Franchise
> Oversight Board c/o Executive Chamber The Capitol
> Albany, NY 12224
> Attention: Chairman
> Telecopy: (518) 486-9652

With a copy to:

> The New York State Office of General Services
> State of New York State Office of General Services
> Legal Services Bureau
> 41st Floor, Corning Tower
> The Governor Nelson A. Rockefeller Empire State Plaza
> Albany, New York 12242

With a copy to:

> Charities Bureau
> Department of Law
> 120 Broadway - 3rd Floor
> New York, New York 10271

With a copy to:

> The Racing and Wagering Board
> Chairman
> N.Y.S. Racing and Wagering Board
> 1 Broadway Center, Suite 600
> Schenectady, New York 12305
> Telecopy: (518) 347-1250

With a copy to:

> Paul, Weiss, Rifkind, Wharton & Garrison LLP
> 1285 Avenue of the Americas
> New York, NY 10019
> Attn: Alan S. Kornberg, Esq.

14.5    Modifications. This Lease may be modified only by written
agreement signed by Lessor and Lessee and approval of the State Comptroller.

14.6    Descriptive Headings. The descriptive headings of this Lease are inserted for convenience in reference only and do not in any way limit or amplify the terms and provisions of this Lease.

14.7    Force Majeure. The time within which either Party hereto shall be required to perform any act under this Lease shall be extended by a period of time equal to the number of days during which performance of such act is delayed unavoidably by strikes, lockouts, acts of God, governmental restrictions, failure or inability to secure materials or labor by reason of priority or similar regulations or order of any governmental or regulatory body, enemy action, civil disturbance, fire, unavoidable casualties or any other cause beyond the reasonable control of the party seeking the delay.

14.8    Partial Invalidity. If any term, provision, condition or covenant of this Lease or the application thereof to any Party or circumstances shall, to any extent, be held invalid or unenforceable, the remainder of this Lease, or the application of such term, provisions, condition or covenant to persons or circumstances other than those as to whom or which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Lease shall be valid and enforceable to the fullest extent permitted by law.

14.9    Applicable Law and Venue. This Lease shall be governed by and construed in accordance with the laws of the State of New York.

14.10    Attorneys' Fees. If any Party to this Lease brings an action against the other party based on an alleged breach by the other party of its obligations under this Lease, the prevailing party may seek to recover all reasonable expenses incurred, including reasonable attorneys' fees and expenses. In the event that Lessee fails to quit and surrender to Lessor the Premises upon the termination of this Lease as provided herein, Lessee shall be responsible for all costs and expenses, including reasonable attorneys' fees and expenses, incurred by Lessor in regaining possession of the Leased Premises following the Expiration Date.

14.11    Net Rental. It is the intention of Lessor and Lessee that the Rental payable under this Lease after the Commencement Date and other costs related to Lessee's use or operation of the Leased Premises, other than Impositions, shall be absolutely net to Lessor, and that Lessee shall pay during the Term, without any offset or deduction whatsoever, all such costs.

14.12    No Broker. Lessor and Lessee represent and warrant one to the other that no broker commission, finder's fees or similar compensation is due to any party claiming through Lessor or Lessee, as applicable, and Lessor and Lessee agree to hold the other Party harmless from any liability to pay any such brokerage commission, finder's fees or similar compensation to any parties claiming same through the indemnifying Party.

14.13 <u>Memorandum of Lease</u>. Lessor and Lessee agree to execute and deliver to each other a short form of this Lease in recordable form which incorporates all of the terms and conditions of this Lease by reference in the form mutually agreed upon by Lessor and Lessee ("Memorandum of Lease"). Lessor and Lessee agree that at Lessee's option, and at Lessee's cost, Lessee may record such Memorandum of Lease, in the office of the county clerk in which the Leased Premises is located.

14.14 <u>No Waiver</u>. No waiver of any of the provisions of this Lease shall be deemed, or shall constitute a waiver of any other provision, whether or not similar, nor shall any waiver constitute a continuing waiver, nor shall a waiver in any instance constitute a continuing waiver, nor shall a waiver in any instance constitute a waiver in any subsequent instance.

14.15 <u>Consents</u>.

(a)     Wherever in this Lease Lessor's consent or approval is required and Lessor agrees that such consent or approval shall not be unreasonably withheld, conditioned or delayed, if Lessor shall refuse such consent or approval, Lessee in no event shall be entitled to and shall not make any claim, and Lessee hereby waives any claim, for money damages (nor shall Lessee claim any money damages by way of set-off, counterclaim or defense) based upon any assertion by Lessee that Lessor unreasonably withheld or unreasonably delayed its consent or approval. Lessee's sole remedy in such circumstance shall be an action or proceeding to enforce any such provision by way of specific performance, injunction or declaratory judgment.

(b)     If Lessor fails to approve or disapprove a request for consent within thirty (30) days (provided, that if Lessee requires a response from Lessor prior to such thirtieth (30th) day in order to ensure the orderly operation of the Franchise and the Leased Premises, Lessee may, in its initial submission to Lessor, request that Lessor respond with a shorter period of time, but in no event less than fifteen (15) Business Days), Lessee shall have the right to provide Lessor with a second written request for consent (a "<u>Second Consent Request</u>"), which shall set forth in bold capital letters the following statement: "IF LESSOR FAILS TO RESPOND WITHIN TEN (10) BUSINESS DAYS AFTER RECEIPT OF THIS NOTICE, THEN LESSEE SHALL BE ENTITLED TO TAKE THE ACTION LESSEE HAS REQUESTED LESSOR'S CONSENT TO PREVIOUSLY AND TO WHICH LESSOR HAS FAILED TO TIMELY RESPOND." In the event that Lessor fails to respond to a Second Consent Request within ten (10) Business Days after receipt by Lessor, the action for which the Second Consent Request is submitted shall be deemed to be approved by Lessor. Notwithstanding the foregoing, in no event shall this Section 14.15 (b) apply to a request by Lessee to assign the Lease or sublet the Leased Premises pursuant to Section 7.1 hereof or to mortgage or encumber its leasehold interest in the Leased Premises pursuant to Section 8.1 hereof.

14.16 <u>Non-Interference</u>. Lessor will use reasonable efforts to ensure that neither Lessor nor any tenants, licensees or occupants of the Premises or any adjacent

property owned by Lessor, interferes in a material adverse manner with Lessee's use and occupancy of and the conduct of its operations at the Leased Premises.

14.17 Primacy of Documents. In the event of a conflict between the provisions of the Legislation and the provisions of this Lease or the Franchise Agreement, the provisions of the Legislation shall prevail. In the event of a conflict between the provisions of this Lease and the Franchise Agreement, the provisions of the Franchise Agreement shall prevail. Notwithstanding the foregoing, the description of the Leased Premises set forth in this Lease shall prevail over any contrary provision in the Franchise Agreement.

14.18 Counterparts. This Lease may be executed in two or more fully or partially executed counterparts, each of which shall be deemed an original, binding the signer thereof against the other signing Party, but all counterparts together will constitute one and the same instrument.

14.19 State Appendix. New York State Appendix A, attached hereto as Exhibit F, is incorporated herein and made a part of this Lease.

14.20 Regulatory Space. Lessee acknowledges that certain agencies of the State of New York relating to racing and wagering (the "Agencies") occupy space on the Leased Premises, and Lessee agrees that the Agencies may continue to occupy such space, free of charge, for the Term hereof. In the event that Lessee desires to relocate the Agencies within the Leased Premises, Lessee shall provide facilities of comparable size, character, quality and utility and reasonably convenient location to the Agencies, and shall pay all reasonable costs of relocating the Agencies to such replacement space.

14.21 Lessor Mortgage of Leased Premises. Lessor represents and warrants that as of the date hereof it has not mortgaged or encumbered its fee interest in the Leased Premises. Lessor may not mortgage or encumber its fee interest in the Leased Premises without obtaining a non-disturbance agreement in favor of Lessee, which must be in form and content reasonably satisfactory to Lessee.

14.22 Successors and Assigns. The provisions of this Lease shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

## SIGNATURE PAGES TO FOLLOW

Lessor and Lessee have executed this Lease as of the day and year first above written.

LESSOR:

THE PEOPLE OF THE STATE OF
NEW YORK ACTING BY AND
THROUGH THE STATE FRANCHISE
OVERSIGHT BOARD PURSUANT TO
CHAPTER 18 OF THE LAWS OF 2008

By:_____
Name: Laura L. Anglin
Title: Chairperson

Approved as to form by:

THE OFFICE OF THE ATTORNEY
GENERAL OF THE STATE OF NEW
YORK

By:_____
Name:
Title:

Saratoga

LESSEE:

**THE NEW YORK RACING ASSOCIATION, INC.**

By: Patrick L. Kehoe
Title: General Counsel

Saratoga

Lessor and Lessee have executed this Lease as of the day and year first above written.

**LESSOR:**

**THE PEOPLE OF THE STATE OF
NEW YORK ACTING BY AND
THROUGH THE STATE FRANCHISE
OVERSIGHT BOARD PURSUANT TO
CHAPTER 18 OF THE LAWS OF 2008**

By: _____
   Name: Laura V. Anglin
   Title: Chairperson

Approved as to form by:

**THE OFFICE OF THE ATTORNEY
GENERAL OF THE STATE OF NEW
YORK**

By: _____
   Name:
   Title:

APPROVED AS TO FORM
NYS ATTORNEY GENERAL

SEP 12 2008

PETER FAVRETTO
ASSOCIATE ATTORNEY

Saratoga

State of New York )

County of New York ss.:

On the 17th day of September in the year 2008 before me, the undersigned, personally appeared Laura L. Aralin , personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

Signature and Office of individual
taking acknowledgment

NATALIA LUCAS
Notary Public, State of New York
No. 01LU6174987
Qualified in Westchester County
Commission Expires October 1, 2011

Saratoga

State of New York )

County of New York ss.:

On the 12th day of September in the year 2008 before me, the undersigned, personally appeared Patrick L. Kehoe , personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

Signature and Office of individual
taking acknowledgment

NATALIA LUCAK
Notary Public, State of New York
No. 01LU6174987
Qualified in Westchester County
Commission Expires October 1, 2011

# EXHIBIT E

## DECLARATION OF HENRY M. GREENBERG, ESQ.

## 06/30/2021

---

## The Jockey Club's Thoroughbred Regulatory Rulings

## violations between 2010 and 2020

## Kentucky Horse Racing Commission Stewards Ruling

## January 30, 2021

Use (including viewing) of the material contained herein constitutes acceptance of the Terms of Use

# Thoroughbred Regulatory Rulings

Detail Report For: **Bob Baffert** **- Showing Ruling 8 of 20**

Click for Trainer Stat Profile Page
*Powered by Equibase*

- Thoroughbred Regulatory Rulings may not contain all rulings issued for all Thoroughbred trainers, all rulings issued for a specific Thoroughbred trainer, all rulings from all Racing Regulatory Authorities or all rulings from a specific Racing Regulatory Authority and may, in some cases, contain rulings related to a non-Thoroughbred.
- Please immediately report any errors to info@thoroughbredrulings.com
- A SINGLE RULING MAY CONTAIN ONE OR MORE ADJUDICATED VIOLATIONS.
- A SINGLE ADJUDICATED VIOLATION MAY BE REFLECTED IN ONE OR MORE RULINGS.
- To obtain the most current information about the status of a ruling, or for an official copy of the ruling or applicable regulations, please contact the Racing Regulatory Authority. Click here for contact information.
- Racing Regulatory Authorities contained in Thoroughbred Regulatory Rulings™ may be found here.
- Thoroughbred Regulatory Rulings™ is periodically updated as new rulings are received from Racing Regulatory Authorities and/or other official sources.

Search Critera:Last Name like **BAFFERT**

| | | | |
|---|---|---|---|
| Regulatory Authority: | **California Horse Racing Board** | Breed: | **Thoroughbred** |
| Date: | **1/7/2010** | Fine: | **$1,000.00** |
| Medication 1: | **Flunixin** | Medication 2: | |
| Association: | **SANTA ANITA PARK** | Suspension Start: | |
| Horse: | **Mother Ruth** | Suspension End: | |
| Website Updated: | **4/30/2019** | | |

- Description -

```
Trainer ROBERT BOB BAFFERT, who started the horse Mother Ruth, the fifth place finisher
in the third race at Santa Anita Race Track on January 7, 2010, is fined ONE THOUSAND
DOLLARS ($1,000.00)* pursuant to California Horse Racing Board rule #1887  (Trainer to
Insure Condition of Horse) for violation of California Horse Racing Board rule #1844  (c)
(2) (Authorized Medication  Flunixin in excess of permitted level  1st offense).
```

**\*NOTE: This ruling may have been abbreviated to fit in the text space allotted. Please contact the appropriate jurisdiction for full ruling text.**

Return to Ruling List

Copyright © 2021 The Jockey Club. All rights reserved.

# Thoroughbred Regulatory Rulings

Detail Report For: **Bob Baffert** - **Showing Ruling 14 of 20**

Ruling Number: **LATS#030**

Click for Trainer Stat Profile Page
*Powered by Equibase*

- Thoroughbred Regulatory Rulings may not contain all rulings issued for all Thoroughbred trainers, all rulings issued for a specific Thoroughbred trainer, all rulings from all Racing Regulatory Authorities or all rulings from a specific Racing Regulatory Authority and may, in some cases, contain rulings related to a non-Thoroughbred.
- Please immediately report any errors to info@thoroughbredrulings.com
- A SINGLE RULING MAY CONTAIN ONE OR MORE ADJUDICATED VIOLATIONS.
- A SINGLE ADJUDICATED VIOLATION MAY BE REFLECTED IN ONE OR MORE RULINGS.
- To obtain the most current information about the status of a ruling, or for an official copy of the ruling or applicable regulations, please contact the Racing Regulatory Authority. Click here for contact information.
- Racing Regulatory Authorities contained in Thoroughbred Regulatory Rulings™ may be found here.
- Thoroughbred Regulatory Rulings™ is periodically updated as new rulings are received from Racing Regulatory Authorities and/or other official sources.

Search Critera:Last Name like **BAFFERT**

| | |
|---|---|
| Regulatory Authority: **California Horse Racing Board** | Breed: **Thoroughbred** |
| Date: **10/23/2016** | Fine: **$250.00** |
| Medication 1: **Phenylbutazone** | Medication 2: |
| Association: **SANTA ANITA PARK** | Suspension Start: |
| Horse: **American Gal** | Suspension End: |
| Website Updated: **4/30/2019** | |

- Description -

Trainer ROBERT BAFFERT, who started the horse AMERICAN GAL which finished first in the third race at Santa Anita Race Track on October 23, 2016 is fined TWO HUNDRED FIFTY DOLLARS ($250.00)* pursuant to California Horse Racing Board rule #1887 (Trainer to Insure Condition of Horse) for violation of California Horse Racing Board rule #1843(a)(d) (Medication, Drugs and Other Substances) and rule #1844(c)(1) (Authorized Medication, Phenylbutazone, in excess of permitted level 2.69 ug/ml Class 4).

**\*NOTE: This ruling may have been abbreviated to fit in the text space allotted. Please contact the appropriate jurisdiction for full ruling text.**

Return to Ruling List

Copyright © 2021 The Jockey Club. All rights reserved.

Use (including viewing) of the material contained herein constitutes acceptance of the Terms of Use

# Thoroughbred Regulatory Rulings

Detail Report For: **Bob Baffert** - Showing Ruling 15 of 20

Ruling Number: **LATC#028**

Click for Trainer Stat Profile Page
*Powered by Equibase*

- Thoroughbred Regulatory Rulings may not contain all rulings issued for all Thoroughbred trainers, all rulings issued for a specific Thoroughbred trainer, all rulings from all Racing Regulatory Authorities or all rulings from a specific Racing Regulatory Authority and may, in some cases, contain rulings related to a non-Thoroughbred.
- Please immediately report any errors to info@thoroughbredrulings.com
- A SINGLE RULING MAY CONTAIN ONE OR MORE ADJUDICATED VIOLATIONS.
- A SINGLE ADJUDICATED VIOLATION MAY BE REFLECTED IN ONE OR MORE RULINGS.
- To obtain the most current information about the status of a ruling, or for an official copy of the ruling or applicable regulations, please contact the Racing Regulatory Authority. Click here for contact information.
- Racing Regulatory Authorities contained in Thoroughbred Regulatory Rulings™ may be found here.
- Thoroughbred Regulatory Rulings™ is periodically updated as new rulings are received from Racing Regulatory Authorities and/or other official sources.

Search Critera: Last Name like **BAFFERT**

| | | | |
|---|---|---|---|
| Regulatory Authority: | **California Horse Racing Board** | Breed: | **Thoroughbred** |
| Date: | **7/2/2017** | Fine: | **$1,000.00** |
| Medication 1: | **Phenylbutazone** | Medication 2: | |
| Association: | **SANTA ANITA PARK** | Suspension Start: | |
| Horse: | **Diamondsandpearls** | Suspension End: | |
| Website Updated: | **4/30/2019** | | |

- Description -

Trainer ROBERT BAFFERT, who started the horse DIAMONDSANDPEARLS first place finisherin the second race at Santa Anita Park on July 2, 2017 is fined ONE THOUSAND DOLLARS($1,000.00)* pursuant to California Horse Racing Board rule #1887 (Trainer to Insure Conditionof Horse) for violation of California Horse Racing Board rule #1843(a)(d) (Medication, Drugs andOther Substances) and rule #1844(c)(1) (Authorized Medication Phenylbutazone  in excessof permitted level  3.19 ug/ml  Class 4).

**\*NOTE: This ruling may have been abbreviated to fit in the text space allotted. Please contact the appropriate jurisdiction for full ruling text.**

Return to Ruling List

Copyright © 2021 The Jockey Club. All rights reserved.

Use (including viewing) of the material contained herein constitutes acceptance of the Terms of Use

# Thoroughbred Regulatory Rulings

**HOME**    STATS

Detail Report For: **Bob Baffert** - Showing Ruling 16 of 20

Click for Trainer Stat Profile Page
*Powered by Equibase*

---

- Thoroughbred Regulatory Rulings may not contain all rulings issued for all Thoroughbred trainers, all rulings issued for a specific Thoroughbred trainer, all rulings from all Racing Regulatory Authorities or all rulings from a specific Racing Regulatory Authority and may, in some cases, contain rulings related to a non-Thoroughbred.
- Please immediately report any errors to info@thoroughbredrulings.com.
- A SINGLE RULING MAY CONTAIN ONE OR MORE ADJUDICATED VIOLATIONS.
- A SINGLE ADJUDICATED VIOLATION MAY BE REFLECTED IN ONE OR MORE RULINGS.
- To obtain the most current information about the status of a ruling, or for an official copy of the ruling or applicable regulations, please contact the Racing Regulatory Authority. Click here for contact information.
- Racing Regulatory Authorities contained in Thoroughbred Regulatory Rulings™ may be found here.
- Thoroughbred Regulatory Rulings™ is periodically updated as new rulings are received from Racing Regulatory Authorities and/or other official sources.

---

Search Critera: Last Name like **BAFFERT**

Regulatory Authority: **California Horse Racing Board**                     Breed: **Thoroughbred**
                            Date: **7/27/2019**                              Fine: **$500.00**
               Medication 1: **Phenylbutazone**                      Medication 2:
                     Association: **DEL MAR**                      Suspension Start:
                            Horse: **Cruel Intention**                  Suspension End:
          Website Updated: **11/27/2019**

- Description -

```
 Trainer ROBERT BAFFERT, who started the horse CRUEL INTENTION, third place finisher in
the  third race at Del Mar Race Track on July 27, 2019, is fined FIVE HUNDRED DOLLARS
($500.00)  pursuant to #1887 (Trainer or Owner to Insure Condition of Horse) for violation
of California Horse  Racing Board rule #1843(a)(b)(d) (Medication, Drugs and Other
Substances), for violation of #1843.1  (Prohibited Drug Substances ? Phenylbutazone (Class
4).
```

**\*NOTE: This ruling may have been abbreviated to fit in the text space
allotted. Please contact the appropriate jurisdiction for full ruling text.**

Return to Ruling List

Copyright © 2021 The Jockey Club. All rights reserved.

# Thoroughbred Regulatory Rulings

Thoroughbred Rulings                                    **HOME**          **STATS**

Detail Report For: **Bob Baffert** - Showing Ruling 17 of 20

Ruling Number: **DFTD #017**

*Click for Trainer* Stat Profile Page
*Powered by Equibase*

- Thoroughbred Regulatory Rulings may not contain all rulings issued for all Thoroughbred trainers, all rulings issued for a specific Thoroughbred trainer, all rulings from all Racing Regulatory Authorities or all rulings from a specific Racing Regulatory Authority and may, in some cases, contain rulings related to a non-Thoroughbred.
- Please immediately report any errors to info@thoroughbredrulings.com
- A SINGLE RULING MAY CONTAIN ONE OR MORE ADJUDICATED VIOLATIONS.
- A SINGLE ADJUDICATED VIOLATION MAY BE REFLECTED IN ONE OR MORE RULINGS.
- To obtain the most current information about the status of a ruling, or for an official copy of the ruling or applicable regulations, please contact the Racing Regulatory Authority. Click here for contact information.
- Racing Regulatory Authorities contained in Thoroughbred Regulatory Rulings™ may be found here.
- Thoroughbred Regulatory Rulings™ is periodically updated as new rulings are received from Racing Regulatory Authorities and/or other official sources.

Search Critera:Last Name like **BAFFERT**

Regulatory Authority:**California Horse Racing Board**          Breed:**Thoroughbred**
Date:**8/3/2019**                                         Fine: **$1,500.00**
Medication 1:**Phenylbutazone**                            Medication 2:
Association:**DEL MAR**                              Suspension Start:
Horse:**Eclair**                                  Suspension End:
Website Updated:**11/27/2019**

- Description -

Trainer ROBERT BAFFERT, who started the horse ECLAIR, fourth place finisher in the first race at  Del Mar Race Track on August 3, 2019, is fined ONE THOUSAND FIVE HUNDRED DOLLARS ($1,500.00)* pursuant to #1887 (Trainer or Owner to Insure Condition of Horse) for violation of  California Horse Racing Board rule #1843(a)(b)(d) (Medication, Drugs and Other Substances), for  violation of #1843.1 (Prohibited Drug Substances ? Phenylbutazone (Class 4) second offense in 365  days).

**\*NOTE: This ruling may have been abbreviated to fit in the text space allotted. Please contact the appropriate jurisdiction for full ruling text.**

Return to Ruling List

Copyright © 2021 The Jockey Club. All rights reserved.

Use (including viewing) of the material contained herein constitutes acceptance of the Terms of Use

# Thoroughbred Regulatory Rulings

Thoroughbred Rulings                                    **HOME**                    **STATS**

Detail Report For: **Bob Baffert** - Showing Ruling 19 of 20

Click for Trainer Stat Profile Page
*Powered by Equibase*

- Thoroughbred Regulatory Rulings may not contain all rulings issued for all Thoroughbred trainers, all rulings issued for a specific Thoroughbred trainer, all rulings from all Racing Regulatory Authorities or all rulings from a specific Racing Regulatory Authority and may, in some cases, contain rulings related to a non-Thoroughbred.
- Please immediately report any errors to info@thoroughbredrulings.com
- A SINGLE RULING MAY CONTAIN ONE OR MORE ADJUDICATED VIOLATIONS.
- A SINGLE ADJUDICATED VIOLATION MAY BE REFLECTED IN ONE OR MORE RULINGS.
- To obtain the most current information about the status of a ruling, or for an official copy of the ruling or applicable regulations, please contact the Racing Regulatory Authority. Click here for contact information.
- Racing Regulatory Authorities contained in Thoroughbred Regulatory Rulings™ may be found here.
- Thoroughbred Regulatory Rulings™ is periodically updated as new rulings are received from Racing Regulatory Authorities and/or other official sources.

Search Critera:Last Name like **BAFFERT**

| | | | |
|---|---|---|---|
| Regulatory Authority: | **California Horse Racing Board** | Breed: | **Thoroughbred** |
| Date: | **7/25/2020** | Fine: | **$2,500.00** |
| Medication 1: | **Dextromethorphan** | Medication 2: | |
| Association: | **DEL MAR** | Suspension Start: | |
| Horse: | **Merneith** | Suspension End: | |
| Website Updated: | **1/11/2021** | | |

- Description -

Pursuant to California Horse Racing Board rule #1887 (Trainer or Owner to Insure Condition of Horse), trainer BOB BAFFERT, who started the horse "Merneith", the second place finisher in the fourth race at Del Mar Race Track on July 25, 2020, is fined TWO THOUSAND FIVE HUNDRED DOLLARS ($2,500.00)* for violation of California Horse Racing Board rule #1843 (a &d) (Medication, Drugs, and Other Substances) and #1843.1 (a) (Prohibited Drug Substances- Dextromethorphan 5 ng/ml-class 4).

**\*NOTE: This ruling may have been abbreviated to fit in the text space allotted. Please contact the appropriate jurisdiction for full ruling text.**

Return to Ruling List

Copyright © 2021 The Jockey Club. All rights reserved.

ANDY BESHEAR
GOVERNOR

JONATHAN RABINOWITZ
CHAIRMAN

KERRY B. HARVEY
SECRETARY

MARC A. GUILFOIL
EXECUTIVE DIRECTOR

## PUBLIC PROTECTION CABINET

KENTUCKY HORSE RACING COMMISSION
ESTABLISHED 1906
4063 IRON WORKS PKWY., BLDG. B
LEXINGTON, KENTUCKY 40511
TELEPHONE: (859) 246-2040   FAX: (859) 246-2039
WEBSITE: HTTP://KHRC.KY.GOV

## STEWARDS RULING

**Ruling number: 21-0015**
**Sample #E377808**

**Track: Turfway Park**                    **Date: January 30, 2021**

**Trainer: Robert A. Baffert (D.O.B. 1/13/1953)**

**Upon receipt of notification from Industrial Laboratories, the official testing
laboratory for the Kentucky Horse Racing Commission, and confirmed at UIC
Analytical Forensic Testing Laboratory, sample number E377808 taken from
GAMINE, who finished third in the twelfth race at Churchill Downs on September
4, 2020 contained betamethasone in blood (Class C drug). After waiving his right to
a formal hearing before the Board of Stewards, Robert A. Baffert is hereby fined
ONE THOUSAND FIVE HUNDRED ($1,500.00) DOLLARS. GAMINE is
disqualified and all purse money forfeited. Pari-mutuel wagering is not affected by
this ruling. Upon receipt of this ruling, the licensee is required within thirty (30)
days to pay any and all fines imposed to the Kentucky Horse Racing Commission.
Failure to do so will subject the licensee to a summary suspension of license
pursuant to 810 KAR 3:020 Section 15 (cc).**

**810 KAR 4:100 Section 3, subsections (1) and (2)(d)**
**810 KAR 4:010 Section 10, subsection (4)**
**810 KAR 4:060 Section (6)(7)**
**810 KAR 8:010 Section 2**
**810 KAR 8:010 Section 15, subsection (2)(3)**
**810 KAR 8:030, Section 4, subsection (3)(a)(b)**

## BY ORDER OF THE STEWARDS

*Kentucky*
UNBRIDLED SPIRIT
EQUAL OPPORTUNITY M/F/D

# EXHIBIT F

## DECLARATION OF HENRY M. GREENBERG, ESQ.

## 06/30/2021

---

## Article by Gary B. Grave - Published by the Associated Press

## "Bob Baffert No Stranger to Failed Drug Tests By His Horses"

## May 10, 2021

A

# Bob Baffert no stranger to failed drug tests by his horses

By GARY B. GRAVES

May 10, 2021



LOUISVILLE, Ky. (AP) — Trainer Bob Baffert is used to making history.

The Hall of Famer could make some unwanted history if Medina Spirit becomes only the second Kentucky Derby winner to be disqualified for a failed drug test. Baffert announced that Medina Spirit tested positive for the steroid betamethasone, but denies wrongdoing while promising to be transparent with Kentucky racing officials.

No matter the outcome — which could take weeks to resolve— the episode marks the fifth such controversy for Baffert in just over a year. The list of failed tests go back even longer, with the New York Times reporting last fall that Baffert has been cited in 29 instances spanning more than four decades.

The latest crisis could strip him of a milestone he didn't expect to achieve with the 12-1 underdog, who held off Mandaloun by half a

length in horse racing's premier event.

ADVERTISEMENT

For now, Dancer's Image (1968) remains the only Derby winner to be disqualified.

Below is a list of recent episodes of failed drug tests by Baffert horses:

— May 9, 2021. Kentucky Derby winner Medina Spirit failed a postrace drug test for an excessive amount of the corticosteroid betamethasone, which is sometimes used to treat pain and inflammation in horses. Betamethasone is allowed in Kentucky, though a stricter level of detection replaced the allowable threshold of 10 picograms per milliliter last year. Medina Spirit's betamethasone level in the postrace sample was 21 picograms per milliliter. Rules in the state of Kentucky limits the use of the steroid to 14 days or more before a race. Any level of detection on race day is a violation.

— January 2021. The California Horse Racing Board voted to let eventual 2018 Triple Crown winner Justify keep his Santa Anita Derby victory despite the detection of scopolamine in postrace samples in him and Hopportunity. The positive tests were revealed in a New York Times story in September 2019.

— October 20, 2020. Filly Gamine was disqualified from third to last in the Kentucky Oaks on Sept. 4 after testing positive with 27 picograms of betamethasone. Baffert did not appeal and was fined $1,500.

— July 25, 2020. Three-year-old Merneith finished second in a race at Del Mar in California before testing positive afterward for the medication dextromethorphan. Stewards fined Baffert $2,500 on Nov. 30, 2020.

— May 2020: Gamine and colt Charlatan and test positive for the painkiller lidocaine after victories at Oaklawn Park. Tests revealed 185 picograms in Gamine and 46 in Charlatan, who had won a division of the $1 million Arkansas Derby. Arkansas stewards initially fine and

suspend Baffert 15 days for the violation. His appeal was heard last month, with the suspension lifted and fines reduced to $5,000 per horse.

___

More AP sports: https://apnews.com/hub/apf-sports and https://twitter.com/AP_Sports

# EXHIBIT G

**DECLARATION OF HENRY M. GREENBERG, ESQ.**

**06/30/2021**

---

**Article by Joe Drape –
Published by the New York Times**

**"California Examines Puzzling Trend of
Horses' Sudden Deaths"**

**April 10, 2013**

**The New York Times** | https://www.nytimes.com/2013/04/11/sports/california-examines-puzzling-trend-of-horses-sudden-deaths.html

# California Examines Puzzling Trend of Horses' Sudden Deaths

**By Joe Drape**

April 10, 2013

Seemingly healthy racehorses have been dropping dead at an alarming rate in California, perplexing researchers and attracting the attention of regulators. The three-time Kentucky Derby-winning trainer Bob Baffert has had seven horses die suddenly in the last 16 months, necropsies revealed.

**DON'T MISS A MOMENT AT THE TOKYO OLYMPICS:** *Sign up for our daily email update with the biggest highlights, the latest medal count and the stories you won't see on TV.*  [ Sign Up ]

Mike Marten, a spokesman for the California Horse Racing Board, said an investigator was assigned to help Rick Arthur, the equine medical director for the state, and researchers from U.C. Davis review the deaths.

"The C.H.R.B. carefully monitors fatalities trends," Arthur said Wednesday. "I don't believe there is much that slips by our notice," especially "clear anomalies either by surface, track, trainer or diagnosis or any combination thereof."

In California, 19 horses died acutely in the fiscal year that ended on June 30, 2012. Four of them were trained by Baffert. During this fiscal year, which ends June 30, 17 have died suddenly, three of which were in Baffert's care, including a 5-year-old mare who died last month while training in the morning at Hollywood Park.

"The main necropsy findings were the severe diffuse pulmonary edema and the multifocal pulmonary hemorrhage, which are indicative of acute severe respiratory distress, the cause of which remains undetermined," the necropsy report said.

California has one of the most comprehensive post-mortem protocols in the country and has conducted necropsies on all the horses.

"We have not been able to find the cause," Dr. Francisco Uzal of the California Animal Health and Food Safety Laboratory System said at a meeting of the board's medication committee. "We have done extensive toxicological studies. We have done, of course, all sort of other things — pathology and histology. We don't know what's going on."

Thoroughbreds rarely die suddenly: a 2010 study in the Equine Veterinary Journal found that sudden death occurred in 9 percent of fatalities in California. Several trainers and owners said they could not remember losing a horse to a heart attack or an unexplained occurrence.

"I've had thousands of horses in my barn, and I've seen them die from colic or break bones or get an illness, but I don't think there was but maybe one who just dropped dead," said Gary Contessa, who has been training horses for 38 years, primarily in New York.

Last June, after the Baffert-trained C J Russell collapsed after finishing last in a race, the necropsy had the notation "4th horse to collapse/die for this trainer in less than one year." The necropsy concluded that C J Russell died of "cardiovascular collapse."

Cardiac failure or heart problems were noted in three other of the Baffert-trained horses, including a 2-year-old colt who died while galloping at Hollywood Park from "failure of the cardiac conduction system" on Nov. 4, 2011, according to the necropsy. The other two Baffert horses died of internal bleeding, according to the necropsies. One of them, a 3-year-old, had a "massive abdominal/thoracic cavity hemorrhage."

The names of the horses and their owners were redacted by the California authorities.

Baffert did not respond to messages left by phone and e-mail.

Necropsies of two horses, including one under Baffert's care, showed traces of rat poison, but not the kind used by California racetracks. Arthur said the causes of death of those two horses were determined to be from internal hemorrhage.

The inquiry into sudden deaths comes as horse racing is trying to reform a drug culture that its officials concede is diminishing the sport. Congressional hearings have been held and federal legislation proposed to take over the sport.  A New York Times investigation last year showed how a pervasive drug culture put horses and riders at risk and found that 24 horses a week die at America's racetracks, a rate greater than in countries where drug use is severely restricted.

Last month, the industry took a significant step toward adopting tough uniform rules when eight states agreed to operate their racetracks under one set of rules that will severely restrict the administration of medication.

The states across the mid-Atlantic region, including New York, winnowed to 24 what has long been an unruly list of medications allowed to treat illness and injury in racehorses. They have also stepped up efforts to detect so-called designer drugs and substances that improve performance, but do not have a drug test effective enough to catch cheats.

Uzal acknowledged that researchers had been stymied in their search for answers to the sudden deaths because of the lack of information from trainers and their veterinarians.

"The information of medication that we get is still sketchy," Uzal said at the medication meeting. "But if we can have a summary of medication, that would help a lot."

# EXHIBIT H

**DECLARATION OF HENRY M. GREENBERG, ESQ.**

**06/30/2021**

---

**Article by Gus Garcia-Roberts and Steven Rich –
Published by The Washington Post**

**"The Dark Side of Bob Baffert's Reign"**

**June 18, 2021**

**News**Room

6/18/21 WashingtonPost.com (Pg. Unavail. Online)
2021 WLNR 19810505

WashingtonPost.com
Copyright (c) 2021 The Washington Post

June 18, 2021

Section: /sports/horse-racing

The dark side of Bob Baffert's reign

Gus Garcia-Roberts; Steven Rich

LOS ANGELES — In March 2020, horse racing's most recognizable figure, Hall of Fame trainer Bob Baffert, declared that his sport was "in crisis."

Federal prosecutors had just indicted more than two dozen trainers, veterinarians and others on charges related to doping horses, a seismic event in a sport already reeling from a well-publicized spate of horse deaths and perpetually dwindling revenue.

In an op-ed for The Washington Post, Baffert wrote that reforming racing was not just necessary to the sport's survival but the only moral path forward. "Nothing is more important than the health and safety of our equine and human athletes," Baffert wrote, "and nothing impacts their health and safety more than the policies and procedures concerning drugs."

The bold statement appeared to put Baffert on the right side of history: By the end of the year, President Donald Trump had signed into law the Horseracing Integrity and Safety Act, which promised to reform the sport. But the star trainer's sudden support belied the fact that Baffert has for years been entangled with the very problems he blamed for his sport's potential demise: drugs, dead horses and a feckless regulatory system.

At least 74 horses have died in Baffert's care in his home state of California since 2000, more than all but two of hundreds of trainers in the state, according to a Post analysis of data and public records. But when factoring in the number of races run, Baffert's horses have died at the highest rate of the 10 trainers who have had the most horse deaths.

In more than four decades in the sport, Baffert has faced significant regulatory scrutiny because of a high death rate only once, after seven of his horses collapsed in a short period of time at the same California track. State investigators found that his staff was mixing a potentially dangerous prescription drug into the feed of every horse in his care. But a top veterinary official cleared Baffert, finding that the spate of deaths "remains unexplained" following a probe that demonstrated the hazards of going after Baffert. Among them, according to interviews and records obtained by The Post: a push to have the veterinary official removed from office, supported by a trade group with Baffert among its directors.

Baffert also has wielded unmatched clout when regulators have discovered banned or excessive substances in his horses. Before his Kentucky Derby-winning colt, Medina Spirit, tested positive for betamethasone last month — which could erase the victory — his horses were cited for drug-related violations 29 times, according to the Association of Racing Commissioners International (ARCI). But until now, those violations, some of which Baffert has succeeded in getting overturned or reduced,

have resulted in roughly $20,000 in fines against $321 million in career earnings. Baffert's lawyers have made explicit that he will accept fines but not a suspension, and state regulators have continually obliged him.

This pattern has bred frustration among some horsemen. In a scheme typical of the high-stakes warring behind the scenes in racing, four thoroughbred owners entered talks in 2015 with a private intelligence agency to dig up drug-related dirt on Baffert, according to multiple people with direct knowledge. The owners ultimately abandoned the plan after Baffert's horse, American Pharoah, won the Triple Crown that year, fearing their effort could damage the sport, one of those people said.

As The Post reported in April, the Jockey Club, an industry group of top thoroughbred owners, then hired the same private agency, 5 Stones Intelligence, to probe suspected dopers. That investigation led to the indictments that Baffert said spurred him to embrace more oversight, so "the cheaters would be quickly caught and punished."

But the sport's new governing authority will not take over until mid-2022. And in the 13 months following his essay in The Post, Baffert's horses tested positive for prohibited or excessive substances five times in three states.

"He'll do anything to win, and he's got all his bases covered politically," Barry Irwin, owner of 2011 Kentucky Derby winner Animal Kingdom, said of Baffert. "And because of that, he has become arrogant as hell. He's Mr. Teflon."

On a recent afternoon, Baffert appeared largely unperturbed by the firestorm surrounding him when he answered his door in Arcadia, Calif. "This is the first I've learned of it," Baffert responded when told of The Post's finding that he had the highest rate of horse deaths among other top trainers in the state. He declined to answer further questions.

But Clark Brewster, the attorney representing Medina Spirit's owner, Amr Zedan, then contacted The Post and described Baffert as being unfairly maligned. He claimed that the horse death data provided by the California Horse Racing Board (CHRB) was "not possible."

When The Post shared the data on 72 of the horse deaths with Brewster, he and Baffert's lawyer, W. Craig Robertson III, said that one of the horses listed was never in Baffert's care, though it is marked as his horse in CHRB records, and that another was a stable pony not being raced. The lawyers said that taking into account Baffert's estimate of how many horses he has in his care, a count that differs from the starts data, "the number of deaths of horses in Bob's barn is consistent with what would normally be expected from the horse population in general." Starts are regularly used, including by the CHRB, to study the death rates of a trainer.

"No horse loving person like Bob or his entire team accepts the reality of a horse death with anything other than sadness and despair," the lawyers said in their statement. "In each instance, the death is investigated. Every investigation over the past 20 years has reached the same conclusion: no rules or regulations have been violated nor has there been any improper activity on Bob's part."

Brewster also said that the vast majority of Baffert's drug-related violations, as tracked by ARCI, shouldn't be counted because they were too old or related to overages of otherwise-allowed drugs in a horse, which he dismissed as like "coming to work with too much Advil in your system."

Robertson said in an e-mail that "[n]o one has done more for horse racing and is better for the sport than Bob Baffert," and he listed various awards the trainer has received, including being inducted into four separate Hall of Fames. Robertson blamed the frequency of Baffert's drug-related violations on how often his horses are tested after winning races and said, "Horse racing's regulations need to catch up with the sensitivity of modern day testing."

Jockey Club President James L. Gagliano dismissed that frequent complaint from Baffert. "There's 10,000 other trainers who understand the 'absolute insurer' rule and don't seem to run afoul of it," Gagliano said, referring to the edict that any substances in the horse are the trainer's responsibility. "Other trainers seem to navigate just fine."

Monty Roberts, a trainer who has agitated for more humane treatment of racehorses throughout his six-decade career, said that Baffert has long been one of the most important voices holding the sport back from reform. Asked whether he was surprised by the finding that Baffert's barn was the deadliest in California, Roberts laughed.

"If it surprised me it would be that I expected more," Roberts said. "Bob Baffert has moved his way up the ladder to the extent that he has the most influential, the wealthiest owners in the industry, that he takes on the highest-quality horses possible — because he wins races. And he pushes the envelope to the extent that they give their lives for his bank account."

Horse-racing deaths, like much of the sport, are shrouded by a disjointed bureaucracy. Racing lacks a central clearinghouse for data on deaths nationally, and regulators in many states do not track deaths by trainer.

In response to public records requests in Maryland, New Jersey and Kentucky, officials told The Post that they did not maintain digital records of horse deaths by trainer, instead keeping reams of copies of reports. The Jockey Club has a database of thoroughbred breakdowns — meaning deaths stemming from track injuries — but said it is barred from sharing its data because of its contracts with racetracks.

California keeps track of horse deaths by trainer, but there are errors and limits to the data. (At least one death of a Baffert horse identified by The Post was not included in the agency's data.) The CHRB provided The Post with death data dating back to late 1990 showing that at least 87 of Baffert's horses have died in California since then. The Post separately obtained start data dating back to 2000 from the Daily Racing Form to put the deaths into context. Earlier data was unreliable, the racing publication said.

The 74 total deaths since 2000 put Baffert third among trainers. Jerry Hollendorfer has the most deaths with 122. Like Baffert, Hollendorfer is in the thoroughbred Hall of Fame. But in 2019, he was banned from Santa Anita Park and affiliated tracks after four of his horses died there in six months. Hollendorfer's lawyer, Drew Couto, has claimed his client is being unfairly blamed for a high-profile spike of deaths at the track.

In fact, Baffert's horses, at 8.3 deaths per 1,000 starts, have died at a significantly higher rate than Hollendorfer's, at 6.25. The average death rate for racehorses in California, according to an analysis of more than 5,000 deaths since 2000, is 7.2 per 1,000 starts. That's much higher than the Jockey Club's widely cited national rates, which never exceed two deaths per 1,000 starts. California counts all fatalities of horses in a trainer's care, including breakdowns during training, not just racing deaths.

The majority of the deaths in Baffert's care are attributed to breakdowns, though others have died suddenly without explanation and some of the horses suffered illness — including his most recent death, Noodles, in May where pneumonia was the suspected cause. The deadliest period came between 2000 and 2005, when 34 of Baffert's horses in California died. Nine died in 2000, all but one from breakdowns.

When a horse dies in California, CHRB records often list medications the horse had been prescribed, based on its medical history. In the case of Baffert's recent horse deaths, the records list a typical blend of drugs that have been allowed under certain thresholds, most frequently the anti-inflammatory phenylbutazone (or "bute" to horsemen) and furosemide (also known as Lasix), which is said to decrease bleeding from a horse's lungs.

On at least 14 occasions, Baffert has been caught racing a horse with more than the allowable amount of bute in its system, according to a review of ARCI data, making it his most common offense. He has often blamed drug positives on trace contamination from substances in a horse's barn and has criticized tightening restrictions on the race-day use of bute and other drugs.

"The testing levels have become ridiculous," Baffert told a conference of racehorse veterinarians during his keynote speech in 2000, according to a trade publication. "All they show is contamination, and they have really put the trainers' heads on the chopping blocks. It hurts racing."

In the same speech, Baffert agitated for the continued use of Lasix, which is popular with trainers but increasingly criticized as a potential performance-enhancer and masking agent for other drugs. He also dismissed complaints that doping was rampant in the sport. "We live and work in a fishbowl, with rumors and accusations flowing constantly," Baffert said. "There are no secrets on the backside."

Baffert is known for holding court on such ideas at Clockers' Corner, a popular hangout for horsemen at Santa Anita Park. "He makes it clear that he believes in same-day medication and he believes in his whips," said Roberts, who has long pushed to remove whipping horses from racing.

Arthur B. Hancock III, a prominent thoroughbred owner, has for three decades been a leading proponent for eradicating drugs from the sport. "He has not been in alliance with us," said Hancock, mentioning Baffert's many positive tests and then listing top trainers who have had one or zero positives in their career. "It's all right there in black and white; that's all I can say."

ARCI President Ed Martin said the rules limiting race-day medications have been tightened not out of concern for performance enhancement but to prevent breakdowns. "There's a recognition that certain substances are normal in equine care," Martin said, "but if that horse still requires that, then maybe you shouldn't run the horse."

Martin made a distinction between doping horses with banned substances and running them with too much medication. "I don't see somebody who is doping horses," Martin said after reviewing Baffert's drug-related history. "Some of the earlier violations do give you pause. But the overall record indicates that he may not be running as tight a ship as he should."

It was obvious long before Miner's Daughter collapsed in a blood-tinged froth in March 2013 that there was something amiss in Barn 61 at Hollywood Park, the Los Angeles-area racetrack. The 5-year-old mare was the seventh seemingly healthy horse from that barn to drop dead in 16 months.

"Drop dead while galloping," read a California Horse Racing Board vet's account of the first horse's death in November 2011. It elicited little notice; racehorses die by the hundreds per year in California alone. But they don't usually die in a cluster from a single barn for no clear reason. After Uncle Sam, a 4-year-old colt, died during a workout at the track the following January, a vet wrote: "This is the 3rd for this owner/trainer in about as many months collapsed and died."

The owner was Kaleem Shah. The trainer was Baffert.

By then, Baffert's encounters with regulators dated back decades, to 1977, when he served a yearlong suspension for racing a horse on morphine. But Baffert and his lawyers had since established a reputation for pugnaciousness when regulators attempted to discipline him.

In 2000, for instance, another of his horses, Nautical Look, tested positive for morphine, landing Baffert a two-month suspension. During a hearing, records show, Baffert argued the positive test could have been a result of his stable hands eating poppy seed bagels and muffins around the horse. One of his grooms, Clemintino Abrego Garcia, testified that Baffert called him three or four times attempting to get him to admit that he had eaten baked goods near the horse. The groom denied it. Garcia left California horse racing the next year, according to CHRB records; he could not be reached for comment by The Post.

Baffert sued in federal court, claiming the two months off could cost him $11 million in purses. "His attorney, let me just say, worked very, very hard," recalled former California Deputy Attorney General Jerald L. Mosley, who represented the state in

attempting to uphold the suspension. "That's the only time I ever had to deal with somebody who tried to go to federal court to stop a state administrative action."

Finally, in 2005, after the matter had returned to state court, the CHRB dismissed the suspension after an administrative law judge concluded Baffert "had nothing to gain and a great deal to lose by the use of a banned substance on this horse."

Baffert further solidified his influence in the ensuing years. In 2007, he joined the 15-member board of the Thoroughbred Owners of California (TOC), a nonprofit that represents the roughly 9,000 CHRB-licensed owners in the state. With upward of $1 million in yearly revenue drawn from wagering at tracks, the TOC's stated mission included "establishing fair and reasonable medication rules and integrity standards."

Baffert, the group's resident celebrity, was in business with several of his colleagues. Board member Michael E. Pegram had for decades hired Baffert to train his top horses, including the winner of the 1998 Kentucky Derby, Real Quiet. Former Democratic congressman Dennis Cardoza, also on the board, was co-owner with Pegram of Shakin It Up, a successful thoroughbred trained by Baffert. And Madeline Auerbach, who later became a CHRB commissioner, had partnered with Baffert in thoroughbred breeding. (Pegram and Auerbach did not respond to interview requests.)

Among the TOC's central crusades was countering the movement against Lasix. In 2013 the group hosted a Lasix-focused event at the Four Seasons in Beverly Hills at which one owner reportedly said running a race without the drug was like "waterboarding your horse in their own blood."

In February 2013, with Baffert's Hollywood Park sudden-death toll at six and California's equine medical director, Rick Arthur, probing his barn's operations, state legislation was introduced that would place term limits on Arthur's position, eventually forcing him out of a $309,000-a-year job. The bill was introduced by California Assemblyman Adam Gray, a former aide to Cardoza who had been in office for less than three months.

The previous August, Bob Baffert Racing Stables had donated $1,000 to the TOC's political action committee, California records show. Two months later, the PAC contributed $2,000 to Gray's successful election committee. The TOC, of which Baffert is still a board member, did not respond to requests for comment.

Finding a new director every two to four years would cost $300,000 each time, a committee that analyzed the bill found. Gray's office told the committee that "removing Dr. Arthur from his position, while intentional, is not the sole purpose of the bill," records show. Gray said at the time that the bill also would increase the "institutional knowledge" of California's central horse drug-testing lab.

Gray declined to be interviewed for this story, instead issuing a statement declaring that the "personal vendettas of others, perceived or otherwise, play no roll [sic] in the legislation I carry." His spokesman added that campaign contributions do not affect Gray's policy proposals.

Arthur said the TOC was behind the effort to oust him because of his criticism of Lasix. "There wasn't any question in my mind," he said recently. Cardoza, who now works for a law firm, denied in an interview last month that the TOC was involved: "Not at all." But he then said, "TOC's involvement in that bill had nothing to do with Bob Baffert."

Instead, Cardoza said, the drive to oust Arthur was over his opposition to Lasix. "That didn't feel appropriate to those of who wanted to see science prevail," Cardoza said. The timing of the legislation was coincidental, he added: "I understand where you're going and why, but there were no connections, from my perspective."

Brewster, attorney for Medina Spirit's owner, also said that Baffert's issue with Arthur was about Lasix and that the timing was "irrelevant."

Either way, the state-appointed official probing Baffert's role in the deaths at Hollywood Park did so as his job was being threatened by the efforts of a Baffert-affiliated coalition.

The month after Gray introduced his legislation, Baffert's seventh sudden death made the deaths at Hollywood Park a national news story. The CHRB officially opened an investigation. The month after that, Gray's bill to limit Arthur's term was passed out of a committee.

Arthur and CHRB investigators inspected Baffert's barn, reviewed veterinary records and interviewed Baffert, who was flanked by an attorney. According to Arthur's report, he found that Baffert was dispensing Thyro-L, or thyroxine, a prescription thyroid hormone, to all horses in his care. And Baffert's veterinarians were prescribing it at his request without conducting laboratory tests to see whether the horses needed the drug, according to Arthur's later report.

Arthur indicated in his report that thyroxine was suspected to cause heart problems for horses during exercise, and at least four of the sudden deaths involved confirmed or suspected cardiac failure. "How carefully the dosage was followed was not determined," Arthur wrote. "Per Baffert, barn staff including grooms, were involved in administering the thyroxine in feed."

Baffert told investigators he used the drug for about five years to "build up" his horses, which Arthur noted was unusual because it was typically used to slim them down. The veterinarian chalked up Baffert's response to ignorance. "It's not uncommon to find trainers who don't understand medications and how different medications work," Arthur said.

When Arthur delivered his report in November 2013, the bill to remove him from office was still pending. Arthur called Baffert's blanket use of thyroxine "troublesome" and said at the meeting, "I haven't found an example of a barn that uses it in all their horses like Baffert does." Yet he determined that the drug wasn't to blame for the deaths. His reasoning was that Baffert also administered thyroxine to horses outside of Hollywood Park, where his horses did not suffer sudden deaths.

Arthur also presented exercise histories for the horses that showed they worked harder than average. "The bottom line," he said, "is if you're a horse in Bob Baffert's barn, you're there to work."

The cluster of sudden deaths "remains unexplained" and there was "no evidence whatsoever CHRB rules or regulations have been violated or any illicit activity played a part" in the deaths, Arthur's report concluded.

In a recent interview, Arthur described his findings as "damning" for Baffert, in particular analysis in his report showing that, over a six-year period, Baffert's horses were nine times more likely to die of sudden death than the average trainer's. "It basically said something under his control is associated with these fatalities," Arthur said, but regulators couldn't act without evidence of a rules violation.

Following the publication of the report, Baffert tweeted: "I'm gratified that CHRB completed its investigation & found there was no wrongdoing. My focus will always be on the best care for my horses." Shah, the owner of at least three of the horses, told The Post he had fully trusted Baffert as a trainer and "had no reason to suspect that he would harm the horses — he loves the horses." Brewster, the attorney, said that Baffert believed the horses had ingested rat poison, traces of which were found in one of them. But Arthur's report said Hollywood Park used a different sort of poison than that found in the necropsy.

Two months after Arthur cleared Baffert, the legislation to limit his term died. Four months after that, in May 2014, Arthur issued an advisory that the CHRB was "concerned by the apparently indiscriminate use of thyroxine" and that the drug "must be prescribed for a specific horse for a specific condition." Arthur told The Post that the advisory was a result of the Baffert investigation.

Hollywood Park closed in 2013, and the saga of the dead horses there faded quickly from the headlines. But in 2018, Arthur was still on the job when another Baffert-trained horse tested regulators' willingness to challenge him. After winning the Santa Anita Derby in April of that year, Baffert's Justify tested positive for scopolamine, a banned substance, which normally would have disqualified the victory and made the horse ineligible to run in that year's Kentucky Derby.

But after learning that Justify and another Baffert horse had tested positive for the same drug, Arthur announced in an e-mail to CHRB officials: "The scopolamine cases will be handled differently than usual." Arthur said in a recent interview that he was referring to the logistics of what "was clearly going to be a high-profile case that needed to be handled carefully."

Instead of promptly filing a public complaint against Baffert, the CHRB kept the positive result secret while Arthur conducted a lengthy investigation. Four months later, during a confidential executive session, Arthur and CHRB Director Rick Baedeker recommended that the commissioners not move forward with the disqualification of Justify, arguing that the scopolamine positive was probably the result of contamination from jimson weed. By then, Justify had won the Triple Crown, one of the rarest achievements in sports.

The board agreed not to disqualify Justify. It then changed the classification of scopolamine so that its detection in a horse would trigger only a fine and not disqualification and loss of the race's purse. The positive test only emerged when the New York Times reported it more than a year later.

Mick Ruis, the owner and trainer of the second-place finisher in the Santa Anita Derby, has sued the CHRB. "What I can tell you definitely is this case was handled differently, and it was handled differently because of Rick Arthur," said Ruis's attorney, Darrell Vienna. (A CHRB spokesman declined to comment, citing pending litigation.)

Arthur has defended his handling of the Justify positive. "Usually, regulatory agencies do not have the guts to do what's fair and right," Arthur testified during a CHRB hearing in October, "and this board made that decision appropriately."

He conceded that the lack of transparency was unusual. "And I've warned them that this was not going to stay a secret at the time," he testified of the CHRB, "but that was their decision, not mine." (Baedeker, who retired last year, told The Post they couldn't legally disclose the test results because CHRB did not file a complaint.)

Arthur is retiring at the end of June from a job often consumed by the scandals of a single trainer.

"Bob Baffert has taken up more of my time than I ever should have had to deal with," Arthur said, before again coming to the defense of Baffert's treatment of his horses: "He certainly puts the pedal to the metal, but he doesn't close his eyes. There's one thing that I will say positive about Bob is that he is a horseman. And he does know generally when to stop on a horse."

In 2015, a loose group of prominent thoroughbred owners hatched a plan — according to people with direct knowledge of it — to sic private eyes, from a firm called 5 Stones that helped bring down Russian dopers, on their sport's most famous trainer. The goal, the people familiar said, was to get Baffert to support languishing reforms in the sport.

The scheme involved digging up drug-related dirt on Baffert and then telling him that the evidence could "disappear tomorrow" if he were to endorse the federal reforms of the sport, one of the people said. They had discussions with David Tinsley, the former DEA supervisor who runs 5 Stones, the people said, but the thoroughbred owners involved scrapped the plan. Tinsley declined to comment.

When asked about that plan, attorney Brewster said that in fact 5 Stones did investigate Baffert at the direction of the Jockey Club. Brewster alleged, without providing evidence, that the Jockey Club directed 5 Stones to investigate "anybody who doesn't train for them and wins a lot of races and might run in racetracks they don't run at."

"You know what the conclusion was?" Brewster said of the alleged private investigation into Baffert. "He's good."

Gagliano, the Jockey Club president, denied that the group had any knowledge of whom 5 Stones investigated, outside of the eventual indictments. "It sounds like he's deflecting," Gagliano said of Baffert.

Regardless, the indictments appeared to sway Baffert, whose opinion piece in The Post supported "drastic action to fix a broken system." Among the provisions in the federal legislation that Baffert supported is a phaseout of Lasix on race day — a reform Baffert had opposed for years.

But Baffert's critics say his conduct after penning the article calls into question his seriousness about reform. In the next six months, three of his horses tested positive for banned or excessive substances four times in California, Arkansas and Kentucky.

In September, Baffert learned via a text message from Barbara Borden, chief steward for the Kentucky Horse Racing Commission, that his horse Gamine had tested positive for the anti-inflammatory betamethasone at the Kentucky Oaks. "This whole thing is ridiculous," Baffert texted back, according to messages obtained by The Post via public records request. "When Did threshold change and what were they before?"

No amount of betamethasone is permitted in Kentucky races now, Borden wrote. Baffert responded: "Zero tolerance?"

Robertson, Baffert's attorney, then tried to negotiate for Baffert to avoid potential suspensions in both Arkansas and Kentucky. "Bob is trying to put 2020 behind him and move forward in a positive manner," Robertson wrote in an e-mail to Borden. "Closing everything and moving forward is in Bob's best interest and the best interest of horse racing. Obviously if we can get the Kentucky case resolved, Arkansas will have the benefit of knowing that result before a final decision is made in that case. Again, we can most likely agree to most anything in Kentucky except a suspension."

It went exactly according to the lawyer's plan. In February, Kentucky racing officials decided against suspending Baffert, with Borden telling the Louisville Courier-Journal a lesser punishment was "all in the course of being fair." And in April, Arkansas officials reversed the 15-day suspension for lidocaine positives that the trainer blamed on an assistant's pain patch.

Less than two weeks later, Medina Spirit won the Kentucky Derby. A week after that, Baffert learned of the positive test. The drug was again betamethasone, and Baffert again expressed shock and vowed to clear his name.

Read more:

With private eyes and political muscle, horse racing's elite pushed to punish dopers

Bob Baffert, long horse racing's irreverent king, sits on a precarious throne

Bob Baffert, banned from racing horses in New York, sues state's racing association

---- **Index References** ----

Company: Justify Capital Corp; DEA General Aviation Holding Co., Ltd; LAIX INC.; HALL OF FAME BEVERAGES, INC.; PostNL N.V.; HOLLYWOOD PARK OPERATING COMPANY; Jockey Club; THE NEW YORK TIMES COMPANY

News Subject: (Drug Addiction (1DR84); Government Litigation (1GO18); Health & Family (1HE30); Legal (1LE33); Sports Law (1SP70); Steroids (1ST76))

Industry: (Entertainment (1EN08); Equestrian Events & Horse Racing (1EQ65); Horse Racing (1HO27); Sports (1SP75); Veterinary Services (1VE79))

Region: (Americas (1AM92); Arkansas (1AR83); California (1CA98); Kentucky (1KE38); North America (1NO39); U.S. Southeast Region (1SO88); U.S. West Region (1WE46); USA (1US73))

Language: EN

Other Indexing: (Association of Racing Commissioners International; 5 Stones Intelligence; Animal Kingdom; Medina Spirit; California Horse Racing Board; Thoroughbred Owners of California; Baffert; Democratic; Shakin It Up; Racing Stables; PAC; Kentucky Horse Racing Commission; Arkansas; Louisville Courier-Journal; Justify; DEA; Lasix; Hall of Fame; Post; The Post; Hollywood Park; Jockey Club; New York Times) (Bob Baffert; President Donald Trump; Pharoah; Barry Irwin; Clark Brewster; Amr Zedan; W. Craig Robertson III; James L. Gagliano; Monty Roberts; Jerry Hollendorfer; Drew Couto; Arthur B. Hancock III; Richard B. Hancock; Ed Martin; Sam; Kaleem Shah; Clemintino Abrego Garcia; Jerald L. Mosley; Michael E. Pegram; Dennis Cardoza; Madeline Auerbach; Rick Arthur; Adam Gray; Adam L. Gray; Rick Baedeker; Mick Ruis; Darrell Vienna; David Tinsley; Barbara Borden)

Word Count: 4877

---

          © 2021 Thomson Reuters. No claim to original U.S. Government Works.



---

# EXHIBIT I

## DECLARATION OF HENRY M. GREENBERG, ESQ.

## 06/30/2021

---

### Article by Joe Drape
### Published by The New York times

### "Kentucky Derby Winner Medina Spirit Fails Drug Test"

### May 9, 2021
### Updated June 2, 2021

 https://www.nytimes.com/2021/05/09/sports/horse-racing/bob-baffert-kentucky-derby-medina-spirit-drug-test.html

# Kentucky Derby Winner Medina Spirit Fails Drug Test

The Hall of Fame trainer Bob Baffert, whose horses have failed five tests in a little more than a year, was suspended, but he denied wrongdoing.

 **By Joe Drape**

Published May 9, 2021　Updated June 2, 2021

The 2021 Kentucky Derby winner, Medina Spirit, failed a drug test after the race, putting a new stain on a sport troubled by doping problems and placing thoroughbred horse racing's most recognizable personality, the Hall of Fame trainer Bob Baffert, under uncomfortable scrutiny.

---

**DON'T MISS A MOMENT AT THE TOKYO OLYMPICS:** *Sign up for our daily email update with the biggest highlights, the latest medal count and the stories you won't see on TV.*

**Sign Up**

---

If he is disqualified, Medina Spirit will be stripped of the Derby title and its winning purse, and become only the third horse in the 147-year history of the race to receive such a penalty after finishing first. The colt cannot be disqualified until a second sample, collected at the same time as the first, confirms the result in a test expected in the coming weeks. Mr. Baffert will then have an opportunity to appeal.

The positive test comes as horse racing, acknowledging it has a drug problem, prepares to implement the Horseracing Integrity and Safety Act, which was passed last year in Congress. It will take effect July 1, 2022, and calls for a board overseen by the Federal Trade Commission to write rules and penalties to be enforced by the United States Anti-Doping Agency.

The agency, which regulates Olympic and other elite athletes in the United States, revealed the cyclist Lance Armstrong's cheating and issued him a lifetime suspension in 2012.

In a statement, officials at Churchill Downs, the racetrack in Louisville, Ky., said that if Medina Spirit's positive test was confirmed, the Derby's runner-up, Mandaloun, would be declared the winner.

On Sunday, Churchill Downs officials suspended Mr. Baffert from entering other horses there. It's unclear how long the suspension will last or how it will affect his standing in the sport. The officials said they would await the results of the Kentucky Horse Racing Commission's investigation "before taking further steps" regarding Mr. Baffert's suspension.

The drug found in Medina Spirit's system was betamethasone, a corticosteroid injected into joints to reduce pain and swelling. In a news conference Sunday morning outside his barn at Churchill Downs, Mr. Baffert said neither he nor anyone else on his team had administered the drug to Medina Spirit. He insisted the colt had not been treated with it.

He said he intended to run Medina Spirit in the Preakness Stakes, the second leg of racing's Triple Crown, on Saturday in Baltimore. Preakness officials said they would make a decision about the colt's eligibility after a review of the facts.

"I was totally shocked when I heard this news," he said. "I am the most scrutinized trainer. And I am OK with that. The last thing I want to do is something that would jeopardize the greatest sport. I'm worried about the sport. This is a pretty serious accusation. We're going to get to the bottom of it. We didn't do it.

"There's problems in racing. But it's not Bob Baffert."

Horse racing in the United States has long had a culture of drugs and lax regulation and has a far higher rate of horses breaking down and being euthanized than in most of the world.

Trainers experiment with anything that may give their horses an edge, including chemicals that bulk up pigs and cattle before slaughter, cobra venom, Viagra, blood doping agents, stimulants and cancer drugs. Detection is difficult as laboratories scramble to keep up.

Common drugs such as the anti-inflammatory found in Medina Spirit pose the greatest risk to horse and rider. At higher levels, pain medicine can mask injury, rendering prerace examinations less effective. If a horse cannot feel pain, it may run harder than it otherwise would, putting extra stress on the injury.

The new law was decades in the making. Many in the sport, seeing its profitability decline and concerned about the public's trust in it, urged Congress to create a central agency with uniform rules and meaningful penalties. For now, each of the 38 states that permit horse racing regulates the sport with a hodgepodge of rules.

Harsh punishments are rare. In 2011, another well-known trainer, Rick Dutrow, who won the 2008 Kentucky Derby and Preakness Stakes with Big Brown, was punished for doping violations similar to Mr. Baffert's. He was barred from racing in the United States for 10 years.

The Jockey Club, a leading industry organization that helped push the new law, said in a statement that it was "troubled" by the report about Medina Spirit.

"Bettors and fans need to have unshakable confidence in the integrity of the sport," the statement said.



The jockey John Velazquez rode Medina Spirit to victory in the Kentucky Derby on May 1. Jeff Roberson/Associated Press

With Medina Spirit's victory on May 1, Mr. Baffert won his seventh Kentucky Derby, surpassing a record set by Ben Jones, who collected his blankets of roses in 1938, 1941, 1944, 1948, 1949 and 1952.

At 12-to-1 odds, Medina Spirit was a surprising winner of America's most famous race. The colt was sold as a yearling for only $1,000 and was a bargain for his current owner, Amr Zedan of Saudi Arabia, at $35,000.

The colt's positive test adds to the questions surrounding Mr. Baffert. Regulators in Arkansas last month upheld a ruling that a banned substance had been found in two of his horses, but they decided to reduce his penalty from a suspension to a fine.

Medina Spirit tested positive for the same substance found last year in Mr. Baffert's Gamine after the horse finished third in the Kentucky Oaks, a showcase for 3-year-old fillies held at Churchill Downs the day before the Derby. Gamine was disqualified, and her owners were denied the $120,000 purse for her third-place finish. Mr. Baffert was fined $1,500.

At stake for Mr. Zedan is the Derby's $1.8 million first-place check, which would be awarded to the owners of Mandaloun. Bettors who backed Medina Spirit, however, would keep their winnings, while supporters of Mandaloun would be left with losing tickets.

Officials from the Kentucky Horse Racing Commission did not respond to calls and emails for comment.

Mr. Baffert has gained the enmity of rivals who believe he has persistently cheated, suspicions fueled by 30 drug tests his horses have failed over four decades, including five in the last year or so.

The cases took months, if not years, to adjudicate and were met mostly with modest fines or brief suspensions as Mr. Baffert asserted he did nothing wrong and blamed environmental contamination or human error for the results. Still, deep-pocketed owners flock to Mr. Baffert's stable.

In 2019, The New York Times reported that Justify, also trained by Mr. Baffert, had failed a drug test after winning the 2018 Santa Anita Derby in Southern California. The rule at the time required that Justify be disqualified, forfeiting his prize money and preventing his entry into the Kentucky Derby a month later.

The California Horse Racing Board's chairman at the time, Chuck Winner, had employed Mr. Baffert to train his horses. Justify's failed test was investigated for four months, allowing the horse to keep competing long enough to win not only the Derby, but also the Preakness and the Belmont Stakes to become the 13th Triple Crown winner. His postrace tests were clean in all three.

In August 2018, after Justify's breeding rights had been sold for $60 million, the racing board's medical director suggested the illegal substance might have been present in some jimsonweed the horse ate. The board disposed of the inquiry altogether during a rare closed-door session.

If Medina Spirit is disqualified, Mr. Baffert and the colt will join Maximum Security and Dancer's Image as the only horses to have their Derby victories overturned.

In 2019, Maximum Security was first across the finish line, only to be disqualified for almost knocking over a rival horse in the far turn and slowing the momentum of others. The next year, Maximum Security's trainer, Jason Servis, was among the 27 people charged by federal prosecutors in a wide-ranging scheme to secretly dope horses and cheat the betting public.

In 1968, Dancer's Image's victory was taken away after a drug test showed the presence of a banned anti-inflammatory.

Last year, facing criticism, Mr. Baffert apologized for his horses' violations and promised to be more vigilant in the future.

"I am very aware of the several incidents this year concerning my horses and the impact it has had on my family, horse racing and me," Mr. Baffert said in a statement. "I want to have a positive influence on the sport of horse racing. Horses have been my life, and I owe everything to them and the tremendous sport in which I have been so fortunate to be involved."

# EXHIBIT J

**DECLARATION OF HENRY M. GREENBERG, ESQ.**

**06/30/2021**

---

**Article by Tori B. Powell –
Published by CBS News**

**"Churchill Downs Suspends Trainer Bob Baffert for
2 Years After Horse's Failed Drug Test"**

**June 2 2021**

# Churchill Downs suspends trainer Bob Baffert for 2 years after horse's failed drug test

BY TORI B. POWELL

JUNE 2, 2021 / 6:14 PM / CBS NEWS

Churchill Downs has suspended Hall of Fame trainer Bob Baffert for two years after his horse, Kentucky Derby winner Medina Spirit, failed a second drug test, the racing company announced Wednesday. The colt could soon become the second horse in the Derby's history to be disqualified over a failed drug test.

"Reckless practices and substance violations that jeopardize the safety of our equine and human athletes or compromise the integrity of our sport are not acceptable and as a company we must take measures to demonstrate that they will not be tolerated," Bill Carstanjen, CEO of Churchill Downs Inc., said in a statement.

Carstanjen said that Baffert's record of "testing failures threatens public confidence in thoroughbred racing and the reputation of the Kentucky Derby."

"Given these repeated failures over the last year, including the increasingly extraordinary explanations, we firmly believe that asserting our rights to impose these measures is our duty and responsibility," Carstanjen said.

Earlier Wednesday, Baffert's attorney W. Craig Robertson III said a second drug test found 25 picograms of betamethasone, a corticosteroid used to suppress inflammation, which is banned on race days. The attorney said Otomax — an anti-fungal ointment containing steroids often used to treat ear infections in animals — was being used topically for a skin rash on the racehorse.

"There is other testing that is being conducted, including DNA testing," Robertson said. "We expect this additional testing to confirm that the presence of the betamethasone was from the topical ointment, Otomax, and not an injection."

# EXHIBIT K

**DECLARATION OF HENRY M. GREENBERG, ESQ.**

**06/30/2021**

---

**Article by John Clay –**
**Published by Lexington Herald Leader**

**"Back To Nearly Normal, Kentucky Derby**
**TV Ratings Surge Over Last Year"**

**May 4, 2021**

# Back to nearly normal, Kentucky Derby TV ratings surge over last year

The Lexington Herald Leader (Kentucky)

May 4, 2021 Tuesday

Copyright 2021 The Lexington Herald Leader All Rights Reserved



**Section:** sidelines_with_john_clay

**Length:** 396 words

**Byline:** John Clay

Lexington Herald-Leader

## Body

The return of the Kentucky Derby to the traditional first Saturday in May helped the race's television numbers, according to NBC.

The network reports an average of 14.4 million viewers for the broadcast, up 54 percent from last year's 9.3 million for the Sept. 5 Derby, which was pushed back until fall because of the coronavirus pandemic. The Derby earned a 7.15 rating, up 49 percent from last year.

Medina Spirit won the race, giving trainer Bob Baffert a record seventh victory. It was the second consecutive win for both Baffert and jockey John Velazquez, who won for the fourth time. The two teamed up with Authentic in 2020. Baffert has won three of the last four and four of the last seven runnings of the Kentucky Derby.

The BloodHorse reports that viewership peaked at 15.7 million from 6:45 to 7 p.m. Post time was 6:57 p.m. It was NBC's most-watched broadcast since the NFL playoffs in January.

By comparison, last Thursday's first night of the NFL Draft drew 12.5 million viewers.

After not allowing fans in 2020, the Derby was limited to announced attendance of 51,838 last Saturday. The announced attendance for the 2019 race was 150,729.

According to Sports Media Watch, the 2021 Kentucky Derby was the third most-watched non-football game since the pandemic hit last March. Only the NCAA Men's Basketball Tournament championship game between Baylor and Gonzaga (16.92 million) and the Final Four matchup between Gonzaga and UCLA (14.94 million) drew more viewers.

This year's Derby ratings were down 24 percent from the 2019 race, which was also held in May and produced a 9.4 rating. This year's average audience was down 12 percent from the 16.34 million who viewed 2019, when Country House was awarded the victory after Maximum Security was disqualified for interference.

According to NBC, streaming added an additional 140,000 viewers for this year's race.

Back to nearly normal, Kentucky Derby TV ratings surge over last year

NBC will also broadcast the Preakness Stakes on May 15 from Pimlico Race Course in Baltimore. Coverage begins at 2 p.m. on the NBC Sports Network. NBC will pick up coverage, starting at 5 p.m.

Meet the breeder who sold the Kentucky Derby winner for $1,000. And is thrilled.

Preakness field is shaping up. Will Derby winner Medina Spirit even be the favorite?

His Derby day of Derby days: Basking in the glow of being Bob Baffert

What happened to Essential Quality, Rock Your World and the other Derby also-rans?

**Load-Date:** May 4, 2021

End of Document

# EXHIBIT L

## DECLARATION OF HENRY M. GREENBERG, ESQ.

## 06/30/2021

---

## Article "Churchill Downs' Statement in Response to Medina Spirit's Post-Race Test Result Allegations" - Published by Churchill Downs Incorporated

## May 9, 2021



# Churchill Downs' Statement in Response to Medina Spirit's Post-Race Test Result Allegations

MAY 09, 2021



LOUISVILLE, KY. (May 9, 2021) – It is our understanding that Kentucky Derby winner Medina Spirit's post-race blood sample indicated a violation of the Commonwealth of Kentucky's equine medication protocols. The connections of Medina Spirit have the right to request a test of a split sample and we understand they intend to do so. To be clear, if the findings are upheld, Medina Spirit's results in the Kentucky Derby will be invalidated and Mandaloun will be declared the winner.

Failure to comply with the rules and medication protocols jeopardizes the safety of the horses and jockeys, the integrity of our sport and the reputation of the Kentucky Derby and all who participate. Churchill Downs will not tolerate it. Given the seriousness of the alleged offense, Churchill Downs will immediately suspend Bob Baffert, the trainer of Medina Spirit, from entering any horses at Churchill Downs Racetrack. We will await the conclusion of the Kentucky Horse Racing Commissions' investigation before taking further steps.

---

## About Churchill Downs Incorporated

Churchill Downs Incorporated is an industry-leading racing, online wagering and gaming entertainment company anchored by our iconic flagship event, the Kentucky Derby. We own and operate three pari-mutuel gaming entertainment venues with approximately 3,050 historical racing machines in Kentucky. We also own and operate TwinSpires, one of the largest and most profitable online wagering platforms for horse racing, sports and iGaming in the U.S. and we have seven retail sportsbooks. We are also a leader in brick-and-mortar casino gaming in eight states with approximately 11,000 slot machines and video lottery terminals and 200 table games. Additional information about CDI can be found online at www.churchilldownsincorporated.com.

*Certain statements made in this news release contain various "forward-looking statements" within the meaning of the "safe harbor" provisions of the Private Securities Litigation Reform Act of 1995. Forward-looking statements are typically identified by the use of terms such as "anticipate," "believe," "could," "estimate," "expect," "intend," "may," "might," "plan," "predict," "project," "seek," "should," "will," and similar words or similar expressions (or negative versions of such words or expressions).*

*Although we believe that the expectations reflected in such forward-looking statements are reasonable, we can give no assurance that such expectations will prove to be correct. Important factors, among others, that may materially affect actual results or outcomes include the following: the impact of the novel coronavirus (COVID-19) pandemic and related economic matters on our results of operations, financial conditions and prospects; the occurrence of extraordinary events, such as terrorist attacks, public health threats, civil unrest, and inclement weather; the effect of economic conditions on our consumers' confidence and discretionary spending or our access to credit;*



*sponsorships; loss of key or highly skilled personnel; lack of confidence in the integrity of our core businesses or any deterioration in our reputation; risks associated with equity investments, strategic alliances and other third-party agreements; inability to respond to rapid technological changes in a timely manner; concentration and evolution of slot machine manufacturing and other technology conditions that could impose additional costs; inability to negotiate agreements with industry constituents, including horsemen and other racetracks; inability to successfully expand our TwinSpires Sports and Casino business and effectively compete; inability to identify and complete expansion, acquisition or divestiture projects, on time, on budget or as planned; difficulty in integrating recent or future acquisitions into our operations; costs and uncertainties relating to the development of new venues and expansion of existing facilities; general risks related to real estate ownership and significant expenditures, including fluctuations in market values and environmental regulations; reliance on our technology services and catastrophic events and system failures disrupting our operations; online security risk, including cyber-security breaches, or loss or misuse of our stored information as a result of a breach, including customers' personal information, could lead to government enforcement actions or other litigation; personal injury litigation related to injuries occurring at our racetracks; compliance with the Foreign Corrupt Practices Act or applicable money-laundering regulations; payment-related risks, such as risk associated with fraudulent credit card and debit card use; work stoppages and labor issues; risks related to pending or future legal proceedings and other actions; highly regulated operations and changes in the regulatory environment could adversely affect our business; restrictions in our debt facilities limiting our flexibility to operate our business; failure to comply with the financial ratios and other covenants in our debt facilities and*

*other indebtedness; and increase in our insurance costs, or obtain similar insurance coverage in the future, and inability to recover under our insurance policies for damages sustained at our properties in the event of inclement weather and casualty events.*

*We do not undertake any obligation to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise, except as required by law.*

## Press Contacts

**Nick Zangari**
Vice President, Treasury, Investor Relations & Risk Management
Phone: (502) 394-1157
Email: nick.zangari@kyderby.com

**Tonya Abeln**
Vice President, Corporate Communications
Phone: (502) 636-4506
Email: tonya.abeln@kyderby.com

# You may also be interested in:



# EXHIBIT M

**DECLARATION OF HENRY M. GREENBERG, ESQ.**

**06/30/2021**

---

**Article by WKYT's News  Staff –
Published by WKYT**

**"Baffert Says Ointment Used for Medina Spirit's
Skin Condition Contained Betamethasone"**

**May 11, 2021**

ADVERTISEMENT

# Baffert says ointment used for Medina Spirit's skin condition contained betamethasone



Bob Baffert says an ointment used for a skin condition that Medina Spirit had developed did contain betamethasone.  (Wyatt, Tarrant & Combs, LLP)

By WKYT News Staff

*Updated: May. 11, 2021 at 11:46 AM EDT*

LEXINGTON, Ky. (WKYT) - Bob Baffert says an ointment used for a skin condition Medina Spirit had developed did contain betamethasone.

The Kentucky Derby 147 winner failed a post-race drug test Sunday, testing for excessive levels of the anti-inflammatory drug. After the news broke, Churchill Downs suspended Baffert.

Baffert made the announcement in a statement released through his attorney's Tuesday morning, just hours before the Preakness draw.

In the statement, Baffert says a veterinarian who checked Medina Spirit recommended the use of an ointment called Otomax that would heal the skin condition and keep it from spreading.

ADVERTISEMENT

Baffert says they still do not definitively know that the ointment was the source of the alleged 21 picograms found in Medina Spirit's post-race blood sample, but he says it could explain the post-race test results.

You can read the full statement here:

On May 8, 2021, I was informed by the Kentucky Horse Racing Commission that MEDINA SPIRIT allegedly tested positive for 21 picograms of betamethasone. On May 9, 2021, I held a press conference in which I stated that I intended to thoroughly investigate how this could have happened and that I would be completely transparent throughout the process. I immediately began that investigation, which has resulted in me learning of a possible source for the betamethasone, and now, as promised, I want to be forthright about what I have learned.

Following the Santa Anita Derby, MEDINA SPIRIT developed dermatitis on his hind end. I had him checked out by my veterinarian who recommended the use of an anti-fungal ointment called Otomax. The veterinary recommendation was to apply this ointment daily to give the horse relief, help heal the dermatitis, and prevent it from spreading. My barn followed this recommendation and MEDINA SPIRIT was treated with Otomax once a day up until the day before the Kentucky Derby. Yesterday, I was informed that one of the substances in Otomax is betamethasone. While we do not know definitively that this was the source of the alleged 21 picograms found in Medina Spirit's post-race blood sample, and our investigation is continuing, I have been told by equine pharmacology experts that this could explain the test results. As such, I wanted to be forthright about this fact as soon as I learned of this information.

ADVERTISEMENT

As I have stated, my investigation is continuing and we do not know for sure if this ointment was the cause of the test results, or if the test results are even accurate, as they have yet to be confirmed by the split sample. However, again, I have been told that a finding of a small amount, such as 21 picograms, could be consistent with application of this type of ointment. I intend to continue to investigate and I will continue to be transparent. In the meantime, I want to reiterate two points I made when this matter initially came to light. First, I had no knowledge of how betamethasone could have possibly found its way into MEDINA SPIRIT (until now) and this has never been a case of attempting to game the system or get an unfair advantage. Second, horse racing must address its regulatory problem when it comes to substances which can innocuously find their way into a horse's system at the picogram (which is a trillionth of a gram) level. MEDINA SPIRIT earned his Kentucky Derby win and my pharmacologists have told me that 21 picograms of betamethasone would have had no effect on the outcome of the race. MEDINA SPIRIT is a deserved champion and I will continue to fight for him.

## MORE

- Medina Spirit scandal will not impact Derby race payouts
- Medina Spirit heads to Preakness, minus trainer Bob Baffert
- Medina Spirit's trainer says he never treated horse with betamethasone
- Bob Baffert suspended from Churchill Downs after Derby winner fails drug test
- Experts discuss latest Kentucky Derby controversy; what it could mean for future of horse racing

Copyright 2021 WKYT. All rights reserved.

# EXHIBIT N

## DECLARATION OF HENRY M. GREENBERG, ESQ.

## 06/30/2021

---

## Article by NBC Sports Staff – Published by NBC Sports

### "Bob Baffert's Full Statement on Medina Spirit"

### May 15, 2021

  
# Bob Baffert's full statement on Medina Spirit

By NBC Sports Staff                                            May 15, 2021, 5:00 PM EDT



Pat McDonogh / Courier Journal via Imagn Content Services, LLC

*Editor's note: Bob Baffert issued this statement exclusively to NBC Sports ahead of the 146th running of the Preakness Stakes. The full statement is below.*

As Medina Spirit prepares to run in the Preakness Stakes today, I want to keep the focus on this amazing equine athlete and not me, which is the primary reason I will not personally be in attendance. I do not want to serve as a distraction to what has always been of paramount importance – the joy of this great sport and the horses that make it possible.

As I have stated from the beginning, there was never any attempt to game or cheat the system and Medina Spirit earned his Kentucky Derby win. While the presence of 21 picograms of an allowable therapeutic medication has yet to be confirmed by the split sample analysis, it would have nothing to do with Medina Spirit's hard earned and deserved win. That win was the result of the horse's tremendous heart and nothing else.

Notwithstanding the foregoing, I acknowledge that I am not perfect and I could have better handled the initial announcement of this news. Medina Spirit's Kentucky Derby win was so personally meaningful to me, and I had such a wonderful experience on May

https://sports.nbcsports.com/2021/05/15/bob-baffert-medina-spirit-preakness-statement/

1 at Churchill Downs, that when I got the news of the test results, it truly was the biggest gut punch I had ever received and I was devastated. That, coupled with the fact that I always try to be accommodating and transparent with the media, led to an emotional press conference on May 9 in which I said some things that have been perceived as hurtful to some in the industry. For that I am truly sorry. I have devoted my life's work to this great sport and I owe it, and those who make it possible, nothing but an eternal debt of gratitude.

For those who want an explanation for what transpired with Medina Spirit, I have tried to be open and transparent from the beginning. Our investigation is continuing and I don't have definitive answers at this point. What I do know is that neither my barn, nor my veterinarians, directly treated Medina Spirit with the anti-inflammatory medication betamethasone. Even though it is allowable, it is just not something we have ever used with this horse. The only possible explanation that we have uncovered to date – and I emphasize the word possible – is that betamethasone is an ingredient in a topical ointment that was being applied to Medina Spirit to treat a dermatitis skin condition he developed after the Santa Anita Derby.

I have been deeply saddened to see this case portrayed as a "doping" scandal or betamethasone labeled as a "banned" substance. Neither is remotely true. Betamethasone is an allowable and commonly used medication in horse racing. Further, 21 picograms would have zero pharmacology in a horse. All I ask is that everyone not rush to judgment and allow all of the facts, evidence and science to come to light.

Lastly, while this has been extremely hard and emotionally draining on me and my family, today is not about Bob Baffert. Instead it is about Medina Spirit and all of the other equine athletes in our tremendous sport. I hope that everyone will direct their attention to them and give them the love and respect they so richly deserve.

https://sports.nbcsports.com/2021/05/15/bob-baffert-medina-spirit-preakness-statement/

# EXHIBIT O

**DECLARATION OF HENRY M. GREENBERG, ESQ.**

**06/30/2021**

---

**Article by David T. Rourke –
Published by Paulick Report**

**"NYRA's David O'Rourke: Horseracing Integrity Act
'Vital to Equine Health, Integrity Of Our Sport'"**

**January 27, 2020**

# NYRA's David O'Rourke: Horseracing Integrity Act 'Vital To Equine Health, Integrity Of Our Sport'

by <u>David T. O'Rourke, CEO and president, NYRA</u> | 01.27.2020 | 11:21pm



David O'Rourke, president and CEO of the New York Racing Association

*The following letter from David T. O'Rourke, president and CEO of the New York Racing Association, was provided to Rep Jan Schakowsky, chair, and Rep. Cathy McMorris Rodgers, ranking member, of the U.S. House of Representatives' Energy and Commerce Committee's Subcommittee on Consumer Protection and Commerce. The subcommittee is conducting a hearing on the Horseracing Integrity Act on Tuesday in Washington, D.C.*



Representatives Schakowsky and McMorris Rodgers:

Thank you for giving the New York Racing Association (NYRA) the opportunity to submit this letter of support for H.S. 1754, The Horseracing Integrity Act of 2019 (HIA), which was introduced by Congressmen Paul Tonko (D-NY) and Andy Barr (R-KY).

NYRA holds the exclusive franchise to conduct Thoroughbred racing at Aqueduct Racetrack, Belmont Park and Saratoga Race Course. Our three tracks are the cornerstone of New York's Thoroughbred industry, which is responsible for 19,000 jobs and more than $3 billion in annual economic impact statewide.

Nothing is more important to NYRA than the health and safety of our equine and human athletes, which we believe is critical to ensuring the long-term integrity and fairness of our sport. For that reason, we strongly support passage of H.R. 1754, which will greatly enhance the safety of thoroughbred racing by setting the national standards for drug testing and enforcement that our sport desperately needs.

Unlike other professional sports, horse racing is not governed by a national body. Instead, 38 state and regional organizations across the country oversee a patchwork quilt of regulations that vary by jurisdiction. Different standards for drug testing and enforcement create a fragmented system of regulations that are not in the best interests of health and safety for equine and human athletes alike.

Horses that are subjected to inconsistent medication rules while in competition face the risk of injury when medical plans change each time they race in a different state.



These companies
— have discounts *for the* —
Horse World

TORO

NEW HOLLAND
AGRICULTURE

NEW HOLLAND
CONSTRUCTION

eXmark.

tenda

VENTRAC

FarmPaint!

Call (877) 905-0004

Serving USA and Canada

NYRA also believes a strong anti-doping system is a significant component of ensuring the integrity of the sport and better protecting our athletes. In New York, we have adopted the National Uniform Medication Program (NUMP), which was developed by the Racing Medication and Testing Consortium. However, not all racing jurisdictions have adopted every part of the NUMP.

The Horseracing Integrity Act will create a private, national and independent horse racing anti-doping authority – the Horseracing Anti-Doping and Medication Control Authority (HADA). The authority would be under the governance of the United States Anti-Doping Agency, which is responsible for drug regulation of America's Olympic and Paralympic athletes. The HADA will create a set of uniform anti-doping rules, including lists of permitted and prohibited substances and methods, and also take into consideration international anti-doping standards and veterinarian ethical standards.

H.R. 1754 has garnered widespread bipartisan support with 228 co-sponsors and 27 original co- sponsors, all of whom recognize that it is critical to helping protect racehorses and jockeys. The legislation would bolster safety efforts already underway in our industry.

NYRA, for instance, is accredited by the National Thoroughbred Racing Association's Safety and Integrity Alliance. We are also a founding member of the Thoroughbred Safety Coalition (TSC) – a collective of the nation's leading racing organizations working collaboratively to advance safety measures across the sport while increasing accountability and transparency.

In short, we believe that the passage of H.R. 1754 is vital to equine health and the integrity of our sport, as well as the many industries it supports. We urge that all racing jurisdictions join NYRA and other major tracks in supporting this legislation.

Thank you very much.

Sincerely,

Dave O'Rourke

*New to the Paulick Report? Click here to sign up for our daily email newsletter to keep up on this and other stories happening in the Thoroughbred industry.*
Copyright © 2021 Paulick Report.

This entry was posted in NL List, The Biz and tagged Cathy McMorris Rodgers, equine safety, HADA, Horseracing Anti-Doping and Medication Control Authority, horseracing integrity act, Jan Schakowsky, national uniform medication program, racing medication and testing consortium, united states anti-doping agency, usada by David T. O'Rourke, CEO and president, NYRA. Bookmark the permalink.

**Please read our Commenting Policies**



# EXHIBIT P

## DECLARATION OF HENRY M. GREENBERG, ESQ.

## 06/30/2021

---

## Article by David Grening –
## Published by Daily Racing Form

## "Q and A: NYRA's David O'Rourke"

## July 8, 2019

# Q and A: NYRA's David O'Rourke

**David Grening** | Jul 08, 2019

 



NYRA

**David O'Rourke is preparing for his first Saratoga meet as NYRA's president and CEO.**

David O'Rourke was named New York Racing Association CEO and president on March 26 after serving that role on an interim basis for two months following the resignation of Chris Kay. O'Rourke has been with NYRA since 2008, first as director of financial planning then vice president for corporate development. In 2013, he was appointed senior vice president/chief revenue officer. In that role, he developed NYRA's business strategies in a variety of areas, including industry relations, simulcasting, television, and account wagering. NYRA has expanded its television presence to the point where there will be more than 500 hours of NYRA racing telecasts this year. NYRA Bets has expanded to more than 30 states.

Beginning Thursday, O'Rourke, 45, will oversee his first Saratoga meet. On July 2, O'Rourke sat down with *Daily Racing Form*'s David Grening to talk about a variety of topics.

**Daily Racing Form:** You've been with the company over a decade, but obviously in roles that were different than this

one. What part of the business have you spent most of your time trying to learn?

**David O'Rourke:** The horsemen side, absolutely. The backstretch, trainers. That's the fun part now. For years, I was on the content, wagering side, television, and now it's

expanding the ownership and how do we bring more owners into the game. It's a challenge. It's something we're starting to do some background work on, and I think over the next year or two you'll start seeing us organize our operations and potentially the facilities as we talk about development or adding additional spaces with that customer demographic in mind.

**DRF:** You take over the stewardship at a crucial time for NYRA and the industry as a whole. It seems like we've been talking about construction of a new hockey arena/retail space as well as Belmont Park redevelopment for about 18 months. So far, those of us on the outside haven't seen anything. Can you update us on those projects?

**O'Rourke:** If you look out the window, they're not digging a hole yet. Obviously, we're moving up to Saratoga earlier for a lack of a better term, to get out of the way so the construction can start in earnest. All the information that we have still points to a July groundbreaking, so we look forward to that. It's going to create some challenges over the next year or two, but in the long run I think it's a good thing for the property and Long Island, keep the Islanders here, and get some more foot traffic on our property and increase utilization.

**DRF:** One reason NYRA adjusted the Saratoga schedule was in anticipation of construction at Belmont this spring as you mentioned, but it seems like NYRA, for years, was always looking to go to a five-day race week upstate. What do you hope that schedule does for you?

**O'Rourke:** For years, it has been a piece of conversation. We were the last organization to run six days a week, and I could go through the foal crop and the difficulty there, but there's also the side of the operation itself. Being up there for six weeks, six days, it's a strain on the labor force as well. From an academic side – and I come from the finance, wagering [side] – when you model it out, five days does look good. So there is the potential that it will improve our business and bottom line.

But with Saratoga, in essence it's an ecosystem, it's the town that works with the track and the community. While it might work for us financially, we have to make sure it works for the rest, holistically, up there. So that's a massive component to contemplate. We have the opportunity because of the construction to test this. Part of that test will be how will it impact us outside the gates in terms of the community. I'll see the numbers, but we'll need to have a very open dialogue with the business owners and the community leaders up there to see how it impacts the community as a whole.

**DRF:** Obviously, handle is one metric we use to measure the

success of a race meet. What other metrics will you use to measure the success of Saratoga 2019?

**O'Rourke:** That's a great question. There's KPIs [Key Performance Indicators] not just on handle but food and beverage, there's attendance, people in seats. But what I'd like to begin is a more comprehensive method of customer-satisfaction ratings. That's something we're just getting on; you might see it later in the meet, it's definitely something we'll be rolling out next year. It's very straightforward how much people are wagering on the product, but the overall experience, how do you measure that? That's something I want to get smarter on, it's not something that's in my background, but Gordon Lavalette and the marketing team definitely have some experience there, so I'm challenging them in that area.

**DRF:** How concerned are you that with the larger purses at Ellis Park combined with added expense for out-of-town horsemen to be in Saratoga longer that they'll either be reducing the number of horses they're shipping to Saratoga or may not come at all?

**O'Rourke:** In terms of competition for horses, it's not so much just a near-term challenge or concern, this is something that we're strategically preparing for in the long run because in Kentucky the purses are obviously going up. It's not just at Saratoga, but it's at Belmont and our other meets as well. In the near term, we're trying to create an environment that's as welcoming as possible. In the long run, we're going to have to incorporate this into our planning process and everything we do, including what we do with NYTHA [New York Thoroughbred Horsemen's Association]. To encourage horsemen to race in Saratoga you are correct, it is the cost of

operating up there. The purses do offset it, but if other jurisdictions' purses increase, that advantage might be mitigated slightly. We do have the town to sell. This is something that isn't just 2019. This is something we need to contemplate in our long-term strategy over the next five to 10 years.

**DRF:** Speaking of handle, you've opened up the late pick five to all bettors and at some point during the Saratoga meet you hope to replace the traditional $2 pick six with the in-vogue 20-cent jackpot pick six where a bettor needs to be the only one to have all six winners to take down the whole pool. What were the impetus for these changes?

**O'Rourke:** Customer demand and the marketplace. I believe we were the last major jurisdiction offering the $2 pick six, and there's tradition to that bet and that bet at Saratoga historically has worked out once in a while with large carryovers. But all the information we have and the feedback

carryovers. But all the information we have and the feedback we've gotten [shows] lower-base minimums and high potential outcomes, for lack of a better term, are what the customer wants. So our intention is to launch the Empire 6 during Saratoga, and we look forward to seeing how it plays out.

**DRF:** And the decision to open up the late pick five?

**O'Rourke:** For years, we were hesitant to launch a late pick five in terms of the late pick four, which was one of our most successful pools. So the opportunity came up where we were launching a new ADW platform and looking for a differentiator, that product slid into that mold for a period of time. In my opinion, that has kind of played itself out and I would like to open that up to all of our bettors because I believe it is one of our best bets, it usually incorporates our best races. We think it'll do really well in the open market. Now, the challenge for the NYRA Bets people is to focus on something else.

**DRF:** The 1863 Club is the newest renovation to Saratoga this summer coming a year after The Stretch was introduced. I believe the cost to be at either of those spots is rather high. Has there been a demand for these higher-end hospitality areas?

**O'Rourke:** Yes, there has. What we will monitor is how does the demand shift around the facility. Is one area filling up at

the expense of another? We didn't see much or any of that with The Stretch, but 1863 is obviously a lot bigger. It's at different price points; there's suites, there's the club, and there's the banquet area, which really is a replacement for the tent. Cannibalization is something we're keeping in mind as we look at how the numbers play out.

When you look at the property at Saratoga, 1863, as far as my vision would be on the property, that's the last piece of real estate to really develop there. The rest of it will be refurbishment, kind of polishing the stone. We monitor all of our demand and our price points. We believe the demand is there, the sales are very good so far, so it looks good.

**DRF:** Are there concerns and/or are there any plans to create new amenities for the fans who want a more affordable/regular option to attend a day at Saratoga?

**O'Rourke:** Absolutely. This season was somewhat baked by the time I had a chance to get in here. A lot of the focus up there was 1863 and the five-day meet. So that has taken a lot of the management's focus. I want to look at the backyard experience again. How many tables are back there? Are there enough or are there too many? What are the price points of the offerings that we offer back there?

Saratoga, in essence, is the incubator. There are very few, if any, racetracks that have that type of attendance. In my experience in management here at NYRA countless number of people in this industry that are fans, that backyard is where they came from – there's a good amount from this backyard as well at Belmont. That's something we need to cultivate, keep the character of it – because Saratoga, you have this high-end price point then you have the backyard for the families and fun and everyone's getting close to the horses. So that's something absolutely we're going to look at.

**DRF:** Are you still offering the $100 picnic table purchases?

**O'Rourke:** We are. That is a divisive strategy back there. But the people that use it really appreciate the ability that they don't have to wake up at 5:30 in the morning and run for the table. But you want to keep the experience for the people that do. So, yeah, we will maintain that.

**DRF:** A few years ago, former NYRA president Chris Kay introduced the Saratoga Hall of Fame complete with a red jacket ceremony that was held the day before the Travers.

Will that continue this summer, and in the future, and if not, why not?

**O'Rourke:** That will be on hiatus for this year. I've had some preliminary discussions and look to further those discussions as I get up north about the selection process. Personally, I do think a Saratoga-specific award is a cool thing, it's a good thing. It's how the candidates are brought for voting and ultimately voted on [I want to study]. While the Hall of Fame has a very flushed out, detailed process, I think something akin to that for this type of award would be very good. I just want to put it on pause for a year and work with my A) PR group and B) people in the industry who should be voting on this. I'm not sure I would qualify.

**DRF:** Kay was a strong proponent of night racing at Aqueduct and Belmont. How do you feel about night racing at the two downstate tracks?

**O'Rourke:** I think it's very interesting, but it is a cost-benefit analysis. At Belmont, we're currently going through preliminary planning, which essentially becomes a menu list of options ranging from fundamental investment required for the facilities envelope to amenities that you'd place in. Night racing slots in just before amenities. It could drive revenue, it could drive traffic, but this is a very large track, so there's a significant cost to it. It's definitely something we're still researching, but it's not definitive yet whether we'd go in that direction.

**DRF:** Obviously, there were plans for redevelopment of

Belmont Park's buildings and track that might not have included your input. Now that you're in the position you're in, have you altered those plans or has the process of getting this project started changed?

**O'Rourke:** There were concepts back in January, and we were in the middle of an RFP process for an owner's rep and an architectural firm to get into detailed pre-planning, so the timing was fine in that matter for whatever input I might have. While we did have concepts, now we're getting into detailed planning. If anything, I probably changed the focus a little bit more to a pragmatic point of view. The Belmont facility itself is 1.2 million square feet, what are the fundamental investments required for that asset in the long term rather than an integrated conceptual plan? Those are

the answers I'm looking for first, and then the amenities we'll layer on with that.

**DRF:** How about the tracks themselves? Is there anything you anticipate happening with the surfaces, either redoing them or there has been talk about a synthetic surface at some point?

**O'Rourke:** At the moment, it looks like it's the tracks that might be the first thing that we tackle. We want to redo the tracks to improve drainage, to improve irrigation, and in doing that you look at configuration. Will we ever be racing in the winter here? If that decision wasn't made in the near term you wouldn't want to handcuff the management team in the long term. So we're looking at different configurations . . . Right now, its dirt, turf, turf and in conversations you might have heard there would be a synthetic on the inner at a mile. Personally, I never liked that one just because the distance . . . we challenged ourselves can we go turf, dirt, turf. That dirt course could it be synthetic in the future if necessary? Even if it's not synthetic, is it out of the shadows so you could use it in the winter? Those conversation are going on right now. That's actually a really fun exercise. We anticipate in the fall having some of these preliminary answers to preliminary planning and options.

**DRF:** Have you given any thought to the wrath you might receive if you made the last leg of the Triple Crown on a synthetic surface?

**O'Rourke:** That is a decision that is way above my head. If the industry in the future were to move back toward synthetics I would just want to leave the next management team in position where they could convert. I don't currently see that occurring for us right now, but as we're putting in this infrastructure for the next 50 years, are there things that we could do to make a conversion easier?

**DRF:** You recently made some management changes that are designed to continue NYRA's organizational success. What do you hope Gordon Lavalette, Tony Allevato, and Jelena Alonso bring to their new roles?

**O'Rourke:** I worked with all of them for quite a while, I think they're going to bring focus, commitment. We streamlined our team a little bit. Gordon's moving over to a role he had

with the [New Jersey] Devils and Prudential that he has the background for, so I'm excited for this, actually.

Tony Allevato has been with us for a few years. He's taking on some of the duties I had previously. Tony's got 20 years experience in this. They're all seasoned executives, they're a tight group, and we're looking forward to a lot of challenges that we have coming ahead.

**DRF:** NYRA's made a big push, and I assume significant investment, in getting your races on Fox and more television exposure. What was the goal in doing this, and have you found this to be a worthy investment?

**O'Rourke:** It's given us a platform. We've been on TV for years on MSG, and we had a very robust simulcast. So a lot of the infrastructure was there, including the talent we use on television. Over the last few years, we've been able to position ourselves on Fox for 500 to 600 hours of television. We think that's good for the sport overall because it gets the sport on mainstream sports programming. We were able to show Churchill with our tracks, that creates a nice flow to the show. With sports betting coming, not just in New York but nationally, to be on a mainstream network such as Fox we think that gives us a platform for revenue diversification. We spoke about handle as a metric to measure Saratoga – it is a metric, and it still is our primary revenue driver as a business, but I'm very focused on how can we increase the diversification of our revenue so we're not so reliant on just the wagering dollar. It will likely always be our primary revenue driver, but can television sponsorship, food and beverage with 1863, can we diversify our revenue inputs, which would smooth out our financial performance over the years ahead?

**DRF:** You participated in hearings regarding sports betting. Nothing really got finalized at the last legislative session. What's your feeling on if racing, NYRA in particular, will be included in the future offering of sports wagering?

**O'Rourke:** I believe we'll be included in some form, to what degree [is] the question. However, in those hearings, one of my primary goals to convey was our history is essentially sports betting. At our fundamental core we provide sports

sports betting. At our fundamental core we provide sports-betting content, so I feel it's extremely important for our product to be in the busiest store. These sports-betting platforms that are proliferating are well capitalized. They have

a history in marketing in this area, so while we would like to partake in sports betting here in New York, particularly from the brick-and-mortar side, a huge part of our focus is having our content sit on these other platforms. We think it will diversify the customer that we can connect with and it will have a massive positive impact on the distribution of racing as a sports-betting product.

**DRF:** Are you hoping that the four places that have been granted approval for sports wagering will also offer your product?

**O'Rourke:** It seems that they will via their ability to cut agreements with the New York OTBs. What I'm articulating is more of a five-year vision, and mobile would have a huge piece of this. I think those four facilities would be a nice complement to the New York brick-and-mortar business if they decide to take horse racing. But ultimately I'm looking at the long game – and in the long game sports betting in terms of a mobile product offers us a big opportunity to reach a much larger audience.

**DRF:** As you know, The Stronach Group banned Hall of Fame trainer Jerry Hollendorfer from stabling, racing, and training at its tracks in the wake of him having four equine fatalities during Santa Anita's six-month meet. Hollendorfer had been granted stalls at Belmont and Saratoga, and on June 23 NYRA reaffirmed its commitment to Hollendorfer. Six days later, NYRA reversed course. Why?

**O'Rourke:** Larry Best transferred his horses to Don Chatlos. NYRA was in internal conversations at that time. There was no board action, but there was an active dialogue. With Best's decision to transfer those horses, we welcome Don as a trainer here. Those look like some very nice horses, and we wish him future success.

**DRF:** Many New York horsemen I spoke with worry that they could be next. Is NYRA considering putting in some thresholds regarding breakdowns, injuries, or fatalities at which a trainer could potentially lose the right to race, train, or stable here?

**O'Rourke:** Any changes in that area would be a result of the equine safety or racing committee, which I assume would be in coordination with the state, Dr. [Scott] Palmer. I haven't heard of any modifications, but all our safety policies and procedures are evolving. If by chance something new was

learned that could improve the environment for the animals here, we would research it and implement it.

In terms of our horsemen, we have a culture of an open dialogue, at least I do. Any changes, I can't imagine there would be any surprises, and there would be a consistent conversation between NYTHA, the NYRA board, and the state vet and Gaming Commission.

**DRF:** In general, how conscious are you of the microscope now being aimed at Saratoga in the area of horse safety and are any extra precautions being made to ensure a successful meet in that area?

**O'Rourke:** We feel our policies and procedures are at the forefront in the U.S., so any changes or modifications I would leave to the experts. We're obviously cognizant of the fact Saratoga is the premier meet in the country and that all eyes, good and skeptical, are on us in July and August up there. We love horse racing, we think it's going to be a great meet, we're going to do everything in our capacity to create the safest environment possible and where people can enjoy our beautiful sport, and that's what were focused on.

**DRF:** Since June 9, the day after the Belmont Stakes, through June 30, NYRA carded 65 dirt races, only 12 had eight or more entries. In that same time frame, and counting off-the-turf races, average field size for a dirt race at Belmont was 5.76 horses per race. That's lower than Churchill Downs (8.50), Parx (7.64), Laurel (7.04), Monmouth Park (6.48) and basically on par with Delaware Park (5.76). Why is NYRA having such a hard time filing dirt races?

**O'Rourke:** This isn't new, it's manifesting itself. Dirt racing has been a challenge here, specifically at Belmont, for a couple of years now. Martin Panza could give a more comprehensive answer to this, but there's a scarcity of dirt horses currently in our inventory, with the rain that stressed that even further, which culminates into the numbers that you're articulating, but it's a significant challenge. It's something as Martin's looking at his program going forward we're going to have to adjust and compensate for. I wish the weather would help a little, but in our game you can't be completely reliant on the weather. It's an issue we're discussing, but it's something you have to strategize . . . it's not something to fix here and now. It's more on incentives in the program, which trainers have what type of stock, so it's not a quick answer but obviously we're going to need to adjust slightly because those type of numbers are an issue 1) for the quality of the product and 2) for the economic results for the organization.

**DRF:** This spring you experimented with a 3:05 p.m. post on Thursdays. What were your preliminary conclusions on how that did?

**O'Rourke:** We were able to come to a TV agreement with

Churchill. It sounded like a good idea with us and Churchill, the TV window would work well in terms of the operating overhead for doing that. Does that create more of a wagering marketplace in that time slot? The issue would be it rained basically every Thursday, but the Friday twilight cards for the ontrack experience worked better. It's likely something we won't do again next year. I thought it was worth a try. I don't think it played out the way I thought it would on paper.

**DRF:** First Saratoga in charge for you, what are you most looking forward to?

**O'Rourke:** Saratoga and the experience of it is one of the reasons I love working in horse racing. I'm dying to get up there. It's a long meet. The five days should help the work force, it'll help me, gives us a couple of days off. Who wouldn't want to be in Saratoga for an extra week?



**DRF Top Headlines** View All ›



Latest Headlines

READ MORE

Ron Gierkink's Woodbine analysis for J...
1, 2021

# EXHIBIT Q

**DECLARATION OF HENRY M. GREENBERG, ESQ.**

**06/30/2021**

---

**Article by Joe Drape –**
**Published by The New York Times**

**"Positive Drug Test Confirmed for Kentucky Derby Winner Medina Spirit"**

**June 2, 2021**
**Updated June 14, 2021**

**The New York Times** https://www.nytimes.com/2021/06/02/sports/horse-racing/kentucky-derby-medina-spirit-baffert.html

# Positive Drug Test Confirmed for Kentucky Derby Winner Medina Spirit

Churchill Downs suspended the colt's Hall of Fame trainer, Bob Baffert, for two years, and the colt faces disqualification as the Derby winner.



**By Joe Drape**

Published June 2, 2021    Updated June 14, 2021

Medina Spirit's positive drug test after the Kentucky Derby has been confirmed, setting the stage for the colt trained by Bob Baffert to be the second horse in the 147-year history of the race to be disqualified as its winner because of a failed drug test.

---

**DON'T MISS A MOMENT AT THE TOKYO OLYMPICS:** *Sign up for our daily email update with the biggest highlights, the latest medal count and the stories you won't see on TV.*    **Sign Up**

---

Citing the positive test, Churchill Downs on Wednesday immediately suspended Baffert, a seven-time winner of the Derby and the most recognizable figure in the sport, from entering horses at the racetrack in Louisville, Ky., for two years. That means that no horse trained by Baffert or his stable can race in the Derby in 2022 and 2023.

"Reckless practices and substance violations that jeopardize the safety of our equine and human athletes or compromise the integrity of our sport are not acceptable," Bill Carstanjen, chief executive of Churchill Downs, said on Wednesday. "Mr. Baffert's record of testing failures threatens public confidence in thoroughbred racing and the reputation of the Kentucky Derby."

Clark Brewster, a lawyer who represents Medina Spirit's owner, Amr Zedan, said a laboratory at the University of California, Davis, tested a second postrace sample from the Derby. The test confirmed the presence, at a prohibited level, of the drug betamethasone, a corticosteroid that is injected into joints to reduce pain and swelling. Baffert chose the lab where the sample was tested.

In a text message, however, Brewster said the laboratory did not test the blood or urine samples for the presence of other compounds, "which could prove the trace positive came from an inadvertent and materially inconsequential contamination sourced from a topical ointment used to treat Medina Spirit for a skin lesion on his hip."

Immediately after announcing Medina Spirit's positive test on May 9, Baffert gave a series of television and radio interviews in which he floated various theories about how the colt tested positive for betamethasone. He blamed "cancel culture" for the controversy and said racing officials were out to get him.

Baffert soon reversed himself, however, and acknowledged treating Medina Spirit for a rash with an antifungal ointment called Otomax, which, to Baffert's professed surprise, contains betamethasone.

On Wednesday, Churchill Downs cited Baffert's "increasingly extraordinary explanations" as a reason for suspending him.

Brewster said the Kentucky Horse Racing Commission has agreed to send the original blood and urine tests to an independent and accredited laboratory for analysis to determine whether the specimens contain other components proving the source to be the topical ointment.

A possible disqualification is months away and destined to be tied up in the courts for years. First, racing officials will conduct a hearing and issue a ruling. If they disqualify Medina Spirit and either suspend or fine Baffert, he could appeal to the full commission. If the unfavorable ruling is still not overturned, he could pursue a remedy in civil court.

If Medina Spirit is disqualified, Zedan will forfeit the more than $1.8 million first-place check he earned when his horse crossed the finish line first. In 1968, the Derby victory of Dancer's Image was taken away after a drug test showed the presence of a banned anti-inflammatory. It took four years before Dancer's Image was irrevocably disqualified.

"If it was inadvertent contamination, that should be taken into account," Brewster said in a telephone interview. "We're hopeful that reasonable minds and good-intentioned regulators can see what it is, and what it is not, and not have a draconian response."

Brewster, who breeds and owns horses, said the commission had abandoned disqualifications in previous cases when it found mitigating circumstances.

Neither Baffert nor his lawyer, W. Craig Robertson III, returned requests to comment.

In an email, a spokeswoman for the Kentucky Horse Racing Commission declined to comment on the results of the second sample.

"The K.H.R.C. is not going to be providing comment or updates on the status of this ongoing investigation," Sherelle Roberts, the spokeswoman, said. "We will provide information when the entire matter is complete."

Baffert earned the ire of Churchill Downs officials who had made it clear that if a second sample confirmed the presence of the drug, Medina Spirit would be disqualified and Mandaloun, the runner-up, would be declared the Derby winner.



Mandaloun racing against Medina Spirit during the Kentucky Derby.  Jordan Prather/USA Today Sports, via Reuters

The Medina Spirit controversy comes as horse racing, acknowledging it has a drug problem, prepares to implement the Horseracing Integrity and Safety Act, which was passed last year in Congress. It will take effect July 1, 2022, and calls for a board overseen by the Federal Trade Commission to write rules and penalties to be enforced by the United States Anti-Doping Agency.

The agency, which regulates Olympic and other elite athletes in the United States, revealed the cyclist Lance Armstrong's cheating and issued him a lifetime suspension in 2012.

In the span of four weeks during racing's Triple Crown season, Baffert has gone from being the garrulous and voluble face of horse racing to a mostly silent poster boy for what is wrong with the sport.

For 25 years, New York City has been Baffert's kind of town, and Belmont Park has been the racetrack that made him the most famous thoroughbred trainer in America. Five times, he has brought the Kentucky Derby and Preakness winner for the Test of the Champion, as the Belmont Stakes is known, with a Triple Crown hanging in the balance.

With American Pharoah in 2015 and Justify in 2018, Baffert completed the sweep of the sport's holy grail and left the city a conquering hero, bringing renewed attention to an often-forgotten sport. Over the years, he has thrown out the ceremonial first pitch at a Mets game, dined in Manhattan's finest restaurants and good-naturedly accepted the heckles and hurrahs from the Big Apple's impassioned horseplayers.

For the 153rd running of the Belmont Stakes on Saturday, though, Baffert will be in California after the New York Racing Association barred him from running his horses at state tracks because of Medina Spirit's failed test. He has been shut out of one of the biggest days in horse racing.

Baffert's two-year suspension from Churchill Downs is a significant blow to his business. He has been synonymous with the Derby, and his success in Triple Crown races has attracted an international cast of deep-pocketed owners willing to buy expensive thoroughbreds. Now, with Baffert unable to compete on American racing's grandest stage, these owners will have to give their horses to other trainers.

While track operators in New York and at Churchill Downs have refused to allow him to enter his horses, his powerful stable continues to dominate races in California. He is the leading trainer at Santa Anita Park's current meet with more than $3.6 million in earnings. The track is owned by the Stronach Group, which also owns Pimlico Race Course in Baltimore and allowed Medina Spirit to race in the Preakness Stakes there after passing expanded drug testing.

The California Horse Racing Board said in a statement that like their counterparts in New York and Kentucky, their hands were tied until Medina Spirit's second sample was confirmed and a complaint was filed against Baffert.

Baffert at Churchill Downs a few days before the Kentucky
Derby.  Bryan Woolston/Reuters

"They face the same issue the C.H.R.B. does in that regulators cannot suspend or revoke occupational licenses without a hearing and due process," the statement said. "Should any regulatory body take action against any licensee, we would reciprocate that action in California."

Baffert is also the target of a couple of class-action suits brought by bettors.

Michael Beychok, the handicapper who won the 2012 National Thoroughbred Racing Association's National Horseplayers Championship, filed a suit last month alleging that Baffert and Zedan doped the colt and committed fraud to win the Derby.

Beychok said he had made $966 in bets that would have earned him payoffs between $10,000 and $100,000 had Medina Spirit not won the race, according to the suit filed in U.S. District Court for the Central District of California. Three other horseplayers joined the suit, claiming they stood to make up to $40,000 if the Baffert colt had not finished first.

Beychok and his fellow plaintiffs argue that Baffert and Zedan are in violation of the Racketeer Influenced and Corrupt Organizations Act and the California Control of Profits of Organized Crime Act.

In addition, the recent death of Noodles, a 2-year-old unraced colt in Baffert's care, has rekindled the interest of animal rights activists in Baffert and horse racing. A necropsy will be performed and a fatality review conducted pursuant to California regulations.

In 2013, after seven horses in Baffert's care died over a 16-month period, he was the subject of a report by California regulators, which revealed he had been giving every horse in his barn a thyroid hormone without checking to see if any of them had thyroid problems.

Baffert told the investigators that he thought the medication would help "build up" his horses even though the drug is generally associated with weight loss. In that case, the board's report found no evidence "that C.H.R.B. rules or regulations have been violated."

Baffert has gained the enmity of rivals who believe he has persistently cheated, suspicions fueled by 30 drug tests his horses have failed over four decades, including five in the last year or so.

The cases took months, if not years, to adjudicate and were met mostly with modest fines or brief suspensions as Baffert asserted he did nothing wrong and blamed environmental contamination or human error for the results. Still, deep-pocketed owners flocked to Baffert's stable.

In 2019, The New York Times reported that Justify, also trained by Baffert, had failed a drug test after winning the 2018 Santa Anita Derby in Southern California. The rule at the time required that Justify be disqualified, forfeiting his prize money and preventing his entry into the Kentucky Derby a month later.

The California Horse Racing Board's chairman at the time, Chuck Winner, had employed Baffert to train his horses. Justify's failed test was investigated for four months, allowing the horse to keep competing long enough to win not only the Derby, but also the Preakness and the Belmont Stakes to become the 13th Triple Crown winner. His postrace tests were clean in all three.

In August 2018, after Justify's breeding rights had been sold for $60 million, the racing board's medical director suggested the illegal substance might have been present in some jimsonweed the horse ate. The board disposed of the inquiry altogether during a rare closed-door session.

If Medina Spirit is disqualified, Baffert and the colt will join Maximum Security and Dancer's Image as the only horses to have their Derby victories overturned.

In 2019, Maximum Security was first across the finish line, only to be disqualified for almost knocking over a rival horse in the far turn and slowing the momentum of others. The next year, Maximum Security's trainer, Jason Servis, was among 27 people charged by federal prosecutors in a wide-ranging scheme to secretly dope horses and cheat the betting public.

# EXHIBIT R

**DECLARATION OF HENRY M. GREENBERG, ESQ.**

**06/30/2021**

---

**Article by Steven Taranto –
Published by CBS Sports**

**"Churchill Downs Suspends Trainer Bob Baffert
for Two Years Following Medina Spirit's Drug Test
Reults [sic]"**

**June 2, 2021**

# Churchill Downs suspends trainer Bob Baffert for two years following Medina Spirit's drug test reults

The track handed the Hall of Fame trainer a two-year ban amid controversy over his Kentucky Derby-winning horse.

 By **Steven Taranto** Jun 2, 2021 at 4:26 pm ET • 1 min read



Getty Images

After the confirmation of a failed drug test for Kentucky Derby-winning horse Medina Spirit, a severe shadow of doubt has been cast over the greatest race that Churchill Downs holds. And accordingly, the racetrack's judgment has come down swiftly upon trainer Bob Baffert.

https://www.cbssports.com/nba/news/nba-mock-draft-2021-cade-cunningham-still-no-1-evan-mobley-jalen-green-debate-rages-combine-causes-changes/

On Wednesday, Churchill Downs Incorporated announced that Hall of Fame trainer Bob Baffert has been suspended from Churchill Downs for two years, effective immediately and through the conclusion of the racetrack's 2023 Spring Meet. The racetrack's ruling comes after the confirmation of a banned substance, betamethasone, in the bloodstream of Kentucky Derby-winning horse Medina Spirit.

"CDI has consistently advocated for strict medication regulations so that we can confidently ensure that horses are fit to race and the races are conducted fairly," read a statement by Bill Carstanjen, CEO of Churchill Downs Incorporated. "Reckless practices and substance violations that jeopardize the safety of our equine and human athletes or compromise the integrity of our sport are not acceptable and as a company we must take measures to demonstrate that they will not be tolerated.

"Mr. Baffert's record of testing failures threatens public confidence in thoroughbred racing and the reputation of the Kentucky Derby. Given these repeated failures over the last year, including the increasingly extraordinary explanations, we firmly believe that asserting our rights to impose these measures is our duty and responsibility."

Following the confirmation of Medina Spirit's failed drug test, Baffert's horse faces disqualification from the Kentucky Derby, which was run last month. In the event of disqualification, second-place finisher Mandaloun would be declared the winner.

https://www.cbssports.com/nba/news/nba-mock-draft-2021-cade-cunningham-still-no-1-evan-mobley-jalen-green-debate-rages-combine-causes-changes/

# EXHIBIT S

**DECLARATION OF HENRY M. GREENBERG, ESQ.**

**06/30/2021**

---

**Article by Bennett Liebman –
Published by New York State Bar Association**

**"The Beleaguered Sport of Thoroughbred Horse Racing"**

**May 27, 2021**

# The Beleaguered Sport of Thoroughbred Horse Racing

By Bennett Liebman



## Background

Thoroughbred horse racing for much of the 20th century was the most popular spectator sport in America.[1] In recent years, the popularity of the sport has diminished greatly. Gambling opportunities are now abundant throughout the country, and racing has been perceived as indifferent to the goal of preventing animal abuse. Yet, the Kentucky Derby remains the signature horse race in America. This race for three-year-old thoroughbreds, which starts off the Triple Crown series of races, is the most viewed race in America.[2] The 147th running of the Kentucky Derby was held at Churchill Downs on May 1, 2021. Finishing first in the race was the 12-1 longshot Medina Spirit. Medina Spirit was trained by Bob Baffert, and this would have marked Baffert's record seventh victory in the race.

Nonetheless, a week later, it was disclosed that the horse had tested positive for the corticosteroid betamethasone. The drug test found 21 picograms of betamethasone measured per milliliter of blood. If a test of the split blood sample taken from the horse also proves positive, it is likely that Medina Spirit will be disqualified. Baffert eventually

https://nysba.org/he-baedecker-guide-to-bob-baffert-betamethasone-and-the-beleaguered-sport-of-thoroughbred-horse-racing/

acknowledged that his horse had been treated with the ointment Otomax to prevent dermatitis. Otomax contains betamethasone. As a rule, drug positives are not revealed publicly until such time as a second split sample test of the specimen confirms the positive. The Baffert positive was announced – although not by the Kentucky Racing Commission – before any testing of the split sample.

In the wake of these developments, Churchill Downs announced that it was excluding Baffert from participation in racing at its racetrack. Pimlico Racetrack in Baltimore would only permit Baffert to run Medina Spirit in the Preakness if the horse passed pre-race drug tests. The horse passed these tests and finished third in the race, thereby ensuring that there would be no 2021 Triple Crown winner. Two days after the Preakness, the New York Racing Association, which conducts thoroughbred racing at Belmont Park, Aqueduct Racetrack and Saratoga Race Course, announced that it would temporarily exclude Baffert from its tracks.

**Bob Baffert**

For nearly 25 years, Bob Baffert has been the most famous thoroughbred trainer in America.[3] In 2015, his horse American Pharoah became the first horse to win the Triple Crown since Affirmed in 1978. He repeated his Triple Crown success in 2018 with Justify. He has won 17 Breeders' Cup races, at least six Kentucky Derbies, seven Preakness Stakes, and three Belmont Stakes. He has become "the face of American horse racing."[4]

Controversy has often followed Baffert. In 2000, there was a positive for morphine.[5] Starting in 2011, seven horses trained by Baffert in California died suddenly over a 16-month period.[6]

Yet, the main Baffert questions started in 2019 when The New York Times reported that Baffert's 2018 Triple Crown winner Justify had tested positive for the drug scopolamine in the 2018 Santa Anita Derby.[7] After a long dispute, the California authorities determined that the positive was caused by environmental contamination in the feed of the horse, and there was no reason to disqualify Justify or to punish Baffert.[8]

In 2020, Baffert accumulated four positives. His Eclipse Award-winning filly Gamine tested positive on two occasions. At the Kentucky Oaks, Gamine finished third and tested positive for betamethasone. The horse was disqualified, and Baffert paid a $1,500 fine. She had previously tested positive for the local anesthetic lidocaine in an allowance race at Oaklawn Park. Also, at Oaklawn Park, Baffert's Charlatan tested positive for lidocaine. Baffert claimed that a lidocaine patch worn by an assistant was responsible for the positives. The Arkansas Racing Commission in 2021 largely absolved Baffert of the positives (although it fined him $10,000) and did not disqualify his horses. Baffert's horse Merneith also finished second in a race at Del Mar and was found to have excessive amounts of dextrorphan in her blood.[9] Baffert asserted that a staffer was taking the cough syrup containing the drug. Merneith was not disqualified. Baffert, while not suspended, was assessed a fine of $2,500.[10]

https://nysba.org/he-baedecker-guide-to-bob-baffert-betamethasone-and-the-beleaguered-sport-of-thoroughbred-horse-racing/

While each incident standing separately might be considered a coincidence, and mistakes are made in the administration of therapeutic medication, rarely has there been such a confluence of drug positives involving as prominent a trainer as Baffert. Also, far out of the ordinary was the fact that Baffert's penalties for these drug violations were minimal, and the horses (save Gamine in the Kentucky Oaks) were not disqualified. Horses in California have occasionally tested positive over the past quarter century for scopolamine. While there always was the potential for contaminated feed, the trainers were given small penalties, and the horses were disqualified.[11] Lidocaine positives were frequent in the mid-1990s when lidocaine was added to antibiotic ointments but have been relatively few since then. Again, with the Baffert exception, lidocaine positives resulted in disqualifications.[12]

## Racing Regulation

In America, state governments regulate pari-mutuel horse racing. The governing structure is determined by state legislation and regulation. Regulation is overseen by individual racing commissions. The commissioners are all part-timers who receive minimal pay.

The rules governing racing are generally similar among jurisdictions but are not identical, making for occasional discrepancies between states.

## Drug Regulation

The commissions test horses for drugs in both blood and urine. In 2018, the racing commissions tested 266,300 samples.[13]

Drug regulation is the major cost of state racing commissions. They employ the individuals who conduct the urine tests, the veterinarians who take blood from horses, and the individuals who record and ship the drugs. The commissions pay the chemists and laboratories that conduct the actual tests.

Again, the drug rules for each commission are similar but not identical. The similarities include the following factors:

1. The one drug allowed for race-day administration is lasix. While other racing countries do not permit lasix to be utilized on race day, United States jurisdictions have legalized it. The groups supporting lasix believe that lasix promotes equine health by limiting bleeding – exercise-induced pulmonary hemorrhage – in racehorses.
2. The trainer responsibility rule applies to drug testing. "The doctrine of trainer responsibility means that the trainer is responsible for the physical condition of his or her horse. In practice, it requires that when a horse tests positive for a prohibited medication, the trainer bears the responsibility for the drug test."[14] While in some jurisdictions, the insurer rule only creates a rebuttable presumption of trainer liability, it is most difficult for a trainer to defend against the responsibility rule.

https://nysba.org/he-baedecker-guide-to-bob-baffert-betamethasone-and-the-beleaguered-sport-of-thoroughbred-horse-racing/

3. For the non-elite trainer, there is little chance for beating the trainer responsibility rule. Even the top 1% of successful trainers have had little success combating the trainer responsibility rule. Except for Baffert, they have been able to delay imposition of penalties rather than defeat the penalties.[15]

Most drug violations are caused by human error, not by intentional or willful misconduct. The trainer – or a groom or veterinarian – administered the wrong drug or wrong medication to the wrong horse on the wrong day. While such negligence does require penalties, the major problem in horse racing stems from efforts to find and distribute illicit performance-enhancing drugs that cannot be successfully tested by racing's laboratories. This was illustrated by the massive 2020 federal indictment of a network of 27 individuals who systematically doped horses and avoided any positive drug tests.[16] That has been the most consistent threat to the integrity of racing: individuals with the ability to use major performance-enhancing drugs which could not be detected by drug testing.

**The Drug Penalties**

For much of the 20th century, stewards – the in-game officials at the track– hearing officers, and racing commissions simply used their discretion to determine the length of the penalties assessed to trainers found guilty of drug violations. This process has changed over the last 15 years. The full racing industry created the Racing Medication and Testing Consortium, a group researching the effect of drugs and proposing model rule proposals for drug regulation. Working with the Association of Racing Commissioners International, the umbrella organization representing state racing commissions, they have developed model rules for drug testing and punishment. The penalties are determined by a classification of the drug (based largely on its therapeutic use in horses and the effect of the drug on overall performance) and the prior record of the trainer. They have also developed threshold levels for drugs that are frequently used as therapeutics in horse racing. If the amount of the drug found by the laboratory is below the threshold level, no positive is declared.

The ARCI's rules are frequently updated. The most recent rules were last updated in December of 2020.[17] Individual commissions need not follow model rules. Yet, many racing commissions have started to utilize the model drug rules of the ARCI. The one major issue has been the delays involved in a racing commission adopting model rules. The requirements of the doctrine of incorporation by reference mandate that a racing commission would need to separately promulgate any new ARCI model rule for it to become effective.[18]

The ARCI's rules require that a positive should not be announced until the trainer is given an opportunity to have a split sample of the specimen tested by an approved laboratory.[19] The requirement is the case in Kentucky, but there is no formal split sample requirement in New York's rules.[20]

**Betamethasone**
https://nysba.org/he-baedecker-guide-to-bob-baffert-betamethasone-and-the-beleaguered-sport-of-thoroughbred-horse-racing/

Betamethasone is a steroidal anti-inflammatory drug. It is a class 4 drug, and class 4 drugs are primarily therapeutic medications. Because of its anti-inflammatory action, betamethasone may reduce pain and can have a limited ability to influence performance. Class 4 drugs are in the "Category C" penalty stage. The recommended penalty for a first-time use is a fine up to $1,000 for the trainer with a disqualification of the horse. For a second violation by a trainer within 365 days (this would apply to Baffert's betamethasone positive for Gamine), the suggested penalty would be a "minimum fine of $1,500 and 15-day suspension absent mitigating circumstances."[21]

Baffert claimed that the small level of 21 picograms of betamethasone found in Medina Spirit should be a mitigating circumstance. However, in Kentucky any amount of betamethasone is considered an offense. In Maryland and in New York, the threshold level for betamethasone is set at 10 picograms. Accordingly, this betamethasone finding would also be a violation in all the Triple Crown jurisdictions. Finally, there have been no penalties for betamethasone positives in New York since 1991.

### Helping the Bettors

If Medina Spirit is eventually disqualified, will bettors who hold tickets on the presumed winner, the 27-1 Mandaloun, be paid for their wagers? The short answer is no. Payouts are made on the declared order of finish when the race is made official. New York's rule states, "Rulings of the stewards with regard to the award of purse money, made after the result has been declared official, shall in no way affect the mutuel payoff."[22]

### Excluding Baffert

Both Churchill Downs and the New York Racing Association have indicated their plans to exclude Baffert from their racetracks.[23] The question is whether a racetrack has the authority to exclude an individual from racing who possesses a valid license from the racing commission. In Kentucky the courts have been expansive in their treatment of the common law powers of racetrack owners to exclude individuals.[24] The NYRA situation is far cloudier depending on whether a NYRA exclusion is considered state action. There have been constant reconstructions of NYRA's board in the 21st century. Given the uncertainties about NYRA's status,[25] NYRA will likely act gingerly in its dealings with Baffert and provide him with some manner to contest the length of any penalty. On the other hand, Baffert races sparingly in New York, and it might not be worthwhile to contest any NYRA penalty.[26]

### The Future of Drugs in Thoroughbred Racing

The future of drug use in thoroughbred racing will be determined by the Horseracing Integrity and Safety Act (HISA). The act was part of the huge omnibus Consolidated Appropriations Act, 2021.[27] HISA is Title XII of Division FF of that legislation, and its effective date is July 1, 2022.

https://nysba.org/he-baedecker-guide-to-bob-baffert-betamethasone-and-the-beleaguered-sport-of-thoroughbred-horse-racing/

The legislation is the result of a decade-long attempt to bring national uniformity to thoroughbred racing's drug policies. It places all thoroughbred drug policy and all thoroughbred racing's safety policy within the purview of an independent, private horseracing integrity and safety authority. The authority will contract with the United States Anti-Doping Agency to enforce the anti-doping and medication control program. The Federal Trade Commission will serve as the oversight body which approves the rules of the authority and determines appeals from decisions issued by the authority.

Thus, there will be uniform national drug rules for thoroughbred racing.[28] It establishes a single agency with a dedicated mission where the buck should stop. After a three-year period, only a unanimous vote from the authority board would continue the use of race-day lasix.

Yet, it's never that simple. The grass is not always greener. The best plans for racing often falter, so to speak, at the eighth pole. There are legal challenges to the constitutionality of HISA. The leadership behind HISA has actually called for less testing but more "intelligence-based testing."[29] USADA has no expertise in handling equine matters and will be obligated to use the labs and testers that are frequently the subject of the current criticism. Will the FTC act with proper diligence? Is there any way to resolve the inevitable jurisdictional clashes that will emerge from the states, the authority, the FTC and the racetracks? The status quo is always the favorite in horse racing. The underdog may win, but that's not how you bet them.

*Bennett Liebman is a government lawyer in residence at the Government Law Center at Albany Law School. He previously served as the executive director, acting director and the interim director of the Government Law Center. From 1988 to 2000, he served as a member of the New York State Racing and Wagering Board.*

[1]. Stanley Levey, *Racing Now Virtual King of Sports, Topping Baseball in Gate Appeal*, N.Y. Times (April 30, 1953), https://www.nytimes.com/1953/04/30/archives/racing-now-virtual-king-of-sports-topping-baseball-in-gate-appeal.html.

[2]. 14.4 million viewers watched the 2021 Kentucky Derby. The Derby was the third most-watched non-football game since the pandemic began. John Clay, *Back to Nearly Normal*, Lexington Herald-Leader (May 4, 2021), https://www.kentucky.com/sports/spt-columns-blogs/sidelines-with-john-clay/article251160359.html.

[3]. "Bob Baffert is now the most celebrated horse trainer in America," Andy Beyer, *Horse Trainer Baffert's Reputation Keeps Growing*, Wash. Post (June 4, 1998).

[4]. Joe Drape, *Baffert Takes to Media to Deny Cheating*, Ne.Y. Times (May 11, 2021), https://www.nytimes.com/2021/05/10/sports/horse-racing/baffert-medina-spirit-

cheating-preakness.html. He has been described as "Bill Belichick, Phil Jackson and Tony La Russa rolled into one." Bryce Miller, *Embattled Trainer Bob Baffert Must Earn Horse Racing's Trust*, San Diego Union Tribune (May 10, 2021), https://www.sandiegouniontribune.com/sports/sports-columnists/story/2021-05-10/trainer-bob-baffert-suspended-churchill-drug-positive-medina-spirit-kentucky-derby.

[5]. Bob Mieszerski*, Baffert's Lawyer Expects a Stay of Suspension*, Los Angeles Times (June 19, 2001), https://www.latimes.com/archives/la-xpm-2001-jun-19-sp-12127-story.html. Eventually, Baffert was found not guilty of the violation.

[6]. Joe Drape, *California Examines Puzzling Trend of Horses' Sudden Deaths*, N.Y. Times (April 11, 2013), https://www.nytimes.com/2013/04/11/sports/california-examines-puzzling-trend-of-horses-sudden-deaths.html.

[7]. Joe Drape, *Justify Failed a Drug Test Before Winning the Triple Crown*, N.Y. Times (Sept. 11, 2019), https://www.nytimes.com/2019/09/11/sports/horse-racing/justify-drug-test-triple-crown-kentucky-derby.html.

[8]. *California Board Lets Stand Justify's Win in 2018 Race*, Associated Press (Jan. 23, 2021), https://apnews.com/article/horse-racing-bob-baffert-california-c51a9b6d04f6a33fd6fb87c48af48de8; *California Stewards Dismiss Complaint about Justify Drug Test*, Associated Press (Dec. 10, 2020), https://apnews.com/article/sports-horse-racing-bob-baffert-california-db3b848f45b6dbcf02ad24b7dd92ed9c.

[9]. *Baffert Wins at Arkansas Commission*, Louisville Courier Journal (April 11, 2021), https://www.courier-journal.com/story/sports/horses/horse-racing/2021/04/20/bob-baffert-wins-again-time-before-arkansas-racing-commission/7305895002/.

[10]. *Del Mar Stewards: Baffert Fined $2,500*, Paulick Report, (Nov. 30, 2020), https://www.paulickreport.com/news/the-biz/del-mar-stewards-baffert-fined-2500-brinkerhoff-handed-45-day-suspension/.

[11]. Bill Christine*, Trainers Hit With Light Fines*, Los Angeles Times (Nov. 2, 1994), https://www.latimes.com/archives/la-xpm-1994-11-02-sp-57697-story.html. Bill Christine, *Shoemaker Fined by Stewards*, Los Angeles Times (Jan. 15, 1995), https://www.latimes.com/archives/la-xpm-1995-01-15-sp-20363-story.html.

[12]. Hall of Fame trainers Steve Asmussen, Bill Mott and Nick Zito have all been punished for lidocaine positives. *See Zito v. N.Y. State Racing & Wagering Bd*., 300 A.D.2d 805 (3d Dep't 2002).

[13]. *See* Legislation To Promote the Health and Safety of Racehorses Focusing on H.R.1754, the "Horseracing Integrity Act of 2019" Before the House Energy and Commerce Subcommittee on Consumer Protection and Commerce (testimony by

https://nysba.org/he-baedecker-guide-to-bob-baffert-betamethasone-and-the-beleaguered-sport-of-thoroughbred-horse-racing/

Edward Martin), *available at* https://energycommerce.house.gov/sites/democrats.energycommerce.house.gov/files/documents/Martin_Testimony_012820.pdf.

[14]. Bennett Liebman, *The Trainer Responsibility Rule in Horse Racing*, 7 Va. Sports & Entm't L.J. 1, 2 (2007).

[15]. *Pletcher v. New York State Racing and Wagering Bd.* 35 A.D.3d 920 (3d Dep't 2006); *Dutrow v. New York State Racing and Wagering Bd.*, 97 A.D.3d 1034 (3d Dep't 2012); *Smith v. Cole*, 270 A.D. 675 (1st Dep't 1946).

[16]. *See Manhattan U.S. Attorney Charges 27 Defendants in Racehorse Doping Rings*, Press Release, U.S. Attorney's Office, Southern District of New York (March 9, 2020), https://www.justice.gov/usao-sdny/pr/manhattan-us-attorney-charges-27-defendants-racehorse-doping-rings.

[17]. Model Rules & Standards – Association of Racing Commissioners International, https://www.arci.com/model-rules-standards/.

[18]. For example, the New York Gaming Commission uses the 2016 model ARCI classification rules to determine penalty enhancements. 9 N.Y.C.R.R. Part 4045.

[19]. It took 41 days for Baffert's Arkansas lidocaine positives to be confirmed. Frank Angst, *Split Samples for Baffert Horses Come Back Positive*, Bloodhorse (July 6, 2020), https://www.bloodhorse.com/horse-racing/articles/242181/split-samples-for-baffert-horses-come-back-positive.

[20]. Despite lacking a formal rule, trainers in New York by policy are given a right to seek a split sample.

[21]. The penalty might be higher if Baffert's other fines in 2000 are considered violations.

[22]. 9 N.Y.C.R.R. § 4008.4 In 1986, after the stewards at Saratoga improperly disqualified the horse Allumeuse, suits brought by holders of tickets on Allumeuse were dismissed. *See Cramer v. New York State Racing Association*, 136 A.D.2d 104 (3d Dep't 1988).

[23]. The Churchill Downs exclusion appears to apply only to its Louisville track and not to other tracks the company owns.

[24]. *James v. Churchill Downs, Inc.*, 620 S.W.2d 323 (Ky. App. 1981). *See also Heflin v. Kentucky State Racing Com.*, 701 F.2d 599 (6th Cir. 1983).

https://nysba.org/he-baedecker-guide-to-bob-baffert-betamethasone-and-the-beleaguered-sport-of-thoroughbred-horse-racing/

[25]. Contrast *Galvin v. New York Racing Association*, 70 F. Supp. 2d 163 (E.D.N.Y. 1998) with *Murphy v. New York Racing Association Inc.*, 76 F. Supp. 2d 489 (E.D.N.Y. 1999).

[26]. From 2017–2019, Baffert raced only 32 times in New York, which constituted 3.2% of the starts his horses made. His horses only started twice at Aqueduct. In fact, the frequently glib Baffert allegedly remarked after NYRA banned a trainer for a period which encompassed the Aqueduct meeting, "That's not a penalty; that's a present."

[27]. Public Law No. 116-260 (2020).

[28]. This could also have been accomplished by making the model drug rules of the ARCI part of the Interstate Horseracing Act. 15 U.S.C. Ch. 57.

[29]. Matt Hegarty, *Some Resistance, Questions Remain Despite McConnell's Support of Federal Horse Racing Legislation*, Daily Racing Form (Sept. 1, 2020), https://www.drf.com/news/some-resistance-questions-remain-despite-mcconnells-support-federal-horse-racing-legislation.