UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| BOB BAFFERT, | ) | |
| *Plaintiff* | ) | |
| | ) | |
| v. | ) | 21 Civ. 3329 |
| | ) | |
| THE NEW YORK RACING | ) | |
| ASSOCIATION, INC., | ) | |
| *Defendant* | ) | |

**REPLY MEMORANUMDUM OF LAW IN FURTHER SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION**

WYATT, TARRANT & COMBS, LLP
250 West Main Street, Suite 1600
Lexington, Kentucky  40507-1746
859.233.2012


July 7, 2021

STEPTOE & JOHNSON LLP
1114 Avenue of the Americas
New York, New York 10036
212.506.3900

Brewster & DeAngelis
2617 E. 21st
Tulsa, Oklahoma 74114

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

ARGUMENT ..................................................................................................................... 13

    I.      Baffert Is Likely to Prevail on the Merits. ........................................................... 13

          A.      NYRA Violated 42 U.S.C. § 1983 ........................................................... 13

                1.      NYRA Failed to Provide Baffert Any Due Process Before Suspending Him. ....................................................................... 13

                2.      NYRA Is a State Actor. ............................................................... 18

    II.      Baffert Will Be Irreparably Harmed Absent Injunctive Relief............................. 27

          A.      NYRA's Violation of Baffert's Constitutional Rights Is Itself Irreparable Harm. ................................................................................... 27

          B.      Baffert Has Shown Irreparable Harm, Independent of the Fact that He Has Shown a Constitutional Violation. ............................................................ 29

CONCLUSION .................................................................................................................. 37

# TABLE OF AUTHORITIES

**Page(s)**

*A.H. by and through Hester v. French,*
    985 F.3d 165 (2d Cir. 2021) ...........................................................................28

*Alvarez v. Hayward,*
    No. 1:06-CV-745, 2006 WL 2023002, (N.D.N.Y. July 18, 2006) ......................4

*Barry v. Barchi,*
    443 U.S. 55 (1979)........................................................................................13,16

*Board of Regents of State Colleges v. Roth,*
    408 U.S. 564 (1972)...........................................................................................18

*Buffalo L. & R. R. Co. v. Hoyer,*
    108 N.E. 455 (N.Y. 1915)..................................................................................24

*Cedar Point Nursery v. Hassid,*
    141 S.Ct. 2063 (2021) ................................................................................. 23-24

*Chavis v. McCulloch,*
    9:20-cv-0435, 2021 CL 1294109.......................................................................28

*Clarett v. Nat'l Football League,*
    306 F. Supp. 2d 411 (S.D.N.Y. 2004) ...............................................................29

*Conn. Dep't of Evnt'l Protection v. OSHA,*
    356 F.3d 226 (2d Cir. 2004)........................................................................ 27-28

*Cranley v. National Life Ins. Co. of Vermont,*
    318 F.3d 105 (2d Cir. 2008) .............................................................................22

*Denver Rockets v. All-Pro Management, Inc.,*
    325 F.Supp. 1049, 1057 (C.D. Cal. 1971) ........................................................30

*Donk v. Miller,*
    365 F.3d 159 (2d Cir. 2004) .....................................................................13,15,17

*Donohue v. Mangano,*
    886 F.Supp.2d 126, 150 (E.D.N.Y. 2012) .................................................. 28-29

*Fabrikant v. French,*
    691 F.3d 193 (2d Cir. 2012) .............................................................................21

*Galvin v. New York Racing Ass'n, Inc.*,
   70 F.Supp.2d 163 (E.D.N.Y. 1998) .......................................................................1,14,18,25

*Garcia v. New York Racing Ass'n, Inc.*,
   No. 1:10-cv-01092, 2011 WL 3841524, (N.D.N.Y. Aug. 29, 2011) ...............................4,19

*Halsey v. New York State Racing & Wagering Bd.*
   6 Misc.3d 1041(A), (N.Y. Sup. Ct. Mar. 1, 2005) ...........................................................26

*Jacobson v. New York Racing Ass'n, Inc.*,
   305 N.E.2d at 678 (1973) ...........................................................................................23, 26

*John E. Andrus Mem'l, Inc. v. Daines*,
   600 F.Supp.2d 563, 571-72 (S.D.N.Y. 2009) ....................................................................35

*Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*,
   323 F.Supp.2d 525 (S.D.N.Y. 2004) .................................................................................35

*Joint Anti-Fascist Comm. v. McGrath*,
   341 U.S. 123 (1951) ...........................................................................................................15

*Jolly v. Coughlin*,
   76 F.3d 468, 482 (2d Cir. 1996) ........................................................................................28

*Jones v. United States Postal Serv.*,
   488 F.Supp.3d 103 (S.D.N.Y. 2020) .................................................................................28

*Ligon v. City of N.Y.*,
   925 F.Supp.2d 478 (S.D.N.Y. 2013) .................................................................................36

*Linseman v. World Hockey Ass'n*,
   439 F.Supp. 1315 (D. Conn. 1977) ...................................................................................30

*Madden v. Queens Cty. Jockey Club*,
   72 N.E.2d 697 (N.Y. 1947) ...............................................................................................26

*Matter of Halsey v. New York Racing Ass'n*,
   2005 WL 701115 (N.Y. Sup. Ct. Mar. 1, 2005) ...............................................................26

*Matter of Presti v. New York Racing Ass'n*,
   46 A.D.2d 387 (N.Y. App. Div. 2d Dep't 1975) ..............................................................26

*Matthews v. Eldridge*,
   424 U.S. 319, 348-49 (1976) .............................................................................................15

*Memphis Light, Gas & Water Div. v. Craft*,
    436 U.S. 1 (1978)................................................................15

*Murphy v. New York Racing Ass'n, Inc.*,
    138 Misc.2d 735 (N.Y. Sup. Ct. 1988) ................................ 1,4,14,25,26

*Myron v. Consolidated Rail Corp.*,
    752 F.2d 50 (2d Cir. 1985)..........................................................22

*Nat'l Football League Players Ass'n v. Nat'l Football League*,
    598 F. Supp. 2d 971 (D. Minn. 2008) .........................................29

*Nnebe v. Daus*,
    644 F.3d 147 (2d Cir. 2011)..................................................14,17

*Paykina on behalf of E.L. v. Lewin*,
    387 F.Supp.3d, 225 (N.D.N.Y. 2019) ........................................28

*Patterson v. Coughlin*,
    761 F.2d 886 (2d Cir. 1985)......................................................14

*People v. Licata*,
    268 N.E.2d 787 (N.Y. 1971) .....................................................26

*Regeneron Pharma., Inc. v. United States Dep't of Health & Human Servs.*,
    --- F.Supp.3d ---, 2020 WL 7778037, (S.D.N.Y. Dec. 30, 2020) ............ 34,35-36

*Register.com, Inc. v. Verio, Inc.*,
    356 F.3d 393, 404 (2d Cir. 2004)................................................34

*Saumell v. New York Racing Ass'n*,
    447 N.E.2d 709 (N.Y. 1983).............................................1,4,14,23,25,26

*Statharos v. New York City Taxi & Limousine Comm'n*,
    198 F.3d 317, 322 (2d Cir. 1999)..............................................28

*Stevens v. New York Racing Ass'n, Inc.*,
    665 F. Supp. 164 (E.D.N.Y. 1987) ...........................................4,19

Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.,
    60 F.3d 27, 38 (2d Cir. 1995).................................................31,35

Village of East Rochester v. Rochester Gas & Elec. Corp.,
    46 N.E.2d 334 (N.Y. 1943).....................................................24,25

*Weisshaus v. Cuomo,*
   20-cv-5826, 2021 WL 103481 ..................................................................................28

*V.W. by and through Williams v. Conway,*
   236 F.Supp.3d 554, 589 (N.D.N.Y. 2017 ...........................................36,37

## Statutes

42 U.S.C. § 1983 ............................................................................................13,18
N.Y. Racing L. § 212(1), (8)(a)(iii) .................................................................19
N.Y. Racing L. §§ 208(1), 212(7)(iv) ...............................................................20
N.Y. Racing L. § 206 ..................................................................................22, 24
N.Y. Racing L. § 104(1) ....................................................................................23
N.Y. Racing L. § 104(2) ....................................................................................23
N.Y. Racing L. § 910 .........................................................................................23

## Regulations

810 KAR § 8:025 ...............................................................................................15
9 NYCRR § 4002.1 ............................................................................................22
9 NYCRR § 4002.9 ............................................................................................23
9 NYCRR § 4003.2 ............................................................................................23
9 NYCRR § 4002.10 ..........................................................................................23

## INTRODUCTION

Nowhere in NYRA's Response is there any contention that Baffert has violated any New York statute or racing rule. In fact, the opposite is true. Over the course of his 46-year training career, including more than 30 years of racing in New York, Baffert has never even been accused of violating a New York rule and he has never faced discipline from either NYRA or the New York State Gaming Commission (the "Gaming Commission"). Despite his distinguished New York racing career, without even a hint of wrongdoing, NYRA believes it has free rein to unilaterally void his constitutionally protected property rights and ban him from all activity in New York without notice and for an indefinite period of time based solely on unproven allegations of a minor infraction (an overage of an allowable medication) in another jurisdiction.

This motion can be decided on two purely legal grounds. First, Baffert was not afforded any due process before he was summarily suspended by NYRA. He was given no notice of any charges against him and no opportunity to be heard. Instead, he received a letter stating that he was immediately suspended and would not be permitted to race any horses in New York. That letter was issued over 50 days ago and, to date, Baffert has not been afforded a due process hearing. Courts have continually rejected NYRA's efforts to either deny or limit a licensee's right of access to racetracks without pre-deprivation due process of law. *See Saumell v. New York Racing Ass'n*, 447 N.E.2d 709 (N.Y. 1983); *Galvin v. New York Racing Ass'n, Inc.*, 70 F.Supp.2d 163 (E.D.N.Y. 1998); *Murphy v. New York Racing Ass'n, Inc.*, 138 Misc.2d 735 (N.Y. Sup. Ct. 1988), *aff'd,* 146 A.D.2d 778 (2d Dep't 1989). NYRA's failure to give Baffert any due process is alone grounds for injunctive relief.

Second, NYRA does not have the authority to suspend Baffert trainer's license under New York law. That authority rests exclusively with the Gaming Commission. As long as Baffert has a valid trainer's license with the Gaming Commission—which he does—NYRA cannot prohibit

him from exercising that license at New York's state-owned racetracks. If it believes Baffert has engaged in conduct that warrants the suspension of his license, it needs to take that matter up with the Gaming Commission. The Gaming Commission has been noticeably silent throughout this process because, unlike NYRA, it is following New York racing law and waiting for the administrative process related to MEDINA SPIRIT that is currently ongoing in Kentucky to play out before taking any action. Neither may NYRA claim under these circumstances that it has some common-law right of exclusion that empowers it to prohibit Baffert from exercising his constitutionally protected right to use his trainer's license. NYRA's suspension of Baffert is "tantamount"[1] to revoking his license issued by the Gaming Commission, and NYRA may not do through the backdoor what it is statutorily prohibited from doing through the front.

The bottom line is that Baffert possesses a valid and unrestricted thoroughbred trainer's license in New York. There are only three significant racetracks in New York in which Baffert may exercise that license and NYRA operates all of them pursuant to a government-created monopoly. As a consequence of this special statutory privilege, NYRA committed the track property to public use and New York state and federal courts have consistently stated that this means NYRA is a state actor. As such, NYRA may not exclude state licensees from its tracks indiscriminately and without due process—which is exactly what it has done here.

The long string of uninterrupted cases refusing to allow NYRA to trample upon licensed individuals' rights exist because allowing NYRA to operate "outside of the regulatory framework"—as it has openly admitted it is doing in this case—undermines the entire purpose of both the Constitution of the United States and the Gaming Commission's licensing and disciplinary authority. There is no point to any of the statutory and constitutional safeguards afforded a licensee

---

[1] *See Galvin v. New York Racing Ass'n*, 70 F.Supp.2d 163 (E.D.N.Y. 1998).

if NYRA—which possesses a monopoly over thoroughbred tracks with the State's express blessing—may render those rights worthless on a whim.

While NYRA sanctimoniously claims to be acting in the interest of the "integrity of racing," the fact that NYRA routinely allows onto its tracks trainers who have actually been found to have broken New York's rules of racing completely shatters that false narrative. NYRA smears Baffert with allegations about other positive tests, without providing the critical context of those, including that they involved minor overages of permitted substances, none of which merited a suspension and some of which Baffert was, for all practical purposes, vindicated. NYRA also overlooks that if the Kentucky investigation shows that MEDINA SPIRIT's positive test from the Kentucky Derby arose from a topical cream (and not an injection), Baffert will have *violated no rules at all*. It does not serve the "integrity" of horse racing to suspend first, and ask questions later.

It is the role of the courts to protect due process rights against those who seek to trample on the rights of a decorated trainer who simply wants to continue to work at his craft and in the sport that he has spent the entirety of his professional life serving. For the reasons that follow, and those set forth in his initial memorandum, Baffert is entitled to a preliminary injunction allowing him to continue to race horses in New York as he has for the past 29 years without incident.

## FACTS

In his Motion, Baffert set forth the facts relevant to this Court's inquiry. Those facts need not be repeated here. However, in its Response, NYRA makes for four "factual" assertions that really are more akin to arguments than factual statements. They are as follows: (1) NYRA claims it is a "private" corporation and not a state actor; (2) NYRA claims Baffert has a "history" of drug related violations; (3) NYRA asserts that Baffert made "contradictory" statements following MEDINA SPIRIT's alleged betamethasone overage; and (4) NYRA contends it "temporarily"

suspended Baffert to keep him from running MEDINA SPIRIT in the Belmont. (*See* ECF 18 ("Opp") 3-9).  Each of these factual contentions is misplaced and will be briefly addressed.

### A.      NYRA is a State Actor.

While this argument will be addressed in greater detail *infra,* it is shocking that NYRA even attempts to claim it is not a state actor in face of the overwhelming case law—and NYRA's own prior judicial admissions—stating otherwise.   New York Courts have repeatedly and consistently held that NYRA is a state actor.  *Garcia v. New York Racing Ass'n, Inc*., No. 1:10-cv-01092, 2011 WL 3841524, at *10 (N.D.N.Y. Aug. 29, 2011); *Galvin v. New York Racing Ass'n*, 70 F.Supp.2d 163, 173 (E.D.N.Y. 1998); *Saumell v. New York Racing Ass'n*, 58 N.Y.2d 231, 237 (1983); *Murphy v. New York Racing Ass'n, Inc.*, 525 N.Y.S.2d 548, 550 (1988), *aff'd*, 146 A.D.2d 778 (2d Dep't 1989); *Alvarez v. Hayward*, No. 1:06-CV-745, 2006 WL 2023002, at *3 (N.D.N.Y. July 18, 2006); *Stevens v. New York Racing Ass'n, Inc*., 665 F. Supp. 164, 172 (E.D.N.Y. 1987).  In fact, NYRA has conceded this point in the past and *both NYRA and its current counsel even argued in favor of being declared a state actor* in prior litigation. *Saumell*, 58 N.Y.2d at 237 ("NYRA concedes for the purposes of this proceeding that its exclusion of petitioner constitutes 'State Action'"); *Wandering Dago, Inc. v. NYRA* ("NYRA, a state actor") (copy attached as Ex. 9).[2]  Many things could be said about the sudden about face of NYRA and its counsel, but suffice it to say that any contention that NYRA is not a state actor is without merit.

### B.      NYRA's Portrayal of Baffert Is False, and Its Alleged Motivation to Protect Racing "Integrity" Is Belied By How It Treats Other Trainers.

This Court should not be misled about Baffert, what he stands for in racing, and his long and prestigious career.  Objectively, he has consistently been recognized for excellence and as one

---

[2] Citations in the form "Ex. [number] refer to the exhibits to the accompanying reply declaration of W. Craig Robertson III.

of the most positive influences on horse racing throughout the course of his 46-year career. Some of his most notable accomplishments include:

- In 1997, Baffert was awarded the Mr. Fitz Award by the National Turf Writers and Broadcasters' Association. This honor is awarded to an individual or group who typifies the spirit of racing.

- In 1998, Baffert was awarded the Big Sport of Turfdom Award by the Turf Publicists of America. This award is given to a person or group who enhances coverage of thoroughbred racing through cooperation with the media and racing publicists.

- In 1997, 1998, 1999, and 2015, Baffert earned the Eclipse Award, presented by the National Turf Writers and Broadcasters' Association for being the nation's most outstanding trainer.

- In 2007, Baffert was inducted into the Lone Star Park Hall of Fame.

- In 2009, Baffert was inducted into the Thoroughbred Racing Hall of Fame.

- In 2010, Baffert was inducted into the Arizona Sports Hall of Fame.

- In 2010, Baffert was named a University of Arizona Hispanic Alumni Portraits of Excellence Honoree.

- In 2015, Baffert was named March of Dimes Sportsman of the Year.

- In 2018, Baffert was inducted into the Kentucky Sports Hall of Fame.

(Reply Affidavit of Bob Baffert, sworn to July 6, 2021 ("Baffert Reply Aff.") ¶ 3 (copy attached as Ex. 1)).

The foregoing hardly sounds like an individual who is a blight on horse racing as NYRA now purports to claim. In that regard, NYRA asserts that over his career Baffert has been cited for medication violations "at least 30 times." (Opp. 3). However, NYRA's citation to this alleged "fact" is an affidavit from an individual who makes such a statement "on information and belief."

The Jockey Club's official records paint a far different picture.[3]  According to The Jockey Club's database of regulatory rulings, Baffert has had 8 medication related regulatory rulings dating back to 2005[4] (which is apparently as far back as the Jockey Club's records go).  Three important points are to be made here.  First, all 8 of these alleged violations occurred in racing jurisdictions other than New York.   Second, all but one of those rulings were for minor overages of lawful medications.[5]  All of those instances were thoroughly investigated by each racing jurisdiction and all were deemed minor violations.  A trainer found to have committed a violation can either be fined (for minor violations) or suspended (for more serious violations), and it is notable that *none* of the incidents here resulted in a suspension.  Not one.

Second, and most importantly, Baffert's record is comparable (or better) the records of virtually every other trainer who races in New York—demonstrating that NYRA is simply singling Baffert out, perhaps to unfairly make an example out of him.  For example, the number of medication violations for the current top twelve trainers for the ongoing Belmont meet:

| Medication Violations | |
|---|---|
| Trainer 1 | 3 |
| Trainer 2 | 1 |
| Trainer 3 | 2 |
| Trainer 4 | 6 |
| Trainer 5 | 15 |
| Trainer 6 | 10 |
| Trainer 7 | 7 |
| Trainer 8 | 0 |

[3] The Jockey Club maintains a database that collects thoroughbred regulatory rulings from state racing commissions throughout the country. *See* The Jockey Club, Thoroughbred Regulatory Rulings, https://www.thoroughbredrulings.com/ (last accessed July 5, 2021). Since The Jockey Club has interjected itself into this dispute, claiming to have a "unique perspective and information" (*see* ECF 14-1, at 1), Baffert will reference that entity's records.

[4] The Jockey Club, Thoroughbred Regulatory Rulings, Bob Baffert, https://www.thoroughbredrulings.com/Default.asp?RTReport=2&From=SRCH&EPID=83&L=Baffert&M=%20&F=Bob&LAST=BAFFERT&BRD=&SHOWSEARCH=YES (last accessed July 5, 2021) (attached as Ex. 2.).

[5] The only exception was a finding of innocent contamination of dextrorphan—the main ingredient in human cough medicine—which came from a groom taking with Dayquil after contracting Covid-19. (Robertson Reply Decl. ¶ 7).

-6-

| Trainer 9 | 10 |
|-----------|----|
| Trainer 10 | 8 |
| Trainer 11 | 15 |
| Trainer 12 | 2 |

(*See* Robertson Reply Declaration, ¶¶ 2-4, Ex. 17).

The foregoing chart shows that NYRA's suspension is not about Baffert's "history," as NYRA claims. Many of the foregoing trainers not only have more medication related violations than Baffert, they have medication-related violations in the State of New York—something Baffert has never had in his entire career. Despite this fact, none of the foregoing trainers are facing any type of suspension or exclusion by NYRA. They all continue to "ply their trade" to this day and NYRA welcomes them with open arms.

NYRA has also consistently opened its doors to trainers who were found guilty of misconduct by the Gaming Commission and had their licenses suspended—neither of which has ever happened to Baffert. In those instances when the Gaming Commission suspended a trainer's license, NYRA continued to allowed them to race while their suspension was appealed. NYRA has historically been content to sit by as an idle spectator when it comes to other thoroughbred trainers that have been disciplined by the Gaming Commission for infractions far more severe than anything Baffert has been accused of in Kentucky.

For example, New York trainer Richard Dutrow, Jr. was suspended or fined nearly 70 times over a 30-year period. (*See In re Richard E. Dutrow*, New York Gaming Comm'n, Aug. 8, 2018,, pp. 10-11 (copy attached as Ex. 11).) Then, in 2011, he was fined $50,000 by the Gaming Commission and suspended from racing in New York for 10 years following a positive drug test and the discovery of hypodermic needles in a desk drawer in his office. (*Id.* at 2.) Despite this fact, NYRA took no action and Dutrow continued to race at NYRA for the next year and a half while

his suspension was being appealed. Indeed, from the time of the Gaming Commission's suspension on October 2, 2011 until his appeal rights were exhausted in 2013, Dutrow-trained horses made a total of 513 starts at NYRA tracks.[6]

Similarly, and only months ago, the Gaming Commission fined New York-based trainer Linda Rice $50,000 and suspended her thoroughbred training license for three years.[7] Rice was found to have traded substantial amounts of money for information from the racing office that would have given her a competitive advantage in races spanning from 2011-2015. The Gaming Commission's final report concluded that her violations of the rules of racing were "intentional, serious, and extensive, and that her actions constituted improper and corrupt conduct … inconsistent with and detrimental to the best interests of horse racing."[8] In the midst of this controversy, NYRA has again taken no position. In fact, since the implementation of the Gaming Commission's suspension on June 7, 2021, as Rice appeals, she has had at least 14 horses start at NYRA tracks and has continued to be permitted to enter horses in NYRA races.[9]

A final example relevant to Baffert's indefinite suspension is NYRA's behavior toward trainer Wayne Potts, who has been accused of serving as phony "front" trainer (sometimes called a "paper" trainer) for another trainer with major disciplinary issues.  NYRA did not summarily suspend Potts but instead issued the following public statement emphasizing Potts' right to "due process":

---

[6] *See* https://www.equibase.com/profiles/allStartsPeople.cfm?eID=110865&typeSource=TE&rbt=TB&year=2011 and https://www.equibase.com/profiles/allStartsPeople.cfm?eID=110865&typeSource=TE&rbt=TB&year=2013 (excerpts attached as Ex. 12).

[7] Chelsea Hackbarth, *Linda Rice's License Revoked, Trainer Fined $50,000*, The Paulick Report, May 17, 2021 (attached as Ex. 18).

[8] T.D. Thornton, *Three-Year License Revocation, $50k Fine for Rice's 'Improper and Corrupt Conduct,'* Thoroughbred Daily News, May 17, 2021 (attached as Ex. 19).

[9] https://www.equibase.com/profiles/allStartsPeople.cfm?eID=1553&typeSource=TE&rbt=TB&year=2021 (excerpts attached as Ex. 20).

> NYRA is aware of the allegations publicly leveled against Wayne Potts earlier this week. These allegations must be thoroughly investigated and adjudicated by the relevant regulatory agencies *in order to provide due process to this trainer or any trainer in question*. NYRA will take additional actions only as warranted by the facts developed and presented by regulators.

*NYRA Will Allow Potts To Continue Racing, Pending Regulatory Investigation*, PAULICK REPORT, Aug. 22, 2020 (copy attached as Ex. 3) (emphasis added).

In other words, NYRA has decided that it will give every other trainer due process except for Baffert. A look at NYRA's history paints a clear picture that Baffert is being treated differently from every other trainer before him.  Unlike those other trainers, Baffert has not been found in violation of any rule or statute either in New York or Kentucky.  Even still, the conceivable charges against him are minor.  Betamethasone is a lawful substance commonly administered to horses. Any possible discipline Baffert may face dwarfs in comparison to Dutrow, Rice, or Potts, yet NYRA was content to allow them to enter horses.  This hypocrisy clearly demonstrates that NYRA's claim it must act against Baffert to protect the "interest of racing" is totally false— NYRA's own prior actions prove that affording due process to trainers is perfectly consistent with NYRA's mission.  It is clear that NYRA's stated need to exclude Baffert immediately "in the interest of racing" is little more than a pretext to vindictively target him.

Lastly, NYRA's insistence on wanting to discuss Baffert's history is dangerous and problematic.  It is important to note that, until the alleged positive test that occurred after this year's Kentucky Derby, which is just in the preliminary stages of investigation, NYRA saw no reason to suspend Baffert.  Now, based on an event that has yet to be adjudicated, NYRA wants to go back and re-litigate matters that have already been decided by other states.  This case should not devolve into a series of mini-trials of past issues related to Baffert that have already been investigated and

decided by other racing jurisdictions outside of New York—almost overwhelmingly in Baffert's favor.

Nevertheless, because NYRA seems to place particular emphasis on what it claims are four "drug-related violations" within the past 12 months, those matters will be briefly addressed. Each of those four incidents was thoroughly investigated and reviewed by racing regulatory bodies in Arkansas, Kentucky, and California. The Arkansas case, which concerned two of the alleged incidents, is a classic example of why it is dangerous for NYRA to claim it wants to use matters that have been decided by another jurisdiction, and for which NYRA does not have all the facts, as a reason to punish Baffert. In Arkansas, two horses trained by Baffert, CHARLATAN and GAMINE, allegedly tested over the allowable limit of lidocaine—a lawful, therapeutic medication. (Robertson Reply Decl. at ¶ 5). Initially, Arkansas indicated that it was going to suspend Baffert for 15 days and disqualify the horses, both of which won their respective races. (*Id.*) However, following months of investigation and two days of public hearing, the following evidence was uncovered and became undisputed:

1.    CHARLATAN was identified as a gelding when his samples were sent to the test lab when, in fact, he is a colt. This called into question whether the samples that were tested came from the correct horse.

2.    The testing lab initially reported that CHARLATAN's samples had passed, only to later say this was a "mistake."

3.    The test samples left Oaklawn Park in coolers with two identification numbers and arrived at the testing lab in different coolers with different identification numbers—meaning there was a broken chain of custody for all test samples, casting into doubt the validity of any test results.

4.    The official test results were reported by a laboratory that had lost its accreditation and was not accredited at the time of testing.

5.    There were other horses besides CHARLATAN and GAMINE that tested positive for lidocaine on the same day and during the meet, suggesting there may have been a broader contamination event happening at the track.

-10-

(*Id.*)

As a result of these facts, and several other anomalies, Baffert argued for the complete dismissal of the Arkansas cases.  The Arkansas Racing Commission decided to rescind Baffert's suspension, restore the victories of the two horses, and instead issued a small fine. (*Id.* ¶ 6).  That was arguably too harsh of a penalty given the circumstances, but rather than appeal and incur additional costs, Baffert paid the fine and moved on.  However, despite the fact that the Arkansas cases were ones in which Baffert largely prevailed, NYRA wants to use the fact that he was "fined" against him.  As set forth above, that is completely misleading and unfair, and why each racing jurisdiction must trust and respect the process and findings of the others.[10]

NYRA's "facts" are misleading because it wants to paint with a broad brush and claim that past issues—none of which occurred in New York and all of which were thoroughly investigated and decided in a manner that resulted in no suspensions—demonstrate that Baffert has a "history" of problems.  Nothing could be further from the truth.

## C.    Baffert's Good Faith and Transparent Public Statements.

Next NYRA wants to attribute some ill motive to the fact that Baffert was shocked and upset at first learning of MEDINA SPIRIT's alleged positive test, only to later to learn that betamethasone in an ingredient on an ointment prescribed by a veterinarian that was being applied by the horse's groom to treat a skin rash.  In essence, NYRA is complaining about Baffert being

---

[10] The same holds true for the Kentucky case, which was an overage of a lawful medication.  In that case, the horse was administered an allowable anti-inflammatory injection 18 days before a race pursuant to a veterinarian recommendation.  Kentucky's rules stated that such an injection must be given no more than 14 days before a race.  Thus, the medication was given appropriately, but it still resulted in a minor overage.  As a result, Kentucky issued a fine, but no suspension.  Likewise, the California case was the result of innocent contamination from a groom taking Dayquil after contracting COVID-19.  In that instance, the horse tested positive for trace levels of a substance in human cough medicine.  The California Horse Racing Board examined the facts, including that the substance at issue was a Class 4 (the Association of Racing Commissioners International classifies substances from Class 1 – the most problematic and likely to affect performance - to Class 5 – the most benign), and decided to issue a fine with no suspension or disqualification of the horse.  (*See id.* at ¶¶ 7-8.)

-11-

honest with his emotions and transparent with the public upon learning new information.  This is

a ridiculous complaint and has already been addressed by Baffert through the following several

public statements.  A portion of one of those statements is below:

> …I acknowledge that I am not perfect and I could have better
> handled the initial announcement of this news.  MEDINA SPIRIT's
> Kentucky Derby win was so personally meaningful to me, and I had
> such a wonderful experience on May 1 at Churchill Downs, that
> when I got the news of the test results, it truly was the biggest gut
> punch I had ever received and I was devastated.  That, coupled with
> the fact that I always try to be accommodating and transparent with
> the media, led to an emotional press conference on May 9 in which
> I said some things that have been perceived as hurtful to some in the
> industry.  For that I am truly sorry.  I have devoted my life's work
> to this great sport and I owe it, and those who make it possible,
> nothing but an eternal debt of gratitude.
>
> For those who want an explanation for what transpired with
> MEDINA SPIRIT, I have tried to be open and transparent from the
> beginning.   Our investigation is continuing and I don't have
> definitive answers at this point.  What I do know is that neither my
> barn, nor my veterinarians, directly treated MEDINA SPIRIT with
> the anti-inflammatory medication betamethasone.  Even though it is
> allowable, it is just not something we have ever used with this horse.
> The only possible explanation that we have uncovered to date – and
> I emphasize the word possible - is that betamethasone is an
> ingredient in a topical ointment that was being applied to MEDINA
> SPIRIT to treat a dermatitis skin condition he developed after the
> Santa Anita Derby.
>
> I have been deeply saddened to see this case portrayed as a
> "doping" scandal or betamethasone labeled as a "banned"
> substance.  Neither is remotely true.  Betamethasone is an allowable
> and commonly used medication in horse racing.  Further, 21
> picograms would have zero pharmacology in a horse.  All I ask is
> that everyone not rush to judgment and allow all of the facts,
> evidence and science to come to light.

(*Bob Baffert's full statement on Medina Spirit*, NBC Sports (May 15, 2021) (copy attached as Ex.
4)).

Again, Baffert was being honest and transparent with his emotions.  The fact that new

information is learned from day to day and week to week—leading to differing statements as facts

are gathered—is not evidence of an ill motive, but rather a man acting transparently in the face of grievous and unfair assaults on his character and career.

> **D.    NYRA's Suspension is Not "Temporary."**

One thing is clear: there is nothing "temporary" about NYRA's suspension.  It is now running on 51 days with no end in sight, and with no mention of a hearing through which the suspension would potentially be lifted.  And if NYRA's goal was to keep MEDINA SPIRIT out of the Belmont, that mission was accomplished.  The Belmont was run more than a month ago and NYRA offers no reason for why the "temporary" suspension should continue indefinitely—other than the debunked notion that it is acting to protect the "interest of horse racing."  Enough is enough.  This Court should not permit NYRA to continue to act unlawfully under the guise that its actions are only "temporary."  Baffert is entitled to injunctive relief.

<u>**ARGUMENT**</u>

**I.    Baffert Is Likely to Prevail on the Merits.**

> **A.    NYRA Violated 42 U.S.C. § 1983**

>> **1.    NYRA Failed to Provide Baffert Any Due Process Before Suspending Him.**

New York law is crystal clear that Baffert was entitled to due process before NYRA issued its "suspension"—process he was never offered and that he never received.  First, it is beyond question that Baffert has a property interest in his trainer's license issued by the Gaming Commission.  *Donk v. Miller*, 365 F.3d 159, 163 (2d Cir. 2004) ("A horse trainer possesses a property interest in his professional license; accordingly, the Board may not suspend a trainer's license in a manner that violates the Due Process Clause of the Fourteenth Amendment.") (citing *Barry v. Barchi*, 443 U.S. 55, 64 (1979)).  Second, the case law is clear that Baffert is entitled to due process protection if NYRA wants to attempt to prohibit him from exercising that licensee at

-13-

a New York racetrack, as clearly established in the following cases:

- In *Saumell* the Court held that any attempt by NYRA to exclude a Commission licensee from its premises "must conform with the requirements of due process." *Saumell v. New York Racing Ass'n, Inc.*, 447 N.E.2d 706, 707 (N.Y. 1993). In that case, the Court held that the licensee was entitled to notice of his alleged misconduct and a hearing before he was excluded.

- In *Murphy* the Court held that NYRA's attempt to exclude a farrier, or horse-shoer, without a hearing was improper. *Murphy v. New York Racing Ass'n, Inc.*, 138 Misc.2d 735, 737 (N.Y. Sup. Ct. 1988), *aff'd*, 146 A.D.2d 778 (2d Dep't 1989). "The Court holds, therefore, that the due process requirements of *Saumell*… apply to all persons licensed by the Wagering and Racing Board, and the respondent was required to afford petitioner a hearing before excluding him from its premises." *Id*.

- In *Galvin*, in response to NYRA's argument that it had an unfettered right of exclusion, the court stated that "[t]he courts of New York have consistently found that the suspension of NYRA credentials implicates property interests, specifically the interests of holders of New York State Racing and Wagering Board occupational licenses in continuing to enjoy the use of those licenses…a license for any aspect of the racing business…may only be revoked for cause, and then only after a hearing." *Galvin v. New York Racing Ass'n*, 70 F.Supp.2d 163, 173 (E.D.N.Y. 1998) (internal citations omitted).

Among "the fundamental tenets of due process" is that "[a]bsent some exigency" or "circumstances that render a pre-deprivation hearing impossible as a practical matter," state actors must provide citizens the "opportunity to be heard *before* the state deprives an individual of life, liberty or property." *Patterson v. Coughlin*, 761 F.2d 886, 892 (2d Cir. 1985) (emphasis in original). In other words, the "'general rule' is that a pre-deprivation hearing is required" *Nnebe v. Daus*, 644 F.3d 147, 158 (2d Cir. 2011) (*See also* ECF 3-1 ("Baffert Br.") 10-11.).

NYRA's sudden, indefinite, and continuing suspension of Baffert, without any pre-deprivation notice or opportunity to be heard, constitutes a blatant disregard for the due process rights afforded Baffert by virtue of his trainer's license in the State of New York. NYRA, in response to Baffert's Motion, does not dispute that Baffert's license is a protected property interest, but hides from the basic tenets of due process—the touchstone of which is "the requirement that 'a person in jeopardy of serious loss (be given) notice of the case against him and opportunity to

-14-

meet it.'" *Donk*, 365 F.3d at 163 (quoting *Matthews v. Eldridge*, 424 U.S. 319, 348-49 (1976));

*Joint Anti-Fascist Comm. v. McGrath*, 341 U.S. 123, 171-72 (1951) (Frankfurter, J., concurring)).

Likewise, as the *Saumell* court noted, the Supreme Court has repeatedly held that "some kind of

hearing" is generally required prior to the deprivation of a significant property interest. 447 N.E.2d

at 711 (quoting *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 17 (1978)); *see also Board*

*of Regents v. Roth*, 408 U.S. 564, 569-70 (1972).

NYRA tries to escape its admitted lack of pre-deprivation process by advancing a theory

that it had "probable cause" to suspend him. (Opp. 19).  In essence, NYRA argues that having

some belief that a licensee's actions may later be found unlawful is enough to eviscerate the

requirements of due process so as to impose an immediate suspension. (*Id.*)

At the outset, NYRA is flatly wrong when it argues that the positive test at issue here is a

violation of Kentucky laws or regulations. (*Id.* at 6). The relevant regulation applies only to

*injections* of betamethasone:

> The following have a fourteen (14) day stand down period for *intra-*
> *articular injection*. Any *IA corticosteroid injection* within fourteen
> (14) days is a violation:
>
> (i) Betamethasone …

810 KAR § 8:025, Section 3(k) (emphasis added).  Baffert has submitted unrebutted evidence that

there was no injection of betamethasone, and offered a potential alternative explanation that the

positive test arose because of a topical cream—which is not a racing violation and could not have

possibly made any difference in the performance of MEDINA SPIRIT at the Kentucky Derby.

(*See* ECF 3-4 ¶¶ 8-5). A key purpose of the proceedings in Kentucky is to determine if there is

evidence of a violation or not.  Baffert believes he will be vindicated, but NYRA—as the proverbial

judge, jury, and executioner—cannot be bothered to find out the facts first.

-15-

As for the legal authority for its suspend-first-ask-questions-later posture, NYRA relies, primarily and mistakenly, on *Barry v. Barchi*, 443 U.S. 55 (1979) and *Donk* for the idea that a pre-deprivation hearing is unnecessary where the state actor simply believes the actions warrant suspension because of a broad interest in the integrity of horse racing.  But the case law of the Supreme Court and of this Circuit do not support such an expansive exception.

In *Barry v. Barchi*, 443 U.S. 55 (1979), the U.S. Supreme Court held that a horse trainer's suspension "was constitutionally infirm under the Due Process Clause of the Fourteenth Amendment" because the trainer was not "assured a prompt post-suspension hearing . . . that would proceed and be concluded without appreciable delay." *Id*. at 66. In other words, even in the unique circumstances in which the *Barry* Court found that a suspension was lawful before a hearing, the Court stated that a hearing must be afforded to the trainer promptly.  *Id*. at 66. That is exactly what is missing here.  NYRA provided *no procedure* for a hearing, much less a prompt one.

NYRA also completely glosses over other key distinctions between the *Barry* case and the one at bar.  First, the trainer's fifteen-day suspension in *Barry* was initiated by the New York State Racing and Wagering Board (the predecessor to the Gaming Commission), not NYRA. *See Barry,* 443 U.S. at 58.  Second, the trainer in *Barry* was punished for conduct that occurred in New York, under a New York investigation, and specifically pursuant to New York law. *Id*. at 59.  Important to the outcome and analysis of *Barry* was the existence and application of a statute allowing the Wagering Board to temporarily suspended a trainer for a New York rule violation before a hearing and final determination as to the trainer's culpability.[11] *Id*.

Unlike the trainer in *Barry*, Baffert has now been suspended for 51 days (as of July 7,

_____

[11] The statutory provision the Court in *Barry* evaluated, N.Y. Unconsol. L. § 8022 (1979), was subsequently repealed by the legislature in 1982.  *See* L.1982, ch. 865 § 2 (effective April 1, 1983).

2021), with no hint of any end in sight.  NYRA cannot reasonably call this an "interim suspension" "pending an adversary hearing," notably because NYRA has not once proposed an adversarial hearing, which constituted a crucial premise of the Court's holding in *Barry*. *See id*. at 65.

Similarly unhelpful to NYRA is *Donk v. Miller*, 365 F.3d 159 (2d Cir. 2004).  In *Donk*, the New York trainer was "afforded an opportunity for a pre-suspension hearing" in New York. *Id*. at 164. This is yet another example of what Baffert was *not* provided here.  Most importantly, the *Donk* court noted that, while the Wagering Board may have probable cause when it has the benefit of testing conducted in New York, the same cannot be said when it is relying on testing conducted in some other state.  *Id*. at 163.  Here, NYRA is relying on alleged test results from Kentucky and not New York.

Finally, NYRA cites the Second Circuit's 2011 decision in *Nnebe v. Daus*, 644 F.3d 147, 158 (2d Cir. 2011) for the proposition that, consistent with due process, taxi drivers could under certain circumstances have their licenses temporarily suspended because of an arrest, even without a hearing. (Opp. 20.). But NYRA fails to mention that the Second Circuit remanded the case because it did not have an adequate record to evaluate whether the post-deprivation procedures were adequate. 644 F.3d at 161-62.  When the case came back to the Second Circuit in 2019, the Court found that the procedures *did* violate due process because taxi drivers with an arrest were not "provide[d] a prompt post-deprivation hearing," or even a hearing that provided a "deeper inquiry into whether the deprivation is appropriate," beyond the mere fact of an arrest. *Nnebe*, 931 F.3d at 87.  The nonexistent procedures NYRA has provided to Baffert here are far less than what was provided in *Nnebe*, and so the due process violation here is even more apparent.

In the end, try as it might, NYRA cannot distance itself from these settled doctrines of due process. Nor can it distinguish *Galvin*, the Eastern District of New York case that solidifies and

incorporates all of the legal contentions made by Baffert in this matter. *Galvin*'s lengthy discussion on the strength of an individual's property interest in a state-issued license, and the need for a pre-deprivation hearing before the termination of such an interest, demonstrates that NYRA has acted out of bounds in this case. The *Galvin* court explicitly stated that "[s]even or nine days to prepare a defense" against charges was insufficient. 70 F.Supp.2d at 177. Here, there was no "seven to nine days" of advance notice, much less any offer of a hearing. Neither was there any contention that a single rule of New York racing had been violated. Baffert has been suspended for nearly two months, and—on the brink of a major race meet in the State of New York—stands to lose valued racing opportunities he can never get back, despite a lack of *any* notice of violation of State law, any pre-deprivation hearing, or even an offer of a post-deprivation hearing. *None* of the cases cited by NYRA would find these actions to meet the requirements of due process. "Where a person's good name, reputation, honor or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 573 (1972).

NYRA's argument that its offer to allow Baffert to present "information" for seven days after the suspension letter somehow comports with due process is laughable. First, the suspension had already been handed down and it was done without one iota of notice to Baffert before he received the letter. Second, Baffert was not offered a hearing at any point in time in which he would be given notice of the charges against him and an opportunity to be heard. Third, to suggest that Baffert must be the one to "prove" NYRA was wrong in depriving him of his constitutional rights is an affront to due process.

## 2. NYRA Is a State Actor.

NYRA does not dispute that there is a long and unbroken line of cases concluding that NYRA is effectively an arm of the state and therefore a "state actor" for purposes of 42 U.S.C.

§ 1983.  (*Compare* Baffert Br. 12-13 *with* Opp. 25-28).  In arguing for a different outcome here, NYRA asserts that the foundations behind that case law have "eroded" in the "30 years" since one of the leading cases, *Stevens v. New York Racing Ass'n, Inc.*, 665 F. Supp. 164, 172 (E.D.N.Y. 1987), was decided.  Not only is NYRA incorrect, the complete opposite is true.

At the outset, the most recent case on the subject, *Garcia v. New York Racing Ass'n, Inc.*, No. 1:10-cv-01092, 2011 WL 3841524 (N.D.N.Y. Aug. 29, 2011), was decided in 2011—not 30 years ago—and contains an extensive discussion of all the reasons why "the State's involvement with and control over NYRA" demonstrates that NYRA is a state actor. *Id*. at *6-10.  The *Garcia* court noted that the State's control over NYRA had "increased" over time, particularly in 2008 when NYRA was reorganized and ceded ownership of the racetrack property to the State. *Id*. at *9.  NYRA points to no material changes in NYRA's operations since *Garcia* was decided in 2011.  While NYRA is correct that as of 2018 only 6 of its 17 board members are appointed directly by state officials, *see* 2017 Sess. Laws ch. 59, pt. NN, NYRA fails to note that 8 of the remaining 14 are appointed by the "NYRA Reorganization Board" which is itself comprised of a supermajority (12 of 17) of political appointees. *Id*; *see also* 2012 Sess. Laws., ch. 457 § 4 (establishing NYRA Reorganization Board). Thus, **14 of 17** board members are, for all practical purposes, appointed by politicians.

In addition, NYRA's emphasis on its supposedly independent board members ignores that, unlike a truly private corporation, NYRA's board is itself answerable to the New York State's Franchise Oversight Board, whose members are appointed by the governor, and which is mandated by statute to "oversee, monitor and review all significant transactions and operations" of NYRA. N.Y. Racing L. § 212(1), (8)(a)(iii).  Just a few weeks ago, for example, NYRA sought and obtained the Franchise Oversight board's approval to build a tunnel to the infield of Belmont Park.

-19-

*See NYRA Gains Approval in First Step to Add Tunnel at Belmont*, THOROUGHBRED DAILY NEWS (June 16, 2021) (copy attached as Ex. 5).  This example flatly contradicts NYRA's assertion in its brief that it can "renovate or make . . . improvements" to the racetracks in a manner that is "free from state control." (Opp. 27-28).  It can do virtually nothing without state approval in the form of the Franchise Oversight Board.

NYRA's brief also completely ignores the fact that, unlike a truly private entity, NYRA has at all times operated for the financial benefit of the State, with its profits reverting to the State at the end of each year, and even with the State having the power to "impound" NYRA's revenue if NYRA is underperforming. N.Y. Racing L. §§ 208(1), 212(7)(iv).

Put simply, NYRA is an arm of the State and therefore a state actor.  And, in fact, NYRA has repeatedly *conceded* as much, as recently as 2013. Specifically, NYRA expelled a food truck called "Wandering Dago" from the Saratoga Race Course based on the truck's allegedly offensive name, and Wandering Dago filed a federal case on the theory that NYRA, as a state actor, violated its First Amendment rights.  (Ex. 6, at 11 n.1).  Far from disputing the point, NYRA—represented by the same lawyers as in this case—referred to itself as a "state actor" in its motion to dismiss, and argued substantive First Amendment doctrine on the premise that the U.S. Constitution would govern NYRA's decision-making:

> Plaintiff finally appears to accept the reality that the *Central Hudson* test is inapplicable to speech restrictions on contractors working on State-owned property.  Plaintiff contracted to be a food-service vendor for NYRA, a state actor that is in the business of holding races and conducting pari-mutuel wagering in an inclusive environment designed to attract as many, and offend as view, patrons as possible.  In such circumstances, Plaintiff's First Amendment rights were significantly limited under well-settled principles of constitutional law.  Whether the Court

(Ex. 7, at 1.) NYRA opposed the Wandering Dago's preliminary injunction by similarly making clear that NYRA  was a "state actor" and, essentially, "the government":

> In arriving at this absurd position, Plaintiff ignores a mountain of case law authorizing state actors to limit speech that takes place on government-owned property without running afoul of the Constitution.  Time and time again, courts have held that the government may restrict speech in sports-related facilities, including racetracks and other gambling venues, provided the restriction is reasonable and viewpoint-neutral.  Such is the case here.

(Ex. 8, at 2.)  At oral argument, NYRA's counsel said explicitly: "**NYRA is a State actor**." (Ex. 9, at 46 (emphasis added).)

It is hardly surprising that NYRA would concede the point in 2013 because, contrary to the arguments in its brief in this case, there have not been "developments in the applicable legal standard" that would call into question the long line of cases concluding NYRA is a state actor. (Opp. 27.)  NYRA cites *Fabrikant v. French*, 691 F.3d 193 (2d Cir. 2012) to suggest otherwise (*id.* at 26), but that case does not give any hint of a movement in the case law.  And the facts of that case support Baffert.  In *Fabrikant*, the Society for the Prevention of Cruelty to Animals ("SPCA"), a private entity, seized, spayed and neutered 13 dogs owned by the plaintiff, because the SPCA believed they were living in inhumane conditions. *Id.* at 201. The Second Circuit agreed that the spaying and neutering was "state action" because the SPCA's actions were "part of the state function of animal control delegated to the SPCA by state law." *Id*. at 208.  Here, too, New York has delegated by state law the operation of state-owned racetracks to NYRA. As in *Fabrikant*, conduct cannot be shielded from constitutional standards by the State delegating or contracting the running of its own affairs to another entity.

-21-

Equally unhelpful to NYRA is *Cranley v. National Life Ins. Co. of Vermont*, 318 F.3d 105 (2d Cir. 2008), which challenged the conversion of a private insurance company from a mutual company to a stock life insurance company. While the insurance company was "subject to extensive state regulation," the Second Circuit emphasized that the conversion was a purely private matter, and that the "management of [the insurance company] is not a public function. *Id*. at 112. The opposite is true here, given that by statute NYRA must operate in a manner that is "fully accountable to the people of the state of New York." N.Y. Racing L. § 206. In other words, managing NYRA *is* a public function.

The final case NYRA cites, *Myron v. Consolidated Rail Corp*., 752 F.2d 50 (2d Cir. 1985) involved the actions of a railroad company, referred to a as Conrail, that the Second Circuit concluded was "basically a private enterprise," notwithstanding extensive federal funding. *Id*. at 54. Judge Sifton aptly explained in *Stevens* why *Myron* is easily distinguishable: "Although 85% of Conrail's preferred stock is held by the federal government, Conrail nevertheless is a corporation that operates in order to obtain a profit for its common and preferred stock shareholders. The 'profits' raised by [NYRA], in contrast, inure exclusively to the state." 665 F. Supp. at 172 n.4. *Myron* was decided before any of the cases concluding that NYRA is a state actor, and yet did not give *any* of those courts pause in reaching their decisions. In fact, *no court* has found NYRA to be a private actor. This Court should not be the first.

**B.    NYRA's Actions Are Contrary to New York Law.**

New York State law is clear that the Gaming Commission has the exclusive authority to license individuals to participate in thoroughbred horseracing, and the Gaming Commission is correspondingly vested with "general jurisdiction" over all gaming activities in the State— including over "corporations, associations, and persons engaged therein." 9 NYCRR §§ 4002.1(a)

-22-

and (b); N.Y. Racing L. § 104(1); *see also* 9 NYCRR § 4003.2 (all Gaming Commission rules affecting licensing are "applicable also to franchised racing associations, racing corporations, and franchised racing corporations").  It is the Gaming Commission—and  the Gaming Commission alone—that  has the power to suspend or revoke a trainer's license. 9 NYCRR § 4002.9; N.Y. Racing L. § 104(2) (the Gaming Commission has the authority and responsibility to hear "all license" suspension matters).  It is equally clear that prior to suspending any trainer's license, certain procedures must be followed, and an accused trainer is entitled to a hearing.  *Id.* at § 4002.10.  NYRA, a "racing association" that is itself subject to the authority of the Gaming Commission, is not free to ignore or usurp the Gaming Commission's exclusive authority to suspend the license of a thoroughbred horse trainer.[12]

Knowing this, NYRA defends its conduct by suggesting that it possesses a broad common law right to exclude anyone it wishes—including indefinitely suspending those possessing valid and unencumbered state licenses without notice, without due process, and without any allegation of any specific rules violations warranting reprimand. (Opp. 16).  This belief apparently stems from *Saumell*'s distinction between the Gaming Commission's licensing power and "NYRA's common-law right to exclude a licensed person in the best interests of racing." 447 N.E.2d at 710; *see also Jacobson*, 305 N.E.2d at 678 (considering NYRA's ability to exclude licensees).  NYRA's argument is outdated and misplaced.

Historically  courts  recognized  that  NYRA  had  common-law  property  rights  because NYRA owned the tracks in question, and the right of exclusion is among the "bundle of rights" commonly associated with property ownership. *Cedar Point Nursery v. Hassid*, 141 S.Ct. 2063,

---

[12] One reason that Gaming Commission has not acted against Baffert is that, if a trainer is suspended in another state, the Gaming Commission honors that suspension through reciprocity.  N.Y. Racing L. § 910.  Thus, the Gaming Commission is rightly allowing Baffert to have his due process in Kentucky before acting.

2072 (2021).  However, New York state common law has always been clear that the right to exclude others is a right only an owner may assert; the right of exclusion "is an incident of *complete ownership*." *Village of East Rochester v. Rochester Gas & Elec. Corp.*, 46 N.E.2d 334 (N.Y. 1943) (emphasis added).  But when a property owner "subordinates his property rights in the land to the public uses by a dedication, he surrenders the privilege of excluding others and that right, if it exists, passes into the hands of the municipality which is trustee for the public to the extent of the dedication." *Id.* at 338 (citing *Buffalo L. & R. R. Co. v. Hoyer*, 108 N.E. 455 (N.Y. 1915)).  In other words, once purely private property is converted to public property, the original owner loses his or her common law right of exclusion.

Indeed, *Saumell*'s holding hinged upon this common law understanding of property rights and NYRA's then-status as the "*own[er]* and operat[or] of Aqueduct, Belmont Park, and Saratoga racetracks," and noting that, at the time, there was no statutory support for the notion that "the Legislature intended to pre-empt NYRA's common-law power of exclusion." 447 N.E.2d at 709 (emphasis added).  *Saumell* was decided in 1983 and the landscape related to NYRA has markedly changed since that time, including the legislature's clear intentions related to NYRA.  In 2008, following NYRA's financial distress, the New York legislature amended its racing statutes to designate NYRA as a franchised corporation and made NYRA's franchise "subject to appropriate racing laws and regulations." N.Y. Racing L. § 206(1). The State legislature further assumed control over NYRA and its properties through Board appointments and the newly-created Franchise Oversight Board.

But most critically, the 2008 statutes provide that NYRA pledged to "*irrevocably relinquish any present or future rights that it might have, or might claim, with respect to thoroughbred racing facilities and associated assets*" at the three tracks, including "all land

underlying the racetracks." *Id.* at § 208(2) (emphasis added).  The State legislature's actions made clear that "*the People of the State of New York are vested with unencumbered ownership in the real estate for the three racetracks, including all improvements thereon*." *Id.* (emphasis added).  In other words, NYRA no longer owns the land upon which it wants to exclude Baffert—that property is owned by the State of New York.  Since the right to exclude is incidental to "complete ownership," and is extinguished when a property owner dedicates its property for public use, NYRA no longer has a common law right of exclusion. *Village of East Rochester*, 46 N.E.2d at 338. There can be no question that NYRA has relinquished any ownership interest it had in the tracks to the public, thus subordinating them to the "public uses."  NYRA accordingly may no longer assert a broad common law right of exclusion.

Even if NYRA retains some residual common-law right of exclusion, it would not apply to licensees.  New York law has always been clear that any right of exclusion is severely constrained when attempting to exclude individuals possessing valid and unrestricted licenses from the Gaming Commission.  *Saumell*, 58 N.Y.2d at 237; *Murphy v. New York Racing Ass'n*, 525 N.Y.S.2d at 550.  Licensees are different from members of the general public.  *Id.*  Courts have recognized that any attempt to exclude a licensee is "tantamount" to an actual license suspension. *Galvin*, 70 F. Supp. at 172.  Thus, since the exclusive authority to suspend a trainer's license rests with the Gaming Commission, NYRA is attempting to do through the back door what it can't through the front.  In other words, since NYRA has no legal right to suspend a trainer's license, it can't achieve the same result by simply labeling its actions as a "common-law right of exclusion."

NYRA has itself admitted that it is acting "outside the regulatory framework"—which is precisely the problem.[13] NYRA is rendering meaningless the statutes passed by the Legislature and the duly promulgated regulations, in favor of its claimed unilateral right to suspend Baffert with the stroke of a pen.

Lastly, even when NYRA held a common law right of exclusion, it couldn't exclude a *licensee* without affording him or her pre-deprivation notice and due process, and it could not do so arbitrarily.[14] *See Jacobson*, 305 N.E.2d at 768 (NYRA may not exclude a licensed owner or trainer "with impunity"); *Saumell*, 447 N.E.2d at 706 (absolute right of exclusion does not extend to "persons licensed by the state …"); *Halsey v. New York State Racing & Wagering Bd.* 6 Misc.3d 1041(A), *2 (N.Y. Sup. Ct. Mar. 1, 2005); *Murphy v. New York Racing Ass'n*, 138 Misc.2d 735 (N.Y. Sup. Ct. 1988), *aff'd*, 146 A.D.2d 778 (2d Dep't 1989).

Here, NYRA has not provided Baffert with any semblance of due process. Baffert was suspended without notice, for an indefinite period of time, and without a hearing. (*See* Argument, Part I.A.1, *supra*). He was likewise given no notice of any specific violation of any New York racing rule that lead to NYRA's actions. In other words, NYRA made up its mind to suspend him and then extended him no meaningful process.  Baffert is the holder of a defined property right that may not be deprived—even if NYRA still holds a general common law right of exclusion

---

[13] *See* Anne McCloy, *NYRA speaks to latest developments in suspension of trainer Bob Baffert*, CBS 6 News WRGB Albany June 23, 2021, available at https://cbs6albany.com/news/local/nyra-speaks-to-latest-developments-in-suspension-of-trainer-bob-baffert (copy attached as Ex. 10).

[14] NYRA fails to fully grasp this concept. The majority of cases it cited in support of its alleged common-law right of exclusion involved its ability to arbitrarily exclude *unlicensed* individuals. *See People v. Licata*, 268 N.E.2d 787 (N.Y. 1971) (involving unlicensed ticket purchaser); *Madden v. Queens Cty. Jockey Club*, 72 N.E.2d 697 (N.Y. 1947) (unlicensed patron); *Matter of Presti v. New York Racing Ass'n*, 46 A.D.2d 387 (N.Y. App. Div. 2d Dep't 1975) (unlicensed racing broker); *Matter of Halsey v. New York Racing Ass'n*, 2005 WL 701115 (N.Y. Sup. Ct. Mar. 1, 2005) (unlicensed owner).

(which it does not)—without due process of law.  By denying him due process of law, NYRA exceeded any authority it can even arguably possess under New York common law.

NYRA's actions in this regard are unprecedented.  NYRA has never injected itself into another jurisdiction's investigation and blanket-banned a state licensee for conduct unrelated to any New York racing rule—and certainly not before any actual adverse action has been taken by the other state.  Here, NYRA's actions—which already have surpassed the length of Baffert's maximum suspension under Kentucky law—rest solely on *allegations* that remain subject to investigation in Kentucky.  Baffert believes the Kentucky administrative process will completely exonerate him of any wrongdoing.  That being said, the process is still only in its initial stages and NYRA's jumping the gun and unilaterally suspending Baffert's license now, before any finding of wrongdoing, is fundamentally unfair and contrary to the due process to which Baffert is constitutionally entitled.

In sum, because NYRA no longer owns the tracks it operates and committed those facilities to public use, it may no longer generally exclude licensees as part of a common-law right to exclude.  Neither does it have the power to generally exclude a licensee—because that is "tantamount" to a suspension of license—which  authority rests exclusively with the Gaming Commission.  Finally, even if NYRA has retained some common law right or legal authority to exclude, licensees must be provided pre-deprivation due process of law.  NYRA failed to do *any* of this and under any view of the facts or the law, its actions were contrary to New York law.

## II.  Baffert Will Be Irreparably Harmed Absent Injunctive Relief.

### A.  NYRA's Violation of Baffert's Constitutional Rights Is Itself Irreparable Harm.

The Second Circuit has repeatedly "held that the alleged violation of a constitutional right triggers a finding of irreparable injury." *Conn. Dep't of Evnt'l Protection v. OSHA*, 356 F.3d 226,

231 (2d Cir. 2004) (quoting *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996)); *see also*, *e.g.*, *Statharos v. New York City Taxi & Limousine Comm'n*, 198 F.3d 317, 322 (2d Cir. 1999) ("Because plaintiffs allege deprivation of a constitutional right, no separate showing of irreparable harm is necessary.").  "A Court will presume that a plaintiff has established irreparable harm in the absence of preliminary relief if her claim involves the alleged deprivation of a constitutional right." *Paykina on behalf of E.L. v. Lewin*, 387 F.Supp.3d, 225, 241 (N.D.N.Y. 2019).  Baffert has shown a violation of his constitutional right to due process, so irreparable harm follows as a matter of law.

NYRA's contention that courts no longer presume irreparable injury when constitutional rights are threatened or impaired is simply wrong.  In truth, that doctrine—which itself stems from binding Supreme Court precedent—is consistently recognized in this Circuit, with no sign of a recent shift.  In fact, the Second Circuit held earlier this year that "a strong showing of a constitutional deprivation that results in non-compensable damages ordinarily warrants a finding of irreparable harm." *A.H. by and through Hester v. French*, 985 F.3d 165, 176 (2d Cir. 2021); *French*, 985 F.3d 165, 176 (2d Cir. 2021). District courts throughout the Circuit routinely recognize this point, as well. *See, e.g., Chavis v. McCulloch*, 9:20-cv-0435, 2021 CL 1294109, at *2 (N.D.N.Y. April 7, 2021) ("The alleged violation of a constitutional right generally satisfies a plaintiff's burden to demonstrate irreparable harm."); *Weisshaus v. Cuomo*, 20-cv-5826, 2021 WL 103481, at *5 (E.D.N.Y. Jan. 11, 2021) ("'[T]he alleged violation of a constitutional right' generally results in a presumption of irreparable harm.") (citation and emphasis omitted); *Jones v. United States Postal Serv.*, 488 F.Supp.3d 103, 139-40 (S.D.N.Y. 2020) ("In the Second Circuit, it is well-settled that an alleged constitutional violation constitutes irreparable harm. Thus, no separate showing of irreparable harm is necessary.") (citations and quotations omitted; *Donohue*

-28-

*v. Mangano*, 886 F.Supp.2d 126, 150 (E.D.N.Y. 2012) ("[A]s a general matter, there is a presumption of irreparable harm when there is an alleged deprivation of constitutional rights.")

NYRA is also incorrect to argue that irreparable harm is the "single most important prerequisite for the issuance of a preliminary injunction." (Opp. 10 (citation omitted)). Where, as here, a constitutional violation is alleged, irreparable harm is *presumed*, and so the likelihood of success—not irreparable harm—becomes the "dominant, if not the dispositive, factor." *French*, 985 F.3d at 76 (citation omitted).  In other words, NYRA's focus on the alleged lack of evidence to show irreparable harm is entirely misplaced.  As detailed below, Baffert's evidence would nonetheless suffice, even if this were not a case involving constitutional violations.

**B.    Baffert Has Shown Irreparable Harm, Independent of the Fact that He Has Shown a Constitutional Violation.**

Baffert's moving papers explained that he faces irreparable harm if he is denied the right to participate in the "highly prestigious Saratoga summer meet" which begins on July 15. (Baffert Br. 19.)  This is a well-established form of irreparable harm.  Courts have repeatedly held that, in the realm of sports, where the sporting events cannot be replayed after the fact, "[i]mproper suspensions . . . can undoubtedly result in irreparable harm." *Nat'l Football League Players Ass'n v. Nat'l Football League*, 598 F. Supp. 2d 971, 982 (D. Minn. 2008).  There is a long line of case law recognizing the logic of this view. For example:

- A college football player accusing the NFL of improperly deeming him ineligible for the draft showed irreparable harm because "los[ing] a year of playing time in the NFL" was "irremediable."  *Clarett v. Nat'l Football League*, 306 F. Supp. 2d 411, 412 (S.D.N.Y. 2004).

- Five NFL players suspended for four games because of positive drug tests obtained an injunction against their suspensions because there were "substantial questions" about the players' "inadvertent use of a banned substance" and because their "reputation[s]" would be "irretrievably tarnished" if suspensions were implemented. *Nat'l Football League Players Ass'n*, 598 F. Supp. 2d at 982.

- A 19-year-old professional hockey player obtained an injunction against a rule imposing a minimum age of 20, because continued competition carried "financial and emotional rewards in excess of [the player's] salary." *Linseman v. World Hockey Ass'n*, 439 F.Supp. 1315, 1319 (D. Conn. 1977).

- A professional basketball player showed irreparable harm when threatened with a challenge to his eligibility to play under the NBA's draft rules because, if forced to sit out, the player's "public acceptance as a super star will diminish to the detriment of his career." *Denver Rockets v. All-Pro Management, Inc.*, 325 F.Supp. 1049, 1057 (C.D. Cal. 1971).

Baffert is similarly situated.  The Saratoga meet occurs only once a year, and is among the most prestigious events in Thoroughbred racing. (Baffert Reply Aff. ¶ 11.)  Missing the 2021 meet means that opportunity is forever lost, analogous to a football or basketball player being suspended for critical playoff games.  The Travers Stakes and all the other graded races at Saratoga only come around once a year—and if Baffert is prohibited from participating in 2021—it is an opportunity that can never be regained.  There is no compensating for the missed opportunity to participate in the prestigious races that define the success of a trainer's career and garner goodwill with clients.

NYRA's argument that Baffert cannot prove irreparable harm because he can still race in other states misses the mark.  First, there is no meet more prestigious than Saratoga and the gravitas and economic benefit that comes from New York racing cannot be overstated.  From 2011 to 2021 Baffert has entered 135 starters in New York.  (*See* Chart attached as Ex. 13).  Excluding the Breeder's Cup, an analysis of the statistics associated with Baffert's starters in New York compared with those elsewhere reveals the relative importance of the NYRA circuit to Baffert's business:

- Total NYRA purses contested - $57,076,750

- Total earnings at NYRA tracks - $13,532,919

- Earnings per start at NYRA tracks - $100,244

- Earnings per start at non-NYRA tracks - $36,136

(*Id.*)

In other words, Baffert's runners in New York win almost three times the amount that they do outside of New York. This demonstrates the importance of NYRA racing to Baffert despite the fact that he races in other jurisdictions. Further, running and winning in prestigious NYRA races impacts a horse's overall breeding value. The list of Eclipse award champion horses that Baffert trained who started at NYRA tacks includes AMERICAN PHAROAH, ARROGATE, DEFRONG, WEST COAST, ABEL TASMAN, JUSTIFY, GAMINE, IMPROBABLE, SILVER CHARM, REAL QUIET, WAR EMBLEM, POINT GIVEN, SILVERBULLETDAY and PLUM PRETTY. Even New York Senator Chuck Schumer once penned an open letter to Baffert in 2015 urging him to bring AMERICAN PHAROAH to Saratoga because it is the "most historic track in the county" and "America's greatest race track." (*See* Mark Singelais, *Schumer wants to see American Pharoah at Saratoga*, Albany Times-Union (June 11, 2015) (copy attached as Ex. 14)). Baffert's illustrious career has been built in large part due his ability to participate in New York racing. The harm that would result to him if he is now shut out from doing so is immense.

NYRA breezes past these critical issues and casually asserts that Baffert "could be remedied through money damages." (Opp. 13). But NYRA does not say how money damages could be reliably established. As even the Jockey Club as amicus concedes that, if Baffert misses races, there is no way to estimate where his horses would have placed—thereby rendering any damages speculative. (ECF 17, at 4 ("[H]ow well any of [Baffert's] potential starters might fare is, of course, entirely speculative.")). Nor is there a way to calculate the damage to Baffert's current and future client relationships. In other words, Baffert has shown exactly what the Second Circuit has recognized as justifying injunctive relief—namely, "a loss of prospective goodwill that is both imminent and non-quantifiable." *See Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 38 (2d Cir. 1995). This is only exacerbated by the indefinite length of NYRA's

-31-

"temporary" suspension—it is impossible to surmise Baffert's lost business because NYRA has provided no indication as to how long it intends to continue suspending him and he has no way of discerning how many months or *years* NYRA intends to suspend him.

Following NYRA's suspension of Baffert from racing any horses in the State of New York, he has lost clients, suffered repetitive blows to his personal and professional reputation, and continuously receives notice that clients are considering moving their horses to other trainers. (Baffert Reply Aff. ¶¶ 13, 15). The longer NYRA's ban continues, the more profound these losses become.

As for harms that have already occurred as a result of NYRA's ban, one of Baffert's major clients, WinStar Farm ("WinStar") has moved all of its horses to other trainers. (*Id.* at ¶ 5). This included significant thoroughbreds LIFE IS GOOD (this year's Kentucky Derby favorite before he suffered a minor injury) and COUNTRY GAMMER (Grade I winner of the Hollywood Cup and an early favorite for this year's Breeder's Cup Classic). (*Id.* at ¶¶ 6-8). This loss is substantial to Baffert, not only be because of the quality of the horses he lost, but because he has successfully trained many horses owned by WinStar, including recent Triple Crown winner JUSTIFY. (*Id.* at ¶ 5). WinStar's CEO, Elliott Walden, has publicly stated that he pulled these horse from Baffert partially due to NYRA's suspension because Baffert's current ability to enter horses in prestigious races is "limited." (*Id.*); *see also* David Grening, *Country Grammer transferred from Baffert to Pletcher, may run in Suburban*, DRF.COM (June 21, 2021) (copy attached as Ex. 21); Byron King, *Life Is Good Breezes Goes From Baffert to Pletcher*, Bloodhorse (June 24, 2021) (copy attached as Ex. 16). WinStar's move has and will continue to have the added effect of possibly encouraging other notable owners to do the same.

Baffert and others in the industry only expect this trend to continue. (*See* Ex. 15, Affidavit of Jeffrey Bloom, sworn to July 7, 2021 ("Bloom Aff.") ¶16).   Jeffrey Bloom, a prominent thoroughbred owner, jockey, breeder, and bloodstock agent, states that NYRA's actions infinitely suspending Baffert poses an immediate and irreparable harm that would result in the "death knell to Baffert's current business model and training practice."  (*Id*. at ¶¶ 11, 17).  This is because it is critical for owners of elite thoroughbred racehorses to have access to Saratoga, which is among the most prestigious meets in the United States, and features some of the most well-known Graded Stakes races in the industry. (*Id*. at ¶ 12).  Graded Stakes races, and particularly Grade I Stakes races, are only run once a year and offer larger purses than other thoroughbred races. (*Id*.). Saratoga offers 43 Graded Stakes races, 20 of which are Grade I races. (*Id*. at ¶ 14).  "Any trainer who is unable to participate at Saratoga will be extremely harmed as a result and, in my experience, owners will send their horses to trainers who can race at Saratoga." (*Id*.).  As stated by Bloom:

> Currently, Baffert has a reputation as one of, if not the, best trainers in the history of the sport.  As a result, his client base consists of owners with the best horses who want to compete at the highest level.  It is imperative for a trainer such as Bob Baffert to have access to the NYRA race circuit, including Saratoga.  This is because, if he is prohibited from racing in New York, he will no longer have access to all legs of the Triple Crown and will be shut out from arguably the country's most prestigious race meet.

> As a result, in my experience, an owner of an elite thoroughbred is highly likely to choose another trainer besides Baffert because of the inability of their horses to race in New York. By excluding him from all NYRA tracks, NYRA has destroyed any ability for Baffert to do any business in the State.  Horse racing at the highest level is a national endeavor.  Owners from across the country frequently ship their horses to New York to run due the prestige of the New York racing circuit and the lucrative purses.   Thus, NYRA's actions extend beyond Baffert's New York business. Because NYRA has indefinitely suspended Baffert, owners have no way of knowing when he will once again be permitted to enter horses at NYRA tracks, and owners will continue moving their horses to other trainers so long as NYRA's ban continues.

> So long as there remains uncertainty as to Baffert's ability to race in New York, he will continue to lose business.  Some owners may remain with Baffert out of loyalty for a short period of time, but the longer any New York suspension lasts, the more

-33-

likely it is that owners will move their horses to other trainers. This will particularly be so as the 2021 summer Saratoga meet gets in full swing.

Thus, NYRA's suspension of Baffert, should it continue indefinitely, or for any extended period of time, will severely limit his ability to maintain a client base like he currently has, which consists of owners who have the financial wherewithal and the talented horses to compete at the highest level throughout the country.

(*Id.* at ¶ 16).

In addition to Saratoga, New York hosts the Belmont Stakes each year—the third and final leg of the Triple Crown. If a trainer is not allowed to race a horse at the Belmont, an owner is very likely to decide well in advance of the Belmont that it would prefer a trainer who can continue working with a horse through the races leading up to the Kentucky Derby, and through the second and third stretches of the famous three races. (*Id.* at ¶¶ 17, 18); Baffert Reply Aff., ¶ 16). The loss of the ability to train horses that qualify for Graded Stakes races, as well as those comprising the Triple Crown—as Baffert has successfully done throughout his long career—will cause long-term business losses that are difficult if not impossible to quantify. (*Id.* at ¶ 18); Baffert Reply Aff., ¶¶ 12, 16). According to Bloom, so long as NYRA's suspension remains in place, no horse considered a Triple Crown contender is going to be placed in Baffert's care for training, which will be the death knell to his current business model and training practice. (*Id.* at ¶ 17). This is especially true where the cause of the inability to race is continued indefinitely, with no end in sight.

Moreover, NYRA ignores the fact that "[a] court can find irreparable harm based on 'loss of reputation, good will, and business opportunities.'" *Regeneron Pharma., Inc. v. United States Dep't of Health & Human Servs.*, --- F.Supp.3d ---, 2020 WL 7778037, *5 (S.D.N.Y. Dec. 30,

2020) (quoting *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004)).[15]  That is because "these damages are difficult to establish and measure." *Id.* As a result, courts have determined that "a loss of existing business and a decline in the opportunity for new business may qualify as irreparable harm." *Id.;* See also *Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.,* 323 F.Supp.2d 525, 532 (S.D.N.Y. 2004) (finding irreparable harm where complained of conduct would allow competitors to lure away plaintiff's clients); *John E. Andrus Mem'l, Inc. v. Daines*, 600 F.Supp.2d 563, 571-72 (S.D.N.Y. 2009) (finding irreparable harm where defendant's conduct would cause plaintiff's clients to cease giving him business and seek alternative arrangements). Even in *Tom Daugherty Assocs., Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27 (2d Cir. 1995), one of the cases NYRA cites, the Second Circuit noted that the "loss of prospective good will constitute irreparable harm" where there is a clear showing that the product sought is so "uniquely popular" that the harm will "radically alter" the movant's role in its industry. *Id.* at

Baffert's business is unique and unlike almost any other trainer.  He has built a reputation over several decades as one of the best trainers in the world, and Baffert's business model revolves entirely around training horses for Graded Stakes races. (*See* Baffert Reply Aff. ¶ 12; Bloom Aff. ¶ 19).  Given that the Saratoga summer meet offers so many graded stakes races, it presents "a critical opportunity to advance the overall career of a race horse" that is a key aspect of Baffert's "ability to attract clients with the most talented/promising thoroughbreds." (*See id.* ¶ 14).  A large number of Baffert's clients invest significant monies on top class thoroughbreds at annual auctions in Kentucky and New York and those owners expect to be able to race in the country's most prestigious races, including the Triple Crown and the Saratoga summer meet.  (*Id.* ¶ 15).  Baffert

---

[15] NYRA contends that any harm to Baffert's reputation stems "solely from [his] own actions, not NYRA's." (Opp. 14). To the contrary, NYRA created the harm by jumping the gun and defaming Baffert to the entire industry by suspending him without due process and before Baffert has even been found guilty of any wrongdoing in Kentucky.

has been informed that, if he is unable to race in New York, those owners will no longer invested in horses to be placed in his care as a trainer. (*Id.*).

Moreover, the loss of existing business and new clients to competitors as a result of NYRA's action may also establish irreparable harm worthy of injunctive relief. *See Regeneron*, 2020 WL 7778037, at *5. In the thoroughbred racing industry, owners of elite horses desire and expect to compete in New York. (Bloom Aff. ¶14). Even the possibility that those horses may not be able to compete in the State of New York will result in owners sending horses to trainers other than Baffert—which is already taking place. Under any analysis, Baffert has established irreparable harm.

## III.   The Balance of Hardships and Public Interest Favor Injunctive Relief.

NYRA's Response fails to address most of Baffert's arguments related to the parties' competing hardships and whether the issuance of a preliminary injunction would be in the public interest. For example, NYRA does not deny that the public interest is particularly strong where the rights to be vindicated are constitutional in nature, as they clearly are here. *V.W. by and through Williams v. Conway*, 236 F.Supp.3d 554, 589 (N.D.N.Y. 2017) (citing *Ligon v. City of N.Y.*, 925 F.Supp.2d 478, 541 (S.D.N.Y. 2013)). Instead, in support of its argument that the equitable considerations "overwhelmingly" weigh in its favor, NYRA claims potential damage to its "brand" and "investment." It also cites to its obligation to keep horses and jockeys safe as a potential reason to bypass due process. (Opp. 29). As discussed previously in this Reply, however, those consideration have not stopped NYRA from allowing other trainers with much more severe findings (not just allegations) against them to continue racing. Further, NYRA presents the testimony of not a single jockey who claims any concern for his or her safety. In reality, any jockey would jump at the chance to ride a Baffert trained horse.

-36-

NYRA would prefer that the Court ignore Baffert's and the public's general interest in protecting the rule of law and preventing arbitrary deprivations of property interests by state actors. Additionally, as outlined in the Motion and this Reply, Baffert's likelihood of suffering irreparable harm if he is unable to race in New York is significant. The inability to race horses in New York directly impacts Baffert's ability to maintain his overall training business for race horses elsewhere. Not only has Baffert already lost clients because of NYRA's ban, but with each passing day, the likelihood that he loses more is substantial. The harm to Baffert is significant while the interests of NYRA are minimal.

Additionally, while NYRA claims that Baffert's aim to demonstrate that MEDINA SPIRIT was treated with an ointment rather than by injection is futile, its inflammatory language about a lawful, regulated substance as causing "catastrophic injuries" demonstrates exactly why the distinction is important. In essence, NYRA is attempting to ban Baffert indefinitely for treating dermatitis on his horse with a lawful substance pursuant to a veterinarian's recommendation. While betamethasone is regulated as an injection, it is not regulated as an ointment—and no one can argue with a straight face that a topical ointment poses any danger to a horse. NYRA's rhetoric is just another example of pretext intended to disguise its personal animus toward Baffert.

In sum, Baffert should not be required to sit and wait for NYRA to decide his fate with no chance to be heard or idea of when his suspension may end merely to protect NYRA's "brand" and "investment." He has unequivocally demonstrated a likelihood of success on the merits and a strong showing of irreparable harm. Thus, naturally, the balance of the equities and the public interest tip heavily in his favor. *Conway*, 236 F.Supp.3d at 589.

## <u>CONCLUSION</u>

For the foregoing reasons, and those in Baffert's moving papers, Baffert respectfully requests that this Court enter preliminary and immediate injunctive relief in his favor. Specifically,

NYRA's alleged suspension of Baffert should be lifted and he should be allowed to fully and completely exercise his license to train and race horses in New York.

Dated:   July 7, 2021                          Respectfully submitted,

Charles Michael                                BY: /s/ W. CRAIG ROBERTSON, III
cmichael@steptoe.com                           W. Craig Robertson III
STEPTOE & JOHNSON LLP                          wrobertson@wyattfirm.com
1114 Avenue of the Americas                    WYATT, TARRANT & COMBS, LLP
New York, New York 10036                       250 West Main Street, Suite 1600
(212) 506-3900                                 Lexington, Kentucky  40507-1746
                                               859.233.2012

Clark O. Brewster
Brewster & DeAngelis
2617 E. 21st
Tulsa, Oklahoma 74114
cbrewster@brewsterlaw.com
*(Pro hac filed and pending)*

*Counsel for Plaintiff Bob Baffert*

-38-