Clerk's Office
Filed Date:  7/14/21

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------x
BOB BAFFERT,

                          Plaintiff,

          -against-

THE NEW YORK RACING ASSOCIATION,
INC.,

                          Defendant.
---------------------------------------------------------x

NOT FOR PUBLICATION
**MEMORANDUM & ORDER**
21-CV-3329 (CBA) (RML)

**AMON, United States District Judge:**

On May 17, 2021, Defendant New York Racing Association, Inc. ("NYRA") issued a decision suspending Plaintiff Bob Baffert ("Baffert") from entering races or occupying stall space at Belmont Park, Saratoga Race Course, and Aqueduct Racetrack.  Baffert filed a complaint on June 14, 2021, and that same day moved for an order to preliminarily enjoin NYRA from enforcing its suspension pending the resolution of this lawsuit.  A hearing on the motion was held on July 12, 2021.  For the reasons stated below, the motion is GRANTED.

## FACTUAL BACKGROUND[1]

### I.     Jurisdiction

Plaintiff Bob Baffert is a California resident.   Defendant NYRA is a New York corporation.  Baffert invokes both this Court's federal question jurisdiction, 28 U.S.C. § 1331, and diversity jurisdiction, 28 U.S.C. § 1332(a).

### II.     The Parties

#### A. Bob Baffert

Baffert is a thoroughbred racehorse trainer.  (ECF Docket Entry ("D.E.") # 3-3 ("Baffert Aff.") ¶ 2.)  He possesses a trainer's license in several racing jurisdictions, including New York.

---

[1] The following facts are undisputed, unless otherwise noted.

(Id.)   Horses trained by Baffert have achieved considerable success, winning on multiple occasions at each of the Kentucky Derby, Preakness Stakes, Belmont Stakes, and Breeders' Cup. (Id. ¶ 3.)   Horses trained by him have twice won the Triple Crown.   (Id.)   In 2009, Baffert was elected to the National Thoroughbred Hall of Fame.   (Id.)   Over the years, Baffert has been fined by various racing jurisdictions for violating rules barring the use of drugs in thoroughbred horses.   (D.E. # 18-2 ("O'Rourke Aff.") ¶ 22.)   Most recently, after horses trained by Baffert tested positive for drugs on four occasions in 2020, Baffert was fined by the Arkansas Racing Commission, the California Horse Racing Board, and the Kentucky Horse Racing Commission. (Id. ¶¶ 23-24.)   The Kentucky fine was issued after a horse tested positive for betamethasone at the 2020 Kentucky Oaks race, and the horse was disqualified.   (Id. ¶ 28.)

## B.  NYRA

NYRA is a not-for-profit New York corporation.   (Id. ¶ 5.)   It operates substantially all of New York State's thoroughbred racing facilities: Aqueduct Racetrack, Belmont Park Racetrack, and Saratoga Race Course.[2]   (Id. ¶ 6.)   The racetracks themselves are state-owned property.   (Id. ¶ 14.)   In 2008, the state granted NYRA an exclusive 25-year franchise to conduct thoroughbred racing at the racetracks.[3]   (Id. ¶ 9.)   NYRA leases the racetracks from the state.   NYRA's status as the franchised corporation that operates racing in the state is set forth in statute, N.Y. Racing L. § 206.   Under its certificate of incorporation, NYRA's corporate duration is co-terminous with

---

[2] A fourth racetrack, Finger Lakes Race Track, is a private facility that conducts seasonal race cards. Baffert contends that races at Finger Lakes offer "a purse structure that is infinitesimal when compared to the NYRA circuit."  (D.E. # 1 ¶ 13 n.2.)  NYRA has not disputed this characterization, and itself has referred to the three racetracks it operates as "the cornerstone of New York's Thoroughbred industry."  (Def. Ex. O at 2.)

[3] Before 2008, there existed another entity called NYRA, which the franchise agreement refers to as present-day NYRA's "predecessor in interest."  (Def. Ex. C at 1.)  In 2008, the former NYRA entity conveyed to the State of New York its rights, title, and interest in the three racetracks at issue here (which NYRA previously owned) and various other property, in exchange for $105,000,000.  (Id. at 2.)

the franchise.  (Def. Ex.[4] A at 4.)  NYRA's assets and rights "revert to the state" when the franchise ends.  N.Y. Racing L. §§ 206(1), 210-a(4).

By statute, NYRA must operate in a manner that is "fully accountable to the people of the state of New York."  Id. § 206(4).  NYRA is governed by a board of directors consisting of seventeen members, six of whom are appointed by state officials.  (O'Rourke Aff. ¶ 11.)  NYRA appoints its own officers.  (Id. ¶ 13.)  A Franchise Oversight Board, whose members are appointed by the Governor, "oversee[s], monitor[s] and review[s] all significant transactions and operations" of NYRA.  N.Y. Racing L. § 212(1), (8)(a)(iii). NYRA must meet performance standards set by the Franchise Oversight Board, or could lose its franchise rights.  Id. § 212(8)(a)(ii).   The franchise agreement requires NYRA to "ensure jockey and equine safety" and to "use its reasonable best efforts to maximize attendance at each of the Racetracks."  (Def. Ex. C at 9-10.)  The state—not NYRA—determines when races will be run at the racetracks. N.Y. Racing L. § 208(7); (Def. Ex. C at 9.)

NYRA pays the state an annual "franchise fee" that is the lesser of either its adjusted net income or its cash on hand.  N.Y. Racing L. § 208(1); (Def. Ex. C at 11.).  NYRA is obligated to repair the racetracks in the event of a casualty, (Def. Ex. D at 13), and is responsible for "all maintenance, repair and upkeep . . . ."  (Id. at 8.)  The state, however, may borrow funds for NYRA's capital improvements, and certain projects are subject to Franchise Oversight Board approval.  N.Y. Racing L. § 216; (Def. Ex. C at 15.)  Under the franchise agreement, NYRA "shall not be taxable and shall have no obligation to pay real estate taxes or payments . . . ." (Def. Ex. C at 16.)

---

[4] References to "Def. Ex." are to the Defendant's Exhibits, filed at Docket Entry 18-1.

### III.    Baffert's Kentucky Derby-Winning Horse Tests Positive for Betamethasone

On May 1, 2021, a Baffert-trained horse named Medina Spirit finished first in the Kentucky Derby at Churchill Downs Race Track in Louisville, Kentucky.  (Baffert Aff. ¶ 4.)  Post-race samples of blood and urine were collected to test for the presence of drugs.  (Id.)  One week later, on May 8, the Kentucky Horse Racing Commission informed Baffert that Medina Spirit's post-race sample tested positive for betamethasone.  (Id. ¶ 5.)  Betamethasone is a corticosteroid that acts as an anti-inflammatory.  (D.E. # 3-4 ("Barker Aff.") ¶ 9.)  Some jurisdictions prohibit the administration of betamethasone within a certain timeframe before a race, because its effects could mask symptoms of an injury and thereby lead the racehorse to exacerbate that injury in the race.  (O'Rourke Aff. ¶ 36; D.E. # 18-3 ("Toutain Aff.") ¶ 11.)  Betamethasone may be used on horses in Kentucky, but any level of detection on race day is a violation of the state's equine medication protocols.  (O'Rourke Aff. ¶¶ 36-37.)  New York prohibits race-day betamethasone levels at or exceeding ten picograms per milliliter.  9 NYCRR 4043.3(a)(3).  Medina Spirit allegedly tested positive for twenty-one.  (Baffert Aff. ¶ 5.)

Baffert held a press conference the next day, on May 9.  (O'Rourke Aff. ¶ 44.)  He denied that Medina Spirit had been given betamethasone.  (Id. ¶ 45.)  He stated that he was initiating an investigation into the allegation.  (Id. n.2.)  Kentucky allows a secondary sample (referred to as the "split sample") to be sent for further testing after an initial positive test.  (Id. ¶ 49.)  On May 10, Churchill Downs temporarily suspended Baffert pending further investigation.  (Id.)  Baffert then gave interviews to reporters in which he denied that Medina Spirit was given betamethasone and attributed Churchill Downs' suspension in part to "cancel culture."  (Id. ¶¶ 50-55.)

On May 11 and 15, Baffert issued written statements.  (Id. ¶¶ 57, 61.)  He acknowledged that a "possible explanation" for the positive betamethasone test was that "betamethasone is an

ingredient in a topical ointment that was being applied to Medina Spirit to treat a dermatitis skin condition . . . ."  (Def. Ex. N at 2.)  An investigation is underway in Kentucky as to what should be done regarding Medina Spirit's result at the 2021 Kentucky Derby.  (O'Rourke Aff. ¶ 43.)  Medina Spirit has not been disqualified as the winner, and Baffert's training license has not been suspended by the Kentucky racing authorities.[5]  (Id.; Baffert Aff. ¶ 2.)

The authorities who administer the Preakness Stakes—the second leg of the Triple Crown—allowed Medina Spirit to run, under rigorous medical testing conditions.  (O'Rourke Aff. ¶¶ 58-59.)  On May 15, 2021, Medina Spirit finished third in that race.  (Id. ¶ 62.)

## IV.    NYRA Suspends Baffert

The third race in the Triple Crown is the Belmont Stakes, held at NYRA's Belmont Park Racetrack.  (Id. ¶ 67.)  This year, the race was to be held on June 5, 2021.  (Id. ¶ 64.)  With Baffert's having run Medina Spirit in the Kentucky Derby and Preakness, NYRA believed "it was possible, if not likely, that Baffert might seek to enter MEDINA SPIRIT in [the Belmont Stakes]."  (Id. ¶ 88.)

In a letter dated May 17, 2021, NYRA notified Baffert that he was "temporarily suspended from entering horses to race at Belmont Park, Saratoga Race Course and Aqueduct Racetrack."  (D.E. # 3-6 ("Suspension Letter") at 1.)  The letter identified three reasons for the suspension: (1) Churchill Downs' suspension of Baffert and the reasons for that suspension; (2) Baffert's four drug testing violations over the past year; and (3) Baffert's differing explanations as to why Medina Spirit had tested positive for betamethasone.  (Id. at 1-2.)  The letter also stated that the suspension was based upon unspecified "other related information."  (Id. at 2.)

---

[5] On June 2, 2021, an attorney for Medina Spirit's owner reported that a second lab test had indicated a positive result for betamethasone.  (O'Rourke Aff. ¶ 102.)  Later that day, the Churchill Downs racetrack suspended Baffert for two years.  (Id. ¶ 103.)

NYRA did not identify any state statute, regulation, or other legal authority under which it was suspending Baffert.  The letter stated simply that "the best interests of thoroughbred racing compel the temporary suspension of your entering horses in races and occupying stall space at our racetracks."  (Suspension Letter at 2.)  The letter also did not indicate a date on which the suspension would end.  Rather, it stated that "the length and terms of your suspension" would be based "on information revealed during the course of the ongoing investigation in Kentucky." (Id. at 2.)  Baffert was not notified in advance of his suspension or given any kind of pre-suspension hearing.  (Baffert Aff. ¶ 6.)  The letter stated that if Baffert wished "to present to NYRA any information, data or arguments concerning this matter," he could do so "within seven business days from receipt of this letter."  (Suspension Letter at 2.)  Baffert did not submit anything to NYRA in response to this invitation.  (O'Rourke Aff. ¶ 97.)

The New York Gaming Commission—the agency that administers thoroughbred trainers' licenses—has not taken any action against Baffert.  (Baffert Aff. ¶ 2.)  At the July 12 hearing, NYRA's counsel stated (for the first time) that NYRA would make a "final determination" as to the length and terms of Baffert's suspension by August 11, when the NYRA Board next meets. (Transcript of July 12, 2021 Oral Argument ("Tr.") at 35:23-36:8.)  Counsel indicated that after that determination was made, NYRA would offer Baffert the opportunity to have a hearing.  (Id.)

The Belmont Stakes was run on June 5, about three weeks after Baffert's suspension. (Def. Ex. Q.)  Baffert did not participate.  (Id.)  As of July 12, NYRA had not lifted the suspension or held a post-suspension hearing.  Numerous races are scheduled to be held at NYRA's racetracks in the coming months, including the Saratoga summer meet, which involves races held at the Saratoga Race Course from July 15 through early September.  (D.E. # 22-1 at 7 ("Baffert Supp. Aff.") ¶ 10.)  That meet includes races that are only run once per year and are

limited to horses of a particular age.  (Baffert Aff. ¶ 8.)  If NYRA's suspension is enforced against Baffert, horses that he could run in those races this year cannot be run in those races in future years.  (Id.)

### V.    Baffert's Allegations of Harm

Baffert avers that his inability to race horses at NYRA's racetracks will lead owners to transfer their horses to other trainers.  (Id. ¶ 9.)  One prominent owner—WinStar Farm—has already transferred its horses away from Baffert's barn due in part to his inability to race horses at NYRA racetracks.  (Baffert Supp. Aff. ¶¶ 4-8.)  Two other horses have also been transferred away from Baffert's care so that they can race in New York.  (Id. ¶ 9.)  At least five other owners have indicated that they may transfer their horses to other barns if Baffert cannot race in NYRA races.  (Id. ¶ 13; D.E. # 23.)  Owners of horses under Baffert's care desire to have their horses race at this year's Saratoga summer meet.  (Baffert Supp. Aff. ¶ 11.)  At oral argument, Baffert's attorney stated that Baffert "plans on racing horses in New York" this year.  (Tr. at 19:17-19, 20:7-9 ("[H]e is going to participate in the Test Stakes on August 7th, the Ballerina on August 28th, and that is his intention.").)  Baffert's counsel stated—and counsel for NYRA did not dispute—that horses are typically entered only three or four days in advance of a race, such that Baffert could not state with exact specificity which horses would run which races.  (Id. at 19:19-20:2.)  However, he identified horses Gamine, Fenway, and Illumination as horses that Baffert would like to enter at the upcoming Saratoga meet.  (Id. at 20:23-21:5.)

Baffert has also submitted an affidavit of Jeffrey Bloom, who has "been involved in the thoroughbred business for 30+ years" in varying positions, and currently serves on the Board of Thoroughbred Owners of California and the California Racing Affairs Committee.  (D.E. # 22-1 at 255 ("Bloom Aff.") ¶¶ 2, 7.)  Bloom avers that the "Saratoga meet is arguably the most

prestigious racing meet in the United States" and "[a]ny trainer who is unable to participate at Saratoga will be extremely harmed and . . . owners will send their horses to trainers who can race at Saratoga." (Id. ¶ 14.)  In addition to reputational harm, Bloom avers that a trainer who cannot race at Saratoga will suffer diminished horse value and lost purse earnings.  (Id. ¶ 13.)

## STANDARD OF REVIEW

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  Winter v. Nat'l Res. Def. Council, 555 U.S. 7, 20 (2008).

## DISCUSSION

### I.   Irreparable Harm

"A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction."  Faiveley Transp. Malmo AB v. Abet Corp., 559 F.3d 110, 118 (2d Cir. 2009) (internal quotation marks and citation omitted).  A plaintiff must therefore "show that injury is likely before the other requirements for an injunction will be considered."  Kamierling v. Massanari, 295 F.3d 206, 214 (2d Cir. 2002).  "Irreparable harm is an injury that is not remote or speculative but actual and imminent, and for which a monetary award cannot be adequate compensation."  Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc., 60 F.3d 27, 37 (2d Cir. 1995) (internal quotation marks omitted).  It exists "only where there is a threatened imminent loss that will be very difficult to quantify at trial."  Id. at 38.  Courts have found irreparable harm where the plaintiff faces the loss of unique competitive opportunities.  E.g., id. at 37-39; Clarett v. Nat'l Football League, 306 F. Supp. 2d 411, 412 (S.D.N.Y. 2004).

Baffert first argues that his allegation of a constitutional violation permits the presumption of irreparable harm, which would absolve him of the need to offer proof on this prong.  Although there is broad language in Second Circuit opinions to that effect, courts have found that the presumption does not apply to every alleged constitutional violation.  As one court aptly noted, the allegation of a constitutional violation "is not a magic wand that can be waved to conjure up irreparable harm."  Stallworth v. Joshi, No. 17-cv-7119, 2017 WL 8777378, at *7 (S.D.N.Y. Nov. 22, 2017).  The presumption has most often been applied where the alleged constitutional violation implicated substantive rights, such as First Amendment or Eighth Amendment,[6] rather than procedural due process rights.  E.g., Joshi, 2017 WL 8777378, at *7; see also Galvin v. N.Y. Racing Ass'n, 70 F. Supp. 2d 163, 190-91 (E.D.N.Y. 1998); Pinckney v. Bd. of Educ. of Westbury Union Free Sch. Dist., 920 F. Supp. 393, 400 (E.D.N.Y. 1996); but see Alvarez v. Hayward, No. 1:06-cv-745, 2006 WL 2023002 (N.D.N.Y. July 18, 2006).  The rationale is that whereas the deprivation of substantive constitutional rights may be impossible to quantify and therefore irreparable, procedural due process rights often can be quantified simply by assessing the value of the property interest of which the plaintiff was deprived.  Accordingly, I do not find that Baffert is entitled to the presumption.  Nonetheless, as discussed below he has made an adequate showing of irreparable harm.

It is undisputed that there are a number of races scheduled to occur at NYRA's racetracks in the coming months.  The Saratoga summer meet is scheduled to be run from July 15 through

---

[6] For example, Baffert cites Elrod v. Burns, 427 U.S. 347 (1976) (alleging violation of First Amendment rights); A.H. by and through Hester v. French, 985 F.3d 165 (2d Cir. 2021) (First Amendment); Conn. Dep't of Env'tl Protection v. OSHA, 356 F.3d 226 (2d Cir. 2004) (sovereign immunity); Jolly v. Coughlin, 76 F.3d 468 (2d Cir. 1996) (Eighth Amendment); Statharos v. New York City Taxi & Limousine Comm'n, 198 F.3d 317 (2d Cir. 1999) (right to privacy); Int'l Dairy Foods Ass'n v. Amestoy, 92 F.3d 67 (2d Cir. 1999) (First Amendment); Chavis v. McCulloch, 9:20-cv-0435, 2021 WL 1294109 (N.D.N.Y. April 7, 2021) (First and Eighth Amendments); Weisshaus v. Cuomo, 20-cv-5826, 2021 WL 103481 (E.D.N.Y. Jan. 11, 2021) (right to travel, right to privacy, substantive due process); Jones v. United States Postal Serv., 488 F.Supp.3d 103 (S.D.N.Y. 2020) (First and Fifth Amendments); Paykina on behalf of E.L. v. Lewin, 387 F.Supp.3d, 225 (N.D.N.Y. 2019) (Eighth Amendment); Donohue v. Mangano, 886 F.Supp.2d 126 (E.D.N.Y. 2012) (Contract Clause).

early September.  The Travers Stakes at Saratoga is scheduled to be run on August 28.  Baffert has averred that owners of horses under his care would like their horses to run in these races. And data submitted by <u>amicus</u> The Jockey Club indicate that, in each of the past ten years, Baffert-trained horses have never missed a year of NYRA racing and have started in an average of thirteen NYRA races annually.  (D.E. # 17-1.)  His horses' earnings average over $100,000 per start at NYRA racetracks, and he has won the Belmont Stakes three times.  (D.E. # 17-2; Baffert Aff. ¶ 3.)  NYRA's suspension precludes him from entering any of these races for an indefinite period.  This suspension is likely to cause multiple irreparable harms.

First is the irreparable harm from the loss of unique competitive opportunities.  Part of that harm is monetary.  Because a trainer's earnings come in part from the purses earned by competing horses, Baffert's income is contingent upon his being able to participate in these races.  NYRA's indefinite suspension precludes him from earning this income.  Although it is well settled that a litigant is not entitled to an injunction if he can be made whole by money damages, the value of these competitive opportunities would be "very difficult"—if not impossible—"to quantify at trial."  <u>Saban</u>, 60 F.3d at 38.  Baffert would not be able to adduce reliable evidence as to how a particular horse would have fared in a given race.  The very existence of horserace wagering makes plain that such a divination cannot be reliably performed. In this year's Kentucky Derby, for example, Baffert's Medina Spirit finished first despite being considered a 12-1 longshot.  (O'Rourke Aff. ¶ 34.)  Even the <u>amicus</u> supporting NYRA admits that "how well any of [Baffert's] potential starters might fare is, of course, entirely speculative." (D.E. # 17 at 4.)[7]  The loss of unique competitive opportunities also entails non-monetary

---

[7] NYRA's suggestion at oral argument that Baffert's likely purse earnings could be calculated based on prior earnings is highly dubious.  (Tr. at 42:18-21.)  His average annual earnings per Grade Stakes Start at NYRA racetracks range from $13,740 in 2011 to $300,278 in 2016.  (D.E. # 17-2.)  Only somewhat more persuasive is NYRA's argument that it will be known how Baffert would perform at Saratoga, because his horses will still run at

irreparable harms. Certain races in which Baffert's horses would compete are limited to horses of a given age. This means that if Baffert's horses are unable to race this year, they will be unable to do so in the future. Such a missed opportunity cannot be remedied by money damages. See Reynolds v. Int'l Amateur Athletic Federation, 505 U.S. 1301, 1302 (1992) (Stevens, J., in chambers) ("[A] pecuniary award is not an adequate substitute for the intangible values for which the world's greatest athletes compete."); O.M. ex rel. Moultrie v. Nat'l Women's Soccer League, LLC, No. 3:21-cv-683, 2021 WL 2073475, at *7 (D. Or. May 24, 2021) ("[T]he career of a professional soccer player is short . . . ."); Clarett, 306 F. Supp. 2d at 412; Jackson v. Nat'l Football League, 802 F. Supp. 226, 231 (D. Minn. 1992) ("The existence of irreparable injury is underscored by the undisputed brevity and precariousness of the players' careers in professional sports . . . .").

NYRA argues that because Baffert works throughout the nation and his income does not depend substantially on NYRA races, any harm is not irreparable.[8] It relies on the principal that when a business will be "obliterated," Semmes Motors, Inc. v. Ford Motor Co., 429 F.2d 1197 (2d Cir. 1970), monetary damages will not adequately remedy the loss. Although NYRA may be correct that Baffert has not shown that his entire business as a trainer will be obliterated by the New York suspension, the total loss of a business is not the only form of irreparable harm. See, e.g., Saban, 60 F.3d at 30, 40 (approving of an injunction requiring the defendant—the creator of a popular children's television program—to allow the plaintiff to publish a book involving the

Saratoga, just under a different trainer. The notion that other trainers will necessarily run the same horses in the same races as Baffert would—or do so as effectively as Baffert would—is highly speculative.

[8] Amicus The Jockey Club makes a similar argument. The Jockey Club supplements its brief with data indicating that the percentage of Baffert's horses' earnings directly attributable to purses from NYRA races is approximately ten percent of his horses' total earnings in each of the past ten years. (D.E. # 17-2.) As discussed above, however, the issue is not the magnitude of harm but rather the harm's amenability to definite calculation at trial. Moreover, The Jockey Club's analysis of purse earnings directly attributable to NYRA races fails to capture the full extent of threatened harm; NYRA's exclusion order may have ripple effects, because Baffert's inability to race horses in New York may lead horse owners to forgo his services in other jurisdictions as well.

defendant's television characters); <u>Reuters Ltd. v. United Press Int'l Inc.</u>, 903 F.2d 904, 908 (2d Cir. 1990) (same, where business was threatened with "immediate loss of some but not most of its customers"). As discussed, the loss of unique competitive opportunities plus the inability to reliably calculate damages at trial constitutes irreparable harm.

Second, Baffert has persuasively argued that NYRA's action will damage his "reputation and goodwill" in a way that could not readily be remedied should he prevail at trial. <u>Jamaica Ash & Rubbish Removal Co., Inc. v. Ferguson</u>, 85 F. Supp. 2d 174, 181 (E.D.N.Y. 2000) (citing <u>Reuters</u>, 903 F.2d at 904). The inability to race at the Saratoga meet will damage Baffert's goodwill with clients by excluding their horses from racing in this prestigious event. One prominent owner has already transferred horses away from Baffert in part due to NYRA's suspension. (<u>See</u> Pl. Reply Ex.[9] 21 at 1.) Other owners have threatened to do the same. <u>See</u> <u>John E. Andrus Mem'l, Inc. v. Daines</u>, 600 F. Supp. 2d 563, 571–72 (S.D.N.Y. 2009) (finding irreparable harm where existing customers "would begin seeking alternative" arrangements); <u>Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.</u>, 323 F. Supp. 2d 525, 532 (S.D.N.Y. 2004). In sum, Baffert's injuries are those "for which a monetary award cannot be adequate compensation." <u>Jackson Dairy Inc. v. HP Hood & Sons Inc.</u>, 596 F.2d 70, 72 (2d Cir. 1979).

Finally, to the extent that NYRA contends that Baffert's one-month delay in seeking a preliminary injunction precludes his claim, this argument is unpersuasive. "A district court should generally consider delay in assessing irreparable harm." <u>Saban</u>, 60 F.3d at 39. A plaintiff's delay in seeking relief may indicate that the alleged is harm is not "actual and imminent," <u>id.</u> at 37, and therefore insufficient to satisfy the standard. Here, NYRA's letter was dated May 17, 2021. Baffert filed this lawsuit and his motion for a preliminary injunction less than one month later, on June 14, 2021. This limited delay fails to undermine the claim of

---

[9] Plaintiff's Reply Exhibits, docketed at D.E. # 22-1.

irreparable harm.  As Baffert's counsel argued, (Tr. at 26:3-11), the chance to race at Belmont was already lost, and the Saratoga meet was months away.  See Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp., 25 F.3d 119, 125 (2d Cir. 1994) (irreparable harm established despite six-month delay in bringing the action).[10]

## II.   Likelihood of Success

### A.  New York State Law

As a threshold matter, Baffert argues that "NYRA lacks the power or authority to suspend him indefinitely from all New York race tracks because the Gaming Commission is the sole entity with 'general jurisdiction over all gaming activities within the state . . . .'"  (D.E. # 3-1 at 15 (quoting N.Y. Racing L. § 104(1)).)  In a similar vein, he argues that NYRA failed to follow the procedures set forth in regulations that govern the suspension of trainers' licenses.  One such regulation requires an "adjudicatory proceeding" prior to any action being taken related to the suspension of a licensee.  9 NYCRR 4550.3(a).  Another requires the provision of formal notice to the licensee.  Id. 4550.3(b)(1).  As to this argument, Baffert has not shown a likelihood of success on the merits or serious questions going to the merits.

The claim that NYRA had no right to take the action it did would appear to be foreclosed by the New York Court of Appeals decision in Saumell v. New York Racing Association, Inc., 58 N.Y.2d 231 (1983).  In that case, NYRA summarily excluded a licensed jockey, based on an assertion that he had violated a racing regulation.  Id. at 235.  The jockey contended that NYRA "was without authority to do so," because in suspending him NYRA had "usurped the power of the Board."  Id.  The Court of Appeals rejected the jockey's argument.  It held that "[t]he

---

[10] In its opposition brief, NYRA argued that Baffert's claims of irreparable harm were speculative. However, Baffert's reply added substantial and particular information, for example identifying an owner who had transferred horses away from his care.  In response to a request made by NYRA's counsel on a telephone conference held July 8, 2021, Baffert filed a supplemental letter identifying by name five additional owners who have indicated that they may leave Baffert's barn due to the NYRA suspension.

common-law right of [NYRA] to exclude persons from its premises includes the right when there is reasonable cause to believe a jockey licensed by the [state] guilty of misconduct to deny him access." Id. at 234.  The court qualified its holding by noting that in exercising its right of exclusion, NYRA "must conform to the requirements of due process." Id. at 234-35.

Anticipating this hurdle, Baffert argues that Saumell's rationale has eroded since the case was decided.  That is because there have been many changes to NYRA's corporate structure and regulatory regime such that, Baffert argues, the common-law right of exclusion ought no longer to apply.  Baffert identifies two changes that demonstrate this purported evolution.  First, whereas NYRA owned the racetracks when Saumell was decided, NYRA is now only a lessee; the state took ownership of the racetracks in 2008.  Second, legislative amendments in 2008 provided that NYRA's exclusive right to operate franchised racetracks was "subject to appropriate racing laws and regulations," N.Y. Racing L. § 206(1), and the racing laws and regulations only discuss license suspensions being issued by the Gaming Commission.

The developments Baffert identifies do not create cause to doubt the holding of Saumell.  The fact that NYRA leases rather than owns the tracks does not alter its right of exclusion.  The lease agreement for the Saratoga Race Course expressly states that NYRA receives "all rights, privileges, easements and appurtenances belonging to or in any way pertaining to the Leased Premises . . . ."  (Def. Ex. D at 2.)  And a lessee maintains the right to lawfully exclude, even where its lessor is the state.  Nor does it help Baffert that NYRA's exclusive franchise right is "subject to appropriate racing laws and regulations."  N.Y. Racing L. § 206(1).  He contends that the regulations provide that only a state official may suspend a license.  The regulation he cites, however, 9 NYCRR § 4022.12, expressly states that "[n]othing in this section shall be construed to limit any racing association or track licensee's power to exclude or deny any individual from

14

its grounds or privileges thereon." Indeed, although NYRA's actions have functionally deprived Baffert of his trainer's license, NYRA has not formally suspended that license.[11]

In sum, it is not likely that Baffert will be able to prevail on his claim that NYRA had no legal authority to take the action that it did.

### B. 42 U.S.C. § 1983

Baffert seeks relief pursuant to 42 U.S.C. § 1983. He alleges that NYRA, a state actor, violated his right to procedural due process under the Fourteenth Amendment in suspending him without notice and a hearing.

### 1. State Action

Before turning to the central question of what process was due, I address NYRA's threshold claim that it cannot be held liable under § 1983 because it is not a state actor. A due process claim lies only where the challenged conduct constitutes "state action"—i.e., action that is "fairly attributable to the state." Rendell-Baker v. Kohn, 457 U.S. 830, 838 (1982). Under the "nexus" test, state action exists where "there is a sufficiently close nexus between the State and the challenged action." Hadges v. Yonkers Racing Corp., 918 F.2d 1079, 1081 (2d Cir. 1990). Under the "symbiotic relationship" test, state action exists where the state "has so far insinuated itself into a position of interdependence with the [private entity] that it must be recognized as a joint participant in the challenged activity." Burton v. Wilmington Parking Auth., 365 U.S. 715, 725 (1961).

---

[11] The distinction between license-suspension and racetrack-exclusion may matter in other contexts. For example, reciprocity agreements may mean a suspension in one jurisdiction causes a reciprocal suspension in another. E.g., N.Y. Racing L. § 910. But NYRA's exclusion did not trigger any such consequences. So even if the state is the only entity that can suspend a license, that is not what NYRA has done. Of course, the formal suspension of a license is not the only property interest protected by the Due Process Clause, so NYRA is not absolved of complying with the constitution. As Saumell held, NYRA's actions still "must conform to the requirements of due process." 58 N.Y.2d at 235.

Every court to consider whether NYRA's conduct constitutes state action has held that it does.  See Garcia v. N.Y. Racing Ass'n, Inc., No. 1:10-cv-1092, 2011 WL 3841524 (N.D.N.Y. Aug. 29, 2011); Alvarez, 2006 WL 2032002, at *3; Galvin, 70 F. Supp. 2d at 173; Stevens v. N.Y. Racing Ass'n, 665 F. Supp. 164 (E.D.N.Y. 1987); Halpern v. Lomenzo, 81 Misc.2d 467, 473 (N.Y. Sup. Ct. 1975).  Indeed, NYRA has previously conceded its status as a state actor in cases as recently as 2013.  (See Def. Exs. 7-9 (NYRA's counsel arguing that "NYRA is a State actor, it's a State actor . . . .")); Saumell, 58 N.Y.2d at 237 ("NYRA concedes . . . that its exclusion of petitioner constitutes 'State action'").

The laws and contracts that presently govern NYRA demonstrate that, as every other court to consider the issue has held, NYRA's suspension of Baffert constitutes state action. NYRA carries out a statutorily prescribed role: Section 206 of New York's Racing Law provides that NYRA will be the franchisee to administer thoroughbred racing in New York.  By statute, NYRA must operate in a manner that is "fully accountable to the people of the state of New York."  Id.  Over one-third of its directors are appointed by state officials.  A state-appointed Franchise Oversight Board controls NYRA: the maintenance of its franchise is dependent on meeting over ten performance standards to the Board's satisfaction.  (See Def. Ex. C at 8-10.). The state determines when races will be run.  These "powers and responsibilities . . . bolster the conclusion that a symbiotic relationship exists between [the state and NYRA]."  Garcia, 2011 WL 3841524, at *9.

In addition to the state involvement in NYRA's operations, NYRA's financial interests are also deeply intertwined with the state, with each benefiting the other.  NYRA pays the state an annual "franchise fee" equal to the lesser of its adjusted net income, or its cash on hand. NYRA's operations thus "inure exclusively to the state," Stevens, 665 F. Supp. at 172 n.4.  The

racetrack properties are owned by the state, not NYRA.  The state can borrow on behalf of NYRA.  And NYRA is exempt from paying taxes.  In sum, NYRA uses state-owned property to perform a role prescribed by statute and closely regulated by state entities, to generate revenues for the state.  As NYRA has conceded in other cases, New York has so far insinuated itself into a position of interdependence with NYRA that NYRA's actions are fairly attributable to the state. Garcia, 2011 WL 3841524, at *10.  The principal change which NYRA identifies since 2013 (when NYRA last conceded it was a state actor) is that now only six of the seventeen board members are directly state-appointed, rather than twelve.  In light of the foregoing facts, this one change does not alter the conclusion that NYRA's conduct here is fairly attributable to the state.

NYRA further contends that even if some of its conduct might be deemed to be state action, the decision at issue here is not fairly attributable to the state.  But courts have held that the symbiotic relationship test "does not require that the plaintiff demonstrate that the state was involved the challenged conduct."  Stevens, 665 F. Supp. at 171.  NYRA argues that the factors that should be considered are whether the government exercises "control over the private actor's day-to-day operations" and shares in the private entity's profits from the challenged conduct. (D.E. # 18 ("Opp'n") at 26 (quoting Holden v. E. Hampton Town, No. 15-cv-4478, 2017 WL 1317825, at *6 (E.D.N.Y. Mar. 31, 2017)).)  As to day-to-day operations, here the government not only sets the racing schedule, but requires NYRA to meet an extensive list of performance standards to the state's satisfaction.  As to profit-sharing, the government shares in all of NYRA's profits through the annual Franchise Fee.  NYRA all but conceded that the action here affects NYRA's profits (and thus the state's profits) in arguing that suspending Baffert advanced NYRA's mandate to "maximize attendance at each of the Racetracks."  (Opp'n at 5).

In sum, there is an adequate showing that NYRA's conduct constitutes state action.

17

### 2.      Procedural Due Process

The government cannot deprive a person of property without providing due process of law.  U.S. CONST. amend. XIV.  Because "due process is flexible," Morrissey v. Brewer, 408 U.S. 471, 481 (1972), courts assess procedural due process by balancing (1) the plaintiff's interest in the property right; (2) the risk of error in light of the procedures provided, and the likely value of additional procedures; and (3) the state's interest.  Mathews v. Eldridge, 424 U.S. 319 (1976).   In general, the deprivation of property should "be preceded by notice and opportunity for hearing appropriate to the nature of the case." Cleveland Bd. of Ed. v. Loudermill, 470 U.S. 532, 542 (1985); Nnebe v. Daus, 644 F.3d 147, 158 (2d Cir. 2011). Indeed, the "fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'"  Mathews, 424 U.S. at 333 (quoting Armstrong v. Manzo, 380 U.S. 545, 552 (1965)).

For the reasons that follow, I conclude that due process required that Baffert, having an undisputed property interest in his licensed right to race horses in New York, was entitled to a pre-suspension hearing.   And even if one accepted that NYRA's interest in "preserving the integrity of racing" was paramount and that there was a need to act quickly because the Belmont Stakes was "coming like a freight train," Tr. at 34:12-13, the failure to accord Baffert any acceptable form of post-suspension hearing is fatal to NYRA's position that it complied with due process.

### **Pre-Suspension Hearing**

In Barry v. Barchi, the Supreme Court held that a horse trainer has a property interest in his license that cannot be taken from him without due process of law.  443 U.S. 55, 64 (1979). "Given NYRA's 'virtual monopoly power over thoroughbred racing in the State of New York,'

its decision to exclude a licensee from its tracks 'is tantamount to barring [the licensee] from the only places in the State where he may ply his trade.'"   Galvin, 70 F. Supp.2d at 192 (quoting Jacobson v. New York Racing Ass'n, Inc., 33 N.Y.2d 144, 149–50, (1973)).   Not disputing Baffert's property right under Barry, NYRA nonetheless relies on the decision to support its position that its action comported with due process; specifically, NYRA claims that as was the case in Barry, it had "probable cause" to suspend Baffert without a pre-suspension hearing.   In Barry, New York authorities investigated a trainer who had allegedly provided improper drugs to his horse in violation of a regulation.   443 U.S. at 59.   In their investigation, the authorities informed the trainer that post-race analysis had revealed the presence of drugs.   Id.   They also collected evidence, including urinalysis of the horse and two lie-detector tests administered to the trainer.   Id.   The Supreme Court held that under those circumstances, the state had probable cause to believe that the trainer had violated the anti-doping regulation.   Id. at 65.   In such cases, the state may suspend a trainer without a pre-suspension hearing so long as it affords him a "prompt" post-suspension hearing.   Id. at 66-67.

There are notable distinctions between Barry and this case.   First, in Barry, the trainer was at least on notice that the suspension was being contemplated and was given more than one opportunity to present his side of the story to the state's investigator.   Here it is apparently undisputed that Baffert had no knowledge that NYRA was considering suspending him until he received a letter advising him of the fait accompli suspension. See Saumell, 58 N.Y.2d at 241 (distinguishing facts of Barry and concluding that NYRA failed to provide due process by suspending licensed jockey based on a limited investigation).   Second, NYRA's decision was not based upon any violations occurring in New York but rather on events that occurred in other jurisdictions, the most significant of which—the Kentucky Derby incident—remained under

investigation in that jurisdiction.  The Second Circuit has at the very least suggested that a pre-suspension hearing may be required where a suspension is based upon findings of violations in other jurisdictions.  Donk v. Miller, 365 F.3d 159, 163 (2d Cir. 2004).

Addressing the second Mathews prong—the risk of erroneous deprivation and the likely value of additional procedures—favors a pre-suspension hearing here.  NYRA's suspension rested on three stated grounds—(1) Churchill Downs' initial suspension of Baffert; (2) Baffert's four drug-testing violations in the past year; (3) Baffert's post-Derby statements—and one unstated ground, viz. the "other related information."  Baffert has convincingly argued that at a hearing he would have been able to offer evidence addressing each of these issues.

The Kentucky Derby and Baffert's Post-Derby Statements

The most significant circumstance—and the one which primarily motivated NYRA here—was the 2021 Kentucky Derby, including Medina Spirit's alleged betamethasone test, Churchill Downs' suspension of Baffert, and Baffert's post-Derby statements.  But these events were not so straightforward as to deny Baffert an opportunity to address them before being summarily suspended.  The allegation that Medina Spirit had tested positive for betamethasone was only an allegation, and one that Baffert contested.  He had admitted at most that a "possible explanation" was that the horse had been given a topical ointment containing the substance.  But whether the test result was accurate, what the results would be of the split sample testing, and whether Kentucky would take any action against Baffert were uncertain matters of ongoing investigations.  Both Baffert himself and the Kentucky authorities are still investigating the matter.[12]  Baffert was entitled to a pre-deprivation hearing to address these claims.

---

[12] I recognize that on June 2, an attorney for Medina Spirit's owner reported that a second lab had confirmed the positive test for betamethasone, and that later that day, Churchill Downs suspended Baffert for two years.  (O'Rourke Aff. ¶¶ 102, 103.)  This was two weeks after NYRA issued its suspension, and the Kentucky state authorities have not yet concluded their investigation.

Reliance on Baffert's statements to the press following the Kentucky Derby without giving him an opportunity to address them was similarly problematic.  The suspension letter stated that Baffert "provided the media with different accounts and theories as to why Media [sic] Spirit tested positive for betamethasone . . . ."  (Suspension Letter at 2.)  NYRA continues to suggest that Baffert spoke in a duplicitous or at least inconsistent manner in his public statements regarding Medina Spirit.  (E.g., O'Rourke Aff. ¶¶ 53 ("Baffert floated a conspiracy theory"), 56 ("The next day . . . Baffert reversed course, claiming for the first time that MEDINA SPIRIT was treated with an ointment . . . "); Opp'n at 1 ("Almost immediately after making these public statements, Plaintiff reversed course and admitted that Medina Spirit in fact had tested positive for betamethasone."); see also Tr. at 37:1-2 ("He can't be trusted to race them safely.").)  NYRA's belief that Baffert's public statements were unreliable put his credibility in issue.  When the credibility of a property-holder is in issue, that is exactly the situation when a hearing is necessary so that the individual may be heard directly.  Barry, 443 U.S. at 65. At a hearing, Baffert would have the opportunity to present his version of the events, and to address any perceived inconsistencies in the statements he had given to the press.  But NYRA's failure to provide a hearing deprived him of a meaningful opportunity to provide his side of the story.

Violations in Other Jurisdictions

Baffert was likewise denied an opportunity to be heard regarding the four fines from the prior year upon which NYRA partially rested its suspension decision.  Baffert has persuasively explained, for example, why NYRA could have benefited from hearing evidence as to the Arkansas fine.  In that case, Arkansas indicated that it was going to suspend Baffert and disqualify two horses.  (D.E. # 22-1 at 3 ("Robertson Aff.") ¶ 5.)  After months of investigation and two days of public hearing, however, it was revealed that there had been possible testing

21

mistakes at the laboratory, and that there may have been a broader contamination event on the race day because other horses had also tested positive for lidocaine. (Id.) Arkansas ultimately decided not to suspend Baffert or disqualify the horses, and instead issued only a fine. (Id. ¶ 6.) NYRA's decision to suspend Baffert without a hearing meant that it lacked the opportunity to be made aware of potentially mitigating circumstances such as these. NYRA considered only the fact of the violations, rather than the circumstances surrounding them. A hearing would have allowed Baffert to submit evidence and make argument regarding these events.

The "other related information"

NYRA's reliance on "other related information" obviously raises a notice problem. Needless to say, the risk that Baffert was suspended for improper reasons—or reasons for which mitigating information existed that he was unable to provide NYRA—increases dramatically when the decision to suspend him was based upon unspecified reasons. Baffert should have been given notice of all of the reasons that NYRA intended to suspend him.

I find that in light of the foregoing facts, there was a risk of erroneous deprivation, and the benefits of providing notice and a pre-suspension hearing would likely have been substantial. Accordingly, the second Mathews factor weighs heavily in Baffert's favor. The Court's opinion in Galvin v. New York Racing Association supports this finding. 70 F. Supp.2d 163 (E.D.N.Y. 1998), aff'd 166 F.3d 1200 (2d Cir. 1998). In Galvin, NYRA informed a licensed veterinarian that it was considering suspending him from practicing at any NYRA racetrack. 70 F. Supp. 2d at 168. The veterinarian was given three days to prepare for a hearing. Id. at 174. The hearing lasted four days. Id. at 168. But the veterinarian was not able to cross-examine certain witnesses, and NYRA denied the veterinarian's attorney's requests for a particularized list of the charges. Id. at 175, 178. He was thereafter suspended for seven months, decimating his

business.  Id. at 169.  Galvin sued, alleging a violation of procedural due process.  Id. at 168.

The court granted a preliminary injunction enjoining NYRA from enforcing the suspension,

holding that the procedures NYRA had provided were "woefully inadequate."  Id. at 174.  The

Second Circuit affirmed.  Galvin v. N.Y. Racing Ass'n, Inc., 166 F.3d 1200 (2d Cir. 1998).  In

this case, NYRA provided far less process than in Galvin—no pre-suspension notice and no

hearing.

        The third prong of the Mathews test is the state's interest.  NYRA surely has an

"important interest in assuring the integrity of the racing carried on under its auspices."  Barry,

443 U.S. at 64.  Also important is the safety of jockeys and horses, which can be put at risk

through the use of injury-masking substances such as betamethasone.  Although I recognize

these weighty concerns, they are somewhat ameliorated here by the existence of numerous New

York racing laws (including drug-testing), all of which Baffert would be required to follow in

any NYRA races.  NYRA's assertion of these interests is also to some extent undermined by the

fact that apparently it has permitted other trainers with similar or more serious histories of

medication violations to continue racing at NYRA racetracks.  (Robertson Aff. ¶¶ 2-4; Pl. Reply

Ex. 17.)  Likewise undercutting the invocation of integrity and safety here is the fact that Baffert

has raced for many years at NYRA racetracks in over one-hundred races, and has never been

found to have violated any of the state's regulations.  (D.E. # 17-1.)  Although I recognize the

special concern given Baffert's and Medina Spirit's high profile, it is at least of note that when

NYRA issued its decision, the horse had run the Preakness Stakes two days earlier without any

incident.

        I accordingly conclude that, although NYRA invokes important interests here, those

interests do not outweigh Baffert's weightier interest in being able to practice his chosen

profession, especially given the risk of erroneous deprivation and the likelihood that additional procedures would have been valuable. NYRA "was required to afford [Baffert] a hearing before excluding him from its premises." Murphy v. N.Y. Racing Ass'n, Inc., 138 Misc.2d 735, 737 (N.Y. Sup. Ct. 1988), aff'd, 146 A.D.2d 778 (N.Y. App. Div. 1989); Alvarez, 2006 WL 2023002, at *4 (same, where the only process NYRA provided was "an informal hearing, i.e., they told him what the charges were and gave him an opportunity to offer an explanation").

### Post-Suspension Hearing

Even if NYRA had probable cause to suspend Baffert without a pre-deprivation hearing, a "prompt" post-suspension hearing would have been required. Barry, 443 U.S. at 66. NYRA argues that Baffert cannot bring a due process claim because he was "provide[d] apparently adequate procedural remedies" but "has not availed himself of those remedies." N.Y. State Nat'l Org. for Women v. Pataki, 261 F.3d 156, 169 (2d Cir. 2001). But NYRA has held no hearing— let alone a prompt one. Its after-the-fact offer to Baffert of an opportunity to submit written evidence or arguments within a seven-day window was plainly not a hearing.[13] It has been nearly sixty days since NYRA suspended Baffert. At oral argument, counsel for NYRA indicated that a "final determination" as to the length and terms of Baffert's suspension would be made by August 11, and that NYRA would provide him with the opportunity for a hearing after that time. (Tr. at 35:23-36:8.) Such a timeline cannot reasonably be deemed "prompt," especially in light of the upcoming Saratoga meet. NYRA has provided no explanation for why it could not have offered Baffert a hearing in the two months since he was suspended, nor any explanation for why it must wait another month to make a "final determination." And although NYRA characterizes the suspension as "temporary," a better description of it would be

---

[13] I reject NYRA's suggestion, raised for the first time at oral argument, that Baffert was "obliged to ask" for a hearing. (Tr. at 37:23.) At least since the filing of this lawsuit in June, NYRA has been aware that Baffert would like a hearing. It has not offered one.

"indefinite." With so much on the line, Baffert was entitled to (at least) a "prompt" post-deprivation hearing which should have already occurred.

*       *       *

In sum, I find that Baffert has established a likelihood of proving that NYRA's suspension constituted state action, and that the process by which it suspended him violated the Due Process Clause of the Fourteenth Amendment of the United States Constitution.

## III.     Public Interest and Equitable Considerations[14]

A plaintiff seeking a preliminary injunction must establish that "the balance of equities tips in his favor, and that an injunction is in the public interest." Winter, 555 U.S. at 20. These equitable and public interest factors merit serious consideration. See id. at 26-27 (district court improperly "addressed these considerations in only a cursory fashion," where the "entire discussion of these factors consisted of one (albeit lengthy) sentence"). In balancing the equities, courts weigh the competing claims of injury and consider the effect on each party of granting or withholding the requested relief. Main Street Baseball, LLC v. Binghampton Mets Baseball Club, Inc., 103 F.Supp.3d 244, 262 (N.D.N.Y. 2015).

As to the public interest, "the public has a clear interest in protecting the constitutional rights of all its members." Ligon  v. City of New York, 925 F. Supp. 2d 478, 541 (S.D.N.Y. 2013); Sajous v. Decker, No. 18-cv-2447, 2018 WL 2357266, at *13 (S.D.N.Y. May 23, 2018). Courts have held that the "public interest generally supports a grant of preliminary injunctive relief where, as here, a plaintiff has demonstrated a substantial likelihood of success on the merits and a strong showing of irreparable harm." V.W. ex rel. Williams v. Conway, 236 F. Supp. 3d 554, 589 (S.D.N.Y. 2017); see Citigroup Global Markets, Inc. v. VCG Special

---

[14] Because the parties' briefing addresses the "public interest" and "balance of the equities" factors together, I do the same.

Opportunities Master Fund Ltd., 598 F.3d 30, 38 & n.8 (2d Cir. 2010) (indicating that the need to "balance the equities and weigh the relative harms" is necessary only "in close cases" (quoting Hollingsworth v. Perry, 558 U.S. 183, 190 (2010)).  NYRA contends that the public depends on it to ensure that races are conducted in a fair and honest manner and to take immediate steps against actors who threaten the integrity of the sport.  That may be true, but the public has no interest in having the "integrity of the sport" enforced by unconstitutional means.  I accordingly find that in this case, "the public interest lies with the enforcement of the Constitution."  Ligon, 925 F. Supp. 2d at 541.

As to the equities, NYRA invokes weighty and important interests: "protecting its investment, brand and reputation, and supervising activities at its Racetracks so that the public has confidence that the sport is conducted in an honest and safe manner."  (Opp'n at 27.) Protecting "equine and jockey safety" is also supremely important in administering this sport. And NYRA must "ensure that races are conducted in a fair and honest manner and [] take immediate steps against actors who threaten the integrity of the sport."  (Id. at 29.)  But while these interests merit substantial weight in the abstract, NYRA has not demonstrated that Baffert's presence at its racetracks would necessarily and seriously undermine these interests.

Numerous rules and regulations already safeguard the interests NYRA argues for here, and enjoining this suspension of Baffert will not prevent the continued enforcement of those rules.  See generally 9 NYCRR 4000-4046.  Those rules include pre- and post-race laboratory testing to detect the presence of drugs in horses.  9 NYCRR 4012.13.  Baffert and any horses that he races at NYRA's racetracks would be subject to these same regulations.  Moreover, as uncontested data show, NYRA has permitted numerous trainers to race at NYRA this season who have medication violation histories comparable to or more serious than Baffert's.

(Robertson Aff. ¶¶ 2-4; Pl. Reply Ex. 17.)   These data belie NYRA's claim that integrity or safety demand the exclusion of someone with a violation record like Baffert's.

The hardships that Baffert would suffer absent an injunction weigh heavily on the other side of the scale.   The suspension is indefinite, and NYRA concedes at most that Baffert's claims might "be decided within the year."   (Opp'n at 29.)   But the 2021 Saratoga summer meet is a one-time opportunity.   And given that many of the races are limited to horses of a certain age, an inability to compete in those races now means those horses will never have the chance.   Baffert will face substantial damage to his income, client base, and reputation if he cannot enter horses at NYRA races for the indefinite future.   He has already lost one prominent client and stands to lose others, and has been deprived of the ability to compete at Belmont.   I am sensitive to NYRA's concerns about Baffert's involvement in the events surrounding Medina Spirit's Kentucky Derby performance, and the fear that history might repeat itself in New York.   But for the reasons stated, the actual and substantial harm that Baffert will suffer absent an injunction outweighs the speculative harms that NYRA raises.

In sum, I find that enjoining the enforcement of this suspension to be in the public interest, and that the balance of the equities tips in Baffert's favor.

## CONCLUSION

For these reasons, the motion for a preliminary injunction is GRANTED.   The Defendant, The New York Racing Association, Inc. ("NYRA"), its officers, directors, employees, agents, and affiliates, and all other persons who receive actual notice of this Order by personal service or otherwise and who are acting in concert or participation with NYRA and/or its officers, directors, employees, agents, and affiliates, are enjoined, pending the final hearing and determination of

this action, from enforcing the suspension of Baffert which NYRA issued by letter dated May 17, 2021.

      SO ORDERED.

Dated: July 14, 2021
     Brooklyn, New York                   /s/ Carol Bagley Amon_____
                                              Carol Bagley Amon
                                              United States District Judge