Clerk's Office
Filed Date:  1/21/2022

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW
YORK
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x

BOB BAFFERT,

                      Plaintiff,

      -against-

THE NEW YORK RACING
ASSOCIATION, INC.,

                      Defendant.
--------------------------------------------------------x

NOT FOR PUBLICATION
**MEMORANDUM & ORDER**
21-CV-3329 (CBA) (RML)

**AMON, United States District Judge:**

## INTRODUCTION

On November 19, 2021, Plaintiff Bob Baffert ("Baffert") filed his amended complaint (the "Amended Complaint"), alleging injuries stemming from actions the New York Racing Association, Inc. ("NYRA") took on May 17, 2021 and September 10, 2021 to suspend him from, among other things, entering racehorses at NYRA tracks. NYRA moves to dismiss the Amended Complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). For the reasons stated below, NYRA is permanently enjoined from enforcing the suspension in its May 17, 2021 letter, and the remainder of the Amended Complaint is DISMISSED.

## BACKGROUND

### I.    Factual Background

The following facts are taken from the Amended Complaint, and are presumed to be true, as they must be at this stage of litigation.[1]

---

[1] The Amended Complaint also includes recitals of certain regulations and legal conclusions. (See, e.g., ECF Docket Entry ("D.E.") # 49 ("Am. Compl.") ¶¶ 38-48.) Because "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009), I do not include those legal analyses in this background.

Baffert, a California resident, has trained Thoroughbred racehorses for over 46 years. (Am. Compl. ¶ 7.) Horses he has trained have won races at the highest level of the sport. (Id.) Baffert is licensed as a Thoroughbred Trainer by the New York State Gaming Commission (the "Gaming Commission") and is similarly licensed in other states. (Id. ¶¶ 1, 8.)

NYRA is a not-for-profit corporation created by the State of New York. (Id. ¶ 10.) New York law grants it an exclusive franchise to conduct live Thoroughbred racing and simulcasting and to provide for pari-mutuel wagering at state-owned racetracks — Aqueduct Racetrack, Belmont Park, and Saratoga Race Course. (Id. ¶¶ 10, 13 & n.2.) Several of NYRA's directors are state-appointed, and NYRA is subject to edicts of the state-created and controlled franchise oversight board. (Id. ¶ 12.) NYRA operates based on a license to conduct pari-mutuel racing granted by the Gaming Commission. (Id. ¶ 14.)

Baffert was the trainer of Thoroughbred racehorse Medina Spirit, who won the 147th Kentucky Derby. (Id. ¶ 17.) Post-race samples of Medina Spirit's blood and urine were collected to test for the presence of drugs. (Id. ¶ 18.) One week later, on May 8, 2021, the Kentucky Horse Racing Commission informed Baffert that Medina Spirit's post-race sample tested positive for betamethasone. (Id. ¶ 24.) Betamethasone is a corticosteroid that acts as an anti-inflammatory. (Id. ¶ 26.) "If a horse is treated with [betamethasone] by injection, Kentucky's regulations require a 14-day withdrawal period to give the substance time to dissipate from the horse's system prior to race day." (Id. ¶ 28.) Betamethasone can contaminate a horse in ways other than by injection, and there is ongoing testing of Medina Spirit's blood and urine samples to determine whether the presence of betamethasone was the result of an injection or of an innocent contamination. (Id. ¶¶ 30-31.) Baffert's Kentucky training license has not been suspended. (Id. ¶ 31.)

2

In a letter to Baffert on May 17, 2021 (the "May Letter"), NYRA "temporarily suspended" Baffert from entering horses at NYRA tracks. (Id. ¶ 33.) According to Baffert, the suspension was issued "as a result of the media frenzy and the ongoing Kentucky investigation." (Id.) It was issued without any notice or opportunity to be heard and had no announced end date. (Id. ¶ 37.) Moreover, Baffert faced no allegations concerning any misconduct associated with racing activity in New York, and he had no history of any prior misconduct associated with his New York license. (Id. ¶ 50.) The suspension "essentially barred Baffert from exercising his professional and State-issued trainer's license anywhere in the State of New York." (Id. ¶ 37.) According to Baffert, "prior to this case, NYRA . . . never attempted to punish a trainer for conduct that occurred outside of the state of New York." (Id. ¶ 61.)

Following the suspension, Baffert "lost clients, suffered repetitive blows to his personal and professional reputation, and received notice that additional clients are considering moving their horses to other trainers." (Id. ¶ 56.) Specifically, Baffert's client WinStar Farm ("WinStar") moved all of its horses to other trainers, and WinStar's CEO publicly stated that the decision to do so was due in part to the suspension. (Id. ¶ 57.) Other major clients "have indicated that they may move their horses away from Baffert if he cannot race in New York." (Id.)

As discussed in greater depth below, I entered a preliminary injunction on July 14, 2021 enjoining NYRA from enforcing its May suspension. Subsequently, on September 10, 2021, NYRA served Baffert with a letter (the "September 10th Letter"), which attached a "Statement of Charges" and a set of "Hearing Rules and Procedures." (D.E. # 49-2.) The September 10th Letter advised Baffert that NYRA would "conduct a hearing to investigate the charges" in the Statement of Charges, and that a hearing would be held pursuant to the procedures in the Hearing Rules and Procedures. (Id.)

3

The Statement of Charges focuses on Baffert's conduct related to Medina Spirit's drug test; its subject matter does not differ in substance from the conduct targeted in the May Letter. (Am. Compl. ¶¶ 59-60.) It alleges that Baffert engaged in "conduct detrimental to the best interest of racing"; "conduct detrimental to the health and safety of horses and jockeys"; and "conduct detrimental to NYRA business operations." (Id. ¶ 62.)

The Hearing Rules and Procedures were put in place after Baffert engaged in the targeted conduct. (Id. ¶ 60.) They include the requirement that any statement of charges must include the "proposed penalty being sought." (Id. ¶ 64.) The Statement of Charges identifies that NYRA "seeks to . . . exclude [Baffert] from entering or stabling horses on the grounds it operates, or any portion of such grounds." (D.E. # 52-2 at 24.) Baffert notes, however, that it does not include "the precise nature of the sanction NYRA seeks to impose." (Am. Compl. ¶ 60.)

## II.    Procedural Background

### a.    The Initial Complaint and Preliminary Injunction

Baffert filed his initial complaint on June 4, 2021, alleging harms caused by the May suspension. (D.E. # 1.) The complaint included the following counts: Preliminary and Permanent Injunction (Count I); Violation of 42 U.S.C. § 1983 (Count II); Declaratory Judgment (Count III); Tortious Interference (Count IV); and Violation of New York State Law (Count V). (Id. at 15-21.) For harms caused by the May suspension, Baffert sought a preliminary and permanent injunction enjoining NYRA from excluding him from racing at its tracks; declaratory judgment declaring that NYRA violated Baffert's constitutional right to due process and is prohibited from unilaterally suspending or revoking his license; damages; and costs and attorneys' fees. (Id. at 22.)

On the same day, Baffert filed a motion for preliminary injunction. (D.E. # 3.) I granted Baffert's motion for preliminary injunction on July 14, 2021. (D.E. # 26 ("P.I. Order").) In my order, I enjoined NYRA and its affiliates from enforcing the suspension in the May Letter. (Id. at 27-28.) As relevant to NYRA's motion to dismiss, I held that Baffert made an adequate showing that NYRA's conduct constitutes state action, allowing it to be held liable under § 1983. (Id. at 17.) Subsequently, I held that "due process required that Baffert, having an undisputed property interest in his licensed right to race horses in New York, was entitled to a pre-suspension hearing." (Id. at 18.)

I rejected, however, Baffert's argument that "NYRA lacks the power or authority to suspend him indefinitely from all New York race tracks because the Gaming Commission is the sole entity with general jurisdiction over all gaming activities within the state" and that "NYRA failed to follow the procedure set forth in regulations that govern the suspension of trainers' licenses." (Id. at 13 (quoting D.E. # 3-1 at 15).) I held that "[t]he claim that NYRA had no right to take the action it did would appear to be foreclosed by the New York Court of Appeals decision in Saumell v. New York Racing Association, Inc., 58 N.Y.2d 231 (1983)." (Id.) I rejected Baffert's argument that factual developments since 1983 "create cause to doubt the holding of Saumell." (Id. at 14.) Finally, I held that NYRA's actions did "not formally suspend[ Baffert's] license," and that the regulations Baffert cited regarding suspension of trainer licenses did not apply to the actions NYRA did take. (Id.)

### b. Attorneys' Fees Litigation

On August 25, 2021, Baffert moved for attorneys' fees and costs related to litigating the preliminary injunction motion. At oral argument on November 16, 2021, Baffert agreed "not to pursue damages related to his original Section 1983 claim in exchange for an order granting his

request for attorney's fees associated with the Court's injunctions." (D.E. # 51 ("Opp'n") at 8; see Nov. 16, 2021 Hr'g Tr. 10:17-20, 12:17-19, 13:7-18.) On December 15, 2021, I granted Baffert $109,124.81 in costs and fees.

### c. September 10th Letter and Contempt Motion

After I enjoined enforcement of the May suspension, NYRA sent Baffert the September 10th Letter. In response, on September 22, 2021, Baffert filed a motion for contempt and to stay NYRA's renewed suspension proceedings, arguing that the September 10th Letter violated the preliminary injunction and that the new suspension proceedings violated due process. (D.E. # 37.) I denied the motion on October 25, 2021, noting that "the September 10, 2021 letter was a 'separate' proceeding independent of the May 17 suspension." (Opp'n 8 (quoting Oct. 5, 2021 Hr'g).)

### d. Amended Complaint and Motions to Dismiss

Baffert moved for leave to amend his complaint on October 21, 2021, and I granted leave on November 9, 2021. Baffert filed the Amended Complaint on November 19, 2021. It includes the same causes of action and seeks the same remedies as the original complaint, and adds new allegations related to the September 10th Letter and the effects of the May suspension as it relates to his state law claims. NYRA now moves to dismiss the Amended Complaint, incorporating its October 12, 2021 motion to dismiss the original complaint.

### STANDARD OF REVIEW

"A district court properly dismisses an action under Fed.R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction if the court 'lacks the statutory or constitutional power to adjudicate it,' . . . ." Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.á.r.l., 790 F.3d 411, 416–17 (2d Cir. 2015) (quoting Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000)). "A motion to

dismiss based on [an] abstention doctrine is also considered as a motion made pursuant to Rule 12(b)(1)." City of New York v. Milhelm Attea & Bros., Inc., 550 F. Supp. 2d 332, 341 (E.D.N.Y. 2008). "When considering a motion to dismiss pursuant to Rule 12(b)(1), the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff," Raila v. United States, 355 F.3d 118, 119 (2d Cir. 2004), but "the court may also rely on evidence outside the complaint," Cortlandt St., 790 F.3d at 417. The plaintiff carries the burden to prove that claims are justiciable in federal court. See Renne v. Geary, 501 U.S. 312, 316 (1991). "Where, as here, the defendant moves for dismissal under Rule 12(b)(1) . . . as well as on other grounds, 'the court should consider the Rule 12(b)(1) challenge first . . . .'" Rhulen Agency, Inc. v. Ala. Ins. Guar. Ass'n, 896 F.2d 674, 678 (2d Cir. 1990) (quoting 5 C. Wright and A. Miller, Federal Practice and Procedure § 1350 (1969)).

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal of a complaint that "fail[s] to state a claim upon which relief can be granted." A complaint will be dismissed unless the plaintiff states a claim that is "plausible on its face" by alleging sufficient facts for "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A court must dismiss a claim if the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." Id. at 679. Although courts will not credit "conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action," id. at 678, the court must accept as true all material allegations and draw all reasonable inferences in the plaintiff's favor, Johnson v. Priceline.com, Inc., 711 F.3d 271, 275 (2d Cir. 2013).

7

## DISCUSSION

### I.     Rule 12(b)(1)

NYRA argues that this court lacks jurisdiction to adjudicate Count II of the Amended Complaint. Specifically, NYRA argues that Baffert's constitutional claims stemming from the May suspension are moot. Moreover, it argues that the court should abstain from deciding the constitutional claims related to the September 10th Letter under Younger v. Harris, 401 U.S. 37 (1971), and because they are not yet ripe. It also argues that they are barred by Baffert's failure to exhaust his administrative remedies.

#### a.   May Suspension

NYRA argues that Baffert's § 1983 claims related to the May suspension are moot. "[U]nder the 'general rule' of mootness, courts' subject matter jurisdiction ceases when 'an event occurs during the course of the proceedings or on appeal that makes it impossible for the court to grant any effectual relief whatever to a prevailing party.'" County of Suffolk v. Sebelius, 605 F.3d 135, 140 (2d Cir. 2010) (quotation marks omitted) (quoting United States v. Quattrone, 402 F.3d 304, 308 (2d Cir. 2005)). "The hallmark of a moot case or controversy is that the relief sought can no longer be given or is no longer needed." Martin-Trigona v. Shiff, 702 F.2d 380, 386 (2d Cir. 1983).

At the time of the filing of NYRA's motion, Baffert's claims as to the May Letter were not moot because he had only received a preliminary injunction. At oral argument on this motion, NYRA consented to my ordering a permanent injunction enjoining it from enforcing the May Letter's suspension. (Jan. 6, 2022 Hr'g Tr. 4:19-24.)

Given NYRA's consent, I hereby enter the following permanent injunction:

> NYRA, its officers, directors, employees, agents, and affiliates, and all other persons who receive actual notice of this order by personal service or otherwise and

8

who are acting in concert or participation with NYRA and/or its officers, directors, employees, agents, and affiliates, are enjoined from enforcing the suspension of Baffert that NYRA issued by letter dated May 17, 2021.

The Court having so ordered, Baffert's § 1983 claims related to the May suspension have been fully resolved.[2]

### b. September 10th Letter Claims

NYRA makes what it describes as three jurisdictional claims related to the September 10th Letter: that NYRA failed to exhaust administrative remedies, that the court should abstain under Younger v. Harris, and that Baffert's claims are not ripe for adjudication. I may "'choose among threshold grounds' for disposing of a case without reaching the merits." Spargo v. N.Y. State Comm'n on Jud. Conduct, 351 F.3d 65, 74 (2d Cir. 2003) (quoting Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 585 (1999)) (deciding whether to abstain under Younger prior to determining Article III standing); see In re Aiken County, 645 F.3d 428, 434 (D.C. Cir. 2011) ("The ripeness doctrine, even in its prudential aspect, is a threshold inquiry that does not involve adjudication on the merits and which may be addressed prior to consideration of other Article III justiciability doctrines.").

### i. Younger Abstention

In Younger v. Harris, the Supreme Court ruled that "[f]ederal courts must abstain where a party seeks to enjoin an ongoing, parallel state criminal proceeding, to preserve the 'longstanding public policy against federal court interference with state court proceedings' based on principles of federalism and comity." Disability Rts. N.Y. v. New York, 916 F.3d 129, 133 (2d Cir. 2019) (quoting Younger, 401 U.S. at 43-44). The Supreme Court has extended Younger abstention to a

---

[2] Baffert is no longer seeking damages related to these claims. At oral argument on his motion for attorneys' fees, Baffert agreed "not to pursue damages related to his original Section 1983 claim in exchange for an order granting his request for attorney's fees associated with the Court's injunctions." (Opp'n 8; see Nov. 16, 2021 Tr. 10:17-20, 12:17-19, 13:7-18.) As noted, I have since awarded Baffert attorneys' fees.

select group of state proceedings beyond criminal proceedings. Sprint Commc'ns, Inc. v. Jacobs, 571 U.S. 69, 72-73 (2013). Specifically, it "is limited to . . . three 'exceptional' categories — 'ongoing state criminal prosecution,' 'certain civil enforcement proceedings,' and 'civil proceedings involving certain orders uniquely in furtherance of the state courts' ability to perform their judicial functions.'" Disability Rts., 916 F.3d at 133 (quoting Sprint, 571 U.S. at 78).

Prior to the Supreme Court's illumination of these three categories in Sprint, courts in the Second Circuit applied Younger abstention "whenever the three conditions identified in Middlesex County Ethics Committee v. Garden State Bar Association, 457 U.S. 423 (1982), were satisfied." Falco v. Justs. of the Matrim. Parts of the Sup. Ct., 805 F.3d 425, 427 (2d Cir. 2015). Those three conditions were "(1) there is a pending state proceeding, (2) that implicates an important state interest, and (3) the state proceeding affords the federal plaintiff an adequate opportunity for judicial review of his or her federal constitutional claims." Id. (quoting Spargo, 351 F.3d at 75). In Sprint, however, the Supreme Court ruled that those three factors "were not dispositive; they were, instead, additional factors appropriately considered by the federal court before invoking Younger." 571 U.S. at 81. "[I]t remains unclear how much weight [courts] should afford these 'additional factors' after Sprint." Falco, 805 F.3d at 427.

Younger abstention is appropriate here. First, the administrative proceeding qualifies as a "civil enforcement proceeding" under Sprint. In Sprint, the Supreme Court explained that qualifying civil enforcement proceedings "resemble criminal prosecutions in 'important respects': they 'characteristically . . . sanction the federal plaintiff . . . for some wrongful act'; they are 'routinely' initiated by a state actor; and they are 'commonly' preceded by investigations that culminate in the 'filing of a formal complaint or charges.'" Mir v. Shah, 569 F. App'x 48, 51 (2d Cir. 2014) (summary order) (quoting Sprint, 571 U.S. at 79-80). A Younger-eligible civil

10

enforcement proceeding can be a proceeding or hearing in front of an agency or committee tribunal; it does not need to take place in state court. See, e.g., Middlesex, 457 U.S. at 425-26, 433 (discussing "local District Ethics Committees"); Ohio C.R. Comm'n v. Dayton Christian Schs., Inc., 477 U.S. 619, 624 (1986) (discussing "Commission[-]initiated administrative proceedings"); Mir v. Shah, No. 11-cv-5211 (BSJ) (KNF), 2012 WL 3229308, at *1 (S.D.N.Y. Aug. 8, 2012) (discussing disciplinary hearing before administrative law judge), aff'd, 569 F. App'x 48.

NYRA's administrative proceedings resemble criminal prosecutions in the important respects identified in Sprint. First, the purpose of the proceeding is to determine if Baffert should be sanctioned for alleged wrongdoing. The Statement of Charges accuses Baffert of "conduct detrimental to the best interests of racing," "conduct detrimental to the health and safety of horses and jockeys," and "conduct detrimental to NYRA business operations." (D.E. # 52-2 at 23-24 (capitalization altered).)

Second, NYRA initiated the proceedings as a state actor. Baffert argues that NYRA cannot call itself a state adjudicative body because it has previously argued that it is not a state actor. Notably, Baffert does not argue that NYRA is not a state actor, since any such argument would be fatal to his § 1983 claim. Instead, he argues that NYRA is precluded from changing its position. Judicial estoppel applies only when "the party's former position has been adopted in some way by the court in the earlier proceeding." DeRosa v. Nat'l Envelope Corp., 595 F.3d 99, 103 (2d Cir. 2010). Here, I never adopted NYRA's position that it is not a state actor. In fact, I previously ruled that NYRA is a state actor. (P.I. Order 17.) NYRA is not barred from asserting that it is a state actor, and I hold that it is one for the reasons stated in my preliminary injunction ruling. (Id. at 15-17.)

11

Third, NYRA's proceeding was preceded by an investigation that culminated in the filing of formal charges. Baffert does not dispute that the Statement of Charges qualifies as formal charges. Instead, he argues that NYRA failed to conduct a satisfactory, independent investigation before bringing those charges. That argument is not persuasive. An investigation based on public information or another jurisdiction's inquiries qualifies as an investigation under Sprint. In Mir, even though New York's initiation of a disciplinary hearing against the plaintiff was "in response to the [California medical board's] initial decision to revoke [p]laintiff's medical license," Mir, 2012 WL 3229308, at *1, the Second Circuit found that the charges had been "preceded by [an] investigation[]," Mir, 569 F. App'x at 51. This was true even though plaintiff alleged that New York "pursued a 'phony investigation' that prosecuted him based on an 'invalid, illegal [California] complaint.'" Mir, 2012 WL 3229308, at *3. This understanding of an investigation also mirrors criminal prosecution, where different enforcers often cooperate. In any event, among the factors it considered in determining whether a proceeding was a civil enforcement proceeding, the Sprint Court appeared to give the least weight to whether the state actor undertook an investigation. See Sprint, 571 U.S. at 79.

Baffert further argues that a qualifying civil enforcement proceeding must "determine whether the accused violated state policy or standards." (Opp'n 17.) Therefore, Baffert argues, NYRA's proceeding is not a civil enforcement proceeding because "there is no allegation that Baffert has violated any New York state law or regulation concerning the use of his license." (Id. at 18.) But the requirement Baffert cites does not appear in Sprint or in any related precedents. Sprint never discusses "state policy or standards" or "state law or regulation" — it discusses only "sanction[ing] the federal plaintiff . . . for some wrongful act." 571 U.S. at 79. Even if the wrongful act must violate a "state policy or standard," the New York Court of Appeals in Saumell

12

recognized "NYRA's common-law right to exclude a licensed person in the best interests of racing." 58 N.Y.2d at 239. Accordingly, maintaining the best interests of racing is a state policy and standard recognized by New York's highest court.

The additional Middlesex factors also counsel for Younger abstention. Baffert does not argue that the proceeding below is not pending, and I have rejected his argument that it is not a "state" proceeding. He argues, however, that the proceeding does not involve an "important state interest." (Opp'n 18-19.) Baffert does not explain why the integrity of racing is not an important state interest, and his bare assertion is belied by caselaw. The Ninth Circuit ruled in a previous case involving Baffert that "[p]reserving the integrity of racing is a significant interest" to the state of California for Younger abstention purposes. Baffert v. Cal. Horse Racing Bd., 332 F.3d 613, 618 (9th Cir. 2003). And, as the Supreme Court recognized in Barry v. Barchi, 443 U.S. 55 (1979), New York "has an important interest in assuring the integrity of the racing carried on under its auspices." Id. at 64.

Moreover, Baffert's attempt to compare NYRA's proceeding to the ejectment action in Brooklyn Institute of Arts & Sciences v. City of New York, 64 F. Supp. 2d 184 (E.D.N.Y. 1999), is misguided. In that case, the underlying procedure was "an ejectment action, and there is nothing inherently significant in a government landlord's claim of a lease violation by a tenant." Id. at 194. Here, on the other hand, the underlying procedure is to deny Baffert the right to race horses at a racetrack, which clearly links to the important interest of assuring the integrity of racing. Cf. Baffert, 332 F.3d at 616, 621 (holding that Younger abstention applied to state proceeding to suspend Baffert's license to race horses).

Finally, the state proceeding will afford Baffert an opportunity for judicial review of his federal constitutional claims. NYRA argues that Baffert can pursue his federal constitutional

13

claims in an Article 78 proceeding should NYRA suspend him. An Article 78 proceeding supplies a sufficient opportunity for judicial review for <u>Younger</u> abstention purposes. <u>See</u> <u>Christ the King Reg'l High Sch. v. Culvert</u>, 815 F.2d 219, 224-25 (2d Cir. 1987). Baffert argues, however, that NYRA "in previously [sic] filings vigorously denied that it was subject to New York administrative law or procedures" and "cannot have it both ways." (Opp'n 23 n.8.) NYRA proceedings are clearly subject to Article 78. <u>Saumell</u>, 58 N.Y.2d at 235. And as noted above, judicial estoppel does not apply where a court has not ruled in favor of an argument. NYRA's previous arguments about New York administrative law do not bind it.

Finally, Baffert argues that <u>Younger</u> abstention does not apply because "(1) the state is acting in bad faith; (2) the state is harassing or the action is part of a pattern of harassment against an individual; and (3) the law being enforced is flagrantly and patently unconstitutional." (Opp'n 20 n.7.) Although this argument appears to be an invocation of the bad faith exception to the <u>Younger</u> abstention doctrine, at oral argument, Baffert's counsel denied he was making that argument. (Jan. 6, 2022 Hr'g Tr. 31:2-4 ("THE COURT: So, you are not making a claim about a bad-faith exception to <u>Younger</u>. You are or are not? MR. ROBERTSON: I am not.").) I need not consider arguments explicitly abandoned at oral argument. <u>See</u> <u>Friedlander v. Cimino</u>, 520 F.2d 318, 319 & n.3 (2d Cir. 1975).

In any event, the bad faith exception does not apply here. "[F]or a federal plaintiff to invoke the bad faith exception, 'the party bringing the state action must have no reasonable expectation of obtaining a favorable outcome.'" <u>Diamond "D" Constr. Corp. v. McGowan</u>, 282 F.3d 191, 199 (2d Cir. 2002) (quoting <u>Cullen v. Fliegner</u>, 18 F.3d 96, 103 (2d Cir. 1994)). Moreover, the plaintiff must also show that the state proceeding "was initiated with and is animated by a retaliatory, harassing, or other illegitimate motive." <u>Id.</u> "[A] plaintiff who seeks to head off

14

Younger abstention bears the burden of establishing that [an] exception[] applies." Id. at 198.

Aside from conclusory allegations, Baffert has not carried his burden of proving that the state has

no reasonable expectation of success in its enforcement or that the state has a subjective, retaliatory

motive in pursuing his suspension. See Schorr v. Dopico, 205 F. Supp. 3d 359, 364 (S.D.N.Y.

2016) (rejecting bad faith exception where "Plaintiff's allegations of bad faith are conclusory").

Accordingly, the bad faith exception does not apply, and I must abstain under Younger.[3]

### ii. Ripeness

Alternatively, I hold that Baffert's claims based on the September 10th Letter are not ripe.

See Lacewell v. Off. of Comptroller of Currency, 999 F.3d 130, 148 (2d Cir. 2021) (holding that

plaintiff lacks Article III standing but holding "in the alternative" that plaintiff's claims were

unripe). Courts use the term "ripeness" to refer to both constitutional ripeness and prudential

ripeness. See Simmonds v. INS, 326 F.3d 351, 356-57 (2d Cir. 2003). Constitutional ripeness

"prevents courts from declaring the meaning of the law in a vacuum and from constructing

generalized legal rules unless the resolution of an actual dispute requires it." Id. at 357. Prudential

ripeness, on the other hand, is "a tool that courts may use to enhance the accuracy of their decisions

and to avoid becoming embroiled in adjudications that may later turn out to be unnecessary or may

require premature examination of, especially, constitutional issues that time may make easier or

less controversial." Id.

Courts considering prudential ripeness ask first "whether an issue is fit for judicial

decision" and second "whether and to what extent the parties will endure hardship if decision is

withheld." Id. at 359. "[T]he 'fitness' analysis is concerned with whether the issues sought to be

adjudicated are contingent on future events or may never occur." N.Y.C.L. Union v. Grandeau,

---

[3] For the same reasons, I abstain from ruling on the portions of Count I and Count III related to the September 10th Letter.

528 F.3d 122, 132 (2d Cir. 2008) (alterations in original) (quoting Simmonds, 326 F.3d at 359 (internal quotation marks omitted)).  "In assessing this possibility of hardship, 'we ask whether the challenged action creates a direct and immediate dilemma for the parties.'  'The mere possibility of future injury, unless it is the cause of some present detriment, does not constitute hardship.'" Id. at 134 (internal citations omitted) (first quoting Marchi v. Bd. of Coop. Educ. Servs., 173 F.3d 469, 478 (2d Cir. 1999); and then quoting Simmonds, 326 F.3d at 360).  "[B]oth aspects of the inquiry involve the exercise of judgment, rather than the application of a black-letter rule." Connecticut v. Duncan, 612 F.3d 107, 113 (2d Cir. 2010) (quoting Nat'l Park Hosp. Ass'n v. Dep't of Interior, 538 U.S. 803, 814 (2003) (Stevens, J., concurring)).

Baffert's claims related to the September 10th Letter are not prudentially ripe.  First, a merits determination of Baffert's § 1983 claims related to the September 10th Letter is contingent on NYRA suspending him.  A due process claim requires that the government "depriv[e]" the plaintiff of some "property or liberty interest."  Bryant v. N.Y. State Educ. Dep't, 692 F.3d 202, 218 (2d Cir. 2012) (discussing procedural due process); see also Soundview Assocs. v. Town of Riverhead, 725 F. Supp. 2d 320, 333 (E.D.N.Y. 2010) (Bianco, J.) (stating, in discussing substantive due process claim, that "[t]he Due Process Clause of the Fourteenth Amendment protects persons against deprivations of 'life, liberty, or property.'" (quoting U.S. Const. amend. XIV, § 1)).  Baffert bases his due process claim on "his property interest in his State-issued license."  (Am. Compl. ¶ 77; see also id. ¶ 81 ("NYRA deprived/continues to deprive Baffert of his constitutionally protected rights and interests, specifically his professional Thoroughbred racing license duly issued to him without restriction by the State licensing authority."); id. ¶¶ 51, 82.)  Should NYRA decide against suspending Baffert, then Baffert will have little claim that

NYRA has deprived him of that interest.  Accordingly, his § 1983 claim hinges on a fact, his eventual suspension, that has not yet occurred.

Pondolfino v. New York State & Local Retirement System, No. 10-cv-749, 2010 WL 3927624 (N.D.N.Y. Oct. 7, 2010), is instructive.  In that case, defendant, a state actor, summarily terminated Pondolfino's pension benefits without a pre-deprivation hearing.  Id. at *1-2.  Subsequently, in a decision involving a similarly situated plaintiff, a state court declared that the suspension procedure violated the Fourteenth Amendment.  Id. at *2.  The defendant reinstated Pondolfino's benefits in response to the court's order, but it then initiated new charges against Pondolfino, this time allowing for an administrative hearing to determine whether to terminate his pension benefits anew.  Id.  Pondolfino sued in federal court, alleging that the government's "retroactive application of new regulations and policies," among other things, "constitute[d] a violation of his due process rights."  Id.  The district court held that Pondolfino's due process claims were not prudentially ripe because the defendant "ha[d] not rendered a 'final determination' and [Pondolfino] continue[d] to receive his retirement benefits and ha[d therefore] not yet suffered an actual or threatened injury."  Id. at *4 (non-substantive quotation error in original) (quoting Coffran v. Bd. of Trs. of N.Y.C. Pension Fund, 46 F.3d 3, 4 (2d Cir. 1995)).  The court noted that Pondolfino's attempt "to 'bypass the administrative process and review procedures,' including the . . . hearing and subsequent state court review pursuant to CPLR Article 78, . . . 'would create a serious risk that difficult and important constitutional issues would be decided without an adequate factual context or before it was clear that they even need to be decided.'"  Id. at *4 (non-substantive quotation error in original) (quoting Blocksom & Co. v. Marshall, 582 F.2d 1122, 1124 (7th Cir.1978)).

17

As in <u>Pondolfino</u>, Baffert alleges that proceeding with the hearing violates his due process rights. And as in <u>Pondolfino</u>, it is not yet clear that the hearing will deprive Baffert of any property interest. Although Baffert argues that NYRA has targeted Baffert for disparate treatment and that the hearing presents a "fait accompli" of suspension, (Am. Compl. ¶¶ 89, 109), the September 10th Letter does not suspend Baffert. Whether NYRA is a biased agency and whether suspension is a "fait accompli" will certainly be clearer after the hearing has run its course and NYRA has decided whether to suspend Baffert. Accordingly, as in <u>Pondolfino</u>, "'[w]here the challenged procedures have not been applied to the claimant, or where, after their application, the agency has not rendered a final determination adverse to the claimant' . . . the Plaintiff's claims are not yet fit for judicial decision." 2010 WL 3927624, at *4 (non-substantive quotation error in original) (quoting <u>Coffran</u>, 46 F.3d at 4); <u>see also</u> <u>Brezler v. Mills</u>, 86 F. Supp. 3d 208, 218-19 (E.D.N.Y. 2015) (Bianco, J.) (finding due process claim unripe when "plaintiff has not yet been disciplined"). Accordingly, because Baffert's § 1983 claim is "contingent on future events," <u>Grandeau</u>, 528 F.3d at 132 (quoting <u>Simmonds</u>, 326 F.3d at 359 (internal quotation marks omitted)), namely the administrative proceeding and an eventual Article 78 proceeding, any controversy would be better resolved after those events have occurred.[4]

Additionally, that Baffert "has not yet exhausted [his] administrative remedies counsels in favor of invoking the prudential ripeness doctrine." <u>Am. Sav. Bank, FSB v. UBS Fin. Servs., Inc.</u>, 347 F.3d 436, 440 (2d Cir. 2003). Baffert has already moved to dismiss the administrative proceeding and has argued that the procedures fail to comply with due process. (D.E. # 52-2 at 98-101.) Federal court review of the issues would "only benefit by awaiting" the administrative

---

[4] Baffert argues that I should not exercise prudential restraint because his "claims present pure questions of law entirely fit for the Court's review." (Opp'n 21.) Baffert is mistaken in his premise because the questions presented are not purely legal. Whether NYRA will ever suspend Baffert is a factual question, not a legal one.

officer's ruling, the panel's decision, and the result of any Article 78 proceeding. Am. Sav. Bank, 347 F.3d at 440.

As to hardship, abstaining will not cause Baffert significant harm. Baffert identifies two potential injuries he will face. First, he argues that he "should not be forced to present himself before a tribunal without jurisdiction to face potential sanctions for alleged conduct after NYRA has already imposed an unlawful 58-day suspension for the same allegations." (Opp'n 20.)   Courts do not generally consider continued litigation, delay in adjudication, or the requirement that plaintiff participate in an allegedly deficient hearing a "hardship" for ripeness purposes.   See, e.g., Nebraskaland, Inc. v. Sunoco, Inc. (R & M), No. 10-cv-1091 (DGT), 2010 WL 5067962, at *4 (E.D.N.Y. Dec. 7, 2010); Pondolfino, 2010 WL 3927624, at *4; D'Agostino v. DiNapoli, No. 09-cv-1347, 2010 WL 2925703, at *6 (N.D.N.Y. July 20, 2010).  If having to participate in an ongoing administrative hearing counted as per se hardship, courts would routinely find claims ripe while administrative hearings are ongoing; federal circuit courts, however, often find claims unripe in those circumstances.   See, e.g., Am. Sav. Bank, 347 F.3d at 440 (finding no hardship where invoking prudential ripeness doctrine "would avoid . . . interference with ongoing administrative activity"); Farrell-Cooper Min. Co. v. U.S. Dep't of Interior, 728 F.3d 1229, 1237 (10th Cir. 2013) ("Farrell–Cooper will not suffer hardship from delayed review . . . [where] [u]ntil the Department of Interior's hearing process resolves Farrell–Cooper's appeal, the company is not required to meet [regulatory] requirements.").

Second, Baffert argues that "[e]ven the specter that [he] might be suspended from racing in New York has caused his business significant injury." (Opp'n 21.)  Although Baffert claims that "this Court is well aware" of this hardship, (id.), his Amended Complaint does not include allegations that the September 10th Letter has injured his business.  Baffert alleges that one client

19

moved its horses because of the May suspension, and that other owners "have indicated that they may have to move their horses away from Baffert if he cannot race in New York." (Am. Compl. ¶ 100.) These allegations do not indicate that Baffert will suffer any business injury from the ongoing hearing now that his original suspension has been lifted. And Baffert has provided no other evidence indicating an injury accruing from the specter of suspension. Moreover, allegations that "the cloud of official investigation" harms a business's affairs "accompan[y] almost every investigation into a business arrangement or the activities of a particular business entity," and so cannot support prudential ripeness without leading to "courts . . . constantly . . . reviewing such decisions, disrupting the administrative process and adding to already overcrowded court dockets." CEC Energy Co. v. Pub. Serv. Comm'n, 891 F.2d 1107, 1111 (3d Cir. 1989).

In summary, both steps in the prudential ripeness analysis weigh in favor of abstaining from deciding this constitutional challenge until the state proceedings have concluded. I abstain from ruling on Baffert's constitutional claims related to the September 10th Letter because they are unripe.[5] For the same reasons, I abstain from ruling on the portions of Count I and Count III related to the September 10th Letter. Accordingly, Counts I, II, and III are dismissed.

## II.   Rule 12(b)(6)

NYRA moves to dismiss Counts IV and V for failure to state a claim.[6]

### a.   Count IV

Count IV alleges that NYRA tortiously interfered with Baffert's business relationships.[7] According to Baffert, NYRA's public announcement of the May suspension was "knowingly and

---

[5] To the extent that Baffert brings non–procedural due process claims related to the September 10th Letter, abstention under Younger or prudential ripeness doctrine covers those claims as well.

[6] NYRA also moved to dismiss Counts I and III and portions of Count II for failure to state a claim. That portion of the motion is moot given that I have dismissed those counts under Rule 12(b)(1).

[7] Although the Amended Complaint states only that Count IV is for "Tortious Interference," (Am. Compl. 23), Baffert clarified at oral argument that it is a claim for tortious interference with business relations, not for tortious interference with contract, (Jan. 6, 2022 Tr. Hr'g 11:18-25).

intentionally directed . . . to Baffert's clients" and "at least one of Baffert's clients, WinStar Farm, has moved all of its horses to other trainers."  (Am. Compl. ¶¶ 99-100.)

Under New York law, the elements of tortious interference with business relations are as follows:

> [A] party must prove: (1) that it had a business relationship with a third party; (2) that the defendant knew of that relationship and intentionally interfered with it; (3) that the defendant acted solely out of malice or used improper or illegal means that amounted to a crime or independent tort; and (4) that the defendant's interference caused injury to the relationship with the third party

Stuart's, LLC v. Edelman, 152 N.Y.S.3d 472, 476 (App. Div. 2021) (quoting 106 N. Broadway, LLC v. Lawrence, 189 A.D.3d 733, 741 (2020)).  "[C]onduct constituting tortious interference with business relations is, by definition, conduct directed not at the plaintiff itself, but at the party with which the plaintiff has or seeks to have a relationship."  Carvel Corp. v. Noonan, 818 N.E.2d 1100, 1104 (N.Y. 2004).

The Amended Complaint adequately alleges the first element by alleging that Baffert had a business relationship with WinStar.  Additionally, it adequately alleges the second element by alleging that "NYRA knowingly and intentionally directed its public statements about Baffert and any suspension of him to Baffert's clients." (Am. Compl. ¶ 99.)  Finally, Baffert adequately pleads an injury in that WinStar pulled its horses from Baffert's training.

Baffert, however, fails to adequately plead the third element.  That element requires that NYRA publicized the May suspension solely out of malice or used improper or illegal means that amounted to a crime or independent tort.  First, Baffert fails to plead that NYRA's public announcement was made solely out of malice.  Although paragraph 99 of the Amended Complaint alleges that "NYRA acted for a wrongful purpose – specifically to harm Baffert," (id.), that is a conclusory statement.  In any event, even if paragraph 99 does allege that NYRA had some

21

malicious purpose, it does not allege that NYRA's purpose was solely malicious.  NYRA had an obvious alternative motive for announcing Baffert's suspension — informing its customers, the race-viewing public, that a certain category of horses would not be racing at its tracks.  "A motive of 'normal economic self-interest' is inconsistent with a sole purpose of inflicting intentional harm."  Staten Island Chiropractic Assocs., PLLC v. Aetna, Inc., No. 09-cv-2276 (CBA) (VP), 2012 WL 832252, at *14 (E.D.N.Y. Mar. 12, 2012) (quoting Carvel, 818 N.E.2d at 1103). Accordingly, because Baffert fails to exclude the obvious alternative that NYRA's conduct was at least partially motivated by an economic motive related to its customers, he has failed to plead that the announcement was made solely out of malice.  See Twombly, 550 U.S. at 567 (finding claim improperly pleaded where "obvious alternative explanation" for challenged conduct existed). Second, Baffert fails to adequately plead that NYRA's public announcement used improper or illegal means that amounted to a crime or independent tort.  Baffert fails to explain how a state actor's truthful claims reporting a suspension are criminal or independently tortious.  Even though the underlying suspension was allegedly unlawfully undertaken, NYRA's statements about that suspension were entirely accurate and do not constitute a crime or tort.

Moreover, Baffert cannot satisfy the third element by relying on the May suspension itself. To plead a claim for tortious interference with business relations, a plaintiff must plead "alleged tortious conduct [that] was directed at third parties."  Maddaloni Jewelers, Inc. v. Rolex Watch U.S.A., Inc., 838 N.Y.S.2d 536, 538 (App. Div. 2007); see also Com. Lubricants, LLC v. Safety-Kleen Sys., Inc., No. 14-cv-7483 (MKB), 2017 WL 3432073, at *17 (E.D.N.Y. Aug. 8, 2017) ("Plaintiff's claim for tortious interference with prospective economic advantage fails because there is no evidence that Defendant directed any improper or wrongful conduct toward a third party with which Plaintiff had an existing business relationship."); RXR WWP Owner LLC v. WWP

Sponsor, LLC, 17 N.Y.S.3d 698, 701 (App. Div. 2015) ("Plaintiff's claim fails, because ARC engaged in no wrongful conduct directed at WWP, as opposed to plaintiff . . . .").

Accordingly, a tortious interference with business relations claim does not lie where a defendant directs tortious conduct at a plaintiff but has only non-tortious interactions with plaintiff's third-party business relations.  See, e.g., Pride Techs., LLC v. Khublall, No. 19-cv-11315 (LGS), 2021 WL 3668085, at *5 (S.D.N.Y. Aug. 17, 2021) (denying claim where defendant threatened plaintiff, but where conduct directed at third party "was not independently criminal or tortious such that it could support a tortious interference with business claim"); Com. Lubricants, 2017 WL 3432073, at *17 (denying claim on summary judgment where the "only evidence in the record that Defendant contacted any third party with which Plaintiff had a business relationship is [an] email exchange" and "Plaintiff does not argue that this email was improper or wrongful"); Staten Island Chiropractic, 2012 WL 832252, at *15 (holding in the alternative that a tortious interference claim would not lie even had defendant defrauded plaintiff because defendant's only conduct directed at third-party customers was the issuance of non-tortious questionnaires about plaintiff); RXR WWP Owner LLC, 17 N.Y.S.3d at 700–01.  Because the May suspension was directed at Baffert, not his clients, the suspension cannot constitute tortious interference with business relations.

In summary, because Baffert failed to allege that NYRA's announcement of his suspension was wrongful or that the suspension itself was directed at WinStar, he has failed to plead the third element of his tortious interference claim.  Accordingly, that claim is dismissed.

### b.  Count V

In Count V, Baffert alleges that NYRA has violated state law.  As I explained in my order granting Baffert's requested preliminary injunction, "[t]he claim that NYRA had no right to take

the action it did would appear to be foreclosed by the New York Court of Appeals decision in Saumell." (P.I. Order 13.) In that order, I rejected the exact arguments Baffert makes here: that NYRA could not exclude a Gaming Commission licensee because only the Gaming Commission can suspend a license; that NYRA's suspension was bounded by safeguards in Gaming Commission regulations; and that Saumell no longer applies. Baffert mistakes my recitation of the preliminary injunction standard — that "it is not likely that Baffert will be able to prevail on his claim that NYRA had no legal authority to take the action that it did" — for a lack of certainty in the legal conclusion. For the same reasons that Baffert was unlikely to prevail in that argument, he is unable to state a claim for relief now.

Additionally, in its motion to dismiss the original complaint, NYRA argued that there was no private right of action to enforce these alleged violations of state law. Baffert has not identified any express right of action. Instead, he states that "the Court can easily imply [a private right of action] under the governing standards because doing so 'would promote the legislative purpose' and 'would be consistent with the legislative scheme.'" (D.E. # 43 at 16 (quoting Sheehy v. Big Flats Cmty. Day, Inc., 541 N.E.2d 18, 20 (N.Y. 1989)).) New York courts considering whether to imply a private right of action consider "(1) whether the plaintiff is one of the class for whose particular benefit the statute was enacted; (2) whether recognition of a private right of action would promote the legislative purpose; and (3) whether creation of such a right would be consistent with the legislative scheme." Sheehy, 541 N.E.2d at 20. Baffert does not explain why a private right of action would promote the legislative purpose or be consistent with the legislative scheme here. He also completely fails to address the third factor. Baffert states in a conclusory fashion that a private right of action may be implied but fails to explain why. Accordingly, I decline to consider

24

this argument. Shannon v. Credit Agricole Sec. (USA), Inc., 17-cv-667 (AJN), 2021 WL 1063183,

at *4 (S.D.N.Y. Mar. 19, 2021).  Count V is dismissed.

## CONCLUSION

For the foregoing reasons, I hereby enter the following injunction:

NYRA, its officers, directors, employees, agents, and affiliates, and all other persons who receive actual notice of this order by personal service or otherwise and who are acting in concert or participation with NYRA and/or its officers, directors, employees, agents, and affiliates, are enjoined from enforcing the suspension of Baffert that NYRA issued by letter dated May 17, 2021.

The remainder of the Amended Complaint is DISMISSED.

SO ORDERED.

Dated: January 21, 2022
     Brooklyn, New York

s/Carol Bagley Amon

Carol Bagley Amon
United States District Judge

25